**UNITED STATES DISTRICT COURT**
**FOR THE**
**EASTERN DISTRICT OF CALIFORNIA**

**OFFICE OF THE CLERK**
**2500 Tulare Street**
**Fresno, CA 93721**

FILED
JUL 31 2008
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY DEPUTY

Southern District of California
Office of the Clerk
880 Front Street, Suite 4290
San Diego, CA 92101-8900

'08 CV 1403 H AJB

2254 ___ 1983 ✓
FILING FEE PAID
Yes ___ No ✓
IFP MOTION FILED
Yes ✓ No ___
COPIES SENT TO
Court ✓ ProSe ___

**RE:** **ESTER BURNETT vs. ARNOLD SCHWARZENEGGER**
**USDC No.:** **1:08-CV-01068-WMW**

Dear Clerk,

Pursuant to the order transferring the above captioned case to your court, dated July 29, 2008 , transmitted herewith are the following documents.

**Paper Documents: 1 to 2.**
**Electronic Documents: 1 to 3.**

Documents maintained electronically by the district court are accessible through PACER for the Eastern District of California at **https://ecf.caed.uscourts.gov**.

Please acknowledge receipt on the extra copy of this letter and return to the Clerk's Office.

Very truly yours,

**July 29, 2008** /s/ **M. Sondheim**

Deputy Clerk

RECEIVED BY: ______________________________

Please Print Name

DATE RECEIVED: ______________________________

NEW CASE NUMBER: ______________________________

I hereby attest and certify on 7/29/08
that the foregoing document is a full, true
and correct copy of the original on file in my
office and in my legal custody.
VICTORIA C. MINOR
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
By M. Sandoval Deputy

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ESTER BURNETT,

Plaintiff,

vs.

ARNOLD SCHWARZENEGGER, et al,

Defendants.

/

1:08-cv-01068-WMW (PC)

ORDER TRANSFERRING CASE TO THE SOUTHERN DISTRICT OF CALIFORNIA

Plaintiff, a state prisoner proceeding pro se, has filed a civil rights action pursuant to 42 U.S.C. § 1983.

The federal venue statute requires that a civil action, other than one based on diversity jurisdiction, be brought only in "(1) a judicial district where any defendant resides, if all defendants reside in the same state, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought." 28 U.S.C. § 1391(b).

In this case, none of the defendants reside in this district. The claim arose in Imperial County, which is in the Southern District of California. Therefore, plaintiff's claim should have been filed in the United States District Court for the Southern District of California. In the interest of justice, a federal court may transfer a complaint filed in the wrong district to the correct district.

See 28 U.S.C. § 1406(a); Starnes v. McGuire, 512 F.2d 918, 932 (D.C. Cir. 1974).

Accordingly, IT IS HEREBY ORDERED that this matter is transferred to the United States District Court for the Southern District of California.

IT IS SO ORDERED.

**Dated: July 29, 2008** **/s/ William M. Wunderlich**
UNITED STATES MAGISTRATE JUDGE

[redacted]

CLOSED, IFP_PENDING

**U.S. District Court**
**Eastern District of California - Live System (Fresno)**
**CIVIL DOCKET FOR CASE #: 1:08-cv-01068-WMW**
**Internal Use Only**

(PC) Burnett v. Schwarzenegger et al
Assigned to: Magistrate Judge William M. Wunderlich
Cause: 42:1983 Prisoner Civil Rights

Date Filed: 07/24/2008
Date Terminated: 07/29/2008
Jury Demand: None
Nature of Suit: 550 Prisoner: Civil Rights
Jurisdiction: Federal Question

**Plaintiff**

**Ester Burnett** represented by **Ester Burnett**
V-35245
CENTINELA STATE PRISON (901)
P.O. BOX 901
IMPERIAL, CA 92251-0901
PRO SE

V.

**Defendant**

**Arnold Schwarzenegger**

**Defendant**

**M. Sullivan**

**Defendant**

**Jack St. Clair**
*Chief Medical Officer*

**Defendant**

**Clay**
*Warden*

**Defendant**

**James Tilton**
*Secretary for the Youth and Adult Correctional Agency*

**Defendant**

**D.L. Porter**
*Captain*

**Defendant**

**N. Grannis**

**Defendant**

**R. Stogsdill**
*Chief Dental Officer*

I hereby attest and certify on 7/29/08
that the foregoing document is a full, true and correct copy of the original on file in my office and in my legal custody.
VICTORIA C. MINOR
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
By [illegible] Deputy

**Defendant**

**P. Bolles**
*Health Care Appeals Analyst*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/24/2008 | 1 | (1983) COMPLAINT against all defendants by Ester Burnett. (Attachments: # 1 Part 2) (Sondheim, M) (Entered: 07/28/2008) |
| 07/24/2008 | 2 | MOTION/Application to PROCEED IN FORMA PAUPERIS by a Prisoner by Ester Burnett. (Sondheim, M) (Entered: 07/28/2008) |
| 07/28/2008 | | (Court only) ***STAFF NOTE: Case screened, email sent to chambers regarding proper venue. (Sondheim, M) (Entered: 07/28/2008) |
| 07/29/2008 | | (Court only) ***STAFF NOTE: Order transferring case to Southern District submitted to WMW/tb, per Tim B. (Sondheim, M) (Entered: 07/29/2008) |
| 07/29/2008 | 3 | ORDER, CASE TRANSFERRED to Southern District of California signed by Magistrate Judge William M. Wunderlich on 7/29/2008. Original file, certified copy of transfer order, and docket sheet sent. CASE CLOSED. (Sondheim, M) (Entered: 07/29/2008) |
| 07/29/2008 | 4 | TRANSMITTAL of DOCUMENTS on *7/29/2008* to * Southern District of California* *Office of the Clerk* *880 Front Street, Suite 4290* *San Diego, CA 92101-8900*. * Paper Documents: 1 to 2. * *Electronic Documents: 1 to 3. *. (Sondheim, M) (Entered: 07/29/2008) |

ORIGINAL
FILED
JUL 2 4 2008

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY______________________
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

Ester BURNETT
(Name of Plaintiff)

Centinela State Prison P.O. Box 731
(Address of Plaintiff)
Imperial, Ca. 92251

1: 08 CV 01068 WMW PC
(Case Number)

vs.

COMPLAINT

arnold Schwarzenegger et. al.,

(Names of Defendants)

I. Previous Lawsuits:

A. Have you brought any other lawsuits while a prisoner: ☒ Yes ☐ No

B. If your answer to A is yes, how many?: 2 Describe the lawsuit in the space below. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper using the same outline.) I file one I believe in "96" that was time barred dismissed in "97" Issues of staff assualt parties or defendants Forgotten

1. Parties to this previous lawsuit:

Plaintiff Ester Burnett

Defendants DR. Bruce Faecher, Et. al.,

FORM TO BE USED BY A PRISONER IN FILING A COMPLAINT
UNDER THE CIVIL RIGHTS ACT, 42 U.S.C. § 1983

Rev'd 5/96

2. Court (if Federal Court, give name of District; if State Court, give name of County)

   United States District court Central District of California

3. Docket Number CV08-02745-PSG (MLG)

4. Name of judge to whom case was assigned U.S. Magistrate Judge marc Goldman

5. Disposition (For example: Was the case dismissed? Was it appealed? Is it still pending?)

   Still Pending

6. Approximate date of filing lawsuit May 20r8, 2008 AM 9:39

7. Approximate date of disposition N/A

II. Exhaustion of Administrative Remedies

A. Is there a grievance procedure available at your institution? ☒ Yes ☐ No

B. Have you filed a grievance concerning the facts relating to this complaint? ☒ Yes ☐ No

   If your answer is no, explain why not ____________________

C. Is the grievance process completed? ☒ Yes ☐ No

   See exhibit Blue for completed grievance Process

III. Defendants

(In Item A below, place the full name of the defendant in the first blank, his/her official position in the second blank, and his/her place of employment in the third blank. Use item B for the names, positions and places of employment of any additional defendants.)

A. Defendant arnold schwarzenegger is employed as Govenor of califorina at Governor office in Sacramento, ca.

B. Additional defendants See defendants in table of contents number 5, 6, 22

IV. Statement of Claim

(State here as briefly as possible the facts of your case. Describe how each defendant is involved, including dates and places. Do not give any legal arguments or cite any cases or statutes. Attach extra sheets if necessary.) ✱

See [redacted] Table of contents Number 22 facts & constitutional Claims Page 36-54

V. Relief.

(State briefly exactly what you want the court to do for you. Make no legal arguments. Cite no cases or statutes.)

See table of contents number 14,15,16,17,18

Signed this 26 day of June, [redacted] 2008.

Ester Burnett
(Signature of Plaintiff)

I declare under penalty of perjury that the foregoing is true and correct.

6-26-08
(Date)

Ester Burnett
(Signature of Plaintiff)

# Table of Contents


1. 3 Page Civil Complaint united states District court Eastern District of california
2. 2 Page united State District court Eastern District of California application To Proceed in Forma PauPERIS By a Prisoner
3. Table of abbrieviations Page-1.
4. Serious medical need Page-2.
5. Defendants Page-2
6. Defendants sued as "Doe's" Page-2
7. all the defendants Listed owed Plaintiff a duty of Reasonable care Page-3
8. Breach of Duty of Reasonable care Page-3
9. motion for determination of Jurisdiction Page-4-6
10. Legal notice / opening statement Page-7-16
11. Notice-Page-17-22
12. TimeLiness-17-22 Res Judicata-17
13. Legal causes of action 23-26
14. Demand for Relief Page 27-
15. Reasons in support of Demand for Relief Page-28
16. Demand for injunctive Relief + Reasons in support of Demand for injunctive Relief Page-29-32
17. future claims or injuries Page-33
18. declaratory Relief Page-33
19. Declaration of citizen ship-Page-34
20. additional Party information Page-35
21. JuRisdiction Page-35
22. facts + constitutional claims Page-36-54
23. Exhibits Blue, 06, 7, 28, 29, 30, 31, 32, 33, 34, 35, 37, 48, 49, 50, 51, 52, 70 Pages 55-110
24. Exhibits 74, 81, 83, 85, 99, 100, 102, 103, C, C2, 200, 206, 207, 208, 209, 213, 6, Page 111-180
25. Exhibits H, BX-B6, BB, R, V, 300, 301 Page 181-242


Original Copy

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

Ester Burnett Plaintiff
vs.

arnold Scnwarzenegger et.al., Defendant

APPLICATION TO PROCEED
IN FORMA PAUPERIS
BY A PRISONER

CASE NUMBER:

I, Ester Burnett, declare that I am the plaintiff in the above-entitled proceeding; that, in support of my request to proceed without prepayment of fees under 28 U.S.C. § 1915, I declare that I am unable to pay the fees for these proceedings or give security therefor and that I am entitled to the relief sought in the complaint.

In support of this application, I answer the following questions under penalty of perjury:

1. Are you currently incarcerated: ☒ Yes ☐ No (If "No" DO NOT USE THIS FORM)

If "Yes" state the place of your incarceration. Centinela State Prison Imperial, ca. 92251, P.O. Box 731

**Have the institution fill out the Certificate portion of this application and attach a certified copy of your prison trust account statement showing transactions for the past six months.**

2. Are you currently employed? ☐ Yes ☒ No

a. If the answer is "Yes" state the amount of your pay.

b. If the answer is "No" state the date of your last employment, the amount of your take-home salary or wages and pay period, and the name and address of your last employer.

3. In the past twelve months have you received any money from any of the following sources?

a. Business, profession or other self-employment ☐ Yes ☒ No

b. Rent payments, interest or dividends ☐ Yes ☒ No

c. Pensions, annuities or life insurance payments ☐ Yes ☒ No

d. Disability or workers compensation payments ☐ Yes ☒ No

e. Gifts or inheritances ☒ Yes ☐ No

every 4 or 5 months a friend sends me a Quarterly Package hygene cookies Potato chips et.al.

f. Any other sources ☒ Yes ☐ No

If the answer to any of the above is "Yes" describe by that item each source of money and state the amount received and what you expect you will continue to receive. Please attach an additional sheet if necessary.

# Table of abbrieviations

(dept.) - department
(DPPV) - disability Placement Program verification
(CDC) - California department of Corrections
(U.S.) - united States
(CDCR) - California department of Corrections & Rehabilitations
(C.C.P.O.A.) - California Corrections Peace officers association
(SCC)-(SCC III) Sierra Conservation center
(ca.)-California
(U.S.C.A.)-united States Constitution of america
(CMC-E)-(CMC-E)-California mens colony State Prison East
(RJD)- Richard J. Donovan correctional facility
(SVSP)- Salinas valley State Prison
(CSP)-(CEN)-Centinela State Prison
(Rd)- Road

## Serious medical need

Serious medical need Possessed by Plaintiff see Exhibits 28-35 failure to treat Plaintiff Serious medical need has resulted in Plaintiff further significant injury + the unnecessary wanton inflection of Pain. The existence of Plaintiff injury led to doctors in Exhibits 28-35 reasonably finding Plaintiff injury worthy of comment or treatment the Presence of Plaintiff medical condition significantly affects Plaintiff individual daily activities See Exhibits 37,81,83,7 which led to Pain or Back specialist in Exhibit 31 Placing Plaintiff in the department of corrections + Rehabilitation disability Placement Program. Chronic + Substantial Pain was + is Present with Plaintiff at all times indicating that Plaintiff has a Serious medical need see Exhibit C for Chronic Pain.

## Defendants

John or Jane Doe #2 - Position unknown
John or Jane Doe #3 - Position unknown
John or Jane Doe #4 - Position unknown
John or Jane Doe #5 - Position unknown
M. Sullivan - associate warden
John or Jane Doe #6 - Position unknown
Jack St. Clair - chief medical officer
John or Jane Doe #1 - chief deputy warden
Clay - warden
John or Jane Doe #7 - Director of corrections + Rehabilititions
James Tilton - Secretary for the Youth + adult correctional agency
Arnold Schwarzenegger - Governor of California
D.L. Porter - Captain
N. Grannis - Position unknown work at Sacramento chief Inmate appeals Branch
R. Stogsdill - chief Dental officer
P. Bolles - Health care appeals analyst

Defendants Sued as "Does" The above 7 listed defendants sued as "Does" are because Their True names + capacities are unknown to Plaintiff

## All THE DEFENDANTS LISTED OWED PlAINTIFF A DUTY OF Reasonable Care

We start at Exhibit-"206" title 15 3270 General Policy article 2. Security State the "Primary objectives" of the correctional institutions are to Protect the Public "by safely keeping Persons committed to the custody of the director of corrections." Doctors & custodial staff fall under the above Primary objectives oweing Plaintiff a duty of reasonable care. Exhibit "206" also states "inmate & Public Safety must take Precedence over all other considerations in the operation of all the Programs & activities of the institutions of the department." Exhibit 207 title 15 3004. Rights & respect of others, state "inmates & Parolees have the right to be treated respectfully, impartiall & fairly by all employees". Further Establishing a duty of reasonable care. Exhibit 208 title 15 3291. Emploiees Law Enforcement & Peace officer Personnel. States "Law Enforcement Responsibility. [all] employees of the department shall be responsible to enforce "laws", "regulations" & "Procedures" which govern the actions of inmates." this Establishes that all Parties listed in this action had a responsibility not to violate Plaintiff 8th amendment right to Prohibition against cruel & unusual Punishment, for all the defendants listed must or should have known that found in the state of california's Constitution at article III, Sec. 1 it states that the constitution of the united states is the supreme law of the land. if they did not know this as employees of the dept. of corrections they should of known that they had a duty to enforce Plaintiff 8th amendment Right which mandates Prison officials must Provide reasonably necessary medical care which would be available to Plaintiff if not incarcerated. this is the nature of the duty the defendants listed owed Plaintiff a duty of reasonable care. now come the Breach of their duty of Reasonable care.

## BREACH OF DUTY OF REASONABLE CARE

We start at Exhibit 31 a State of california Disability Placement Program verification (DPPV) CDC 1845. Which States Plaintiff has a verified Permanent disability not impacting Placement. However it does indeed impact were Plaintiff can not be housed. We end with Exhibit Blue Page 1 of 13 Paragraph 5 & Page 8 of 13 Paragraph-1 & Page 12 of 13 Paragraph-7 & 13 of 13 Paragraph 4 were the defendants admit someone in Corrections canceled my appoint for medical treatment ordered by a CDC hired doctor or Surgeon seriously needed medical treatment.

# Motion for determination of Jurisdiction



In this matter, I exercise my rights under the constitution of the united states of america, at amendment VII to have this matter a judicated under common law exclusively, & for the court to operate under the authority of article III of the constitution of the united states of america. I am cognizant of the fact that article I courts operate under a form of admiralty law, & that statutes, regulations, etc., can be ambiguous & interpreted whimsically in such courts. I know common law is based on Reason, Justice, & truth, & unlike article I adminstrative courts, article III courts must base their rulings in such a manner that they do not conflict with common law & constitutional laws.

I support this motion under amendment VII of the constitution of the united states of america. also in clear support as found in the state of california's constitution at article III, sec. 1, it states that the constitution of the united states is the supreme law of the land. additionally, in california's Government Code at 22.2 states clearly, "The common law of England, so far as it is not repugnant to or inconsistent with the constitution of the united states, or the constitution of this state, is the rule of decision in all courts of this State."

In legal theory it is a well known fact that most lay persons, the general citizenry have the misconception that any statute passed by legislators bearing the form & appearance of law constitute the law of the land. The U.S. Constitution is the supreme law of the land, & any statute, to be valid, must be in agreement. It is impossible for a law which violates the constitution or alters it in ambiguous interpretations to be valid. The following supreme court rulings succinctly support this. "all laws which are repugnant to the constitution are null & void." marbury vs. madison, 5 U.S. (2 cranch) 137, 174, 176, (1803) this was & still is a monumental ruling. additionally, where rights secured by the constitution are involved, there can be no rule making or legislation which would abrogate them." miranda vs. arizona, 384 U.S. 436 p. 491, further more... "an unconstitutional act is not law, it confers no right, it imposes no duties, affords no protection, it creates no office, it is in legal contemplation, as inoperative as though it never had been passed". Norton vs. Shelby County 118 U.S. 425, P. 442 further, as found at 16 Am. Jur. 2d. sec. 177 late 2d. sec. 256 the high court in its ruling.

Stated, "The general rule is that an unconstitutional statute, though having the form + name of law, is in reality no law, but is wholly void, + ineffective for any purpose, since unconstitutionality dates from the time of its enactment + not merely from the date of decision branding it. No one is bound to obey an unconstitutional law + no courts are bound to enforce it." also in that same ruling the court ruled as also noted in 16 Am. Jur. 2d. 177, late am. Jur. 2d 256 "In so far as a statute runs counter to the fundamental law of the land, it is superceded thereby". In Yakus vs. U.S. 321 U.S. 414 Pg. 468 (1944), the court ruled, "But whenever the Judicial Power is called into play, it is responible directly to the fundamental law + no other authority can intervene to force or authorize the Judicial body to disregard it."

In Taylor vs. Porter 4 Hill 140, 146 State vs. Simon + Spears, 761, 767, it states, "Law of the land [redacted] means common law." In concurrance with that, another similar ruling in Caldwell vs. Hill 176 S.E. 383 (1934) is found; "The united states adopted the common law of England with the constitution." One of the tenants of common law, which our constitution is, all contracts + agreements one enters into must be done so knowingly, voluntarily + intentionally. In this matter I wish the court to abide by, + inform the respondants/defendants of the following facts that terminology used in this matter must be words that are found only in the standard + webesters dictionaries, not to use words + terminology ment to confuse lay persons where for example a commonly known word in "legalese", (attorney syntax), can mean something entirely different, for the sake of an example, the word "cup" in legal dictionaries, could mean "fence post". I am supported on this at 16A Am. Jur 2d. Constitutional law, 818, which demands definiteness of vagueness of laws, regulations + orders, states.

"It is a general principle of statutory law that a statute must be definite to be valied." This also has the effect that renders any statute, law, regulation, code, or governmental policy moot + invalid if there is any ambiguity, such as subsections is such law, regulation, etc., that in any way are contradictory, can have 2 or more meanings, or in any way contradicts the constitution.

Lastly, under the doctrine of law which requires States to recognize the laws of sister states within the union of the united states, & due to the fact where I am confined at this time, in a prison with a very limited stock of legal materials, I hereby, Party in this matter as initiator & Plaintiff in this matter, I request of the court to take Judicial notice of law, under Montanna code annotated (M.C.A.). There should be a similar section in California & in most other states, however, it is not to be found in this Prisons Poorly Stocked law library. Therefore I invoke my Right under M.C.A. rule 202, is noted (1) "The common law, constitutions & statutes of the united states & of this & every other State, territory, & Jurisdiction of the united states. In M.C.A. rule 202 it

directs that as found in (d) "when mandatory, a court shall take Judicial Notice, (1) of the Common law, constitutions & statutes of the united states." this rule Provides the right to be heard as to the propriety of taking Judicial notice. In summation, I have the absolute guaranteed right to have this matter adjudicated at every stage of the Proceedings under common law, which is an unalienable right under amendment VII of the constitution of the united states of america.

To the best of my knowledge, the foregoing is true & correct.

without Prejudice UCC. 1-207, 1-103 & 1-105

Ester Burnett

Ester Burnett
Plaintiff/Petitioner
Dated 6-26-08

## Legal Notice/opening statement:

I the undersigned hereby notify this court of the following fact; bear in mind, I realize that I can speak only for myself, as I know, sense + feel on how current circumstances + conditions effect me in my environment; which is in the correctional treatment center in Centinela State Prison, in the county of Imperial, the state of California. This matter is of great concern to my mental, physical + emotional well beings.

as can clearly be seen in the Exhibits I submit from various credible news publication, the dangerous levels of over crowding is an established facts. the higher [redacted] ranking authorities of the California department of corrections + Rehabilitation (CDCR) Representatives of the California corrections peace officers association (C.C.P.O.A.) the guards union, various elected state legislator, the governor + various other private, + public groups, organization + agencies all concur + the courts have found it factually true. This Prison system is so overcrowded it indeed is endangering + a endanger to my very life.

In the particular facility I'm housed in identified as California State Prison at Centinela State Prison Imperial County of California I feel it is imperative that this court be made aware of some recent facts. I have experienced in 3 of the 5 housing units on facility "A" that does not include, the one originally designed as an exercise/recreational use gym, that instead of doing anything to alleviate the problem of overcrowding, they have added 40 bunks in each of our housing units, in open areas previously used for recreation, exercise + other leisure time activities. There are still only 6 showers (2 are double sized ones for 2), 2 full services toilets that can accommodate a sit down use, 3 urinals + 6 sinks, 2 have always been used for the men to wash their clothes. Those of us in cells now numbering 98 that were originally designed for single occupancy, but have long been utilized as two man cells, now have less accommodation + more crowding forced upon inmates to make my previous conditions much worse than before. Before this recent addition of inmates that also requires an additional guard (correctional officer) we were already double celled, meaning double the designed capacity for each housing unit.

In other words, we are now a housing unit with up to 236 inmates that was designed for 100 maximum. the over-crowding I'm now forced to contend with further hinders my mental, physical, + emotional well being + does put my life at great risk greater than previously.

Persons who do not have any actual real life experience in prisons can not easily nor accurately understand this sort of environment. Liberal minded Psychologist + others who mistakenly believe that all prisoners could somehow get along in peace + harmony don't have a realistic concept of human nature. In prison we all have the various natural differences including but not limited to racial, national origin, religion, cultural, ancestral, traditional, social belief, moral belief, home family, neighborhood + several other differences, many of them that manifest serious harm + prejudices.

No amount of therapy, psycho babble, analyzing, can change a man's core belief systems which encompasses an individuals self identity. the fact is there already is all sorts of stress, tension, diversity + difference in loyalty, ect... that we already have serious levels of animosity, tension, stress, aggravation + all sorts of divided diversity. now we are confronted with further over-crowding that only serves to make an already hostile enviornment into one more volatile + subject to be eventual inevitable anger flare ups, that are more likely than not to become physical violent incidents + all the more endangering my life. which indeed I now suffer cruel + unusual punishments which is a serious violation of my constitutional rights as enumerated at amendment VIII.

of the constitution of these united states of america which expressly forbids such mistreatment of prisoners. The added level of over-crowding is inexcusable. the courts have already found that the over-crowding [redacted] had caused such a lack of adequate medical care as well as dental + mental care. that over 66 prisoners deaths have resulted because of that.

other Sources Such as the Los angeles times, orange County Edition, the San Diego union Tribune + the Los angeles daily Journal, Shed additional light on the broken (CDCR) health care system + its incompetent doctors. Staff writers such as Jenifer warren (Times), Maura Dolan (Times), Steve Schmidt (union Tribune), Don Thompson (union Tribune), Dan morain (Times), Jordan Rav (Times), Robert L. Bastian, Jr. (L.A. Journal), Tim Reiterman (Times) + clea Benson (union Tribune), had written articles depicting the massive State wide dysfunctional health care system of the (CDCR).

Particularly, 64 Prisoners die each Year in the (CDCR), whos death were ineed Preventable. But because of Poor medically-lax health care System's more Prisoners will die needlessly. See supporting deficient (supporting attachments Exhibit H 22+23 ). the entire health care System in the (CDCR) was recently Put in the hands of a federal receiver by the honorable Thelton E. Henderson, U.S. District Judge, because of the Poor + inadequate medical care Prisoner-s Receive. (see supporting attachment Exhibit H 13+14).

I indeed appealed the decision to the warden. all the defendants in this case were Put on notice + was fully aware of my medical Condition, + should have reasonably known I was refused doctor or surgeon ordered medical treatment that in the Past has relieved the acute Excruciatingly Painful symptoms I was [redacted] experiencing. Subjecting Plaintiff to unnecessary wanton Serious Excruciating Pain, Further deterioration of my health + Permanent injury(ies). all listed defendants were fully aware, + or should have reasonably known that the medical system with in the CDCR, Robert Presley + other state officials, signed a stipulation for injuctive Relief, in case marriano Plata, et al., V. Gray Davis, et al, INo1C-01-135 Teh. the action filed on august 20, 2001 See Exhibit G.

The action alleges that (CDCR) Prisoners are not Receiving constitutionally adequate Medical care as required by the 8th amendment of the U.S. Constitution, + that such inadequacies arose over the course of the last 15 years.

I indeed appealed the decision to the warden see Exhibit Blue. all the defendants in this case were Put on notice & was fully aware of my medical condition, & or should have reasonably known, that I was [redacted] in need of epidural Injection ordered by Doctors Hospital of manteca See Exhibit Blue Page 1of13 Paragraph 4. and without them I would be subjected to unnecessary wanton serious Excruciating Pain, & further deterioration of health & Possible Permanent injury(ies). all the defendants were fully aware, & or should have reasonably known that the medical system within the CDCR, Robert Presley & other State officials, signed a stipulation for injunctive Relief, in case marciano Plata, et. al., V. Gray Davis, et. al., , NO, C-01-135 Teh. The action filed on april 5, 2001 & an amended complaint was filed on august 20, 2001. See Exhibit6 the action alleges that (CDCR) Prisoners are not Receiving constitutionally adequate medical care as required by the 8th amendment of the U.S. Constitution, & that such inadequacies arose over the course of the last 15 years. all expert testimony referred to throughout this action comes by way of (CDCR) doctors statements & medical Records If you would look at ExhibitC Page 2of2 a neurology specialist, doctor J. Paul muizelaar said I did not require surgery at that Point. However after denial of seriously needed epidural injections by the defendants which led to the acute Excruciatingly Painful Tremendously deterioration of my Physical health. doctor Calvin Neurosurgeon in Exhibit-00 1of7 say surgery is now needed. I need this surgery to try & repair Permanent damage to my back done by all the defendants in this action dening me medical treatment that Doctors Hospital of manteca ordered & was agreed opond by (CDCR) doctors who set the appointment for 6-7-07 which was canceled the day of which it was supose to be done by their own admission in Exhibit Blue. the defendants in Exhibit Blue say they canceled my appointment for seriously needed medical treatment due to dorm lockdown; will reschedule due to Classification for conversion of (SCCIII) to a sentsitive needs yard Program. but on 6-26-07 Plaintiff was transferred from the (SSCIII) to (CEN) before the Doctors Hospital of manteca Provided (SCCIII) with a rescheduled date for [redacted] Plaintiff epidural injection. There is a lot wrong with this lie told by (CDCR) Prison officials

frist the doctors Hospital of manteca orders the treatment Recommends or request the needed treatment then it is (SCCIII) Specialty Clinic Scheduler who request an appointment from Doctors Hospital of manteca for Plaintiff to have an epidural injection at the Pain management clinic according to Exhibit blue Page 7 of 13 last Paragraph. So N. Grannis, Chief Inmate appeals Branch Knowingly lied when [redacted] he or she in Exhibit blue Page 1 of 13 Typed Paragraph-5 trying to conceal his or her Subordinates violations at (SCCIII) which is Criminal and fraud. the day Plaintiff Seriously needed treatment was canceled (SCCIII) officials Knew They Planed to Transfer Plaintiff before he could be rescheduled for his epidural injection. thats why it was so conveniently canceled so they could save money and time. look at Exhibit Blue again N. Grannis in Paragraph-4 states that on 3-30-07 that the Specialty clinic Scheduler at SCCIII Requested an appointment look at how long that took for Plaintiff appointment to come about over 68 days. why would you request another appointment when on 6-7-07 when Plaintiff went to Classification M. Sullivan Said Plaintiff would be gone [redacted] by then end of the month and Plaintiff was 19 days later on 6-26-07. So the rescheduled date mentioned on Page 1 of 3 Exhibit Blue Paragraph 5 + on Page 8 of 13 of Exhibit Blue Jack St. Clair + P. Bolles + R. StoGsDill in Exhibit Blue Page 12 of 13 Paragraph 8 all Knew Plaintiff would be gone long before he could be rescheduled for any Specialty clinic. So all involved lie or fraud they committed. Plaintiff has been in (CDCR) now for over 4 years and has went "outside Prison gates" Several times for Specialty Clinic appointments + none of them were completed in less than 2 months. if you would look at Exhibit Blue Page 10 of 13 If the defendants did reschedul a Specialty Clinic appointment why was the medical hold which had another 51 more days lifted and Plaintiff was transferred. ONLY Doctor Jack St. Clair Chief medical officer + the warden or chief Dental officer or Healthcare manager could lift a medical hold according to Plaintiff limited understanding but sence St. Clair Placed the hold he had to of been contacted to lift the hold.

It makes Plaintiff wonder why SCC III staff would reschudule a epidural injection but lift the medical "hold" which made Plaintiff ineligible for transfers/endorsement-s to another (CDCR) institution until 8-4-07 according to Exhibit Blue page 10 of 13. By lifting the medical hold its clear that SCC III staff were going to transfer Plaintiff before he could be reschuduled for another appointment so their statements in Exhibit Blue 12 of 13 + 13 of 13 + 8 of 13 + 1 of 13 were all lies or fraud. Finally the defendants in Exhibit Blue said that Plaintiff specialty clinic appointment was canceled due to dorm lock down 6-7-07 it should be noted Plaintiff went to Pill call or medication line for pain medication at breakfast and noontime at noontime medication line when Plaintiff returned to the building the officer in the control booth told Plaintiff to stay out on the yard and enjoy the day with the rest of the buildings + Plaintiff did. this dorm lock down was also a lie or fraud. there was no institutional emergency that would prevent Plaintiff from being taken to his specialty appointment. infact a check of SCC specialty appointments may show indeed that other inmates went to specialty appointments the day Plaintiffs was canceled. to Renforce that Exhibit Blue is full of lies and fraud on page 4 of 13 P. Bolles Health care appeals analyst in section C informal level dated 6-29-07 states "Denied. Due to your transfer to Centinela State Prison on 6-26-07, there is insufficient time to schedule another specialty clinic appointment for your epidural injection." end quote so they indeed did not reschudule they lied [redacted] they may even of made fake documents saying they reschuduled by P. Bolles said this 6-29-07 after Plaintiff was transfered as such Im sure someone in Bolles position would of checked 6-29-07 to see if they Reschuduled before putting it on paper if the court would read line 4+5 above on this page you'll see Plaintiff statement was Right. all the defendants in Exhibit Blue indeed committed the 13 "legal causes of action" listed in this complaint see legal causes of action listed in "table of contents". there was also a bus [redacted] schedule that the defendants should have that showed the day that inmates who went to

Classification the day Plantiff went that will show the days Prisoners would be leaveing according to those who frist went to Classification which Plaintiff was among the frist to go to Classification.

with in (CDCR) there are to great beast custody + medical against which Plaintiff has No hope. if custody violates Plaintiff Right to seriously needed medical treatment medical + custody will Point the finger back + fourth at one another using lies a decite to confuse Plaintiff when they both were to blame. dispite all the outcome study + outcome data in Plaintiff medical file saying Plaintiff Needed the epidural injection to relieve Tremendously acute Excruciating Pain the defendants [redacted] denied Plaintiff said treatment. (See Exhibit BX title 15 3350.(a)+(b) for the definitions of outcome study + outcome Data) medical + custody staff will over ride or ignore the diagnostic information + consultations with appropriate Specialists + their expert clinical Judgment. Consultants hired by (CDCR) because a decision needs to be made outside (CDCR) facility employed health care staff area of expertise. ("see Exhibit BX 3350.(b)(3)(2)(4)(5)(c)(7) + 3354.(a) for verification of lines 11-14") medical ignores the consultations with appropriate Specialists + their expert clinical Judgment without medical Justification. disregarding Plaintiff medical needs + excessive Risk[redacted] to Plaintiff health or saftey on Non-medical grounds setting in motion a series of events that they Knew or reasonably should, should have Known Placed Plaintiff in the way of foreseeable harm. they should have [redacted] Known this would cause a constitutional violation. Treating Plaintiff "Not as a Patient, but as a nuisance" + "were insufficiently interested in Plantiff to take even minimal steps to guard against the Possibility that Plaintiff injury was severe." or the Possibility that Plaintiff acute Tremendously excruciatingly Painful leg + back symptoms would further "deteriorate" without needed treatment. This situation caused Plaintiff to suffer Pain needlessly when relief was readily availabe that would stop needless Painful suffering. (epidural injections which had worked before) But instead medical and custody staff caused the unnecessary + wanton infliction of Pain totally without Penological Justification. "arbitarily + capriciously" denying Plaintiff seriously needed

medical treatment. all the defendants behavior was malicious & sadistic denying Plaintiff seriously needed medical treatment. Impinging on Plaintiff constitutional right against cruel & unusual Punishment & the americans with disabilities act-(ADA) a denial of due Process occurs where (SCC) Staff allows false evidence to go uncorrected. "Such as exhibit Blue" (SCC) officials have a constitutional duty to correct evidence (exhibit Blue) it Knows is false. whe this false evidence ("Exhibit Blue") is used Plaintiff 14th amendment to due Process Rights are violated. Hall v. Director of corrections, 343, f.3d 976 (9th cir 2003) denial of due Process occurs were state allows false evidence to go uncorrected". Hayes v. woodford, 301 F.3d 1054 (9th cir 2002) Prosecutor has constitutional duty to correct evidence he Knows is false." Phillips v. woodford, 267 F.3d 966 (9th cir 2001) if officers use false evidence to secure a conviction, the defendant's due Process rights are violated. all support above line 3-7 thus Plaintiff is forced into a situation were Physically its only a matter of time till Plaintiff is faced with an unreasonable excessive Risk to his health & safety resulting in Permanent significant Physical Injury to his back which now requires surgery to try & correct Plaintiff injury. "I rare cases, where Prison officials create or maintain an "unreasonable risk" of injury they may be held to a standard of "strict libility" & be held liable without Proof of negligence [redacted] Perro v. State, 517 So. 2d 258, 263 (La. APP. 1987)", how can Plaintiff survive against the beast (CDCR) who has so many Resourses seemingly unlimited Power to do what ever it wants. all the defendants listed in this action violated my 8th amendment Rights to cruel & unusual Punishment which "forbids exposure of Prisoners to conditions that pose "an unreasonable" Risk of serious damage to "their" future health." [redacted] Plaintiff alleges that all the defendants listed intended to inflict Pain on Plaintiff without medical Justification & the sheer number of specific instances were the defendants lied in Exhibit Blue. By their repeated examples of negligent acts which disclose a pattern of conduct. Statements by Prison officals directly showing an indifferent or hostile attitude toward Plaintiff medical needs, showing that Professional Judgement was either not exercised or was not followed. failing to carry out their responsibilities to Provide

adequate medical care. failing to remedy unlawful conditions that they knew or should of knew about. Their acts Plaintiff believes are deliberate indifference which falls some where between mere negligence (carelessness) and actual malice (intent to cause harm). Exhibits 206,207,208,209,213 Shows the[redacted] duty staff had to keep me [redacted] safely. when Plaintiff ask for pain medication to stop the tremendously acut excruciating pain I was & still am in they say I was self diagnosing myself & medication seeking no I was not I was begging for relief which they were determined not to give.

Please refer to the Exhibit G, especially, the one marked as G14 which quotes the Federal Judges & their representatives that had to take control of some of the Prison operations. (medical) In one instance as reported, that one where a quadriplegic died sound like a murder. with global satellite tracking, radios chase & lead cars & transportation personnel qualified well trained experienced officers & plenty of Police Stations, Patrols, etc.., to be found, it is unbelievable that a transportation vehicle with inmates in it could get 'lost'. Just one death thats' caused by carelessness & ineptitude is never Justified, nor excusable & should be considered to be nonthing less than murder. it is at the least, a wanton disregard for human life & unprofessional conduct as well as carelessness to a reckless degree. This States Governor, Schwarzenegger stated on September 23, 2007 as shown on the San [redacted] francisco ABC TV network affiliate, that he could not blame the court for considering placing a population cap in the Prison system as the state authorities have done nonthing in a decade to address this problem. Robert Sillan, the court over seer has stated that the Prison authority's are unable to manage the operation due to the size. Prison staff has no concern for my well-being, they are only concerned with their excessively high salaries & incredible insurance & retirement benefits. understandable as human beings. However, the fact remains California's Prison system is a monumental waste of tax payers money. any such system that feeds off negative effects of society, if successful would not grow nor enlarge its operations, it would grow smaller. The crime rate would diminish & the Prison would too. more prisoners means more prisons needed, which means more staff positions

needed which in turn means Job security in seniority for those already with Prison Positions & faster Promotions. money spent on such waste & ineptitude could be better spent finding ways to educate, teach trades & create viable Jobs for individuals before they become Criminals. Honest, realistic rehabilitation Programs would serve the People of the state for better then most of the current ones that really are nonthing more than well paying Jobs for staff supervisors of such Programs. Everyday now, I continue to suffer the stress, tension, frustration aggravation, general feelings of misery that such levels of overcrowding cause me a inmate with a verified disability which is covered under the americans with disabilities act. Such as constant lack of adequate medical care which has caused my Physical health to decline leaving me unable to Perform the daily activities of life significantly. See Exhibit 81 & 83 now I require surgery to alleviate severe Pain to a degree of discomfort I can stand do to constant lack of adequate medical care. there is no getting around this fact I need surgery. the fact is it's wrong, inexusable & inhumane for the Prison decision makers to have the overcrowding Problem they were already aware of it having been Proven & Publicized was already at such unreasonable levels that it actually endangers my very life. my only recourse [redacted] is obvious to me. my Patience has Proven futile, I believe my only hope is to file suit in the federal courts. Future incidents of inadequate medical care will cause me to suffer undue Punishment & needless Painful suffering. In lines 6-12 above, I feel I should explain some. Historically while I have been housed in (CDCR) sence may I believe 14th or 15th of 2004 I have been constantly without warning cut off my Pain medicine time & time again causing me to suffer needless Pain when there is treatment readily available which would curb or help my Pain. Once again 4-22-08 my Pain medication was simply cut off. again today 4-27-08 my Pain medication was again stoped leaving me to suffer more needless Pain. [redacted]

I SWEAR this to be true & correct to the best of my knowledge, by the alpha & omega by the Holy Scriptures.

Eston Burnett 6-26-08
Signature of Plaintiff

without Prejudice, U.C.C. 1-207, 1-103, 1-105 have a nice day...

# "Notice"

A. notice of intent to file civil action in 90 days was mailed via US. mail to the office of the attorney General 6-10-08 (CCP 364, 364.1)

B. Notice of Intent to file civil action in 90 days was mailed to the medical Board of the State of ca. Via U.S. mail (CCP 364.1) 6-10-08

Notice

C. Notice of intent to file civil action in 90 days was mailed to california Department of of Corrections & Rehabilitation Via U.S. mail (CCP) 364, 364.1 6-10-08

# "Time Liness"

A. This action is being filed 90 days after Notice was mailed to applicable defendants. (CCP 364)

B. This action is being filed with in 6 months of Petitioner hereing from his board of Control Claims Government Claim in California

C. This action is being filed within 1 Year + 2 months of the date of last action causing injury.

Plaintiff is asking the court to declare the legal Principle of "Resjudicata" So Plaintiff can Bring Both federal and State law claims See Government claim G571716

CALIFORNIA VCGCB
Victim Compensation & Government Claims Board

STATE OF CALIFORNIA
ARNOLD SCHWARZENEGGER, Governor

GOVERNMENT CLAIMS PROGRAM
400 R Street, 5th Floor ♦ Sacramento, California 95811
Mailing Address: P.O. Box 3035 ♦ Sacramento, California 95812
Toll Free Telephone Number 1-800-955-0045 ♦ Fax Number: (916) 491-6443
Internet: www.vcgcb.ca.gov

ROSARIO MARIN
Secretary
State and Consumer Services Agency
Chairperson

JOHN CHIANG
State Controller
Board Member

MICHAEL A. RAMOS
San Bernardino County District Attorney
Board Member

KAREN McGAGIN
Executive Officer

Ester Burnett V35245
PO Box 911
Imparial, CA 92251

January 25, 2008

RE: Claim G571716 for Ester Burnett, V35245

Dear Ester Burnett,

The Victim Compensation and Government Claims Board rejected your claim at its hearing on January 17, 2008.

If you have questions about this matter, please mention letter reference 118 and claim number G571716 when you call or write your claim technician or analyst at (800) 955-0045.

Sincerely,

Laura Alarcòn, Program Manager
Government Claims Program
Victim Compensation and Government Claims Board

cc: B-23 Corrections and Rehabilitation, Attn: Donna Corbin

Warning

"Subject to certain exceptions, you have only six months from the date this notice was personally delivered or deposited in the mail to file a court action on this claim." See Government Code Section 945.6. You may seek the advice of an attorney of your choice in connection with this matter. If you desire to consult an attorney, you should do so immediately".

* * * * * * * * * *

It is not necessary or proper to include the Victims Compensation and Government Claims Board (Board) in your court action unless the Board was identified as a defendant in your original claim. Please consult Government Code section 955.4 regarding proper service of the summons.

Ltr 118 Board Claim Rejection

18.

To: state medical board of California

Please take notice that Plaintiff, Ester Burnett is given required notice of his intent to file civil action (CCP 364.1)

Doctors, chief medical officer, Health care manager

ON 6-7-08 canceled my specialty clinic appointment for Lumbosacral Epidural steroid injection and removed a medical hold on Plaintiff, intentionally denying Plaintiff seriously needed medical care ordered by a surgeon or doctor,

at Sierra conservation center 5100 O'Byrens ferry Rd Jamestown, ca. 95327.

Defendants: P. Bolles Health care appeals analyst, R. Stogsdill chief dental officer, Jack st. clair chief medical officer and 5 John Doe's who's name I'm unaware of.

Ester Burnett 6-10-08 without defendants names/6-26-08 mailed with defendants names

Ester Burnett V35245/INF #6
Centinela state Prison
P.O. Box 731, Imperial, Ca. 92251

Ester Burnett V35245
INF #6
Centinela State Prison
P.O. Box 731, Imperial, Ca. 92251

TO: [redacted] Litigation Coordinator, Dept. of corrections P.O. Box 942883, Sacramento, Ca. 94238.

Please take Notice that Plaintiff, Ester Burnett is given required Notice of his intent to file civil action (CCP § 364). Due to the fact that Petitioner is an inmate without means to obtain necessary information & was denied said information, when he requested it, these Notices are being sent to You for distribution

Prison officials at Sierra Conservation Center 5100 O'Byrens ferry Rd Jamestown, Ca. 95327 for Prison doctors & correctional staff intentionally denying of Medicare Prescribed by Specialty Clinic Pain management consultant doctor or surgeon.

The defendants will be listed as (Jane or John Doe) because their true names & capacities are unknown to me. Defendants: John or Jane Doe # 1 chief deputy warden, M. Sullivan associate warden, Jack St. Clair - Chief medical officer, Clay warden, John or Jane Doe #7 Director of corrections & Rehabilitations, James Tilton secretary for the Youth & adult correctional agency, arnold Schwarzenegger Governor of Ca., D.L. Porter captain, N. Grannis works at Sacramento chief inmate appeals Branch, R. Stoggsdill chief dental officer, P. Bolles Health care appeals analyst, 5 other defendants listed as Doe's who names & Position I donot Know

mailed to, attorney General U.S. courthouse 1130 O St., Room 4304 Fresno, Ca. 95814

Ester Burnett 6-10-08 without defendants names

mailed again 6-26-08 with defendants names

TO, whom it may concern:

my name is Ester Burnett I'm writing to inform the court that I intend to file a civil suit within 90 days. due to being housed in the correctional treatment center at centinela state Prison in imperial, California 92251, P.O. Box 731, INF #6 awaiting back surgery. I'm unable to get the copies I need to file my suit. to Preserve my Right to also include state claims I'm letting the court know of my intentions. my time to file is over July 17, 2008 by goverment claim G 571716 rejection or denial January 17, 2008. So I Pray this Notice perserves my Right to add state claims with my 1983 suit of deliberate indifference to my serious medical needs by Prison officials at Sierra Conservation center 5100 O'Byrnes Ferry Road Jamestown, Ca 95327 of Prison doctors and correctional staff intentionally denying of medical care Prescribed by specialty clinic Pain management consultant doctor or surgeon. Please take notice that Plaintiff, Ester Burnett is given required Notice of his intent to File civil action (CCP § 346).

The defendants will be listed as ("Jane or John Doe") because their true names & capacities are unknown to me.

Ester Burnett 6-10-08

Ester Burnett V35245/INF#6
P.O. Box 731, Imperial, Ca. 92251
Centinela state Prison

Ester Burnett V35245
INF #6
Centinela State Prison
P.O. Box 731, Imperial, Ca. 92251

To: attorney General U.S. Courthouse 1130 O St., Room 4304 Fresno, Ca. 95814

Please take notice that Plaintiff, Ester Burnett is given required notice of his intent to file civil action (CCP 364). Due to the fact that Petitioner is an inmate without means to obtain necessary information & was denied said information, when he requested it, these notices are being sent to You for distribution.

Prison officials at Sierra Conservation Center 5100 O'Byrnes Ferry Rd Jamestown, Ca. 95327 for Prison doctors & correctional staff intentionally denying of medical care Prescribed by Specialty clinic Pain management consultant doctor or Surgeon.

The defendants will be listed as (Jane or John Doe) because their true names & Capacities are unknown to me. Defendants: John or Jane Doe #1 chief deputy warden, M. Sullivan associate warden, Jack St. Clair - chief medical officer, clay warden, John or Jane Doe #7 Director of corrections & Rehabilitations, James Tilton Secretary for the Youth & adult correctional agency, arnold Schwarzenegger Governor of ca., D.L. Porter captain, N. Grannis works at Sacramento chief inmate appeals Branch, R. Stogsdill chief dental officer, P. Bolles Health care appeals analyst, 5 other defendants listed as Doe's who names & Position I do not know

mailed to Ligigation Coordinator, Dept. of corrections P.O. BOX 942883, Sacramento, Ca. 94283.

Ester Burnett 6-10-08 Mailed without defendants names
6-26-08 mailed with defendants names

1of4

# "Legal causes of action"

This Complaint Contains the following Legal Causes of action

1. Culpable negligence:

A. Plaintiff alleges that between the dates of 11-17-06 to 6-27-07 6-25-08 that defendants, et. al., failed to exercize the required degree of medical care which was mandatory give his Circumstances.

B. Plaintiff alleges that the defendants' medical care & treatment was deficient & that a man of ordinary Prudence & required expirience would not have omitted such care or treatment in a similar situation.

C. Plaintiff alleges that these failures to exercize such Prudence & Provide the necessary & reasonable care, resulted in causing & worsening the Plaintiff's existing condition, caused him undue Pain & suffering & caused him to expirience mental anguish as well.

2. Imputed negligence:

A. Plaintiff alleges that between the dates of 11-17-06 to 6-27-07 to 6-25-08 that defendants, et. al., had the responsibility & duty to ensure that any subordinate employees, such as other defendants listed herein, exercized due care to treat existing injuries & to Prevent further injuries or harm.

B. Plaintiff alleges that the defendants owed the Plaintiff, & has a duty to ensure all subordinate employees exercize due care while acting under the color of the law, but have not done so. Thus, & said defendants were negligent & are liable for actions which resulted in injury to the Plaintiff while subordinate employees acted under the color of the law.

C. Plaintiff alleges that injuries, specifically undue Pain & suffering, worsening the existing condition of the Plaintiff & mental anguish, due to the lack of diligence & intervention by the defendants listed here in Petition.

3. Subsequent negligence:

A. Petitioner alleges that between the dates of 11-17-06 & 6-27-07 & 6-25-08 that defendants, et. al., saw Petitioner in a Position of danger & at risk to injury.

B. Plaintiff alleges that defendants, et. al., failed to exercize due & Proper Procaution to Prevent injury to the Plaintiff.

C. Plaintiff alleges that due to the lack of such precautionary measures being taken, he continued to suffer injuries, specifically pain & suffering, worsening & aggrevating his existing injury & mental anguish, due to said delays & lack of intervention.

4. Ordinary Negligence:

A. Petitioner alleges that between the dates of 11-17-06 & 6-27-07 & 6-25-08 that defendants, et, al., failed to provide care which a person of common prudence would have provided.

B. Plaintiff alleges that defendants, et, al., failed to provide care & prudence that the majority of medical professionals exercized or the majority of mankind would expect under the same or similar circumstances.

C. Petitioner alleges that the results of such failures to act by the defendants, et, al., should have been known at the time.

D. Plaintiff alleges that such failures to act caused him the expected or anticipated harm of him enduring undue pain & suffering, worsening of his existing condition & undue mental anguish.

5. Gross Negligence:

A. Plaintiff alleges that between the dates of 11-17-06 & 6-27-07 & 6-25-08 that defendants et. al., consciously & voluntarily failed to provide a level of care which was required & were aware that such failure was likely to result in injury.

B. Plaintiff alleges that said defendants failed to provide said care consciously indifferent to the rights & welfare of the plaintiff.

C. Plaintiff alleges that said defendants were indifferent to discharging their legal duty to provide the required care & to prevent injury.

D. Plaintiff alleges thats said defendants exercized a manifesty smaller amount of watchfulness & circumspection the circumstances required of a person of ordinary prudence.

E. Plaintiff alleges that as a result of such actions or failures to act, that he suffered injury the defendants were aware or should have been reasonably aware of by forcing him to endure pain & suffering, mental anguish & worsening of his existing condition.

6. Neglect:

A. Plaintiff alleges that between the dates of 11-17-06 & 6-27-07 & 6-25-08 defendants, et, al., failed

to do what was required to be done under the given circumstances.

B. Plaintiff alleges that defendants had a clear duty to provide him with necessary medical care & that they refused or were unwilling to preform said duty.

C. as a result, the Plaintiff alleges that he suffered irreparable harm, mental anguish as well as pain & suffering from such failure or unwillingness to perform their required duty.

7. failure of duty to exercize due care:

A. Plaintiff alleges that between the dates of 11-17-06 & 6-27-07 & 6-25-08 defendants, et.al., had a legal duty to provide him with medical care & other treatment which his condition requires.

B. Petitioner alleges that the defendants, et.al., failed to adhere to their legal obligation & provide the required care.

C. Plaintiff alleges that injury was caused as a diret result of said failure. The Plaintiff endured undue pain & suffering, injury & worsening of his existing injuries & mental anguish.

8. medical malpractice:

A. Petitioner alleges that between the dates of 11-17-06 & 6-27-07 & 6-25-08 defendants, et.al., had a duty to provide medical care to the Petitioner.

B. Plaintiff alleges that the maintenence of health & the prevention of undue pain & suffering are applicable standards of care which were violated conciously by the defendants.

C. Plaintiff alleges that there is a connection between the violations of such standards & the injuries sustained by the Petitioner.

D. Plaintiff alleges that injuries did result & existing injuries were aggravated. He expirienced undue pain & suffering, mental anguish & undue hardships.

9. medical misfeasance:

A. Plaintiff alleges that between the dates of 11-17-06 & 6-27-07 & 6-25-08 defendants, et. al., violated applicable statutes & laws relating to their obligation to provide proper & adequate care.

B. Plaintiff alleges that the defendants improperly performed acts which they were obligated by laws, statutes & regulations to do.

C. Plaintiff alleges that undue pain & suffering, mental anguish & worsening of his existing condition as a direct of such improper acts.

4 of 4

10. medical nonfeaseance:

A. Plaintiff alleges that between the dates of 11-17-06 + 6-27-07 + 6-25-08 defendants, et. al., had obligations to the Plaintiff to Provide him with necessary, Professional + adequate care.

B. Plaintiff alleges that defendants, et. al., neglected to Provide such care + refused to Perform their required duties.

C. Petitioner alleges that as a result, he suffered undue harm, Pain, Suffering + mental anguish + worsening of his existing condition.

11. oppression:

A. Petitioner alleges that between the dates of 11-17-06 + 6-27-07 + 6-25-08 defendants, et. al., while acting under the color of the law, wrongfully caused injury or caused circumstances which were likely to result in injury to the Plaintiff or otherwise cause harm.

B. Plaintiff alleges that defendants, et. al., used excessive authority subjecting him to cruel or unjust hardship.

C. Petitioner alleges that as a result, he suffered undue Pain + suffering unjust or cruel hardships, mental anguish, injury + worsening of his existing condition.

12. constructive malice:

A. Petitioner alleges that between the dates of 11-17-06 + 6-27-07 + 6-25-08 defendants, et. al., acted in ways where maliciousness can be inferred.

B. Petitioner alleges that said acts by the defendants resulted in injury.

C. Petitioner alleges that injury did infact occur as he suffered mental anguish, undue Pain + suffering + worsening of his existing injury.

13. fraud:

A. Petitioner alleges that between the dates of 11-17-06 + 6-27-07 + 6-25-08 defendants, et. al., acted or failed to act contrary to their legal obligations + duties.

B. Plaintiff alleges that the defendants' actions were contrary to good conscience which contributed to or caused the Plaintiff's injury.

C. Plaintiff alleges that as a result he suffered undue Pain, Suffering + hardship, mental anguish + worsening of his existing medical condition.

I SWEAR This to be True + Correct to the best of my Knowledge, by the ALPHA + omega by the Holy Scriptures.

Eoten Burnett 6-25-08
Signature of Plaintiff

without Prejudice, U.C.C. 1-207, 1-103, 1-105
have a nice day...

# Demand for Relief

for the foregoing reasons, Plaintiff respectfully demands that this court:

A. award the Plaintiff the following general relief:

1. Trial by Jury on all issues of fact;

2. Compensatory damages, Jointly + severally, from each defendant named here in the amount of 10,000,500.00

3. Costs of this case including reasonable attorney's fees if later applicable;

B. award Punitive/exemplary damages Jointly + severally from each defendant named herein for malicious, fradulent + or oppressive acts. in the amount of 40,000,000.00 lastly Plaintiff seeks immediate Release from (CDCR) appoint counsel to litigate my civil action; See Reasons below if the court would look at Exhibit-00 1of7 it will see I am awaiting a massive surgery on my back do to massive back spasm + severe excruciating acute pain Plaintiff can not sit or stand long. damages which will mostly go toward further developing medical Problems I will face due to the lack of + Poor inadequate medical care that has led to the acute decline of my Physical health + due to the fact when I was sentenced to (CDCR) I worked earned a good living at San Diego fence company in clairmont in San Diego but now with a pending surgery needed no my back I will never be able to work as a fence installer again. 5-15-08 Plaintiff went to see doctor calvin for a final consultation before surgery. Plaintiff was told the surgery could be or should be soon which will require along recovery Process. I have been rehoused in the correctional treatment center to wait for surgery at times moving is impossible my pain is unamaganable I Never Thought I would ever experience what Im going through.

## Verification

I, Ester Burnett, declare under penalty of perjury under the laws of the state of ca. having read this complaint + all allegations made herein, affirm that all allegations are true + correct, except as to matters, I believe them to be true

Dated 6-25-08 Ester Burnett Plaintiff/affiant in Persona Pro Per

Eston Burnett
Signature

## Reasons in support of Demand for Relief

The Petitioner has suffered continuous injury over the Previous 4 Years due to the defendant's refusal and/or failure to Provide adequate & necessary medical care & treatment due to the lack of, or refusal to Provide, the necessary care & treatment. Plaintiff case is highly complicated yet filled with merit. Plaintiff is not highly or legal smart. I Pray after Reading this Your Honor will appoint an attorney or law firm to litigate my civil action with a surgery on my back only days away & a long recovery ahead Plaintiff will need a attorney to secure his Rights violated by the defendants. and to move this action foward without delay. there should be no doubt of how much Pain Plaintiff is in. Sir my Pain is mine splitting at times while writeing this action Im in so much Pain I can not think. Sometimes my words run together sir making it hard for the court to read I do not do this on Purpose I do it because of the Pain. thats why sir I need an attorney to Push this foward without delay by the time You Read this I may be already in surgery Please appoint an attorney. Plaintiff has visible injuries that have gotton excrucatingly worse do to inadequate medical care show by magnetic Resonance Imaging (mri) told of by Neuro Surgery & neurologic exams, Plaintiff has suffered 4 Years of Emotional distress or Pain & suffering mental trauma that resulted from the injury not being able to sleep, nausea, feelings of fear. These injuries cannot be confirmed by any medical tests or x-rays. my general statement that I hurt is evidence of an injury, tests cannot confirm or deny the existence of injury. Punitive damages must be awarded for Punishment alone for outrageousness of the defendants conduct. ("resulting in further Permanent Provable disability. my injury Required surgery & hospitalization, long term therapy, Physical therapy, Permanent disfigurement, Permanent symptoms of injury, Permanet loss of feeling in leg & back & feet these are "specialdamages" that an attorney is needed to determine a dollar figure").

I, Ester Burnett, declare under Penalty of PerJury of the laws of the state of ca. that the foregoing is true & correct

Respectfully submitted Ester Burnett
Dated 6-25-08

Ester Burnett
Petitioner in Persona Pro Per

28.

# Demand for injunctive Relief & Reasons in Support of Demand for injunctive Relief

Starting with Exhibit 85 it took Prison officials over 6 months to have Plaintiff seen by a Pain Specialist when it was ordered 6-22-05 + 21 days before a follow-up appointment was done by a doctor after the Specialty clinics consultation when Exhibit BB the Plata court order. States Specialty appointments must be completed within 14 to 90 days of approval depending on Seriousness of Problem; Prisoners waiting for a Specialty appointment must been seen by a doctor every 30 days. follow-up appointment with clinic doctor within 14 days of appointment. then when doctors cut off Plaintiff oxycontin ordered 6-22-05 with no reason when Plaintiff ask for more oxycontin which did relieve Plaintiff acute Pain. doctors Refused instead given Plaintiff medication which did nonthing to relieve Pain. Saying Plaintiff was not in Pain in Exhibit 99 which was a lie. to further keep Plaintiff for Readily available Pain relief doctors in Exhibit 100 told Plaintiff he could not use narcotics to control his Pain when nonthing else help Stop Plaintiff Pain. falsifing Plaintiff medical Records Saying Plaintiff had no Verifiable disability which was also a lie in Exhibits 102 & 103. Saying Plaintiff was medication Seeking narcotics when Plaintiff would of taken dirt if it would of Relieved his Pain see Exhibit C2. Exhibit C2 also Shows again how adamantly doctors were to falsely say Plaintiff was not in Pain again in Exhibit 49 Saying Plaintiff was medication seeking. if narcotic such as oxycontin Releived Plaintiff Pain why were they going to such malicious & sadistic lenghts to deny Plaintiff relief from Painful Suffering. again in Exhibits 70 & 74 falsely saying Plaintiff was in no Pain conspiring with Sergeant Dawson in Exhibit 74 to deny Plaintiff seriously needed medical housing. again in Exhibit Bble against my constitutional Rights overriding of medical orders denying Plaintiff seriously needed medical treatment for non-medical reasons causing Plaintiff to suffer the unnecessary + wanton infliction of Pain totally without Penological Justification. resulting in Plaintiff health + safety being in a foreseeable unnecessary inexcusable excessive risk exposing Plaintiff to conditions that Posed "an unreasonable" Risk of Serious damage to Plaintiff future health. Resulting in Plaintiff falling down stairs 11-12-06 + 11-13-06 See Exhibits 48, 49, 50, 51, 52. In Exhibit C 6-22-05 J. Paul muizelaar, doctor + Proffesor of neurosurgery of UC Davis health System of Sacramento, CA. Said on Page 2 of 2 of Exhibit C said that surgery would not help me at that time. However

after falling down stairs & over 4 years of tremendously acute pain excruciating pain Doctor Calvin a neurosurgeon said surgery is needed. For; the defendants knowingly compelling Plaintiff to climb stairs that was beyond Plaintiff physical ability due to his injuries a dangerous risk to Plaintiff health & unduly painful forbided by U.S.C.A. 8th amendment. Providing false diagnoses of Plaintiff physical injury imposeing an atypical & significant hardship in relation to the ordinary incidents of prison life forceing Plaintiff to climb stairs. denial of medical care. subjected Plaintiff to ridicule an derision in response to complaints of pain & inability to climb stairs. failing to give medication that helped stop painful suffering. interferring with pain or back specialist made a order or recommendation & prison officials ignored, delayed or other wise interfered with. multipule incidents of improper or delayed medical care. inflicting pain without justification an entailed substantial risk of serious harm to Plaintiff. officials failing to provide reasonably necessary medical care which would be avaliable to prisoner if not incarcerated. overriding of medical decisions by security staff & medical staff. delay of treatment for non-medical reasons. disregarding a surgeons recommendation on non-medical grounds. disregarding an excessive risk to Plaintiff health or safety. Plaintiff suffered needless pain when relief was or is readily available. the named defendants are responsible & accountable for causing the current situation Im forced to contend with, which is further over-crowding added to what has already been found to be true by two federal judges to be in fact endangering my life, as well as detrimental to out mental & physical well being due to poor & inadequate medical care, as well as dental care, ect... In summation, this is a gross violation of my absolute rights to be protected from cruel & unusual punishment as [illegible] is expressed at amendment 8, U.S.C.A. & my unalienable rights to be punished only once as is expressed at amendment 5, of the U.S.C.A & common law. Violating Plaintiff rights under the american with disabilities act denying Plaintiff the benefits of the services, programs or activities of the department with no reason that limited penological concerns. medical staff & correctional or custodial staff knew of & disregarded a excessive risk to my health & saftey. Prison doctors intended to inflict pain on me without medical justification purposefully perscribed medications they knew did nonthing to relieve my acute excruciating pain. And the sheer number of specific instances in which doctors insisted on continuing courses of treatment that these doctors knew

were Painful, ineffective, or entailed a Substantail risk of Serious harm to my health + saftey. medical staff in (CDCR) has treated me "not as a Patient, but as a Nuisance," + "were insufficiently interested in my health to take even minimal steps at california mens colony state Prison + Richard J. Donovan Correctional facility to guard against the Possibility that my injury was Severe." let me explain a horrorable, terribly, outrageous truth sence I was seen by the frist Neurosurgeon or Pain Specialist at (CMC-E). No (CDCR) doctor had my complete medical Record. they often ask me what the Neurosurgeon or Specialist said + what he perscribed, because they can't find the information in my medical file. They'll flip through my medical file get up set then close it in anger, then grab a interdisciplinary Progress notes CDC 7230 medical form or a Physicians orders CDC 7221 form + start my medical visit off as if they are clueless of what Im there for or whats wrong with me. The shocking truth is they are clueless to my Situtation + that is why my health has debilitated to were I need surgery. because medical + Custodial staff are recklessly clueless to my medical needs when all they have to do is open up my medical file + review it to be informed they will not. instead they use their mighty all Power-full Positions as licensure, board certified Physician's to shape my medical file into a frivolous outrageous, terrible lie. saying I don't need care ordered or Recommended by a Specialty consultants hired by (CDCR) to diagnose injuries out of Regular (CDCR) Physician's diagnostic scope area of expertise. for these listed Reasons the named defendants in this action must be analyzed under "Strict Scrutiny." also by the Reason listed for Reasons in support of demand for injunctive Relief. Plaintiff has shown that for over almost 5 years from Intake Processing on may/2004 at (RJD) to [redacted] (SVSP) to (CMC-E) to back to (RJD) to [redacted] (SCC) to (CSP) govenor arnold Schwarzenegger + James Tilton Secretary for the Youth + adult correctional agency + the Director of Corrections liste as John or Jane Doe #15 et al., listed subordinates of Schwarzenegger, Tilton and the Director have Proven without a doubt that they will not treat or Provide Plaintiff adequately needed Serious medical care. Therefore Plaintiff demand for injunctive Relief to be housed in a community corrections facility in San Diego either - VOA San Diego 650 11th avenue San Diego, Ca. 92101 or W+B Re-entry 1791 national avenue San Diego, Ca. 92113. or any work fulough in San Diego were in the future when Plaintiff back

need medical attention he can seek adequate care in the surrounding community. Plaintiff seeks this injunctive Relief for the remainder of his incarceration in the department of corrections + Rehabilitations to stop known violations of his 8th amendment Right. I ask the court to understand that I am confined and at the mercy of the Proverbial 'lions den' who will do anything to deceive + miss lead the true nature of my excruciatingly Painful injury. That That has been debilitated due to reckless + grossly inadequate medical care over the almost 5 years leading to Plaintiff current need for Surgery which was approved in January of 2008 + over 6 months later Plaintiff is still waiting in excruciating Pain. for Plaintiff to say that he is suffering tremendous acute excruciating Pain doesen't even Scratch the surface of the emotional + mental injurys, sleepless nights due to excruciating tremendous. Pain months spent in + out of hospital setting due to being unable to walk the fear of being crippled for life + lots more suffering thrust on me by reckless grossly malicious + sadistic inadequate delay + denial of seriously needed medical care by Plaintiff. Plaintiff is currently housed in the correctional treatment center at centinela state Prison a hospital setting. Thus Ends Plaintiff demand for injunctive Relief + Reason in support of demand for injuctive Relief... from or against Governor arnold Schwarzenegger, James Tilton, et. al.,

If the court looks at Exhibit 301 Page 10 of 14 last Paragraph it will see that the injunctive Relief sought by Plaintiff has been granted before in other cases even total release from (CDCR) Exhibit 300 shows (CDCR) total inability to Provide constitutional adequate medical care.

I SWEAR this to be True + correct to the best of my Knowledge, by the ALPHA + OMEGA by the HOLY SCRIPTURES.

Fenton Burnett 6-25-08 without Prejudice, U.C.C. 1-207-1-103.1-105

Signature of Plaintiff

have a nice day...

future Claims or injuries

at the time of filing; defendants, et. al.

being such, it is likely that it will continue until resolution of the instant matter. this claim may need to be amended at a later date, to reflect future claims, add defendants, or seek future damages. which will include my neck & left shoulder, among others.

## Declaratory Relief

Plaintiff ask the Court to declare each Party's Rights & Liabilities of each defendant as the Court can see in Exhibit Blue Pages 1of13 Paragraph-2, 4of13 Section D, 6of13 & Paragraph-2 7of13, 12of13 Paragraph-2 there is an actual controversy between Plaintiff & the defendants as to who actually canceled Plaintiff specialty appointment so Plaintiff ask the court to declare from the defendants whom it was. the defendants in Exhibit Blue Page 9of13 Paragraph-2 told Plaintiff he could submit another appeal as to who actually canceled Plaintiff specialty appointment Plaintiff filed 3 such appeals and has heard from none of them to date.

Finally Plaintiff request the court to grant such other relief as it may appear Plaintiff is entitled to

Respectfully Submitted
Ester Burnett Dated 6-25-08
Ester Burnett

# Declaration of Citizenship

To whom it may concern:

I Ester Burnett, am a member of the Sovereignty as defined in Yick Wo vs. Hopkins, 118 U.S., 356 & the Dred Scott case, 60 U.S. 393.

Please be advised that I am a non resident alien, (american), of the united states, never having lived, worked nor having received income from any source within the district of columbia, Puerto Rico, virgin Islands, Guam, American Samoa, or any other territory within the united states, which entity has it origin & Jurisdiction from article I, Section 8, clause 17 of the U.S. Constitution. I am, therefore, not subject to the Jurisdiction of the united states, nor of the defacto Corporation known as the state of california which is a fictitious name for business Purposes.

under the constitution of the united states, I have certain unalienable rights. Citizens of the 50 States are under Judicial Precedent law, created by article III Justice Courts of law.

The constitution of the united states of america is the supreme law of the land. "Law of the land means common law." See Taylor vs. Porter, 4 Hill, 140, 146, state vs. Simon 2 Spears, 761, 767, also, See 22.2 California Government code.

To the best of my knowledge the foregoing is true and correct.

U.C.C. 1-207, & 1-103 & 1-105

Signature: Ester Burnett Dated 6-25-08

Printed name: Ester Burnett

## additional Party information:

1. Defendants Sued in Both their official capacity and their individual capacity are in Supervisory Positions + are being Sued both for monetary + Punitive damages

2. Defendants sued in their individual capacity are employees of the state of california who caused injury while acting under the color of law as such, they are individually being sued for monetary damages

3. Punitive + exemplory damages are also being saught against individual defendants for their acts of oppression, Fraud or malice.

4. The Coming facts narrative is not all-inclusive + the issues will be more specified as this matter progresses. This claim relates to over 4 years of tortious actions + injuries, + as such it is prudent to save space on items or specifics that do not need to come to light + to rather indentify + elaborate on important issues as they are indentified.

## Jurisdiction

A. This Court has proper Jurisdiction becaue the defendants are public entities, employees there of or public officials who were acting under the color of law, + such will fully or partially be represented by the office of the State of california, whose office is located in the county of Sacramento, (CCP 401)

B. at least one defendant resides in the Jurisdiction of this court. (CCP 395)

C. A court of this state may exercize Jurisdiction over any case. (CCP 410.10)

1. Defendant John or Jane Doe#2 is employed at sierra conservation center state Prison-(scc)5150 o Byrnes Ferry Rd Jamestown, Ca. 95327. at all times mentioned here in was employed at (scc) Doe#2 official Position + capacities are unknown to me. an individual sued in Doe#2 official + individual capacities. Plaintiff alleges Doe#2 violated his 8th amendment Right + title 42 U.S.C. section 12102 Provisions of title II of the americans with disabilities act. manifested by the intentional denial, delay or interference with Plaintiff medical care by Purposefully ignoring + failing to respone to Plaintiff Pain or medical needs. at all times mentioned here in Doe#2 acted under color of law while committing the deprivations alleged.

2. 6-7-07 Doe#2 during classification when Plaintiff Said that canceling his Specialty clinic for epidural Steriod shots for his Tremendously excruciatingly Painful medical need was in violation of Plaintiff 8th amendment Right + americans with disabilities act denying Plaintiff the benefits of the services, Programs or activities of the department with no Reason that limited Penological concerns. the entire Committie acted as if Plaintiff was Speaking in a unknown Forgein language.

3. Doe#2 actions + inactions by ignoring, delaying, or other wise interferring with the order or Recommendations of a doctor or Surgeon, inflicted Pain on Plaintiff without Justification, Doe#2 over ruled a doctor's medical Judgement regarding treatment, overriding of medical decisions by security staff, disregarded a Surgeons Recommendation on non-medical grounds, caused Plaintiff needless Pain + Suffering when readily available relief was at hand in the form of epidural steroid shots 6-7-07 violated my above mentioned Constitutional Rights. Currently Plaintiff is housed at centinela State Prison were after Receiving a magnetic Resonance Imaging-(mri) of his Lumbar spine a neurological Surgeon has Recommended after over 4 years of Tremendously excruciating Pain that Plaintiff Receive a massive Surgery on his Lumbar spine see Exhibit 60 1of7. Doe#2 actions or inactions caused the unnecessary + wanton infliction of Pain on Plaintiff totally without Penological Justification. See Exhibit Blue for denial of treatment

1. Defendant John or Jane Doe #3 is employed at sierra conservation center state Prison-(scc) 5150 O Byrnes Ferry Rd Jamestown, Ca. 95327. at all times mentioned here in was employed at (scc) Doe #3 official Position & capacities are unknown to me. an individual sued in Doe #3 official & individual capacities. Plaintiff alleges Doe #3 violated his 8th amendment Right & title 42. U.S.C. Section 12162 Provisions of title II of the americans with disabilities act. manifested by the intentional denial, delay or interference with Plaintiff medical care by Purposefully ignoring & failing to respone to Plaintiff Pain or medical needs. at all times mentioned here in Doe #3 acted under color of law while committing the deprivations alleged.

2. 6-7-07 Doe #3 during classification when Plaintiff said that canceling his specialty clinic for epidural sterioid shots for his Tremendously excruciatingly Painful medical need was in violation of Plaintiff 8th amendment Right & americans with disabilities act denying Plaintiff the benefits of the services, Programs or activities of the department with no Reason that limited Penological concerns. the entire committie acted as if Plaintiff was speaking in a unknown forgein language.

3. Doe #3 actions & inactions by ignoring, delaying, or other wise interferring with the order or Recommend-ations of a doctor or surgeon, inflicted Pain on Plaintiff without Justification on Plaintiff, Doe #3 over ruled a doctor's medical Judgement regarding treatment, overriding of medical decisions by security staff, disregarded a surgeons Recommendation on non-medical grounds, caused Plaintiff needless Pain & suffering when readily available relief was at hand in the form of epidural steroid shots 6-7-07 violated my above mentioned Constitutional Rights. Currently Plaintiff is housed at centinela state Prison were after Receiving a magnetic Resonance Imaging-(mri) of his Lumbar spine a neurological surgeon has Recommended after over 4 years of Tremendously excruciating Pain that Plaintiff Receive a massive surgery on his Lumbar spine See Exhibit 00 1 of 7 Doe #3 actions or inactions caused the unnecessary & wanton infliction of Pain on Plaintiff totally without Penological Justification. See Exhibit Blue for denial of treatment

1. Defendant John or Jane Doe#4 is employed at sierra conservation center state Prison-(ssc) 5150 d Byrnes ferry Rd Jamestown, ca. 95327. at all times mentioned here in was employed at (scc) Doe#4 official Position + capacities are unknown to me. an individual sued in Doe#4 official + individual capacities. Plaintiff alleges Doe#4 violated his 8th amendment Right + title 42.U.S.C Section 12102 Provisions of title II of the americans with disabilities act. manifested by the intentional denial, delay or interference with Plaintiff medical care by Purposefully ignoring + failing to respone to Plaintiff Pain or medical needs. at all times mentioned here in Doe#4 acted under color of law while committing the deprivations alleged.

2. 6-7-07 Doe#4 during classification when Plaintiff said that canceling his specialty clinic for epidural steriod shots for his tremendously excruciatingly Painful medical need was in violation of Plaintiff 8th amendment Right + americans with disabilities act denying Plaintiff the benefits of the services, Programs or activities of the department with no Reason that limited Penological concerns. the entire committie act if Plaintiff was speaking in a unknown forgein language.

3. Doe#4 ~~actions + inactions by ignoring, or other-wise-interferring~~ with the order or Recommendations of a doctor or surgeon, inflicted Pain on Plaintiff without Justification on Plaintiff. Doe#4 over ruled a doctor's medical Judgement regarding treatment, overriding of medical decisions by security staff, disregarded a surgeons Recommendation on non-medical grounds, caused Plaintiff needless Pain + suffering when readily available relief was at hand in the form of epidural steroid shots 6-7-07 violated my above mentioned constitutional Rights. Currently Plaintiff is housed at centinela state Prison were after Receiving a magnetic Resonance Imaging-(mri) of his lumbars spine a neurological surgeon has Recommended after over 4 years of tremendously excruciating Pain that Plaintiff Received a massive surgery on his lumbar spine see Exhibit 60 1 of 7 Doe#4 action + inactions caused the unnecessary + wanton infliction of Pain on Plaintiff totally without Penological Justification. See Exhibit Blue for denial of treatment

1. Defendant John or Jane Doe#5 is employed at Sierra Conservation Center State Prison-(SCC) 5150 O'Byrnes Ferry Rd Jamestown, Ca. 95327. at all times mentioned here in was employed at (SCC) Doe#5 officials Positions and capacities are unknown to me. an individual sued in Doe#5 official & individual capacities. Plaintiff alleges Doe#5 violated his 8th amendment by the intentional denial, delay or interference with Plaintiff medical care by Purposefully & ignoring & failing to respone to Plaintiff Pain or medical needs & title 42.U.S.C. Section 12102 Provisions of title II of americans with disabilities act. at all times mentioned here in Doe#5 acted under color of law while committing the depriuations alleged.

2. 6-7-07 Doe#5 during classification when Plaintiff said that canceling his Specialty clinic for epidural steriod shots for his Tremendously excruciatingly Painful medical need was in violation of his 8th amendment Right & americans with disabilities act denying Plaintiff the benefits of the services, Programs or activities of the department with no Reason that limited Penological concerns. the entire committie acted as if Plaintiff was speaking in a unknown forgein language. Doe#5 actions & inactions by ignoring, delaying, or other wise interferring with the order or recommendations of a doctor or surgeon, inflicted Pain on Plaintiff without Justifications on Plaintiff, Doe#5 over ruled a doctor's medical Judgement regarding treatment, overriding of medical decisions by security staff, disregarded a Surgeons Recommendation on non-medical grounds, caused Plaintiff needless Pain & suffering when readily available relief was at hand in the form of epidural steroid shots 6-7-07 violated my above mentioned constitutional Rights. Currently Plaintiff is housed at Centinela State Prison were after Receiving a magnetic Resonance Imaging-(mri) of his lumbar spine a neurological surgeon has Recommended after over 4 years of Tremendously excruciating Pain that Plaintiff Receive a massive surgery on his lumbar spine See Exhibit 00 1of1 Doe#5 actions or inactions caused the unnecessary & wanton infliction of Pain on Plaintiff totally without Penological Justification.

See Exhibit Blue for denial of treatment

1. Defendant m. sullivan is employed at sierra conservation center state Prison-(scc) 5150 o'Byrnes Ferry Rd Jamestown, ca. 95327. at all times mentioned here in was employed as a associate warden at (scc). Sullivan an individual sued in his official + individual capacities. Plaintiff alleges Sullivan violated [redacted] his 8th amendment Right + title 42. U.S.C. Section 12102 Provisions of title II of the americans with disabilities act. manifested by the intentional denial, delay or interference with Plaintiff medical care by PurPosefully ignoring + failing to respone to Plaintiff Pain or medical needs. at all times mentioned here in Sullivan acted under color of law while committing the deprivations alleged.

2. 6-7-07 Sullivan during classification when Plaintiff said that canceling his specialty clinic for epidural steriod shots for his Tremendously excruciatingly Pain [redacted] ful medical need was in violation of Plaintiff 8th amendment Right + the americans with disabilities act denying Plaintiff the benefits of the services, Programs or activities of the department with no Reason that limited Penological concerns. the entire committie acted as if Plaintiff was speaking in a unknown forge in language.

3. Sullivan actions + inactions by ignoring, delaying, or other wise interferring with the order or Recommendations of a doctor or surgeon, inflicted Pain on Plaintiff without Justification on Plaintiff, Sullivan overruled a doctor's medical Judgement regarding treatment, overriding of medical decisions by security staff, disregarded a surgeons Recommendation on non-medical grounds, caused Plaintiff needless Pain + suffering when Readily available relief was at hand in the form of epidural steroid shots 6-7-07 violated Plaintiff above mentioned constitutional Rights.

4. Currently Plaintiff is housed at centinela state Prison, P.O. Box 731 Imperial, ca. 92251 were after Receiving a magnetic Resonance Imaging-(mri) of his Lumbar spine a neurological surgeon has Recommended after over 4 years of Tremendously excruciating Pain that Plaintiff Receive a massive surgery on his Lumbar spine see Exhibit oo 1of7. Sullivan actions or [redacted] inactions caused the unnecessary + wanton infliction of Pain on Plaintiff totally without Penological Justification.

see Exhibit Blue for appeal of denial of treatment

1. Defendant D.L. Porter is employed by (CDCR) as a facility Captain location unknown at all times mentioned here in was employed as appeals Examiner on behalf of the director of (CDCR) an individual sued in his or her official & individual capacities. Plaintiff alleges Porter violated his 8th amendment Right & title 42. U.S.C. Section 12102 Provisions of title II of the americans with disabilities act. manifested by the intentional denial, delay or interference with Plaintiff medical care by Purposefully ignoring & failing to respone to Plaintiff Pain or medical needs. at all times mentioned here in Stogsdill acted under color of law while committing the deprivations alleged. Porter also violated Plaintiff 4th amendment to due Process manifested by the intentional creation of false evidence then letting the false evidence go uncorrected for the Purpose of missleading Plaintiff as to who canceled Plaintiff Seriously needed medical treatment. & Refusing to inform Plaintiff who canceled his appointment.

2. ON [redacted] 5-21-08 Porter used evidence that he as a appeals Examiner Knew or should of known was false. Conspiring to hide fellow employees violation of Plaintiff above mentioned constitutional Rights

1 Defendant N. Grannis is employed at (CDCR) inmate appeals Branch P.O. Box 942883 sacramento, Ca. 94283-0001. at all times mentioned here in was employed at inmate appeals branch Director's level appeal decision as chief Inmate appeals Branch official position is unknown. an individual sued in his orher official & individual capacities. Plaintiff alleges Grannis violated 8th amendment Right & title 42. U.S.C. Section 12102 Provisions of title II of the americans with disabilities act. manifested by the intentional denial, delay or interference with Plaintiff medical care by purposefully ignoring & failing to respone to Plaintiff Pain or medical needs. at all times mentioned here in Grannis acted under color of law while committing the deprivations alleged. Grannis also violated Plaintiff 4th amendment to due Process manifested by the intentional creation of false evidence then letting the false evidence go uncorrected for the Purpose of missleading Plaintiff as to who canceled Plaintiff seriously need medical treatment. & Refusing to inform Plaintiff who canceled his appointment. conspiring to hide fellow employees violation of Plaintiff above mentioned constitutional Rights.

1 Defendant R. STOGSDILL is employed at Sierra Conservation Center State Prison-(SCC) 5150 O'Byrnes Ferry Rd Jamestown, Ca. 95327. at all times mentioned here in was employed at (SCC) as chief Dental officer. an individual sued in his or her official & individual capacities. Plaintiff alleges Stogsdill violated his 8th amendment Right & title 42. U.S.C. Section 12102 Provisions of title II of the americans with disabilities act. manifested by the intentional denial, delay or interference with Plaintiff medical care by Purposefully ignoring & failing to respone to Plaintiff Pain or medical needs. at all times mentioned here in stogsdill acted under color of law while committing the deprivations alleged. Stogsdill also violated Plaintiff 4th amendment to due Process manifested by the intentional creation of false evidence then letting the false evidence go uncorrected for the Purpose of missleading Plaintiff as to who canceled Plaintiff Seriously needed medical treatment. and Refusing to inform Plaintiff who canceled his appointment. conspiring to hide fellow employees violation of Plaintiff above mentioned constitutional Rights

1 Defendant P. Bolles is employed at sierra conservation center state Prison-(scc) 5150 O'Byrnes ferry Rd Jamestown, Ca. 95327. at all times mentioned here in was employed at (scc) as Health care appeals analyst. an individual sued in her official & individual capacities. Plaintiff alleges Bolles violated his 8th amendment Right & title 42. U.S.C Section 12102 Provisions of title II of the americans with disabilities act. manifested by the intentional denial, delay or interference with Plaintiff medical care by purposefully ignoring & failing to respone to Plaintiff Pain or medical needs. at all times mentioned here in Bolles acted under color of law while committing the deprivations alleged. Bolles also violate Plaintiff 14th amendment to due Process manifested by the Intentional creation of false evidence then letting the false evidence go uncorrected for the purpose of missleading Plaintiff as to who canceled Plaintiff seriously needed medical treatment. and Refusing to inform Plaintiff who canceled his appointment. Conspiring to hide fellow employees violation of Plaintiff above mentioned constitutional Rights.

1. Defendant John or Jane Doe# 6 is emPloyed at Sierra ConseRVAtion Center state Prison-(scc)5150 O'Byrnes Ferry Rd Jamestown, Ca. 95327. at all times mentioned here in was employed at (scc) Doe#6 official Position & capacities are unknown to me. an individual sued in Doe #6 official & individual capacities. Plaintiff alleges Doe# 6 violated his 8th amendment Right & title 42 U.S.C. section 12102 Provisions of title II of americans with disabilities act. manifested by the intentional denial, delay or interference with Plaintiff medical care by Purposefully ignoring & failing to respone to Plaintiff Pain or medical needs. at all times mentioned here in Doe#6 acted under color of law while committing the deprivations alleged.

2. 6-7-07 Doe#6 actions by ignoring, delaying, or other wise interferring with the order or Recommendations of a doctor or surgeon, inflicted Pain on Plaintiff without Jusification on Plaintiff. Doe#6 over ruled a doctor's medical Judgement regarding treatment, overriding of medical decisions by security staff, disregarded a surgeons Recommendation on non-medical grounds, caused Plaintiff needless Pain & suffering when readily available relief was at hand in the form of epidural steroid shots canceled by Doe#6 6-7-07 violated my above mentioned constitutional Rights. Currently Plaintiff is housed at centinela state Prison were after Receiving a magnetic Resonance Imaging (mri) of his Lumbar spine a neurological surgeon has Recommended after over 4 years of Tremendously excruciating Pain that Plaintiff Receive a massive surgery on his Lumbar spine. see exhibit oo 1 of 7 Doe# 6 actions caused the unnecessary & wanton infliction of Pain on Plaintiff totally without Penological Justification.

See Exhibit Blue for appeal of Doe #6 behavior

1. Defendant Jack St. Clair is employed at Sierra Conservation Center State Prison 5150 O'Byrnes Ferry Rd Jamestown Ca. 95327. at all times mentioned here in was employed as a chief medical officer at Sierra Conservation Center-(SCC) St. Clair is an individual sued in his or her official + individual capacities.

2. Plaintiff alleges St. Clair violated his 8th amendment Right + title 42. U.S.C. Section 12102 Provisions of title II of the americans with disabilities act. manifested by the intentional denial, delay or interference with Plaintiff medical care by Purposefully ignoring + failing to respone to Plaintiff Pain or medical needs. at all times mentioned here in St. Clair acted under color of law while committing deprivations alleged.

3. St. Clair according to Exhibit Bb as chief medical officer is and was responsible for all Plaintiff health care services while housed at (SCC) as such St. Clair had to be the one who lifted Plaintiff medical hold in Exhibit Blue 10 of 13 or involved in the lifting of Plaintiff medical hold.

4. St. Clair Knew a doctor had made a order or recommendation that he + Prison officials eithor ignored, delayed, or other wise interfered with the order or Recommendation. St. Clair inflicted Pain without Justification on Plaintiff that he Knew entailed a substantial risk of serious harm to Plaintiff. St. Clair Knew Prison officials may not overrule a doctor's medical Judgement regarding treatment or should of Known.

5. St. Clair Knew or should of Known overriding of medical decisions by security staff was his Job to stop. St. Clair Knew or should of Known Prison officals disregarding a surgeons Recommendation on Non-medical grounds would cause Plaintiff needless Pain and suffering when readily available relief was at hand in the form of epidural steroid shots was also his Job to stop 6-7-07 See Exhibit Blue for Plaintiff appeal of these events. See Exhibits R+V + 300 + 301

6. Currently Plaintiff is housed at Centinela State Prison, P.O. Box 731 Imperial, Ca. 92251 were after Receiving a magnetic Resonance Imaging-(mri) of his Lumbar spine a neurological surgery has Recommended after over 4 years of Tremendously excruciating Pain that Plaintiff Receive a massive surgery on his Lumbar spine see exhibit OO Page 1 of 7. St. Clair actions or inaction Caused The unnecessary + wanton infliction of Pain on Plaintiff totally without Penological Justification.

1. Defendant John or Jane Doe #1 is employed at sierra conservation center state Prison-(scc) 5150 O'Byrnes Ferry Rd Jamestown, Ca. 95327. at all times mentioned here in was employed as chief deputy warden at (scc). Doe #1 an[redacted] individual sued in his or her official + individual capacities. Plaintiff alleges Doe #1 violated his 8th amendment Right + title 42. U.S.C. Section 12102 Provisions of title II of the americans with disabilities act. manifested by the intentional denial, delay or interference with Plaintiff medical care by Purposefully ignoring + failing to respone to Plaintiff Pain or medical needs. at all times mentioned here in Doe #1 acted under color of law while committing the deprivations alleged.

2. as chief deputy warden Doe #1 is second in charge of inmate health + safty at (scc) Doe #1 is one of the head Policy makers + incharge of establishing Procedures + Rules Reguarding Plaintiff health + safty should of knew or had Policy in Place for him or her to know of any last minute cancelations of inmate specialty clinics which would relieve Painful suffering of inmates. as chief deputy warden Doe #1 should of had Policy or Procedures in Place that let [redacted] subordinates know that either ignoring, delaying, or other wise interferring with the order or Recommendations of a doctor or surgeon were against inmate 8th amendment Right. what would inflict Pain on Plaintiff without Justification on Plaintiff + entailed a substantial risk of serious harm to Plaintiff. See Exhibits R + V + 300 + 301

3. Doe #1 Policy or Procedures also should of stated Prison officials may not overrule a doctors medical Judgement regarding treatment. because overriding of medical decisions by security staff was a violation of Prisoner's 8th amendment Right as well as Prison officials disregarding a surgeons Recommendation on non-medical grounds would cause Plaintiff Needless Pain + suffering when readily available relief was at hand in the form of epidural steriod shots 6-7-07 which was canceled by Doe #1 or his subordinates. See Exhibit Bleie for Plaintiff appeal of these events.

4. Currently Plaintiff is housed at centinela state Prison, P.O. Box 731 Imperial, Ca. 92251 were after Receiving a magnetic Resonance Imaging-(mri) of his Lumbar Spine a neurological surgeon has Recommended after over 4 years of Tremendously excruciating Pain that Plaintiff Receive a massive surgery on his Lumbar Spine See Exhibit OO 1 of 7. Doe #1 actions or inactions caused the unnecessary + wanton infliction of Pain on Plaintiff totally without Penological Justification.

1. Defendant clay is employed at sierra conservation center state Prison 5150 O'Byrnes ferry Rd Jamestown ca. 95327. at all times mentioned here in was employed as warden at Sierra conservation center. Clay is an individual sued in his official + individual capacities. Plaintiff alleges clay violated his 8th amendment Right + title 42. U.S.C. Section 12102 provisions of title II of the americans with disabilities act. manifested by the intentional denial, delay or interference with plaintiff medical care by purposefully ignoring + failing to respone to Plaintiff pain or medical needs. at all times mentioned here in clay acted under color of law while committing the depriuations alleged.

1. as warden clay is the head caretaker at sierra conservation center of Plaintiff health + safety. clay is the head Policy maker + incharge of establishing Procedures + Rules Reguarding Plaintiff health + safety Should of Knew or had Policy in Place for him to Know of any last minute cancelations of inmate Specialty clinics which would relieve painful suffering of inmates.

3. as warden clay Should of had Policy or Procedures in Place that let his Subordinates Know that either ignoring, delaying, or other wise interferring with the order or Recommendations of a doctor or surgeon were against Plaintiff 8th amendment Right. what would inflict pain on Plaintiff without Justification on Plaintiff and entailed a substantial risk of serious harm to Plaintiff.

4. Clay's Policy or Procedures also should of Stated Prison officials may not overrule a doctor's medical Judgement regarding treatment, because overriding of medical decisions by security staff was a violation of Prisoner's 8th amendment Right as well as Prison officials disregarding a Surgeons Recommendation on non-medical grounds would cause Plaintiff needless pain + suffering when readily available relief was at hand in the form of epidural Steroid shots 6-7-07 which was canceled by clay or his subordinates. See Exhibit Blue for Plaintiff appeal of these events. See Exhibits 300 + 301 + R + V

5. Currently Plaintiff is housed at centinela state Prison, P.O. Box 731 Imperial, ca. 92251 were after Receiving a magnetic Resonance Imaging (mri) of his Lumbar spine a neurological surgeon has Recommended after over 4 years of Tremendously excruciating pain that Plaintiff Receive a massive Surgery on his Lumbar spine See Exhibit OO 1 of 7. Clay actions or inactions caused the unnecessary + wanton infliction of pain on Plaintiff totally without Penological Justification.

See Exhibit 213 for further Responsiblities clay had towards Plaintiff

1. Defendant John Doe#7, is employed as Director of the department of corrections & Rehabilitations of California at 1515 S street #351 Sacramento, Ca. 95814 at all times mentioned here in was employed as Director of corrections & Rehabilititions of the state of ca. an individual sued in Doe#7 official & individual capacities. Plantiff alleges Doe#7 violated his 8th amendment Right & title 42. U.S.C. Section 12102 Provisions of Title II of the americans with disabilities act manifested by intentional denial, delay or interference with Plaintiff medical care by Purposefully ignoring & failing to respone to Plaintiff Pain or medical needs. at all times mentioned here in Doe#7 as director acted under color of law while committing the deprivations alleged.

2. From may-13-04 to 68-08 [redacted] Doe#7 has failed to remedy the deprivation to bring the delivery of medical care to Prisoners up to constitutional standards. aggravated by the limited alternatives imposed by over crowding which are now assuming a size, Scope & frequency that will clearly extend the time frames & cost of the receivership & may render adequate medical care impossible, especially for Patients like Plaintiff who require longer term chronic care, with Prisons mission changes, Yard flips & Prison-to-Prison transfers.

3. underscore the Receivers's expressed concerns that overcrowding Presents Serious Problems Not only because of the substantive ways in which it interferes with delivery of medical care. also because the amount of time & attention the Receiver must devote to dealing with crowding-related issues. It is clear that the crowded conditions of california's Prisons, which are now Packed well beyond their intended capacity, are having and in the absence of any intervening remedial action, will continue to have a Serious impact on the Receiver Thelton E. Henderson, Judge of the united states district court ability to complete the Job for which he was appointed; namely to eliminate the unconstitutional condition Surrounding delivery of inmate medical health care. crowding is the Primary cause of Plaintiff 18 U.S.C. 3626(a)(3)(E) federal rights violation. See Exhibits "U" R & V

4. the courts have given Doe#7 & his Subordinates every reasonable opportunity to bring its prison medical System up to constitutional standards & it is beyond reasonable dispute that the State & Doe#7 & his Subordinates have failed. See Exhibit H for Doe#7 & his Subordinates many failures similarly, the court explained that it "has attempted to move the defendants in this action toward meeting constitutional standards by issuing a series of court orders with detailed objectives & measures. unfortunately, the defendants have repeatedly delayed their Progress & ultimately failed to achieve even a semblance of compliance with a June 13, 2002 Stipulated order for injunctive relief or the 9-17-04 stipulated order regarding the quality of Patient care. Thus, Not only is it clear the court has Previously entered orders for less intrusive relief; it is equally clear that the defendants have

had a reasonable amount of time to comply with the June 2002 + Sept.04 orders 18 U.S.C. § 362 (a)(3)(A)(ii)".

5. It is beyond reason that a willing + competent institution would not beable to show over a period of several years + with the court virtually screaming at every step of the way asking for significant improvements in the hiring of medical personnel, the furnishing of adequate medical facilities, + the development of thoughtful + comprehensive plans for managing the delivery of medical health care. Yet that is precisely what has happened in this case + it is why the appointment of the Receiver ultimately became necessary; as Director Doe#7 is the or one of the chief care takers of plaintiff health [redacted] while housed in (CDCR), responsible for ensuring that all services in (CDCR) are properly provided. Doe#7 knew about the inadequacy of the medical care system, which denied plaintiff (CDCR) seriously needed doctor ordered treatment. as one of the or head policy makers of (CDCR) is both directly + indirectly responsible for policies + practices that are unconstitutional such as denying plaintiff by reason of his disability, excluding plaintiff from participation in the benefits of the services, programs, or activities of the department, subjecting plaintiff to wrongful discrimination per Exhibit 200 is Title 15 3085. americans with disabilities act. See Exhibits 300 + 301

6. John Doe#7 subordinates that ignored delayed, or other wise interferred with doctor or surgeon orders + recommendations denying plaintiff epidural steroid shots 6-7-07 with no reason that limited penological concerns was upheld all the way up the (CDCR) chain of command even at the director's level of appeal see Exhibit Blue. Doe#7 subordinates actions [redacted] by ingoring, denying, or other wise interfering [redacted] with the order or recommendations of a doctor or surgeon, inflicted pain on plaintiff without justification Doe#7 subordinates overruled a doctor's medical judgement regarding treatment, over rode medical decisions by security staff, dis-regarded a surgeons recommedations on non medical grounds, caused plaintiff needless pain + suffering when readily available releif was at hand in the form of epidural steroid shots 6-7-07 violated my above mentioned constitutional rights. Currently plaintiff is housed at Centinela State Prison were after receiving a magnetic resonance imaging (mri) of his lumbar spine a neurological surgeon has recommended after over 4 years of tremendously excruciating pain that plaintiff receive a massive surgery on his lumbar spine see Exhibit 00 1of7 Doe#7 subordinates actions caused the unnecessary + wanton infliction of pain on plaintiff totally without penological justification.

1. Defendant James Tilton is employed as Secretary for the Youth & adult Correctional agency at 1100 11th street, Suite 400 Sacramento, Ca 95814. at all times mentioned here in was employed as Secretary for the Youth & adult correctional agency of the state of california. an individual sued in his official & individual capacities. Plaintiff alleges Tilton violated his 8th amendment Right & title 42.U.S.C. Section 12102 Provisions of title II of the americans with disabilities act manifested by intentional denial, delay or interference with Plaintiff's medical care by Purposefully ignoring & failing to respone to Plaintiff Pain or medical needs. at all times mentioned here in Tilton acted under color of law while committing the deprivations alleged.

2. From may-13-04 to 6-8-08 Tilton has failed to remedy the deprivation to bring the delivery of medical care to Prisoners up to constitutional Standards. aggravated by the limited alternatives imposed by over crowding which are now assuming Size, Scope & frequency that will clearly extend the time frames & cost of the receiver ship & may render adequate medical care impossible, especially for Patients like Plaintiff who require longer term chronic care, with Prisons mission changes, Yard flips & Prison-to-Prison transfers. under score the Receiver's expressed concerns that over crowding Presents Serious Problems not only because of the Substantive ways in which it interferes with delivery of medical care. also because the amount of time & attention the receiver must devote to dealing with crowding related issues. See Exhibits "R" & "V" Exhibit 300 & 301

3. It is clear that the crowded conditions of california's Prisons, which are now Packed well beyond their intended capacity, are having & in the absence of any intervening remedial action, will continue to have a serious impact on the Receiver Thelton E. Henderson, Judge of the united states district court ability to complete the Job for which he was appointed; namely to eliminate the unconstitutional condition surrounding delivery of inmate medical health care. crowding is the Primary cause of Plaintiff 18 U.S.C. 3626(a)(3)(E) federal rights violation. the courts have given tilton & his subordinates every reasonable opportunity to bring its Prison medical system up to constitutional standards & it is beyond reasonable dispute that the state & Tilton & his Subordinates have failed. See Exhibit H for Tilton & his Subordinates many failures Similarly, the court explained that it has attempted to move the defendants in this action toward meeting constitutional standards by issuing a Series of court orders with detailed objectives & measures. unfortunately, the defendants have repeatedly delayed their Progress & ultimately failed to achieve even a semblance of compliance with a 6-13-02 stipulated order for injuctive relief or the 9-17-04 stipulated order regarding the quality of Patient care. Thus, not only is it clear the court has Previously entered orders for less intrusive relief; it is equally clear that the defendants have

had a reasonable amount of time to comply with the June 2002 & sept-04 orders 18 U.S.C. 3626(a)(3)(A)(i)."

4. It is beyond reason that a willing & competent institution would not beable to show over a Period of several years & with the court virtually screaming at every step of the way asking for significant improvements in the hiring of medical Personnel, the furnishing of adequate medical facilities, & the development of Thoughtful & comprehensive Plans for managing the delivery of medical health care. Yet that is Precisely what has happened in this case & it is why the appointment of the Receiver ultimately became necessary. Tilton is the or one of the chief care takers of Plaintiff health & safety while housed in (CDCR) Tilton is responsible for ensuring that all services in (CDCR) are Properly Provided. Tilton knew about the inadequacy of the medical care system. which denied Plaintiff (CDCR) Seriously needed doctor ordered treatment. as one of the or head Policy makers of (CDCR) is both directly & indirectly responsible for Policies & Practices that are unconstitutional such as denying Plaintiff by reason of his disability, excluding Plaintiff from Participation in the benefits of the services, Programs, or activities of the department, subjecting Plaintiff to wrongful discrimination Per Exhibit 200 is title 15 3085. americans with disabilities act.

5. Tilton Subordinates that ignored delayed, or other wise interferred with doctor or surgeon orders & Recommendations denying Plaintiff epidural steroid shots 6-7-07 with no Reason that limited Penological concern was up held all the way up the (CDCR) chain of command even at the director's level of appeal see Exhibit Blue. Tilton Subordinates actions by ingoring, denying, or other wise interferring with the order or Recommendations of a doctor or surgeon, inflicted Pain on Plaintiff without Justification Tilton Subordinates overruled a doctor's medical Judgement regarding treatment, overrode medical decisions by Security Staff, disregarded a surgeons Recommedations on non medical grounds, caused Plaintiff needless Pain & suffering when readily available relief was at hand in the form of epidural steroid shots 6-7-07 violated my above mentioned constitutional Rights. Currently Plaintiff is housed at Centinela state Prison were after over 4 years of Tremendously excruciating Pain a doctor or surgeon has Recommended that Plaintiff Receive a a massive surgery on his lumbar spine see Exhibit 00 1 of 7 Tilton Subordinates actions caused the unnecessary & wanton infliction of Pain on Plaintiff totally without Penological Justification.

1. Defendant arnold [redacted] Schwarzenegger, is employed as C.E.O., Governor of the incorporate state of california at Governor's office state capitol, 1st floor Sacramento, Ca. 95814. at all times mentioned here in was employed as Governor of the state of california. an individual sued in his or her official & individual capacities. Plaintiff alleges Schwarzenegger violated his 8th amendment Right & title 42. U.S.C. Section 12102 Provisions of title II of the americans with disabilities act. manifested by intential denial, delay or interference with Plaintiff's medical care by Purposefully ignoring & failing to respone to Plaintiff Pain or medical needs. at all times mentioned here in Schwarzenegger as Governor acted under color of law while committing the deprivations alleged.

2. from may-13-04 to 6-8-08 Schwarzenegger as Governor has failed to remedy the deprivation to bring the delivery of medical care to Prisoners up to constitutional standards. aggravated by the limited alternatives imposed by over crowding which are now assuming size, Scope & frequency that will clearly extend the time frames & cost of the receiver ship & may render adequate medical care impossible, especially for Patients like Plaintiff who require longer term chronic care, with Prisons mission changes, Yard flips & Prison-to Prison transfers. under score the Receiver's expressed concerns that over crowding Presents serious Problems not only-because of the substantive ways in which it interferes with delivery of medical care. also because the amount of time & attention the receiver must devote to dealing with crowding-related issues. See Exhibits "R" & V See Exhibits 300 & 301

3. It is clear that the crowded conditions of california's Prisons, which are now Packed well beyond their intended capacity, are having & in the absence of any intervening remedial action, will continue to have a serious impact on the Receiver Thelton E. Henderson, Judge of the united states district court ability to complete the Job for which he was appointed; namely to eliminate the unconstitutional condition surrounding delivery of inmate medical health care. Crowding is the Primary cause of Plaintiff 18 U.S.C. 3626 (a)(3)(E) federal rights violation. the courts have given Schwarzenegger & his subordinates every reasonable opportunity to bring its Prison medical system up to constitutional standards & it is beyond reasonable dispute that the State & Schwarzenegger & his subordinates have failed. See Exhibit U for Schwarzenegger & his subordinates many failures similarly, the court explained that it has attempted to move the defendants in this action toward meeting constitutional standards by issuing a series of court orders with detailed objectives & measures. Unfortunately, the defendants have repeatedly delayed their Progress & ultimately failed to achieve even a semblance of compliance with a June 13, 2002 stipulated order for injuctive relief or the 9-17-04 Stipulated order regarding the quality of Patient care. Thus, not only is it clear the court has Previously entered orders for less intrusive relief; it is equally clear that the defendants have

had a reasonable amount of time to comply with the June 2002 & sept. 04 orders 18 U.S.C. 362 (a)(3)(A)(ii)."

4. It is beyond reason that a willing & competent institution would not beable to show over a Period of Several years & with the Court virtually Screaming at every step of the way asking for significant improvements in the hiring of medical Personnel, the Furnishing of adequate medical facilities, & the development of thoughtful & comprehensive Plans for managing the delivery of medical health care. Yet that is Precisely what has happened in this case & it is why the appointment of the Receiver ultimately became necessary. as Govenor Schwarzenegger is the or one of the chief care takers of Plaintiff health & safety while housed in (CDCR). Schwarzenegger is responsible for ensuring that all services in (CDCR) are Properly Provided. Schwarzenegger Knew about the inadequacy of the medical care system, which denied Plaintiff (CDCR) Seriously needed doctor ordered treatment. as one of the or head Policy makers of (CDCR) is both directly & indirectly responsible for Policies & Practices that are unconstitutional such as denying Plaintiff by reason of his disability, excluding Plaintiff from Participation in the benefits of the Services, Programs, or activities of the department, Subjecting Plaintiff to wrongful discrimination Per Exhibit 200 is title 15 3085. americans with disabilities act.

5. Schwarzenegger Subordinates that ignored delayed, or other wise interferred with doctor or surgeon orders & Recommendations denying Plaintiff epidural steroid shots 6-7-07 with no Reason that limited Penological concerns was up held all the way up the (CDCR) chain of command even at the director's level of appeal see Exhibit Blue. Schwarzenegger Subordinates actions by ingoring, denying, or other wise interferring with the order or Recommendations of a doctor or surgeon, inflicted pain on Plaintiff without Justification Schwarzenegger Subordinates overruled a doctor's medical Judgement regarding treatment, overrode medical decisions by Security staff, disregarded a surgeons Recommedations on non medical grounds, caused Plaintiff needless pain & suffering when readily available relief was at hand in the form of epidural steroid shots 6-7-07 violated my above mentioned constitutional Rights. currently Plaintiff is housed at Centinela State Prison were after over 4 years of Tremendously excruciating pain that [redacted] a Surgeon Recommended Plaintiff Receive a massive surgery on his lumbar spine see Exhibit 00 1 of 7 [redacted] Schwarzenegger Subordinates actions caused the unnecessary & wanton infliction of pain on Plaintiff totally without Penological Justification.

Exhibit-Blue

Exhibit Blue 1 of 13

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS AND REHABILITATION
INMATE APPEALS BRANCH
P. O. BOX 942883
SACRAMENTO, CA 94283-0001

# DIRECTOR'S LEVEL APPEAL DECISION

Date: MAY 2 _ 2008

In re: Ester Burnett, V35245
Centinela State Prison
P.O. Box 731
Imperial, CA 92251-0731

IAB Case No.: 0717295 Local Log No.: SCC-07-01132

(1) This matter was reviewed on behalf of the Director of the California Department of Corrections and Rehabilitation (CDCR) by Appeals Examiner D. L. Porter, Facility Captain. All submitted documentation and supporting arguments of the parties have been considered.

(2) I **APPELLANT'S ARGUMENT:** It is the appellant's position that he has not received adequate medical care at the Sierra Conservation Camp (SCC). The appellant states that on June 6, 2007, he was told that he would be going out to a specialty clinic for epidural shots for his lower back. The appellant indicates that on June 7, 2007, he was told that his "specialty clinic was cancelled due to classification for conversion of the SCC III to a Sensitive Needs Yard (SNY) program." The appellant complains that his pain was 8.5 on a scale of one to ten, and he could have gone to classification at any time. The appellant contends that the cancellation of his medical treatment was unnecessary. The appellant requests on appeal to be sent to a "specialty clinic to have epidural steroid shots completed at once." The appellant added a request to be given the names of the person who cancelled his appointment on June 7, 2007.

(3) II **SECOND LEVEL'S DECISION:** The reviewer found that a comprehensive and thorough review of the appellant's appeal was conducted. The institution states that on October 10, 2007, the appellant was interviewed by P. Bolles, Health Care Appeals Coordinator (HCAC), at the First Level of Review (FLR) regarding his appeal issue(s). This interview was conducted via telephone with the assistance of Correctional Counselor I (CC-I) Takara at the California State Prison, Centinela (CEN), where the appellant is presently housed.

(4) A review of the appellant's Unit Health Record (UHR) indicates the following: On March 30, 2007, the Specialty Clinic scheduler at the SCC requested an appointment from the Doctors Hospital of Manteca (DHM) for the appellant to have an epidural injection at the Pain Management Clinic.

(5) On June 7, 2007, the appellant had an appointment to have an epidural injection at DHM. The Specialty Clinic log at the SCC indicated "corrections cancelled appointment due to dorm lockdown; will reschedule." On June 26, 2007, the appellant was transferred from the SCC to CEN before the DHM provided SCC with a rescheduled date for his epidural injection.

(6) On August 2, 2007, the appellant's primary care provider (PCP) at CEN evaluated him and wrote orders for the appellant to have Neurontin, 600 milligrams, three times a day for four months; Naproxen, 500 milligrams, two times a day, as needed for four months; and Tylenol, three times a day, as needed for back pain for six weeks. The PCP also requested that laboratory tests be obtained and scheduled the appellant for a follow-up appointment in one month. In addition, the PCP issued CDC Forms 128-C, Medical Chrono, requesting that the appellant be housed in a lower bunk and lower tier with an extra mattress. A chrono outlining the appellant's work restrictions was also issued. The PCP submitted CDC Form 7243, Health Care Services Physician Request for Services, to the Medical Authorization Review (MAR) committee requesting approval for the appellant to have a physical therapy consultation and a consultation with a neurosurgeon for consideration of an epidural injection. On August 17, 2007, the MAR committee at CEN approved the CDC 7243 for the appellant to have neurosurgery consultation and a physical therapy consultation. On August 24, 2007, P. Bolles, HCAC, contacted the HCAC at CEN to obtain information from the appellant's UHR.

On October 10, 2007, P. Bolles, HCAC at SCC interviewed the appellant via telephone at CEN regarding his appeal issue(s). The appellant stated to Ms. Bolles that his appointment for the epidural injection through SCC had been cancelled the day of the appointment and his condition had not gotten any better in the interim. The appellant also stated that he had recently been released from the infirmary at CEN, he could not walk on his right leg, and he needed crutches in order to walk. The appellant indicated to Ms. Bolles that he had seen the physical therapist at CEN and he was scheduled to see the physical therapist again on October 11, 1007. According to the appellant's statement, the physical therapist told him that physical therapy would probably not help his pain. The appellant also stated that the physicians at CEN had told him that he needed surgery on his back. In addition, the appellant stated that he was scheduled to see the neurosurgeon. Ms. Bolles explained to the appellant that the medical staff at SCC had been made aware that his appointment of June 7, 2007, had been cancelled, but the injection could not be rescheduled prior to his transfer to CEN on June 26, 2007, due to the unavailability of an appointment at the Pain Management Clinic at the DHM.

On November 30, 2007, Dr. St. Clair, Chief Medical Officer (CMO,) at the SCC reviewed the appellant's appeal issue(s). Based on information received from the Medical Department at CEN, Dr. St. Clair noted that the appellant saw Dr. Collinsworth on August 2, 2007, and the physician requested that the appellant see a neurosurgeon for a consultation and consideration of an epidural injection. In addition, Dr. St. Clair noted that the appellant saw Dr. Calvin, a neurosurgeon, on November 8, 2007. Dr. Calvin recommended a new lumbosacral spine Magnetic Resonance Imaging (MRI) be obtained and requested that the appellant have a follow-up appointment following the MRI. The MRI was completed on November 27, 2007, and the results were pending at the time of Dr. St. Clair's review of the appeal. Dr. St. Clair noted that the appellant had continued to receive physical therapy, with treatments on November 3, 2007; November 17, 2007; and November 24, 2007.

The institution takes the position that the appellant's request for "specialty clinic to have epidural steroid shots completed at once," is partially granted. According to documentation in the appellant's UHR, Dr. Collingsworth at CEN, requested that the appellant see a neurosurgeon for consideration of an epidural injection. Dr. Calvin, neurosurgeon evaluated the appellant on November 8, 2007, and requested that further studies be obtained. The appellant was informed that his further medical treatment will be determined at CEN based on his physician's evaluation, diagnosis, recommended treatment plan, and departmental policy.

The institution notes that during the interview at the FLR, the appellant added new issues that were not on the original appeal submitted at the Informal Level dated June 7, 2007. The institution maintains that the appellant's issues were addressed appropriately in accordance with California Code of Regulations (CCR), Title 15, Section 3084. The appellant was informed that he may submit a new appeal on the additional issues added at the FLR. The appeal was granted in part at the Second Level of Review (SLR).

III DIRECTOR'S LEVEL DECISION: Appeal is denied.

A. FINDINGS: The Director's Level Review (DLR) reviewed the issues of the appellant's appeal and reaffirms the institution's examination and conclusions as addressed within the SLR. It is important to note that inmates may not demand a particular medication, diagnostic evaluation, or course of treatment.

In this case, the institution has established that clinicians are attentive to the appellant's medical needs and have pursued a reasonable evaluative course to determine the medical needs of the appellant. CCR 3354 establishes that only qualified medical personnel shall be permitted to diagnose illness and prescribe medical treatment for inmates. It is not appropriate for the appellant to self-diagnose his medical problems and then expect a physician to implement the appellant's recommendation for a course of medical treatment. In this particular matter, the appellant's contention that he has not received adequate medical care is refuted by the medical records and professional staff familiar with the appellant's medical history.

B. BASIS FOR THE DECISION:
CCR: 3350, 3350.1, 3354

C. ORDER: No changes or modifications are required by the institution.

3 of 13



This decision exhausts the administrative remedy available to the appellant within CDCR.

N. GRANNIS, Chief
Inmate Appeals Branch

cc: Warden, CEN
Health Care Manager, CEN
Appeals Coordinator, CEN
Medical Appeals Analyst, CEN
Appeals Coordinator, SCC
Medical Appeals Analyst, SCC

STATE OF CALIFORNIA

NOV - 1 2007 2ND
AUG 2 8 2007 1ST
JUL 2 3 2007

JUL 1 2007

DEPARTMENT OF CORRECTIONS

**INMATE/PAROLEE APPEAL FORM**
CDC 602 (12/87)

Location: Institution/Parole Region 1. SCC 2.

Log No. 1. 07-01132 2.

Category VIII

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME | NUMBER | ASSIGNMENT | UNIT/ROOM NUMBER |
|---|---|---|---|
| Burnett | V35245 | | ~~5T 114L~~ |

A. Describe Problem: 6-6-07 I was told at around 8:45 P.m that 6-7-07 I would be going out to a speciality for epidural shots for my lower back due to the acute pain in my lower back. I was told not to eat any thing past 12:00 Pm. but at 8:30am on 6-7-07 i was told my speciality clinic was canceled due to classification for the conversion of SCC III to SNY Program. I have been in nonstop pain for almost 3 years your canceling of my seriously needed medical treatment was uncalled for and cruel sadistc and malicious. i could of went to classification any time but you chose to over ride my serious medical need for something that could never over ride my serious medical needs on a scale of one to 10 my pain is a 8½ during classification I brought the canceling of my speciality clinic to associate warden m. sullivan he and the commettie blew it off as if it was nonthing

If you need more space, attach one additional sheet.

RECEIVED DEC 7 2007 INMATE APPEALS BRANCH

B. Action Requested: Speciality clinic for epidural steriod shots completed at once

Inmate/Parolee Signature: Eaton Burnett Date Submitted: 6-7-07

C. INFORMAL LEVEL (Date Received: JUN 1 8 2007)

Staff Response: Denied. Due to your transfer to Centinela State Prison on 6/26/07, there is insufficient time to schedule another specialty clinic appointment for your epidural injection. You are advised to submit a CDC 7362 Health Care Services Request Form to the Medical Department at Centinela to request a sick call appointment and follow up on this procedure.

Staff Signature: P Belles, SSA Date Returned to Inmate: JUN 2 9 2007

D. FORMAL LEVEL

If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

a doctor or surgeon Recommended the epidural injection because it was a serious need in helping my acute back pain the appointment was set and then canceled. it appears your staff canceled for no security or medical reason weather it was custody or medical who canceled I don't know but I do know that Sierra conservation center canceled my seriously need medical treatment which violates my consitutional Rights to me treatment additional sheet

Signature: Eaton Burnett Date Submitted: 7-7-07

Note: Property/Funds appeals must be accompanied by a completed Board of Control form BC-1E, Inmate Claim

CDC Appeal Number:

59.

First Level ☐ Granted ☒ P. Granted ☐ Denied ☐ Other

E. REVIEWER'S ACTION (Complete within 15 working days): Date assigned: AUG 28 2007 Due Date: OCT 11 2007

Interviewed by:

SEE ATTACHED

Staff Signature: P. Bolles SSA Title: SSA Date Completed: OCT 11 2007

Division Head Approved: Returned

Signature: [signature] Title: CDW Date to Inmate: OCT 11 2007

F. If dissatisfied, explain reasons for requesting a Second-Level Review, and submit to Institution or Parole Region Appeals Coordinator within 15 days of receipt of response. ON 6-7-07 the lock down You are speaking of due to Building 5 being Locked down so the classification committee could Reclassifie the whole building for the Purposes of conversion to SNY Program. So the whole reason my appointment was canceled was so you could classife me to leave SCC III NON adversly The Problem with that is a week before I signed a waiver so I wouldn't have to go to classification I waived my Right to appear during classification so why would I need to be in classification you sent most of the People to Prisons they didn't want to go to so my presence wasn't needed at committee. Then you say because correction cancelled my appointment due to dorm Lock down Problem with that is after committee I went to the yard for the Purpose of getting my noon see attached sheet labled Exhibit B

Signature: Eston Burnett Date Submitted: 7-24-07

Second Level ☐ Granted ☒ P. Granted ☐ Denied ☐ Other

G. REVIEWER'S ACTION (Complete within 10 working days): Date assigned: NOV 01 2007 Due Date: 12-04-07

☒ See Attached Letter

Signature: [signature] Date Completed: DEC - 3 2007

Warden/Superintendent Signature: Date Returned to Inmate: DEC 03 2007

H. If dissatisfied, add data or reasons for requesting a Director's Level Review, and submit by mail to the third level within 15 days of receipt of response.

Your failure to give me doctor ordered treatment has led to my back growing extremely worst now instead of epidural steroid shots I need a operation that is because of your failure to give me treatment that had helped me in the past even your medical hold states I was not eligible for transfer or endorsements to another CDCR institution till the epidural shots were completed but the medical hold was lifted and it could only be lifted by medical so the medical chief officer had to of lifted the hold you had time to complete my treatment but chose not to and sent me to another institution were I grew worst till I have been in unnessary pain due to your failwer to treat my condition.

Signature: Eston Burnett Date Submitted: 12-13-07

For the Director's Review, submit all documents to: Director of Corrections
P.O. Box 942883
Sacramento, CA 94283-0001
Attn: Chief, Inmate Appeals

DIRECTOR'S ACTION: ☐ Granted ☐ P. Granted ☒ Denied ☐ Other

☒ See Attached Letter

Date: MAY 2 - 2008

CDC 602 (12/87)

Then 6-26-07 I was Transfered to Centinela state Prison I was given NO medication for my back. I was Just Placed ON a bus it took 2 days to arrive at cenIII. my back was spasmed and cramped the whole Ride I ask For Pain meds. before I left and medical and correctional both Deined me my Pain medication.

Contents of appeal 6 pages
602 of screen out Dated JUL-23-2007
Screen out
appeal and extra page
envelope I used to mail appeal to Sccill from cen
envelope Sccill used to mail appeal back to me from Sccill to Cen

Were are these to Pages of my appeal
10-24-07
Eston Burnett
there were 6 pages minus your frist level Response
So 2 pages are missing

[redacted]60.

Exhibit-B 6 of 13

Pain meds and every building was having rec. yard there was no Emergency that led to the canceling of [redacted] my appointment due to you or corrections canceling my appointment for non Emergency Reasons my medical condition grew so Bad 10-3-07 I was admitted to CSP Correctional Treatment Center for Pain management 10-3-07 I cannot walk without cruches my pain level stays at a 8 out of 10 most of the day Rising to a 10 out of 10 at night. I sleep 1 hour a night. So if corrections canceled my appointment who lifted the medical hold that was placed on me 4-05-07 through 8-4-07 Please look at Exhibit "A" while I was at SCC III I was given several copies of it the wording is very specific. You had to lift the medical hold for me to leave sence your medical chrono Exhibit-A states this inmate "is not eligible for transfers/Endorsements to another CDCR institution. that medical hold was good until 8-4-07 approved by the chief medical officer Jack St. Clair, M.D. I was approved for the treatment 4-05-2007 my appointment was for 6-7-07 the medical hold was good [redacted] until 8-4-07, so you had plenty of time to reschedule my appointment within the medical hold time it only took you 2 months after it was approved to set the appointment. I went to classification 6-7-07 the day of my appointment so you had 2 months to reschedule after you say correctional canceled it but you chose to remove my medical hold for so my seriously need medical treatment ordered by a Physician and approved by the chief medical officer according to Exhibit-A. So who lifted my medical hold? Correctional or the chief medical officer?? I still don't really know who canceled my appeal because of the decit and trickery CDC staff.

Medical sent me another 128C dated 5-29-07 stating I'll quote it word for word "in Preparation for an upcoming medical Procedure, Your Physician would like you to stop any of these medications starting on sunday 6-1-07 You may resume these medications after your procedure is complete unless you are told differently by an MD.

1) do not take aspirin. Ibuprophen (motrin). Naprosyn, or any other anti-inflammatories. it is okay to take acetaminophen (Tylenol).

2) Do not take iron pills" end quote. Signed and approved by Jact St clair, M.D. CMO.

Then you screened out my appeal stating you are attempting to change your original appeal issue which I have never done I have never stated that medical or correctional canceled my appointment I simply said it was canceled your position on our 10-10-07 interview was it was corrections fault not medicals I then said I don't know who's fault it was all I know is it was canceled. in my Describe the Problem section of my appeal I described exactly that and I plan on suing medical and correctional for that once my adm. remedies are exhausted. its not like I can ask for compensation in a appeal. I don't care if it is medical or correctional who answers my appeal all Im doing is whats Required by law and that is exhaust my adm. remedies. because correctional may have canceled my appointment but someone other than correctional lifted my medical hold and sent me to CSP were I became so bad I can't walk without medical devices known as cruches and my pain is horrible every second of the day. there were 6 pages minus your frist level response so 2 pages are missing so your destroying my exhibits now.

State of California | Department of Corrections and Rehabilitation

# Memorandum

Date: December 1, 2007

To: BURNETT, E.
V-35245
CENTINELA STATE PRISON

From: **Sierra Conservation Center, Jamestown, CA 95327**

Subject: SCC APPEAL LOG # SCC-X-07-01132
SECOND LEVEL RESPONSE

**APPEAL DECISION:** Appeal Partially Granted.

1 **APPEAL ISSUE:** Your CDC 602 indicates on June 6, 2007, you were told you would be going out to a specialty clinic for epidural shots for your lower back pain. You indicate on June 7, 2007, you were told your "specialty clinic was cancelled due to classification for the conversion of the SCC III to SNY program." You further indicate your pain was 8.5 on a scale of 1 to 10, you could have gone to classification at any time, and the canceling of your medical treatment was uncalled for.

2 You are requesting "specialty clinic for epidural steroid shots completed at once." At the First Formal Level interview, you added a request that you be given the name of the person who cancelled your appointment on June 7, 2007.

3 **APPEAL RESPONSE:** Mr. Burnett, you were interviewed by P. Bolles, Health Care Appeals Coordinator, on Wednesday, October 10, 2007 for the First Formal Level. This interview was conducted via telephone with the assistance of Correctional Counselor I Takara at Centinela State Prison (CSP). This appeal response is based on the interview, review of the First Formal Level response, review of your health record, and review of CCR Title 15 and DOM. You were interviewed at the First Level of Review and examination of the documents presented indicates that the issues do not need clarification.

4 A review of this matter, including examination of submitted documentation and interviews with staff, was conducted in preparation for a Second Level response.

Rules governing this issue are:

5 *California Code of Regulations (CCR), Title 15, Section 3001. Subject to Regulations.*
*CCR 3084.3. Screening Appeals,*
*CCR 3350. Provision of Medical Care and Definitions.*
*CCR 3350.2. Off-Site Health Care Treatment.*
*CCR 3352. Medical Authorization Review Committee.*
*CCR 3354. Health Care Responsibilities and Limitations.*

6 Review of our records and the available portions of your Unit Health Record (UHR) indicate the following:

7 On March 30, 2007, the Specialty Clinic scheduler at SCC requested an appointment from Doctors Hospital of Manteca (DHM) for you to have an epidural injection at the Pain Management Clinic.

1 On June 7, 2007, you had an appointment to have an epidural injection at DHM. The Specialty Clinic log at SCC indicated "corrections cancelled appointment due to dorm lockdown; will reschedule."

2 On June 26, 2007, you were transferred from SCC to CSP before DHM provided SCC with a rescheduled date for your epidural injection.

3 On August 2, 2007, your Primary Care Provider (PCP) at CSP evaluated you and wrote orders for you to have Neurontin 600 mg three times a day for four months, Naproxen 500 mg two times a day as needed for four months, and Tylenol #3 three times a day as needed for back pain for six weeks. Your PCP also requested that laboratory tests be obtained and scheduled you for a follow-up appointment in one month. In addition, your PCP issued CDC 128-Cs requesting that you be housed in a lower bunk and lower tier and be issued an extra mattress. A chrono outlining your work restrictions was also issued. Your PCP submitted CDC 7243s Physician Request for Services (RFS) to the Medical Authorization Review (MAR) Committee requesting approval for you to have a physical therapy consultation and a consultation with a neurosurgeon for consideration of an epidural injection.

4 On August 17, 2007, the MAR Committee at CSP approved the RFSs for you to have a neurosurgery consultation and a physical therapy consultation.

5 On August 24, 2007, P. Bolles, HCAA, contacted the Health Care Appeals Analyst at CSP to obtain information from your UHR.

6 On October 10, 2007, P. Bolles, HCAA, interviewed you at Centinela State Prison via telephone regarding your appeal issues. You stated to Ms. Bolles your appointment for the epidural injection through SCC had been cancelled the day of the appointment and your condition had not gotten any better in the interim. You also stated you had recently been released from the infirmary at CSP, you could not walk on your right leg, and you needed crutches in order to walk. You indicated to Ms. Bolles you had seen the physical therapist at CSP and you were scheduled to see the physical therapist again on October 11, 2007. According to your statement, the physical therapist told you that physical therapy would probably not help your pain. You also stated the physicians at CSP had told you that you needed surgery on your back. In addition, you stated you were scheduled to see a neurosurgeon. Ms. Bolles explained to you that the medical staff at SCC had been made aware that your appointment of June 7, 2007 had been cancelled, but the injection could not be rescheduled prior to your transfer to CSP on June 26, 2007 due to the unavailability of an appointment at the Pain Management Clinic at DHM.

7 On November 30, 2007, Dr. St. Clair, Chief Medical Officer at Sierra Conservation Center, reviewed your appeal issues. Based on information received from the Medical Department at CSP, Dr. St. Clair noted you saw Dr. Collinsworth on August 2, 2007 and the physician requested that you see a neurosurgeon for a consultation and consideration of an epidural injection. In addition, Dr. St. Clair noted you saw Dr. Calvin, a neurosurgeon, on November 8, 2007. Dr. Calvin recommended a new lumbosacral spine Magnetic Resonance Imaging (MRI) be obtained and requested you have a follow-up appointment following the MRI. The MRI was completed on November 27, 2007 and the results were pending at the time of Dr. St. Clair's review of your appeal. Dr. St. Clair noted you had continued to receive physical therapy, with treatments on November 3, 2007; November 17, 2007; and November 24, 2007.

9 of 13



(1) Your request for "specialty clinic for epidural steroid shots completed at once" is partially granted. According to documentation in your UHR, Dr. Collinsworth, at CSP, requested that you see a neurosurgeon for consideration of an epidural injection. Dr. Calvin, neurosurgeon, evaluated you on November 8, 2007 and requested that further studies be obtained. Your further medical treatment will be determined at CSP based on your physician's evaluation, diagnosis, recommended treatment plan, and departmental policy.

(2) As noted, during the interview at the First Level of Review, you added new issues that were not on the original appeal submitted at the Informal Level dated June 7, 2007. Your issues were addressed appropriately in accordance with CCR 3084. You may submit a new appeal on the additional issues added at the First Formal Level.

(3) Mr. Burnett, a determination has been made at the Second Level of Review that your appeal is partially granted. Thank you for your interest and participation in your health care.

(4) If you are dissatisfied with this decision, you may appeal to the Director's Level by following the instructions on your appeal form.

(5) It is noted that you are not on the TABE 4.0 or Learning Disability list.

JACK ST. CLAIR, MD
Chief Medical Officer
Sierra Conservation Center

cc: Central File
Appeals File
Medical File

10 of 13

Exhibit-A

**NAME: BURNETT** **CDC#: V-35245** **HOUSING: 5T 114L** **C 128C (Rev 3/01)**

A Physician's Request for Services form has been evaluated by the Medical Advisory Review Committee (MARC) and approved on 04/05/2007. Per Ch. 8 of the Health Care Services Division General Procedure, each **Routine** consultation or procedure will occur within **90 days** from approval date. Based on this information, he is being placed on a medical hold for the time indicated. This inmate is not eligible for transfers / endorsements to another CDCR institution.

FROM: 04-05-2007 THROUGH: 08-04-2007

Jack St. Clair, M.D.
Chief Medical Officer

Orig: C-File
cc : Health Record/Inmate Assign. Lt.
CCI/Inmate

**DATE: 04-06-07** JS:cd

**SIERRA CONSERVATION CENTER**

**NAME: BURNETT, ESTER CDC#: V35245** **HOUSING 5T114L** **CDC 128C (Rev 3/01)**

Exhibit-A

In preparation for an upcoming medical procedure, your physician would like you to stop any of these medications starting on SUNDAY JUNE 1, 2007. You may resume these medications after your procedure is complete unless you are told differently by an MD.

1) Do not take Aspirin, Ibuprophen (motrin), Naprosyn, or any other anti-inflammatories. It is okay to take acetaminophen (Tylenol).
2) Do not take iron pills

J.SWEETLAND MD.

Jack StClair, M.D. CMO
Chief Medical Officer

Orig: MED-File
cc: Inmate

**DATE 5/29/07** **SIERRA CONSERVATION CENTER**

65.

2 of 6 Pages

11 of 13

**State of California**
**CDC FORM 695**
**Screening For:**
CDC 602 Inmate/Parolee Appeals
CDC 1824 Reasonable Modification or Accommodation Request

RE: Screening at the FIRST Level

July 23, 2007

*BURNETT, V35245*
*CEN*

Log Number: SCC-X-
(Note: Log numbers are not assigned to screen out appeals, or informal level appeals)

The enclosed documents are being returned to you for the following reasons:

***You are attempting to change your original appeal issue.***

***Your appointment was changed by custody not medical.***

Z. Allen, CC II
Appeals Coordinator
Sierra Conservation Center

NOTE: Failure to follow instruction(s) will be viewed as non-cooperation and your appeal will be automatically dismissed pursuant to CCR 3084.4(d). This screening decision may not be appealed. You have only 15 days to comply with the above directives.

660

**PERMANENT APPEAL ATTACHMENT – DO NOT REMOVE**

12 of 13

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date: October 10, 2007

To: BURNETT, E.
V-35245
CENTINELA STATE PRISON

From: **Sierra Conservation Center, Jamestown, CA 95327**

Subject: SCC APPEAL LOG # SCC-X-07-01132
FIRST LEVEL RESPONSE

**APPEAL DECISION:** Appeal Partially Granted.

(1) **APPEAL ISSUE:** Your CDC 602 indicates on June 6, 2007, you were told you would be going out to a specialty clinic for epidural shots for your lower back pain. You indicate on June 7, 2007, you were told your "specialty clinic was cancelled due to classification for the conversion of the SCC III to SNY program." You further indicate your pain was 8.5 on a scale of 1 to 10, you could have gone to classification at any time, and the canceling of your medical treatment was uncalled for.

(2) You are requesting "specialty clinic for epidural steroid shots completed at once." At the First Formal Level interview, you added a request that you be given the name of the person who cancelled your appointment on June 7, 2007.

(3) **APPEAL RESPONSE:** Mr. Burnett, you were interviewed by P. Bolles, Health Care Appeals Coordinator, on Wednesday, October 10, 2007, at 0845 hours. This interview was conducted via telephone with the assistance of Correctional Counselor I Takara at Centinela State Prison (CSP). This appeal response is based on the interview, review of your health record, and review of CCR Title 15 and DOM.

Rules governing this issue are:

(4) *California Code of Regulations (CCR), Title 15, Section 3001. Subject to Regulations.*
*CCR 3084.3. Screening Appeals,*
*CCR 3350. Provision of Medical Care and Definitions.*
*CCR 3350.2. Off-Site Health Care Treatment.*
*CCR 3352. Medical Authorization Review Committee.*
*CCR 3354. Health Care Responsibilities and Limitations.*

(5) Review of our records and the available portions of your Unit Health Record (UHR) indicate the following:

(6) On March 30, 2007, the Specialty Clinic scheduler at SCC requested an appointment from Doctors Hospital of Manteca (DHM) for you to have an epidural injection at the Pain Management Clinic.

(7) On June 7, 2007, you had an appointment to have an epidural injection at DHM. The Specialty Clinic log at SCC indicated "corrections cancelled appointment due to dorm lockdown; will reschedule."

(8) On June 26, 2007, you were transferred from SCC to CSP before DHM provided SCC with a rescheduled date for your epidural injection.

67.

13 of 13

BURNETT – V-35245
SCC-X-07-01132
Page 2

(1) On August 2, 2007, your Primary Care Provider (PCP) at CSP evaluated you and wrote orders for you to have Neurontin 600 mg three times a day for four months, Naproxen 500 mg two times a day as needed for four months, and Tylenol #3 three times a day as needed for back pain for six weeks. Your PCP also requested that laboratory tests be obtained and scheduled you for a follow-up appointment in one month. In addition, your PCP issued CDC 128-Cs requesting that you be housed in a lower bunk and lower tier and be issued an extra mattress. A chrono outlining your work restrictions was also issued. Your PCP submitted CDC 7243s Physician Request for Services (RFS) to the Medical Authorization Review (MAR) Committee requesting approval for you to have a physical therapy consultation and a consultation with a neurosurgeon for consideration of an epidural injection.

(2) On August 17, 2007, the MAR Committee at CSP approved the RFSs for you to have a neurosurgery consultation and a physical therapy consultation.

(3) On August 24, 2007, P. Bolles, HCAA, contacted the Health Care Appeals Analyst at CSP to obtain information from your UHR.

(4) On October 10, 2007, P. Bolles, HCAA, interviewed you at Centinela State Prison via telephone regarding your appeal issues. You stated to Ms. Bolles your appointment for the epidural injection through SCC had been cancelled the day of the appointment and your condition had not gotten any better in the interim. You also stated you had recently been released from the infirmary at CSP, you could not walk on your right leg, and you needed crutches in order to walk. You indicated to Ms. Bolles you had seen the physical therapist at CSP and you were scheduled to see the physical therapist again on October 11, 2007. According to your statement, the physical therapist told you that physical therapy would probably not help your pain. You also stated the physicians at CSP had told you that you needed surgery on your back. In addition, you stated you were scheduled to see a neurosurgeon. Ms. Bolles explained to you that the medical staff at SCC had been made aware that your appointment of June 7, 2007 had been cancelled, but the injection could not be rescheduled prior to your transfer to CSP on June 26, 2007 due to the unavailability of an appointment at the Pain Management Clinic at DHM.

(5) Your request for "specialty clinic for epidural steroid shots completed at once" is partially granted. According to documentation in your UHR, on August 17, 2007, the MAR Committee at CSP approved the request for you to have a neurosurgery consultation for epidural injection consideration through CSP. Your further medical treatment will be determined at CSP based on your physician's evaluation, diagnosis, recommended treatment plan, and departmental policy.

(6) As noted, during the interview at the First Level of Review, you added new issues that were not on the original appeal submitted at the Informal Level dated June 7, 2007. Your issues were addressed appropriately in accordance with CCR 3084. You may submit a new appeal on the additional issues added at the First Formal Level.

(7) Mr. Burnett. based on the aforementioned information, your appeal is partially granted.

(8) If you are dissatisfied with this decision, you may appeal to the Second Formal Level by following the instructions on your appeal form.

| | |
|---|---|
| P. BOLLES, SSA | R. STOGSDILL, CDO |
| Health Care Appeals Analyst | Chief Dental Officer |

68.

cc: Central File / Appeals File / Medical File

Exhibit QQ

State of California
Centinela State Prison/Imperial

Department of Corrections and Rehabilitation

Memorandum

Exhibit-OO 1of7

Appeal Response Level: SECOND
Date: May 7, 2008
To: BURNETT, ESTER
CDC#: V35245
Appeal Log #: CEN-B-08-00230
Issue APPEALED: medical-medications/Referral

INTERVIEW:
You were seen by the clinic Physician on 3/26/08, 3/27/08, and 4/08/08.

Problem Description/action Requested:

You are stating that You continue to experience a lot of Pain in Your back and right leg and are requesting that Your medications be disPonsed timely and that You feel that surgery is Your best option.

Appeal Response:

There is no change to the Frist formal level response. During the clinic visits, the Physicians evaluated Your medical condition and reviewed Your unit health Record. Your medications have been refilled. ~~The Pharmacy~~ has currently dispensed ultram and Neurontin for Pain.

You had seen the neurology specialist, Dr. Calvin, on 12/20/07. He had Recommended back surgery which was approved by the MAR committee on 01/30/08. You are currently scheduled for a follow up consulation with Dr. Calvin and will be notified accordingly.

therefore, based upon the above response, Your appeal is Granted in Part, in that Your medications have been refilled and dispensed by Pharmacy and that you are scheduled for a neuro consultation.

Decision:

Partially Granted

[signature] Micheal Fraze, MD
N. Barreras, M.D. Lic. # A69508
Chief medical officer/Health care manager
Centinela State Prison

CDC 1617 (3/89)

70.

~~Citizen Complaint~~ Per title 15 3391 (a)(c) and (d)

2 of 7 Pages

**INMATE/PAROLEE APPEAL FORM**
CDC 602 (12/87)

07-858

1 of 2 copies

Location: Institution/Parole Region: 1. ~~Duplicate~~ CEN B 2.

Log No.: 1. 07 8-230 2.

Category: 8

#2 (1-9-08)

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME | NUMBER | ASSIGNMENT | UNIT/ROOM NUMBER |
|---|---|---|---|
| Burnett | V35245 | Voc-Electric | Fac-B 4 Bld-148L |

A. Describe Problem: On 11-22-07 I was informed that my tramadol was not ordered by the nurses on B Fac. so I would have to wait till monday till it was refilled I became very upset due to this information but nurse said She would work with me to make sure I got my meds and so did she got my meds. from the central infirmary daily over the weekend but monday 11-26-07 the 2nd watch nurse gave me my morning meds then she said I would have to wait till after 6:00 pm to get another dose it took me 20 minutes to understand what she was saying I'm not being disrespectful but you have at least 2 nurses that work here that I can't understand when they talk and that doesn't cut it when I'm trying to get medical care I need to talk to someone who's not going to look at me and say they don't understand once again I'm having problems receiving my medication, this is a never ending always present problem. a problem you told me you were going to take care of months ago. you told me on paper that this was a problem you were going to look into take care of but as of yet the problem continues and is growing worse daily. on a scale of 1 to 10 my pain is a 8 or 9 all day and the pain meds I take make it possible for me to function so when your nurses don't reorder my meds till they're out I'm going to miss doses. my pain is constant and always the only way my pain shall get better is a operation that's what a neurosurgeon told me. so my meds keep the pain from being unbearable missing one dose causes me further more dier pain. even your refill slips say order meds. 2 or 3 days before they run out why can't your nurses get this right. they wait till they my meds run out then they point at one another saying she forgot to reorder your meds. then when I ask who forgot they get disrespectful tell me to get away from the window. then I in turn get this respectful by talking loud demanding the treatment a

If you need more space, attach one additional sheet.

B. Action Requested: Senior medical officer to correct the systemic deficiencies with his nurses delivering my meds and reordering my meds before they run out and stop his nurses racial bigotery and their intentional interfering with treatment ordered by a doctor.

Inmate/Parolee Signature: Ester Burnett Date Submitted: 11-30-07

C. INFORMAL LEVEL (Date Received: ______ )

Staff Response: By Pass

Hand made copy
Real copy sent to Sacramento for 3rd level copy

Staff Signature: ______ Date Returned to Inmate: ______

Please complete at informal level Inmate appeals office

D. FORMAL LEVEL
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

By Pass

Signature: ______ Date Submitted: ______

Note: Property/Funds appeals must be accompanied by a completed Board of Control form BC-1E, Inmate Claim

CDC Appeal Number:

Centinela State Prison
Jan 09 2008
inmate appeals office

71
[redacted]

Centinela State Prison
Jan 29 2008
inmate appeals office

CSP - CENTINELA

First Level ☐ Granted ☒ P. Granted ☐ Denied ☐ Other

E. REVIEWER'S ACTION (Complete within 15 working days): Date assigned: JAN 30 2008 Due Date: MAR 13 2008

Interviewed by:

Your appeal is partially granted. Due to your appeal a request was forwarded to the medical clinic on your yard for you to be scheduled for an appointment. You were seen by Dr. Fraze on 3/10/08 to address your medical concerns.

Staff Signature: See Belo Title: Date Completed: 3/13/08

Division Head Approved: Signature: [signature] M.D. Title: Chief Physician Returned Date to Inmate: Mar 13 2008

F. If dissatisfied, explain reasons for requesting a Second-Level Review, and submit to Institution or Parole Region Appeals Coordinator within 15 days of receipt of response.

dissatisfied I still haven't had my surgery and my meds are often not given because your nurses forget to bring them I'm in unthinkable pain 24/7 due to your medical care all I'm trying to do is get to or in a situation were my back and right leg isn't in so much pain and surgery is at this point my best option my pain meds are not working anymore

Signature: Eston Burnett Date Submitted: 3-20-08

Second Level ☐ Granted ☒ P. Granted ☐ Denied ☐ Other

G. REVIEWER'S ACTION (Complete within 10 working days): Date assigned: MAR 25 2008 Due Date: APR 23 2008

☒ See Attached Letter

Signature: See below Michael Fraze, MD Date Completed: 5-8-08

HCM

~~Warden/Superintendent Signature:~~ [signature] Lic. # A69508 Date Returned to Inmate: MAY 08 2008

H. If dissatisfied, add data or reasons for requesting a Director's Level Review, and submit by mail to the third level within 15 days of receipt of response.

I Received this back 5-20-08 Yes I'm very dissatisfied for all reasons stated in body of this appeal

Signature: Eston Burnett Date Submitted: 5-21-08

For the Director's Review, submit all documents to: Director of Corrections
P.O. Box 942883
Sacramento, CA 94283-0001
Attn: Chief, Inmate Appeals

DIRECTOR'S ACTION: ☐ Granted ☐ P. Granted ☐ Denied ☐ Other

☐ See Attached Letter

Date:

CDC 602 (12/87)

doctor ordered. this isn't a Pharmacy Problem it's a your Nurses continually forgetting to order my meds weekly this happens sir every week. then when I file a 602 or 1824 you say its a duplicate it's not it's your failure to address and fix a simple Problem that leads to me filing further paper work. title 15 clearly covers my medical condition at 3350(a)(b)(1)(3)(4)and(5) but your Nurses won't do what the law requires and thats give me my meds at the times Im suppose to get them. your mexican Nurses went out of there way to not give me my meds 11-26-07 at 12pm NOON they said I had to wait till the Pharmacy renewed them. [illegible] So I suffered in Pain needlessly. then when the black nurse came on third watch I went to the window at 2:30pm explained my Problem right there on the spot she came up with my noon dose. explain how she was able to help me instantly but your mexican nurses have a Problem with helping no not helping but giving me my meds. I'm left with no other answer I don't want to say it but I can no longer deny it your mexican Nurses are racist and I'm not rushing to Judgment I'm stating facts. it's your mexican nurses who continually show contempt toward me reciving my treatment. you'll say that my attitude towards your Nurses causes Problems. sir I don't even have to speak to your Nurses all I should have to do is go to the window give my (Id) then receive my meds. I Should never ever have to say more than my name is Burnett I'm here to receive my tramadol. However weekly your mexican Nurses take my (Id) then come back in a very disrespectful tone and tell me we don't have nonthing for you leave you might get your meds after dinner. then with my Pain level going from 8 or 9 out of 1 to 10 you better believe I'm not trying to leave the window without my Pain meds then they go to the I don't understand English routine. now the mta is were I Receive my treatment or medication when your mexican Nurses are not Racial bigots. then 11-27-07 the Nurse delievered medication to Bld 4 and told me I had to come to the mta to get my meds she forgot to bring them. I'm in Severe acute Pain and she forgot to bring my meds when I went to the mtA at 9:15Am the nurse told me I didn't have no Pain meds the Pharmacy didn't refill your meds last night. I was called to centeral infimary for a mri due to your nurses refusing me my meds I couldn't lay in the mri machine. so I was given a shot of toradal. I was in so much Pain I couldn't make it back to my yard nurses called B fac. from central infirmary and they were told I wouldn't have my Pain meds till after 2pm. I spoke to the Senior Nurse 2 and was told the same thing The Senior Nurse told me a doctor was going to come talk to me. at 2:30pm doctor Collins worth came and told me my meds had been a B fac mta Sence 11-26-07 third watch. So today 11-27-07 I was denied my Pain meds for no apparent reason other than racial bigotery by 3 mexican Nurses its always mexican nurses that have a Problem giving me my doctor ordered Pain meds. not black or white. 11-28-07 again the nurse when she delivered meds in Bld 4 she said I don't have no meds for you. I was in so much Pain I could bearly stand. I fell down due to my leg and back Pain my cellie helped me to my bed and he yelled man down for 30 minutes. then co asael; Sgt Thomas and Nurse Johnson came to my door and said if I want my meds I had to come to the door and get them I told them I needed help to get out of bed I told them my Pain was a 10 on a scale of 1 to 10. I begged for help they laughed at me and continued to hold my meds up as if I was a dog who was being told to fetch. after 5 to 10 minutes the nurse gave my meds to sgt thomas who gave my morning and noon meds. to my cellie who gave them to me I was instructed by the nurse and sgt thomas to take both doses. I refused sgt thomas then said are you refusing to take your meds I said no he said take them all so I did I then told them I needed to see a doctor they laughed at me then left. my cellie yelled man down at 1:00pm the mac Rep was released he came to my cell and told me to fill out a complaint he took it to the Program office the sgt thomas a Nurse came to my door and told me to get up I told them what part of I can't did they not understand the nurse laugh and left then sgt thomas had my door opened and four co's came in and grabed me like I was a sack of Potato's and Roughly Put me in a strecher and took me to central infirmary were I Received treatment medical treatment should not be this complicated. I was denied treatment that eliminated Pain and suffering at least temporarily. your nurses even though I couldn't walk intentionally denied and delayed access to medical care. for my serious inJury your nurses daily intentionally interfer with my doctor ordered treatment. it is evident that your Nurses conspired together and treated me not as a Patient but as a nuisance and were insufficiently interested in my health to take even minimal steps to guard against the Possibility that I might not be able to get up because of leg & back acute Pain was severe. your nurses and co's intended to inflict Pain on me and did by leaving me in my cell all day in acute Pain unable to get up. title 15 3084.1(a) clearly state I can appeal these incidents because your staff's behavior has a serious adverse effect upon my welfare dening me treatment that eliminates my Pain and suffering at least temporarily sometimes.

4 OF 7

State of California
CDC FORM 695
Screening For:
CDC 602 inmate/Parolee appeals
CDC 1824 Reasonable modification or accommodation Request

RE: Screening at the informal Level

January 9, 2008

Burnett N35245
FBB2T 1000000150L

Log Number: CEN-B- 11-30-07
(Note: Log numbers are not assigend to screen out appeals, or informal level appeals)

The enclosed documents are being returned to you for the following reasons:

You have submitted an appeal that duplicates a previous appeal upon which a decision has been rendered or is pending (CCR 3084.3(c)(2)).

After review of the screening form attached, the response to Log# CEN-B-07-01082 and your action requested in section 'B' of the current appeal, it has been determined that the screening is appropriate.

Y Marcie
appeals coordinator
Centinela State Prison

NOTE: Failure to follow instruction(s) will be viewed as Non-Cooperation and your appeal will be automatically dismissed pursuant to CCR 3084.4(d) 6 this screening decision may not be appealed. If you believe this screen out is in error, Please return this form to the appeals Coordinator with an explanation of why you believe it to be in error, and supporting documents. You have only 15 days to comply with the above directives.

PERMANENT APPEAL ATTACHMENT - DO NOT REMOVE

[redacted]. 73.

Warden, victor almager

Months ago I filed appeal Log# CEN-B-07-01082 said appeal addressed The fact that your medical staff have been delaying and dening me treatment ordered by a doctor. when the above appeal was answered your staff said it would make the necessary changes to make sure I received all my medication. and treatment on time as ordered. well sir this did and has not happened. inclosed is another appeal I filed relating to the same issue and it goes futher in depth. I allege that your staff left me in my cell correctional and medical for over 8 hours when I couldn't move due to my disability. yes your staff has addressed these issues but to date I still have the same problems I alleged in my original appeal. Now that I filed the above appeal your staff say it is a duplicate and screened it out title 15 3084.1.(a) is clear. your staff leaving me in my cell for 8 hours refusing to take me to ctc for Emergency treatment is a huge adverse effect on my welfare. then for your medical appeals coordinator C. Cook and Degeuss to say I have exhausted my appeal remedies at the institutional level when nouthing has changed is wrong my medical health is serious. when you say this your in a sence saying we don't care what happens to you mr. Burnett if in June your staff denyed and delayed me treatment and I filed a 602 and it was fravorably answered, but in november it got worse that is not a duplicate. duplicate sir by merriam webster collegiate Dictionary is a copy of things exactly alike. this appeal is not like or exactly alike the other yes they deal with the same issue different months days and people are involved sir. what your staff is saying sir is if I get assualted by someone monday who is staff, then next month get assualted by a different staff I can't appeal the second incident because its the same basic issue. I beg to differ sir according to title 15 3084.1.(a) is clear "I may appeal any departmental decision, action, condition, or policy which I can demonstrate as having an adverse effect upon their welfare." sir I was left in my cell unable to move in acute excruciating pain for over 8 hours when there was ready avaliable treatment that would of relieved my sysptoms.

and when I filed an appeal your appeals coordinators have conspired together to deny me constitutional Due Process established by title 15 administrative rules and regulations to cover staff behavior.

I'm writing you to make sure your are aware of your staff behavior and violations copy of screened out appeal inclosed if you refused to address this I will write director of inmate appeals then proceed into court sir

how can your staff tell me they are not going to revisit an issue they never solved or fixed

1-13-08 Eston Burnett V35245 fac B/2-150

[redacted]. 74.

6 of 7

*** Patient ProFile***
Includes all Prescriptions from 04/07/2008
Discontinued Drugs are marked with *
*************************************************
V-35245 Burnett, Ester Current unit: AB5T1105L
allergies: DoB: 06/06/1967 HT: ft in WT: 0

| Start | RX/Qty | Drug | Physician | | Stop |
|---|---|---|---|---|---|
| 03/11/2008 | 559158 | I BuProFen 800mG (motRiN) * | Fraze, michael | * | 04/09/2008 |
| T | 30 | Take 1 Tab 2X A Day after Breakfast & DiNNER | KoP | | AB5T1124L |
| 03/26/2008 | 562162 | NaProxeN 500 mG (NAPROSYN) | Shiller, Ben | | 06/24/2008 |
| WR | 60 | Take 1 Tab Twice a Day with meals * | KoP | | AB4T1128L |
| 04/02/2008 | 563318 | DC medications * | Shiller, Ben | * | 09/09/2008 |
| T | 0 | Discontinue OLD ultram order/start new | | | AB4T1128L |
| 04/07/2008 | 559167 | NeuRontin 600 mG *** | FRaze, michael | * | 04/22/2008 |
| TP | 90 | Take 2 capsules 3 Times A Day **** | approved **** Na | | AB4T1128L |
| 04/07/2008 | 564451 | ULTRam (TRamadol) 50 mG *** | Fraze, micheal | * | 04/15/2008 |
| RCR | 48 | Take 2 Tablets 3X's A Day *NA* approved TiL 4/15 | | | AB4T1128L |
| 04/07/2008 | 564452 | NON-Formulary medication * | Fraze, micheal | * | 04/15/2008 |
| RCR | 0 | ultram DiDN't Receive Request X90 Days To mD | | | AB4T1128L |
| 04/09/2008 | 564719 | Clotrimazole 1% cream | Fraze, micheal | * | 07/08/2008 |
| Sm | 1 | apply to affected area Twice daily *** KoP** | | | AB4T1128L |
| 04/09/2008 | 564720 | methocarbamol 750 mG (RoBax)* | Fraze, micheal | * | 04/16/2008 |
| Sm | 7 | Take 1 Tab at Bedtime if needed / Spasm ** DoT** | | | AB4T1128L |
| 04/15/2008 | 565865 | ULtram (Tramadol) 50 mG *** | Fraze, michael | * | 04/21/2008 |
| T | 30 | Take 2 Tabs 3X a day * Prior auth TiL 4/24 ONLY**Na** | | | AB5T1105L |
| 04/15/2008 | 565866 | NON-Formulary medication * | Fraze, michael | * | 04/21/2008 |
| T | 0 | uLTRam / DiDN't Receive ReQ / To DR Fraze / 2ND ReQ | | | AB5T1105L |
| 04/21/2008 | 565865 | uLTram (Tramadol) 50mG *** | Fraze, michael | * | 04/24/2008 |
| T | 30 | Take 2 Tabs 3X A Day * PrioR auth TiL 4/24 ONLY ** NA** | | | AB5T1105L |
| 04/21/2008 | 566814 | NON-FoRmulary medication * | Collinsworth | * | 04/28/2008 |
| T | 0 | uLTram approved for 7 days ONLY, RcvD 30 ON 4/15 | | | AB5T1105L |
| 04/28/2008 | 568078 | uLtram (Tramadol) 50 mG ** | FRAZE, michael | | 05/08/2008 |
| WR | 60 | Take 2 Tabs 3X'S A Day as NEEDED *PaiN* NA* APPROVED | | | AB5T1105L |
| 04/28/2008 | 568104 | MEthocarBamol 750 mG (RoBAX)* | FRaze, michael | * | 05/05/2008 |
| Sm | 7 | TAKE 1 TabLET AT BedTimE AS NEEDED FoR Back** KoP** | | | AB5T1105L |
| 04/28/2008 | 568110 | NON-FoRMULARY medication * | FRaze, michael | * | 04/29/2008 |
| Sm | 0 | NeuroNtiN * FoRm Put iN Barreras Box | | | AB5T1105L |

Page 1 Printed: 05/07/2008

[redacted]. 75.

*** Patient PROFILE ***

Includes all Prescriptions From 04/07/2008

Discontinued Drugs are marked with *

******************************************************************

V-35245 BurNETT, EsteR — Current unit: ABSTII05L

allergies: — DOB: 06/06/1967 HT: Ft iN — WT: 0

| Start | RX/QTY | Drug | Physician | Stop |
|---|---|---|---|---|
| 04/29/2008 | 568165 | NEURONTIN 600mG ** | FRaze, michael | 07/28/2008 |
| SM | 90 | Take 2 caps 3x a DaY ** **Approved*** | ** NA*** | ABSTII05L |
| 05/08/2008 | 568078 | ULtRam (Tramadol) 50 mG ** | FRaze, michael | 05/28/2008 |
| WR | 60 | TaKE 2 Tabs 3X'S A DaY as NEEDED X | Pain*NA* Approved | ABSTII05L |

 ***** EnD oF ProFiLe ***** Printed: 05/07/2008

[redacted].76

Exhibit-7

Exhibit 7

**HAROLD D. SEGAL, M.D., INC.**
*Neurological Surgery*
140 Casa Street
San Luis Obispo, California 93405
805/543-4319
FAX 805/543-0446

July 14, 2006

**RE: BURNETT, ESTER**
**V 35245**

To Whom It May Concern:

Mr. Burnett was seen in the CMC clinic on 7/14/06 and this letter is for your records.

He is feeling a lot better. He is housed at the hospital so he can avoid stairs. He has residual pain in his back at a 4 out of 10. He is "eons" better following epidural injection.

**EXAMINATION:** SLR negative bilaterally. Reflexes are symmetric. Motor and sensory systems are intact. Gait – There is no lateralizing limp.

**IMPRESSION:** Status post epidural steroid injections with satisfactory course.

**PLAN:** Recommend he proceed with his transfer as planned.

Thank you very much for the opportunity of consulting. I'll keep you informed of any future developments.

Very sincerely yours,

Harold D. Segal, M.D. /rm

Harold D. Segal, M.D.

HDS:rm
Dictated but not read

Exhibit-28

Exhibit-28

**DEPARTMENT OF CORRECTIONS** **STATE OF CALIFORNIA**

**DATE OF PROCEDURE:** 3/24/06

**PREOPERATIVE DIAGNOSIS:** LUMBOSACRAL DEGENERATIVE DISC SYNDROME.

**POSTOPERATIVE DIAGNOSIS:** LUMBOSACRAL DEGENERATIVE DISC SYNDROME.

**NAME OF PROCEDURE:**
1. LUMBOSACRAL EPIDURAL STEROID INJECTION.
2. LUMBAR EPIDURAGRAM.
3. FLUOROSCOPY WITH INTERPRETATION.

**SURGEON:** Harold Segal, M.D.

**PROCEDURE:** After informed consent, patient was brought to the operating room and placed under oral sedation. He was turned in the prone position on the pelvic bolster and the lumbar area was prepped and draped in the usual fashion. Under fluoroscopy the area to be injected was numbed with 1% Xylocaine. After an appropriate period of time a 17 gauge needle was directed towards the epidural space just to the right of midline. Patient had right sciatica. The glass syringe was used with loss-of-resistance-to-air technique. Once the epidural space was entered, I injected 3 cc of Isovue M200 and this outlined the epidural space quite well to the right of midline. There was no obstruction and no subarachnoid injection. A therapeutic mixture of 0.25% Marcaine plain and Kenalog 40 was then injected. The patient tolerated the procedure well and was returned to the recovery area with stable vital signs.

Harold Segal, M.D.

HS:lc
D/R: 3/24/06 T: 3/27/06

Orig: Health Record
cc: Surgery
Harold Segal, M.D.

80.

| | |
|---|---|
| **CDC #:** | V-35245 |
| **NAME:** | BURNETT, ESTER |
| **DOB:** | 6/6/67 |

**CALIFORNIA MEN'S COLONY**
**REPORT OF OPERATION - OUTPATIENT**
CDC 7205

Exhibit-29

Exhibit 29

HAROLD D. SEGAL, M.D., INC.
Neurological Surgery
140 Casa Street
San Luis Obispo, California 93405
805/543-4319
FAX 805/543-0446

February 24, 2006

RE: BURNETT, ESTER
V 35245

To Whom It May Concern:

Mr. Burnett was seen in the CMC clinic on 2/24/06 and this letter is for your records.

1 He is a 38-year-old black male inmate, right-handed. Allergies: None. Past medical history: Sickle cell trait, hypertension. Past surgical history: Negative. Medications: Naproxen, hypertensive meds. Job: None.

**CHIEF COMPLAINT:** Low back pain.

2 **HISTORY:** Since 1990, this gentleman has had back and right leg pain. He suffered an injury playing football. MRIs and epidural steroids have been performed. His pain is getting worse. His last epidural steroid was in 1997 and this helped somewhat. His pain is 65% axial and 35% right sciatica. The axial pain is constant, sciatica is intermittent. Bowel and bladder control are normal.

3 **IMAGING STUDIES:** MRI scan done 3/11/05 shows a reported far lateral protrusion at L4-5 right with excessive degenerative changes.

4 **EXAMINATION:** He limps on the right leg. Otherwise alert and oriented. Flexion limited to 30 degrees in the lumbosacral junction. SLR positive right to 45. Depression of the right extensor hallucis longus. Reflexes are symmetric in the knees and ankles. Decreased heel walk noted, right.

5 **IMPRESSION:** Lumbar disk protrusion with L5 radiculopathy, right.

6 **PLAN:** Recommend this gentleman have epidural steroid injections. Repeat MRI scan will be performed if he does not improve with conservative care.

Thank you very much for the opportunity of consulting.

Very sincerely yours,

Harold D. Segal, M.D. /rr

Harold D. Segal, M.D.

HDS:rm
Dictated but not read

Exhibit-30

**HAROLD D. SEGAL, M.D., INC.**
*Neurological Surgery*
140 Casa Street
San Luis Obispo, California 93405
805/543-4319
FAX 805/543-0446

Exhibit-30

February 24, 2006

**RE: BURNETT, ESTER**
**V 35245**

To Whom It May Concern:

Mr. Burnett was seen in the CMC clinic on 2/24/06 and this letter is for your records.

He is a 38-year-old black male inmate, right-handed. Allergies: None. Past medical history: Sickle cell trait, hypertension. Past surgical history: Negative. Medications: Naproxen, hypertensive meds. Job: None.

**CHIEF COMPLAINT:** Low back pain.

**HISTORY:** Since 1990, this gentleman has had back and right leg pain. He suffered an injury playing football. MRIs and epidural steroids have been performed. His pain is getting worse. His last epidural steroid was in 1997 and this helped somewhat. His pain is 65% axial and 35% right sciatica. The axial pain is constant, sciatica is intermittent. Bowel and bladder control are normal.

**IMAGING STUDIES:** MRI scan done 3/11/05 shows a reported far lateral protrusion at L4-5 right with excessive degenerative changes.

**EXAMINATION:** He limps on the right leg. Otherwise alert and oriented. Flexion limited to 30 degrees in the lumbosacral junction. SLR positive right to 45. Depression of the right extensor hallucis longus. Reflexes are symmetric in the knees and ankles. Decreased heel walk noted, right.

**IMPRESSION:** Lumbar disk protrusion with L5 radiculopathy, right.

**PLAN:** Recommend this gentleman have epidural steroid injections. Repeat MRI scan will be performed if he does not improve with conservative care.

Thank you very much for the opportunity of consulting.

Very sincerely yours,

Harold D. Segal, M.D. /rm

Harold D. Segal, M.D.

HDS:rm
Dictated but not read

Exhibit-31

Exhibit 31

STATE OF CALIFORNIA
DISABILITY PLACEMENT PROGRAM VERIFICATION (DPPV)
CDC 1845 (Rev. 01/04)

DEPARTMENT OF CORRECTIONS
*CHECK ALL APPLICABLE BOXES*

THIS FORM ONLY VERIFIES OR DISCONFIRMS CLAIMED PHYSICAL DISABILITIES LISTED IN SECTION B

| INMATE NAME: | CDC NUMBER: | INSTITUTION: | HOUSING ASSIGNMENT: | DATE FORM INITIATED: |
|---|---|---|---|---|
| Burnett, Ester | V35245 | CMC-E | 7304X | 1-10-06 |

*Sections A - B to be completed by licensed medical staff.*

**SECTION A: REASON FOR INITIATION OF FORM**

- ☐ Inmate self-identifies to staff
- ☐ Third party evaluation request
- ☐ Observation by staff
- ☒ Medical documentation or Central File information

**SECTION B: DISABILITY BEING EVALUATED**

- ☐ Blind/Vision Impaired
- ☐ Speech Impaired
- ☐ Deaf/Hearing Impaired
- ☐ Mobility Impaired

*Sections C - G to be completed by a physician only.*

**SECTION C: PERMANENT DISABILITIES IMPACTING PLACEMENT**

- ☐ FULL TIME WHEELCHAIR USER - DPW
  Requires wheelchair accessible housing and path of travel.
- ☐ INTERMITTENT WHEELCHAIR USER - DPO
  Requires lower bunk, wheelchair accessible path of travel and *does not require* wheelchair accessible cell.
- ☐ MOBILITY IMPAIRMENT - With or Without Assistive Device (Wheelchairs shall not be prescribed) - DPM
  Orthopedic, neurological or medical condition that substantially limits ambulation (cannot walk 100 yards on a level surface without pause). Requires lower bunk, no triple bunk, and no stairs in path of travel.
- ☐ DEAF/HEARING IMPAIRMENT - DPH
  Must rely on written communication, lip reading or signing as residual hearing, with assistive devices, will not enable them to hear, understand or localize emergency warnings or public address announcements.
- ☐ BLIND/VISION IMPAIRMENT - DPV
  Not correctable to central vision acuity of better than 20/200 with corrective lenses in at least one eye (See HOUSING RESTRICTIONS IN SECTION E).
- ☐ SPEECH IMPAIRMENT - DPS
  Does not communicate effectively speaking or in writing.

**SECTION D: PERMANENT DISABILITIES *NOT* IMPACTING PLACEMENT**

1. NO CORRESPONDING CATEGORY
2. NO CORRESPONDING CATEGORY
3. ☒ MOBILITY IMPAIRMENT (Lower Extremities) - DNM
   Walks 100 yards without pause with or without assistive devices.
   ☐ No Housing Restrictions ☐ See HOUSING RESTRICTIONS in Section E
   ☒ Requires relatively level terrain and no obstructions in path of travel. Do not place at: CCI, CMC-E, CRC, CTF-C, FSP, SCC I or II, SOL, or SQ. (CDC 128-C:________)
4. ☐ HEARING IMPAIRMENT - DNH
   With residual hearing at a functional level with hearing aid(s).
5. NO CORRESPONDING CATEGORY
6. ☐ SPEECH IMPAIRMENT - DNS
   Does not communicate effectively speaking, but does when writing.

**SECTION E: ADDITIONAL MEDICAL INFORMATION**

SR ALERT:
- ☐ Requires relatively level terrain and no obstructions in path of travel
- ☐ Complex medical needs affecting placement ☐ CDC 128-C ________

HEALTH CARE APPLIANCE / IDENTIFICATION VEST:
☐ Cane ☐ Crutch ☐ Walker ☐ Leg/Arm prosthesis ☐ Vest
☐ Other: ________ ☐ CDC 128-C(s) dated: ________

ASSISTANCE NEEDED WITH ACTIVITIES OF DAILY LIVING:
☐ Feeding or Eating ☐ Bathing ☐ Grooming ☐ W/C transferring
☐ Toileting ☐ Other: ________ ☐ CDC 128-C(s) dated: ________

OTHER DPP DESIGNATIONS:
☐ NONE ____ ____; ____ ____
CODE DATED CODE DATED

HOUSING RESTRICTIONS: ☒ Lower bunk ☐ No stairs ☐ No triple bunk. CDC 128-C(s) dated: 11-21-05

**SECTION F: EXCLUSIONS**

- ☐ VERIFICATION OF CLAIMED DISABILITY NOT CONFIRMED: My physical examination or other objective data DOES NOT SUPPORT *claimed* disability. (Explain in Comments Section and CDC 128-C dated ________).
- ☐ REMOVAL FROM A DPP CODE: Removal from previous DPP code: ______. (Explain in Comments Section and CDC 128-C dated: ________)
- ☐ REMOVAL FROM ENTIRE PROGRAM: Removal from DPP code(s): ________. (Explain in Comments Section and CDC 128-C dated: ________)

**SECTION G: EFFECTIVE COMMUNICATION FACTORS**

☐ Uses Sign Language Interpreter (SLI) ☐ Reads Braille ☐ Communicates with written notes ☐ Requires large print or magnifier
☐ Reads lips ☐ NO "EFFECTIVE COMMUNICATION" ISSUES OBSERVED OR DOCUMENTED IN THE UNIT HEALTH RECORD

PHYSICIAN'S COMMENTS: *(Focus on affected systems and functional limitations. No specific diagnosis or other confidential medical information.)*

I/M has mild disc protrusions effecting lumbar foramina on (L) surgery not advised by UC-Davis neurosurg. Stairs bother s/p [illegible]

| PHYSICIAN'S NAME (Print) | PHYSICIAN'S SIGNATURE | DATE SIGNED |
|---|---|---|
| GRIFFIN, J B | [signature] | 1-10-06 |
| HEALTH CARE MANAGER'S / DESIGNEE'S NAME (Print) | HEALTH CARE MANAGER'S / DESIGNEE'S SIGNATURE | DATE SIGNED |
| [illegible] | [signature] | 1/10/06 |

86

NOTE: After review by the Health Care Manager or Chief Physician & Surgeon, health care staff shall retain green copy for the UHR, send the inmate copy via institutional mail, and route the original and remaining copies to the C&PR/RC CC-III for tracking and further distribution according to the instructions below.

Exhibit-32

Exhibit 32 1of2

DEPARTMENT OF CORRECTIONS

STATE OF CALIFORNIA

DATE OF CONSULTATION: January 10, 2006

REFERRING PHYSICIAN: Bruce Faecher, M.D.

HISTORY OF PRESENT ILLNESS: Mr. Burnett is a 38-year-old black male with at least a nine-year history of low back pain with more recent radiation into the right lower extremity. Reportedly he was injured in football and experienced a re-injury in approximately March of 2005 while working at a CDC institution. He claims that Tylenol #3 and Vicodin were not helpful initially and he was placed on oxycontin which was helpful in controlling his pain and requested this medication numerous times during this interview and examination. Inmate found Neurontin not to be helpful and has not found Elavil or Naprosyn helpful either.

Mr. Burnett indicates that he has difficulty with stairs causing low back and leg symptoms and also difficulty with getting in above ground bunks and operating X beds.

Mr. Burnett has been seen via telemedicine by Dr. Paul Muizelaar, Chairman of the Department of Neurosurgery at UC Davis who did not recommend surgery on his right lateral protruding disc at L4-5 due to the fact that patient complained of more back pain than leg pain.

In the past epidural steroids have been helpful for up to nine months and he may be a candidate for this again. Patient has had three visits to physical therapy, then he was transferred to this facility and was learning back exercises.

He states that he does have pain at night when he moves around but is not awakened from sleep with pain. Bowel and bladder are functional. He has no true numbness in the lower extremity but radiation of pain from the right lower back into the posterior leg calf all the way to the heel that is sharp. He does not rate the pain on a zero to ten scale.

PHYSICAL EXAMINATION:
GENERAL: The patient is a tall, black male in mild distress when moving about but at times is inconsistent in the amount of antalgia he demonstrates on the right side.
INSPECTION: He demonstrates poor range of motion for flexion, extension, lateral bending and rotation but easily takes off his boots bending forward to the floor.
PALPATION: Reveals some tightness of the right paralumbar and upper gluteus musculature on the right when compared to the left without frank spasm. There is no significant tenderness of the spinous processes of the lumbar spine. There was slight tenderness of the sciatic notch on the right when compared to the left.
MOTOR: Straight leg raising produced mechanical low-back pain at 45 degrees on the right and was unremarkable on the left. Patrick fabere was mildly positive on the right and negative on the left.
SENSORY: Sensation was intact in all dermatomes of the bilateral lower extremities.
NEUROLOGIC: Deep tendon reflexes were trace to 1/4 at the patellas bilaterally, and 1/4 at the Achilles and posterior tibiales bilaterally.

The patient demonstrated generalized slightly less strength in the right lower extremity when compared to the left but there was some make-or-break component to it. All the right was rated 5-/5 while the left was normal.

CDC NO: V-35245
NAME: BURNETT, ESTER
DOB: 6/6/67

CALIFORNIA MEN'S COLONY
CONSULTANT'S RECORD
CDC-7243

Exhibit [redacted] 32

2of2

Date of Consultation: 1/10/06
Page 2

IMPRESSION: Chronic benign back pain with possible nerve root irritation but no specific muscle wasting, weakness or dermatomal distribution of neuro involvement on today's examination.

RECOMMENDATIONS/PLAN:

1. Re-referral to physical therapy if he stays at this institution.
2. Referral to a level institution to reduce aggravation of symptoms.
3. No clear indication for prolonged narcotics for benign problem.
4. Epidural steroid injection can be tried by Dr. Segal if patient and Dr. Segal are in agreement on this.

J. Ben Griffin, M.D.

JBG:lc

Orig: Health Record

t: 1/10/06

| | |
|---|---|
| CDC NO: | V-35245 |
| NAME: | BURNETT, ESTER |
| DOB: | 6/6/67 |

CALIFORNIA MEN'S COLONY
CONSULTANT'S RECORD
CDC-7243

Exhibit-33

Exhibit-33

**DEPARTMENT OF CORRECTIONS** **STATE OF CALIFORNIA**

**DATE OF CONSULTATION:** January 10, 2006

**REFERRING PHYSICIAN:** Bruce Faecher, M.D.

**HISTORY OF PRESENT ILLNESS:** Mr. Burnett is a 38-year-old black male with at least a nine-year history of low back pain with more recent radiation into the right lower extremity. Reportedly he was injured in football and experienced a re-injury in approximately March of 2005 while working at a CDC institution. He claims that Tylenol #3 and Vicodin were not helpful initially and he was placed on oxycontin which was helpful in controlling his pain and requested this medication numerous times during this interview and examination. Inmate found Neurontin not to be helpful and has not found Elavil or Naprosyn helpful either.

Mr. Burnett indicates that he has difficulty with stairs causing low back and leg symptoms and also difficulty with getting in above ground bunks and operating X beds.

Mr. Burnett has been seen via telemedicine by Dr. Paul Muizelaar, Chairman of the Department of Neurosurgery at UC Davis who did not recommend surgery on his right lateral protruding disc at L4-5 due to the fact that patient complained of more back pain than leg pain.

In the past epidural steroids have been helpful for up to nine months and he may be a candidate for this again. Patient has had three visits to physical therapy, then he was transferred to this facility and was learning back exercises.

He states that he does have pain at night when he moves around but is not awakened from sleep with pain. Bowel and bladder are functional. He has no true numbness in the lower extremity but radiation of pain from the right lower back into the posterior leg calf all the way to the heel that is sharp. He does not rate the pain on a zero to ten scale.

**PHYSICAL EXAMINATION:**
GENERAL: The patient is a tall, black male in mild distress when moving about but at times is inconsistent in the amount of antalgia he demonstrates on the right side.
INSPECTION: He demonstrates poor range of motion for flexion, extension, lateral bending and rotation but easily takes off his boots bending forward to the floor.
PALPATION: Reveals some tightness of the right paralumbar and upper gluteus musculature on the right when compared to the left without frank spasm. There is no significant tenderness of the spinous processes of the lumbar spine. There was slight tenderness of the sciatic notch on the right when compared to the left.
MOTOR: Straight leg raising produced mechanical low-back pain at 45 degrees on the right and was unremarkable on the left. Patrick fabere was mildly positive on the right and negative on the left.
SENSORY: Sensation was intact in all dermatomes of the bilateral lower extremities.
NEUROLOGIC: Deep tendon reflexes were trace to 1/4 at the patellas bilaterally, and 1/4 at the Achilles and posterior tibiales bilaterally.

The patient demonstrated generalized slightly less strength in the right lower extremity when compared to the left but there was some make-or-break component to it. All the right was rated 5-/5 while the left was normal.

**CDC NO:** V-35245
**NAME:** BURNETT, ESTER
**DOB:** 6/6/67

**CALIFORNIA MEN'S COLONY**
**CONSULTANT'S RECORD**
CDC-7243

Exhibit-34

Exhibit-34

[redacted] [redacted] 1of2

# Natividad MEDICAL CENTER

## Diagnostic Imaging Services Results

Patient Name :BURNETT, ESTER

V 35245

Account Number: 206782478
Med Rec Number: 36-11-98
Date Of Birth : 06/06/1967
Patient Age : 37
Patient Location :



L3-4: Right foraminal disc bulge, which was seen previously, however, appears more prominent. It does not appear to be causing neural foraminal narrowing on the oblique axial images, however, on the sagittal images there appears to be mild neural foraminal narrowing. Caudal attenuation of the left neural foramen.

**IMPRESSION:**

1. Interval prominence of the left paracentral L5-S1 disc protrusion with posterior disc bulge causing mild bilateral neural foraminal narrowing. The disc appears to touch the exiting nerve root on the right.
2. Posterior disc bulge with a right foraminal component, which is of a different configuration in comparison to the prior study, with imprint on the anterior thecal sac and mild right neural foraminal narrowing.
3. Interval prominence of the right foraminal disc bulge at L3-4, which is thought to be causing mild right neural foraminal narrowing.

Electronically Signed by
B. Misa Hosohama, M.D. 03/13/2005 10:22
B. Misa Hosohama, M.D.

D: 03/11/2005 4:06 P
T: 03/12/2005 4:35 P
000060276 dap

cc: Unknown Physician



REC'D MAR 21 200



[redacted] 93.

Exhibit-34

[redacted] 2 of 2

# Natividad MEDICAL CENTER

## Diagnostic Imaging Services Results

Patient Name :BURNETT, ESTER

V 35245

Account Number: 206782478
Med Rec Number: 36-11-98
Date Of Birth : 06/06/1967
Patient Age : 37
Patient Location :



| Order Number: | Order Date/Time: | Ordering Physician: | Exam Description: |
|---|---|---|---|
| 800396 | 03/11/2005 08:23 A | Physician, Unknown | |

**EXAMINATION:** MAGNETIC RESONANCE IMAGING LUMBAR SPINE

**HISTORY:**

1) Radiculopathy and sciatica. Previous herniated nucleus pulposus. Follow up. Comparison MRI from 8/7/97.

**TECHNIQUE:**

2) Sagittal T1, sagittal proton density, and sagittal T2 with and without fat sat sequences of the lumbar spine. Oblique axial proton density and T2 sequences from L3-4 to L5-S1 were obtained in a 1.0 Tesla magnetic resonance imaging unit.

**FULL RESULT:**

3) There is straightening of the normal lordotic curvature without spondylolisthesis. Disc spaces are preserved, however, there is disc desiccation at L4-5 and L5-S1. Normal signal and morphology of the conus, located at T12-L1. No intrathecal or paraspinal mass. Possible Tarlov cyst at S2-3, which is on the edge of the film.

4) L5-S1: Left paracentral disc protrusion with an associated posterior disc bulge, which appears slightly more prominent in comparison to the prior study. There is mild bilateral neural foraminal narrowing and the disc appears to touch the exiting nerve root on the right.

5) L4-5: The previously identified small central disc protrusion is less prominent and there is now more of a posterior disc bulge with a right foraminal component that is causing mild right neural foraminal narrowing. There is mild caudal attenuation of the left neural foramen. The AP diameter of the thecal sac measures 10mm and the anterior thecal sac is flattened.



RECD MAR 21 2005

[redacted] 94.

Exhibit -35

Exhibit 35

*Diplomates, American Board of Radiology*

William C. Burnette, M.D.
Harry F. Corbett, M.D.
Michael P. Curran, M.D.
Arthur C. Duberg, M.D.
Stephen R. Holtzman, M.D.
Chang S. Kim, M.D.
Thomas L. Miller, M.D.
Sean P. Murray, M.D.
Erik M. Olson, M.D.
William M. Russell, M.D.
Kenneth L. Serra, M.D.
Donna E. Winingham, M.D.

# MRI OF SAN LUIS OBISPO

Radiology Associates

www.rasloimaging.com

**Digital Medical Imaging (DMI)**
522 East Plaza Drive, Santa Maria, CA 93454
PH: (805) 928-3673 FAX: (805) 928-9588

**Five Cities Medical Imaging**
921 Oak Park Blvd., Ste. 102, Pismo Beach, CA 93449
PH: (805) 779-7900 FAX: (805) 779-7910

**MRI of San Luis Obispo**
1064 Murray Ave., San Luis Obispo, CA 93405
PH: (805) 543-5674 FAX: (805) 543-5818

**Radiology Diagnostic Center**
1050 Las Tablas Road, Templeton, CA 93465
PH: (805) 434-0829 FAX: (805) 434-0826

| | | | |
|---|---|---|---|
| **Patient Name:** | **BURNETT, ESTER** V35245 | | |
| **Date of Exam:** | **03/27/2006** | **Date of Birth:** | 06/06/1967 |
| **Referring MD:** | HAROLD C SEGAL M.D. | **Patient ID:** | 476147 |

**Exam:** **MRI LUMBAR SPINE W/O**
**History:** Chronic low back pain with right radiculopathy. Injury in 1990.

**Procedure:** Sagittal T1, sagittal T2, sagittal T2 fat suppressed, axial T1 and axial T2 weighted images of the lumbar spine were obtained on a GE 1.5 Tesla Echo Speed MRI Scanner.

**Findings:** Normal vertebral alignment is maintained with no spondylolysis or spondylolisthesis. Normal vertebral body height is maintained. Marrow signal is preserved. A cystic structure within the central canal of the second and third sacral levels is probably a Tarlov's cyst. The T12-L1 disc is desiccated and decreased in height. L3-4 through L5-S1 also show desiccation and loss of height. The following levels are additionally evaluated in the axial plane:

L1-2: Normal.
L2-3: Normal.
L3-4: Diffuse annular bulge minimally indents the thecal sac. A more focal right foraminal protrusion moderately to severe narrows the right foramen, and extends beyond the foramen displacing the exited L3 nerve root beyond the foramen. Left foramen is patent. Facet hypertrophy is present.
L4-5: Diffuse annular bulge is asymmetric to the right with mild central canal and moderate right lateral recess and foraminal narrowing. Facet and ligamentum flava hypertrophy are present. A small central protrusion is also present.
L5-S1: Diffuse bulge is present with a slightly more focal left central protrusion. This barely contacts the left S1 nerve root in the lateral recess without displacement. The foramina are maintained. Facet hypertrophy is present.

IMPRESSION:

1. **L3-4 right foraminal protrusion moderately to severely narrowing the right foramen and displacing the exited L3 nerve root beyond the foramen.**
2. **L4-5 diffuse bulge with mild central canal and moderate right lateral recess and foraminal narrowing. The bulge is asymmetric to the right and there is a small central protrusion component.**
3. **L5-S1 left central protrusion just contacting the left S1 nerve root.**

**William C. Burnette, M.D.**
D:March 27, 2006 T:March 27, 2006 Trans: dme
Job#: 147929 Accession#: 0010735086SMR

*Thank you for your referral*
*This document was electronically signed by William C. Burnette, M.D. on 03/27/2006 13:30:40*



Form updated 10/31/2005

96.

Exhibit-37

Exhibit-37

STATE OF CALIFORNIA DEPARTMENT OF CORRECTIONS

# COMPREHENSIVE ACCOMMODATION CHRONO

**INSTRUCTIONS:** A physician shall complete this form if an inmate requires an accommodation due to a medical condition. Circle P if the accommodation is to be permanent, or T if the accommodation is to be temporary. If the accommodation is temporary, write the date the accommodation expires on the line. A new form shall be generated when a change to an accommodation is required or upon renewal of a temporary accommodation. Any new form generated shall include previous accommodations, if they still apply. Chronos indicating permanent accommodations shall be reviewed annually. This form shall be honored as a permanent chrono at all institutions.

## A. HOUSING

None

Barrier Free/Wheelchair Access P / T ______

Ground Floor Cell P / (T) 12/1/07

Continuous Powered Generator P / T ______

Bottom Bunk P / (T) 12/1/07

Single Cell (See 128-C date: ______ ) P / T ______

Permanent OHU / CTC (circle one) P / T ______

Other ______ P / T ______

## B. MEDICAL EQUIPMENT/SUPPLIES

None

Limb Prosthesis P / T ______

Brace P / T ______

Crutches P / T ______

Cane: (type) ______ P / T ______

Walker P / T ______

Dressing/Catheter/Colostomy Supplies P / T ______

Shoe: (specify) ______ P / T ______

Dialysis Peritoneal P / T ______

Wheelchair: (type) ______ P / T ______

Contact Lens(es) & Supplies P / T ______

Hearing Aid P / T ______

Special Garment: (specify) [illegible] P / (T) 12/1/07

Rx. Glasses: ______ P / T ______

Cotton Bedding P / T ______

Extra Mattress P / (T) 12/1/07

Other ______ P / T ______

## C. OTHER

None

Attendant to assist with meal access and other movement inside the institution. P / T ______

Attendant will not feed or lift the inmate/patient or perform elements of personal hygiene.

Wheelchair Accessible Table P / T ______

Therapeutic Diet: (specify) ______ P / T ______

Communication Assistance P / T ______

Transport Vehicle with Lift P / T ______

Short Beard P / T ______

Other ______ P / T ______

## D. PHYSICAL LIMITATIONS TO JOB ASSIGNMENTS

Based on the above, are there any physical limitations to job assignments? ☒ Yes ☐ No

If yes, specify: medically unassigned until 12/1/07 (1845)

| INSTITUTION | COMPLETED BY (PRINT NAME) | TITLE |
|---|---|---|
| SCC | James Sweetland | MD |

| SIGNATURE | DATE |
|---|---|
| [signature] | 11/29/06 |
| HCM/CMO SIGNATURE: [signature] | DATE: 12/4/06 |
| (CIRCLE ONE) (APPROVED) / DENIED | |

CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH

Burnett, Ester

V35245

5T-14L

COMPREHENSIVE ACCOMMODATION CHRONO

98.

CDC 7410 (03/04)

Distribution: Original - Unit Health Record Canary - Central File Pink - Correctional Counselor Gold - Inmate

Exhibit-48

Exhibit-48

**NOTE: SEND COPY OF PHYSICIAN'S ORDER FOR MEDICATION TO PHARMACY AFTER EACH ORDER IS SIGNED.**

| Order Date | Time | Problem # | Physician's Order and Medication (Orders must be dated, timed, and signed.) |
|---|---|---|---|
| 11-2-06 | 2020 | | Motrin 800mg PO X 1 dose NOW |
| | | | Toradol 60mg IM x 1 dose NOW & given |
| | | | TO Dr. Dugan / [signature] |
| CJP | | | Noted 2020 11-2-06 |
| | | | [signature] |
| | | | X-Ray - Rt Shoulder — #10 given in T. |
| 11-2-06 | 2130 | | Naprosyn 500mg PO BID ARP x 30 days. |
| | | | Flu Yard MD |
| CJP | | | TO Dr. Dugan / [signature] |
| | | | Noted 11/2/06 @ 2020 |
| | | | [signature] |

ALLERGIES: NKDA

INSTITUTION: RJD.

ROOM/WING: 5-230L.

CDC NUMBER. NAME (LAST, FIRST, MI)

Burnett, E.

V85245

Confidential client information See W & I Code, Sections 4514 and 5328

**PHYSICIAN'S ORDERS**

100.

CDC 7221 (2/00)
STATE OF CALIFORNIA

OSP 00 35617

DEPARTMENT OF CORRECTIONS

Exhibit-49

Exhibit 1-29

| DATE | TIME | NOTES |
|---|---|---|
| 2020 | | ~10-15yr Hx Back problems playing football – ice pack Shoulder. |
| | | A&O x3 (+) verbal needs: grimacing in pain. |
| | | reports 1° "fell while going up stairs" "feels |
| | | like pinched nerve" reports sciatica Hx (L) ; |
| | | reports lifting shoulder ↑ pain, ↓ ROM – [illegible]. |
| 2030 | | MD pg'd ; Orders rec'd. Noted & carried |
| | | out ; Given meds c̄ incident – [illegible] "want vicoden" |
| 2100 | | Denies any relief from Rx ; ice pack to Back now ; |
| | | attempting to provide stretching exercises ; ref. |
| | | to attempt 2° pain – ; MD pg'd – [illegible]. |
| 2130 | | MD c̄ orders ; Ø further & Ø Narcotics ordered ; MD |
| | | reports Hx of med seeking behavior. already |
| | | on PT ; Naprosyn. X-Ray F/U tmr yard – RTC ó report |
| | | any ↑ / worsening of condition – [illegible]. |
| 2230 | L.E. | Awaiting & has been awaiting for court to clear ; |
| | | now waiting for escort back to H/U ; lying on |
| | | Rt side c̄ even, unlabored respirations ; c/o ↑ to |
| | | c/o pain ; verbally abusive toward MD decisions ; [illegible] |
| 2245 | L.E. | Escorted back to H/U by MTA Washington & C/O |
| | | via golf cart ; NAD at this time ; Left arm in |
| | | splint for safety / support ; pending X-Ray of |
| | | site ; Rx Ed done ; (+) understanding ; RTC ó F/U |
| | | yard S/O. [signature] |

CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH

Burnett.
V35245.

Exhibit-50

Exhibit-30

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS

# EMERGENCY CARE FLOW SHEET

| DATE: 11.12.06 | |
|---|---|
| TIME IN: 2010 | TIME OUT: 2250 |

| PATIENT NAME (LAST, FIRST): Burnett. | CDC NUMBER: V35245 | HOUSING: 06/06/07 | DOB: 15-2030 |
|---|---|---|---|
| TIME OF INCIDENT: 2000 | LOCATION OF INCIDENT: H/U - Stairs. | MODE OF ARRIVAL: ETV | |
| STAFF NAME (LAST, FIRST): | OCCUPATION: | SEX: M | AGE: 39 / DOB: |
| CHIEF COMPLAINT: "My Back gave Out" | TB CODE: 22. | DATE OF LAST TETANUS: | |

**MECHANISM OF INJURY**
- ☐ STABBING
- ☐ PHYSICAL ALTERCATION
- ☐ GUNSHOT WOUND
- ☐ BURN
- ☐ SPORTS INJURY
- ☐ ON THE JOB INJURY
- ☑ OTHER Fell: left shoulder.

**SKIN COLOR**: ☑ NORMAL ☐ PALE ☐ ASHEN ☐ CYANOTIC ☐ FLUSHED

**SKIN TEMP**: ☐ HOT ☑ WARM ☐ COOL ☐ COLD

**SKIN MOISTURE**: ☑ NORMAL ☐ DRY ☐ MOIST ☐ PROFUSE

**CAPILLARY REFILL**: ☑ < 2 SECONDS ☐ > 2 SECONDS ☐ NONE

**GLASCOW COMA SCALE**

| | | | | | | |
|---|---|---|---|---|---|---|
| EYE OPENING RESPONSE | SPONTANEOUS | 4 (circled) | 4 | 4 | 4 | 4 |
| | TO VOICE | 3 | 3 | 3 | 3 | 3 |
| | TO PAIN | 2 | 2 | 2 | 2 | 2 |
| | NONE | 1 | 1 | 1 | 1 | 1 |
| BEST VERBAL RESPONSE | ORIENTED | 5 (circled) | 5 | 5 | 5 | 5 |
| | CONFUSED | 4 | 4 | 4 | 4 | 4 |
| | INAPPROPRIATE WORDS | 3 | 3 | 3 | 3 | 3 |
| | INCOMPRESHENSIBLE SOUNDS | 2 | 2 | 2 | 2 | 2 |
| | NONE | 1 | 1 | 1 | 1 | 1 |
| BEST MOTOR RESPONSE | OBEYS COMMAND | 6 (circled) | 6 | 6 | 6 | 6 |
| | LOCALIZES PN. | 5 | 5 | 5 | 5 | 5 |
| | WITHDRAWS PN. | 4 | 4 | 4 | 4 | 4 |
| | FEXION PN. | 3 | 3 | 3 | 3 | 3 |
| | EXTENSION PN. | 2 | 2 | 2 | 2 | 2 |
| | NONE | 1 | 1 | 1 | 1 | 1 |

**LUNG SOUNDS** (RT / LT): ☑ CLEAR ☑; ☐ WHEEZES ☐; ☐ RALES ☐; ☐ RHONCHI ☐; ☐ DIMINISHED ☐; ☐ ABSENT ☐

**RESP. CHARACTER**: ☐ LABORED ☑ UNLABORED ☐ PAINFUL ☐ SHALLOW ☐ DEEP ☐ RETRACTION ☐ NASAL FLARING

**EVIDENCE OF TRAUMA**: ☐ CHEST ☐ HEAD ☐ ABDOMEN ☐ NECK ☐ G/U ☐ EXTREMITIES ☐ PELVIS ☐ OTHER ☑ BACK SPINE

**VITALS**

| TIME | TEMP | PULSE | RESP | BP | $SaO_2$ | CURRENT MEDICATION |
|---|---|---|---|---|---|---|
| 2010 | 97.0 | 82 | 18 | 148/91 | 100% | HTN — Triamterene/HTZ |
| 2050 | 97.0 | 80 | 18 | 138/90 | 100% | |

| TIME | PUPIL RESPONSE | PUPIL SIZE |
|---|---|---|
| 2010 / 2050 | B / B | 4/4 |

KEY C=CLOSED B=BRISK SL=SLUGGISH F=FIXED

3 4 5 6 7 8

**IV**

| TIME | SOL | SITE | GAUGE | RATE |
|---|---|---|---|---|

**MEDICATION ALLERGIES**: NKDA.

**MEDICATION GIVEN IN ER**: Motrin. Toradol 60mg / 2020

**O2 ADMIN**

| TIME | ROUTE | RATE | $SaO_2$ |
|---|---|---|---|

**SOAP NOTATIONS**

SUBJECTIVE: (PATIENT'S STATEMENTS, HISTORY) "I was going to the stairs"

OBJECTIVE: (PHYSICAL EVALUATION) pain ↓ mobility: ↑ pain

ASSESSMENT: (NURSING DIAGNOSIS) Alteration in Comfort.

PLAN: (PT EDUCATION, FOLLOWUP, MD ORDERS, ETC.) Rx; Report any ↑ worsening of condition f/u Yard MD

**ABBREVIATION CODE**

| | | | |
|---|---|---|---|
| Ab - Abrasion | E - Edema | | |
| Amp - Amputation | F - Closed Susp. Fracture | | |
| Av - Avulsion | H - Hematoma | | |
| B - Burn | L - Laceration | | |
| __% - Percent | P - Petechiae | | |
| CP - Compound Frac. | R - Rash | | |
| EC - Ecchymosis | S - Scar | | |
| ENT - Entrance Wound | Ex - Exit Wound | | |
| SI - Surgical Incision | | | |




| PRINT NAME | SIGNATURE | |
|---|---|---|
| T. Clemente RN | T Clemente RN | RN/MTA/MD |
| | | RN/MTA/MD |
| | | RN/MTA/MD |

SUPERVISOR REVIEW

**PATIENT DISPOSITION**
- ☑ RETURN TO CUSTODY
- ☑ ADMIT TO INFIRMARY / HOSPITAL
- ☐ TRANSPORT TO COMM. HOSPITAL VIA:
  - ☐ AMBULANCE
  - ☐ STATE VEHICLE
- ☐ RELEASED TO CORONER

**PATIENT CONDITION ON DISCHARGE**
- ☑ STABLE ☐ UNSTABLE
- ☐ DECEASED TIME____



104

Exhibit-51

Exhibit 51

**NOTE: SEND COPY OF PHYSICIAN'S ORDER FOR MEDICATION TO PHARMACY AFTER EACH ORDER IS SIGNED.**

| Order Date | Time | Problem # | Physician's Order and Medication (Orders must be dated, timed, and signed.) |
|---|---|---|---|
| 11/13/06 | 2400 | | 30mg Toradol IM |
| | | | 25mg Phenergan IM per TO |
| | | | Dr. Duggan / W Belgar |
| | | | L. Duggan MD |
| | | | Noted 11/13/06 CTP W Bel RN |

Given IM to (L) deltoid & (R) deltoid Report

ALLERGIES: NKDA

INSTITUTION: RJDCF

ROOM/WING: 15-230

CDC NUMBER, NAME (LAST, FIRST, MI): V35245 Burnett

Confidential client information See W & I Code, Sections 4514 and 5328

**PHYSICIAN'S ORDERS**

106a

CDC 7221 (2/00)
STATE OF CALIFORNIA
OSP 00 35617
DEPARTMENT OF CORRECTIONS

Exhibit-52

Exhibit
52

| DATE | TIME | |
|---|---|---|
| 1/13 | 2400 | S- C/o falling down stairs again after being evaluated in TTA. Refuses to move States "just send me to Ad Seg". O- A&Ox3 In no apparent distress. A- Pain r/t back injury P- Dr. Dugan called again, Dr. very familiar with pt. Ordered Robaxin + pt. to be monitored. Robaxin not available so pt. OK'ed to get 30mg more of Toradol IM + 50mg Phenergan. E- Pt. still refused to move. States "I hurt and am not going anywhere". Watch Commander called + came to talk to pt. Pt. kept saying he wanted to go to Ad Seg. Was told that decision would not be up to him. Continues to refuse to move. Pt. put in holding tank. In no apparent distress ——— [signature] |
| 1/13/06 | 0615 | Watch Commander Suglich here to talk to I/M pt. re: Ad Seg placement. Pt. sitting upright on bench - good posture noted - no c/o back pain or other distress [illegible] - [signature] |
| | 0830 | Discharged to custody to Ad Seg placement via w/c transport [signature] |

| INSTITUTION | HOUSING UNIT | CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH |
|---|---|---|
| | | V 35245 Burnett, Ester 6/6/1967 |

**INTERDISCIPLINARY PROGRESS NOTES**



CDC 7230 (Rev 04/03)
STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS

Exhibit-7D

Exhibit-70

| E | TIME | |
|---|---|---|
| /06 | 0900 | B/P 137/85, P 71 T 97.3 wt 245 |
| | | F/U back pain, ⊕ med refill, shoulder neck pain |
| | | → 6'4" |
| | | 39 y/o |
| | | (S) Parole 2021 Fam Hx |
| | | Dec 2005 - 268 ⊘ dm |
| | | now → 245 |
| | | 23 lbs weight loss |
| | | Well-developed, upper body muscle group |
| | | (O) Vitals noted, walks s̄ limp - steps LABS 3/06 |
| | | CV - S1 S2 to platform BS 84 |
| | | hyperesthesia to palpation A1C 7.0 |
| | | of muscle groups X plan 172 |
| | | straight leg ⊖ steps to platform |
| | | (A/P) ① Chronic Low Back pain - Deconditioning? (Normal P.E) |
| | | ? Rt buttock sciatica |
| | | (1) Agreed to low Bunk - No need for low tier |
| | | (2) Physical Therapy - referral - I/P agreed |
| | | (3) trial of Ted Neurontin |
| | | ② Hypertension - Continue diazide |

[signature]

| INSTITUTION | HOUSING UNIT | CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH |
|---|---|---|
| | F314-220L | Burnett, E V35245 |

INTERDISCIPLINARY PROGRESS NOTES

110.

CDC 7230 (Rev 04/03)
STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS

Exhibit-74

Exhibit-74

| DATE | TIME | |
|---|---|---|
| /16/06 | | B/P 128/82 P ~~64~~ 67 T - wt 240 |
| | | → F/U neck/back/shoulder pain |
| | | ⓐ MED refills |
| | | → 6/8/06 - CMC |
| | | (S) (Right handed) (2021) |
| | | c/o Cannot turn neck to (left) side, & to the right it hurts. |
| | | Unable to left (arm) above head's pain |
| | | onset → fell down stairs @ another prison → pain |
| | | (O) Very large developed Black man - on oxycontin on street c PT @ ~~Mercy~~ for Temporary disability committed new crime for (15 years) |
| | | (O). Vitals - stands easily and walks s difficulty |
| | | Very large Biceps - chest c developed pecs and lats |
| | | ~~Right~~ Right biceps (38") Left biceps (39") |
| | | turned head easily to see Sgt Dawson enter room. |
| | | (A/P) (1) C/o Pain out of Proportion to P.E. - P.E. WDL |
| | | "Those crack pot doctors" can't overcome a specialist report. |
| | | This complaint is more about housing and privileges. |
| | | (2) Praise for ONGOING Weight loss [signature] |

INSTITUTION

HOUSING UNIT 14-220L

CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH

Burnett, Ester

~~V35~~

V 35245

INTERDISCIPLINARY PROGRESS NOTES

112.

CDC 7230 (Rev 04/03)
STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS

Exhibit-81

# COMPREHENSIVE ACCOMMODATION CHRONO

INSTRUCTIONS: A physician shall complete this form if an inmate requires an accommodation due to a medical condition. Circle P if the accommodation is to be permanent, or T if the accommodation is to be temporary. If the accommodation is temporary, write the date the accommodation expires on the line. A new form shall be generated when a change to an accommodation is required or upon renewal of a temporary accommodation. Any new form generated shall include previous accommodations, if they still apply. Chronos indicating permanent accommodations shall be reviewed annually. This form shall be honored as a permanent chrono at all institutions.

## A. HOUSING

| | | | |
|---|---|---|---|
| None | | Bottom Bunk (circled) | P/T (T circled) ONE YEAR |
| Barrier Free/Wheelchair Access | P/T | Single Cell (See 128-C date: ) | P/T |
| Ground Floor Cell (circled) | P/T (T circled) ONE YEAR | Permanent OHU / CTC (circle one) | P/T |
| Continuous Powered Generator | P/T | Other | P/T |

## B. MEDICAL EQUIPMENT/SUPPLIES

| | | | |
|---|---|---|---|
| None | | Wheelchair: (type) | P/T |
| Limb Prosthesis | P/T | Contact Lens(es) & Supplies | P/T |
| Brace | P/T | Hearing Aid | P/T |
| Crutches | P/T | Special Garment: | |
| Cane: (type) WOOD CANE | P/T (T circled) ONE YEAR | (specify) | P/T |
| Walker (Per Neurosurgeon) | P/T | Rx. Glasses: | P/T |
| Dressing/Catheter/Colostomy Supplies | P/T | Cotton Bedding | P/T |
| Shoe: (specify) | P/T | Extra Mattress (Per P.T) | P/T |
| Dialysis Peritoneal | P/T | Other (circled) Extra Blanket | P/T (T circled) ONE YEAR |

## C. OTHER

| | | | |
|---|---|---|---|
| None | | Therapeutic Diet: (specify) | P/T |
| Attendant to assist with meal access and other movement inside the institution. | P/T | Communication Assistance | P/T |
| Attendant will not feed or lift the inmate/patient or perform elements of personal hygiene. | | Transport Vehicle with Lift | P/T |
| | | Short Beard | P/T |
| Wheelchair Accessible Table | P/T | Other | P/T |

## D. PHYSICAL LIMITATIONS TO JOB ASSIGNMENTS

Based on the above, are there any physical limitations to job assignments? ☒ Yes ☐ No

If yes, specify: Limited use of Back / legs

| | | |
|---|---|---|
| INSTITUTION SVSP | COMPLETED BY (PRINT NAME) N. ADUPA | TITLE MD |
| SIGNATURE [signature] | DATE 7/13/05 | CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH V 35245 BURNETT, ESTER 6-6-67 D4-113 |
| HCM/CMO SIGNATURE [signature] | DATE 7/15/05 | |
| (CIRCLE ONE) APPROVED (circled) / DENIED | | |

COMPREHENSIVE ACCOMMODATION CHRONO

194

Distribution: Original - Unit Health Record | Canary - Central File | Pink - Correctional Counselor | Gold - Inmate

CDC 7410 (03/04)

Exhibit-83

Exhibit-B3

STATE OF CALIFORNIA

# COMPREHENSIVE ACCOMMODATION CHRONO

**INSTRUCTIONS:** A physician shall complete this form if an inmate requires an accommodation due to a medical condition. Circle P if the accommodation is to be permanent, or T if the accommodation is to be temporary. If the accommodation is temporary, write the date the accommodation expires on the line. A new form shall be generated when a change to an accommodation is required or upon renewal of a temporary accommodation. Any new form generated shall include previous accommodations, if they still apply. Chronos indicating permanent accommodations shall be reviewed annually. This form shall be honored as a permanent chrono at all institutions.

## A. HOUSING

None

1. Barrier Free/Wheelchair Access P/T
2. (Ground Floor Cell) (P)/T 12month
3. Continuous Powered Generator P/T
4. (Bottom Bunk) (P)/T 12 month
5. Single Cell (See 128-C date: ) P/T
6. Permanent OHU / CTC (circle one) P/T
7. Other P/T

## B. MEDICAL EQUIPMENT/SUPPLIES

None

8. Limb Prosthesis P/T
9. Brace P/T
10. Crutches P/T
11. Cane: (type) P/T
12. Walker P/T
13. Dressing/Catheter/Colostomy Supplies P/T
14. Shoe: (specify) P/T
15. Dialysis Peritoneal P/T
16. Wheelchair: (type) P/T
17. Contact Lens(es) & Supplies P/T
18. Hearing Aid P/T
19. Special Garment: (specify) P/T
20. Rx. Glasses: P/T
21. Cotton Bedding P/T
22. (Extra Mattress) PER SECURITY INSPECTION (P)/T 12 month
23. Other P/T

## C. OTHER

None

24. Attendant to assist with meal access and other movement inside the institution. P/T

Attendant will not feed or lift the inmate/patient or perform elements of personal hygiene.

25. Wheelchair Accessible Table P/T
26. Therapeutic Diet: (specify) P/T
27. Communication Assistance P/T
28. Transport Vehicle with Lift P/T
29. Short Beard P/T
30. Other P/T

## D. PHYSICAL LIMITATIONS TO JOB ASSIGNMENTS

Based on the above, are there any physical limitations to job assignments? ☐ Yes ☐ No

If yes, specify: no lifting more than 10#, no walking more than 15 minute at a time, no sitting more then 15 min. at a time X 12 month due to med cond

| | | |
|---|---|---|
| INSTITUTION: Centinela | COMPLETED BY (PRINT NAME): Ken Collinsworth | TITLE |
| SIGNATURE: [signature] | DATE: 8/2/07. | CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH: Barnett E V35245 6-6-67 B3-119L |
| HCM/CMO SIGNATURE: [signature] | DATE: 8/4/07 | |
| APPROVED (list the number of items approved): 2, 4, 22 | | |
| DENIED (list the number of items denied): 4 | | |

COMPREHENSIVE ACCOMMODATION CHRONO

CDC 7410 (08/04)

1166

Distribution: Original - Unit Health Record   Canary - Central File   Pink - Correctional Counselor   Gold - Inmate

I/M Housing   I/M assignment

# Exhibit-85

Exhibit-85

~~Exhibit~~ 1 of 16

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS AND REHABILITATION
INMATE APPEALS BRANCH
P. O. BOX 942883
SACRAMENTO, CA 94283-0001

# DIRECTOR'S LEVEL APPEAL DECISION

Date: MAY 02 2006

In re: Burnett, V-35245
California Men's Colony
P.O. Box 8101
San Luis Obispo, CA 93409-8101

IAB Case No.: 0509695 Local Log No.: SVSP 05-02623

This matter was reviewed on behalf of the Director of the California Department of Corrections and Rehabilitation (CDCR) by Appeals Examiner J. G. Arceo, Facility Captain. All submitted documentation and supporting arguments of the parties have been considered.

I APPELLANT'S ARGUMENT: It is the appellant's position that on June 22, 2005, during a telemedicine evaluation, the Salinas Valley State Prison (SVSP) neurologist only commented on his condition but made no recommendations. He requests to physically appear before a neurologist for a physical examination of his medical condition.

II SECOND LEVEL'S DECISION: The reviewer found that the neurosurgery consultation was reviewed with the appellant and the necessary recommendations were ordered including pain medication, a cane, and a consultation with a specialist. The appellant informed his Primary Care Physician that his pain is better. The appellant has been informed that the scheduling for pain management is pending completion of his Pain Questionnaire, which is required by the telemedicine provider. The appellant is to be seen to complete this document no later than October 14, 2005. Once the document is completed the telemedicine nurse will schedule the appellant in the Telemedicine Pain Management Clinic.

III DIRECTOR'S LEVEL DECISION: Appeal is granted in part.

A. FINDINGS: While the appellant disputes the effectiveness of treatment provided to him via his telemedicine neurosurgery consultation, the institution has indicated that he has received the necessary medical treatment for his current medical condition. However, a review of the documentation presented by the appellant does not establish that he has been seen by medical staff to complete the Pain Questionnaire referred to in the Second Level of Review. The institution shall schedule the appellant to the questionnaire. Modification of the decision reached by the institution is required.

B. BASIS FOR THE DECISION:
California Code of Regulations, Title 15, Section: 3350, 3350.2, 3354

C. ORDER: The California Men's Colony (CMC)-Health Care Manager shall review the appellant's Unit Health Record to ensure that medical staff has received the completed Pain Questionnaire from the appellant. If necessary, the appellant shall be scheduled with the appropriate medical staff member in order to complete the document.

This issue was discussed with the office of Health Care Manager.

BURNETT, V-35245
CASE NO. 0509695
PAGE 2

This decision exhausts the administrative remedy available to the appellant within CDCR.

N. GRANNIS, Chief
Inmate Appeals Branch

cc: Warden, CMC
Health Care Manager, CMC
Appeals Coordinator, CMC
Medical Appeals Analyst, CMC
Appeals Coordinator, SVSP
Medical Appeals Analyst, SVSP

3 of 16

INMATE/PAROLEE
APPEAL FORM
CDC 602 (12/87)

(CMC)

Location: Institution/Parole Region: 1. SVSP d 2.
Log No.: 1. 05-02023 2.
Category: 8 2nd
CTC HAP

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

disagrees w/treatment - video examination

| NAME | NUMBER | ASSIGNMENT | UNIT/ROOM NUMBER |
|---|---|---|---|
| Burnett, Ester | V35245 | | D4 113 |

A. Describe Problem: ON the 22 of June I was taken to see a neurologist at SVSP CTC. ONLY I seen him ON a TV screen NO physical visit and NO physical evaluation was done NO mobility test NO strenght test or Balance test Pain test, IN Fact a review of the consult will show NO recomendation of any were made by said neurologist he ONLY commented ON surgery. with SVSP not haveing a regular neurologist to conduct physical examinations and implement treatments. misdiagnosis or delayed [redacted] diagnosis will result [redacted] in needless pain & suffering and INJURY.

If you need more space, attach one additional sheet.

REC'D JUN 27 2005

B. Action Requested: Physical evaluation (examination) by Neurologist. [redacted] immediatly

Inmate/Parolee Signature: Ester Burnott

Date Submitted:

INMATE APPEALS BRANCH

C. INFORMAL LEVEL (Date Received: )

Staff Response: Partially granted the copy of your visit to telemedicine was given to your doctor and if it is deemed necessary you will be seen by a specialist

REC'D JUL 08 2005

Staff Signature: M By—

Date Returned to Inmate: 7/7/05

RECEIVED
INMATE APPEALS BRANCH

D. FORMAL LEVEL

DELIVERED JUL 11 2005

If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

I'm very dissatisfied for reasons I stated above and due to the fact that after my consultation with a telemedicine on June-22-05 none of the treatment ordered has been given none not the cane not the pain med and neither the steriod shot in my back since I'm a level 3 inmate I'm at this time Requesting a transfer to CMF or CMC again I went to a telemedicine on 6-22-05 and its been 21 days since I've seen a doctor

Signature: Ester Burnott

Date Submitted: JUL-12-05

Note: Property/Funds appeals must be accompanied by a completed Board of Control form BC-1E, Inmate Claim

CDC Appeal Number:

REC'D JUL 13 2005

120

CLSP-D-05-2623 (Burnett

First Level ☐ Granted ☒ P. Granted ☐ Denied ☐ Other

E. REVIEWER'S ACTION (Complete within 15 working days): Date assigned: 7/15/05 Due Date: 8/24/05

Interviewed by: Pt was evaluated in the clinic on 7/13/05 and 7/27/05. Neurosurgery consultation was reviewed with patient and necessary recommendations were ordered including pain medication, cane, consult for pain specialist. on 7/27/05. Pt stated that his pain is better now.

Staff Signature: [signature] (ADYA, N) Title: MD Date Completed: 7/27/05

Division Head Approved: [signature] Title: HCM Returned Date to Inmate: RET'D AUG 05 2005

Signature:

RECD SEP 09 2005

F. If dissatisfied, explain reasons for requesting a Second-Level Review, and submit to Institution or Parole Region Appeals Coordinator within 15 days of receipt of response. I'm dissatisfied for reasons stated above and no follow up appointment was not with clinic doctor for 21 days after specialty clinics consultation. No priority ducats ever issued for any appointments specialty appointment not completed within 10 to 40 days. Surgeon perscribed medication wasn't given for 27 days after perscribed no medication newly perscribed was given for 21 days.

I have a right to be physically examined by a neurosurgery which I wasn't. You are treating my symptoms such as pain caused by my herniated disk in my lower back but the problem causeing the pain is not being treated and I still haven't received a cain as of yet. See attached sheet

Signature: Enton Burnett I was never interviewed for this appeal at first level Date Submitted: 9/8/05

Second Level ☐ Granted ☒ P. Granted ☐ Denied ☐ Other

G. REVIEWER'S ACTION (Complete within 10 working days): Date assigned: 9/21/05 Due Date: 10/6/05

☒ See Attached Letter

DELIVERED OCT 20 2005

Signature: [signature] Date Completed: 10/7/05

Warden/Superintendent Signature: [signature] Date Returned to Inmate: DELIVERED OCT 13 2005

H. If dissatisfied, add data or reasons for requesting a Director's Level Review, and submit by mail to the third level within 15 days of receipt of response. If you read this intire appeal you will see that none of the rules & procedures of the CDC have not been followed under Plata vs Davis I quote specialty clinics RECEIVED NOV 08 2005 DELIVERED NOV 08 2005 and consultations: specialty appointments must be completed within 10 to 90 days depending on seriousness of problem: prisoners waiting for a specialty appointment must be seen by a every 30 days. Follow up appointments with clinic doctor within 10 days of appointment. I quote again I quote "medications: formulary prescriptions to be filled immediately if an emergency of urgent, or within 24 hours if routine" the pain meds weren't given for 27 days the consult wasn't done on time and the pain consult specialty clinic wasn't done on time and it still has not been done and SVSP had plenty time to do the pain consult and again I wasn't interview at the frist or second level for this appeal due to the failure of SVSP to let me see a pain clinic. My back is still in constent pain and I'm still dissatisfied with all answers stated at all levels of this appeal

Signature: Enton Burnett Date Submitted: 11-21-05

RECD NOV 07 2005

For the Director's Review, submit all documents to: Director of Corrections
P.O. Box 942883
Sacramento, CA 94283-0001
Attn: Chief, Inmate Appeals

DIRECTOR'S ACTION: ☐ Granted ☒ P. Granted ☐ Denied ☐ Other

☒ See Attached Letter

Date: MAY 02 2006

9

**INMATE/PAROLEE APPEAL FORM**
CDC 602 (12/87)

| Location: Institution/Parole Region | Log No. | Category |
|---|---|---|
| 1. | 1. | |
| 2. | 2. | |

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME | NUMBER | ASSIGNMENT | UNIT/ROOM NUMBER |
|---|---|---|---|
| Burnett | V35245 | | 5 Bldg 528S |

A. Describe Problem: 11-20-05 appeal # SVSP-05-02623 was returned to me. I answered it and then mailed it the following day 11-21-05 as I signed it. So it can't be time barred if I got it on 11-20-05 I moved from SVSP to CMC East 10-14-05 the appeal is stamped Delivered 11-9-05 which is impossible because it was sent through institutional mail via usave-m and it is impossible that it was delivered 11-9-05 when I was in a entirely different Prison
appeal # SVSP-05-02623 is enclosed also

If you need more space, attach one see additional sheet.

B. Action Requested: appeal # SVSP-05-02623 answered in a timely fashion Due to the Fact it can't be time barred

RECEIVED
MAR - 1 2006
INMATE APPEALS BRANCH

Inmate/Parolee Signature: Eston Burnett Date Submitted: 2-20-06

C. INFORMAL LEVEL (Date Received: )

Staff Response:

Staff Signature: Date Returned to Inmate:

D. FORMAL LEVEL
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

Signature: Date Submitted:

Note: Property/Funds appeals must be accompanied by a completed Board of Control form BC-1E, Inmate Claim

CDC Appeal Number:



[redacted]

First Level ☐ Granted ☐ P. Granted ☐ Denied ☐ Other ______________________

E. REVIEWER'S ACTION (Complete within 15 working days): Date assigned: ______________ Due Date: ______________

Interviewed by: ______________________________

Staff Signature: ______________ Title: ______________ Date Completed: ______________

Division Head Approved: Returned

Signature: ______________ Title: ______________ Date to Inmate: ______________

F. If dissatisfied, explain reasons for requesting a Second-Level Review, and submit to Institution or Parole Region Appeals Coordinator within 15 days of receipt of response.

Signature: ______________ Date Submitted: ______________

Second Level ☐ Granted ☐ P. Granted ☐ Denied ☐ Other ______________________

G. REVIEWER'S ACTION (Complete within 10 working days): Date assigned: ______________ Due Date: ______________

☐ See Attached Letter

Signature: ______________ Date Completed: ______________

Warden/Superintendent Signature: ______________ Date Returned to Inmate: ______________

H. If dissatisfied, add data or reasons for requesting a Director's Level Review, and submit by mail to the third level within 15 days of receipt of response.

Signature: ______________ Date Submitted: ______________

For the Director's Review, submit all documents to: Director of Corrections
P.O. Box 942883
Sacramento, CA 94283-0001
Attn: Chief, Inmate Appeals

DIRECTOR'S ACTION: ☐ Granted ☐ P. Granted ☐ Denied ☐ Other ______________________

☐ See Attached Letter

Date: ______________

CDC 602 (12/87)

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS

5 of 16

# HEALTH CARE SERVICES
# PHYSICIAN REQUEST FOR SERVICES

(To be completed by requesting Physician and forwarded to Utilization Management Unit)

| | | |
|---|---|---|
| PATIENT NAME: BURNETT, ESTER | CDC NUMBER: V35245 | INSTITUTION: SVSP D4-113 |
| DATE OF BIRTH: 6-6-67 | EPRD DATE: 2021 | GENDER: M |
| PRINCIPLE DIAGNOSIS: LBP c̄ Radiculopathy | ICD-9 CODE: | CPT CODE(S): |
| REQUESTED SERVICE(S): Pain Specialist Clinic | | # OF DAYS RECOMMENDED: |

*Please circle all that apply:* Diagnostic Procedure/Consultation  Outpatient/Inpatient  Initial/Follow-up

Requested Treatment/Service is: EMERGENT  URGENT  ROUTINE

*For the purpose of retrospective review,* if emergent or urgent, please justify:

Proposed Provider: Pain Manag  Anticipated Length of Stay:

Expected disposition (i.e.: outpatient follow-up, return to institution, transfer):

Medical Necessity (*briefly describe the clinical situation: the history of the illness, treatments used, pertinent lab and imaging studies, or questions for the consultant*): LBP c̄ Radiculopathy currently on oxycontin, Hx of epidural shots which helped.

Estimated time for service delivery, recovery, rehabilitation and follow-up:

Summary of preliminary or diagnostic work up, conservative treatment provided (if applicable, please provide TB code, CD4, viral load, albumin, total protein and dates within last 3 months):

Comments (diagrams, risk factors, prognosis, alternative management, etc.):

| | | |
|---|---|---|
| REQUESTING PHYSICIAN PRINTED NAME: W. ADYA | APPROVED / AUTHORIZED / DENIED / DEFERRED BY | DATE 7/19/05 |
| REQUESTING PHYSICIAN SIGNATURE: [signature] | DATE 7/13/05 | Utilization management tracking |
| DATE OF CONSULTATION | PRINTED NAME OF CONSULTANT | |

FINDINGS:

RECOMMENDATIONS:

FOLLOW-UP OR FURTHER EVALUATIONS REQUESTED:

| | |
|---|---|
| CONSULTANT SIGNATURE | DATE |
| ETA RN SIGNATURE | DATE |
| PCP SIGNATURE | DATE |

CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH
V35245
BURNETT, ESTER
6-6-67

Attach Progress Note page for additional information.

**THIS FORM MUST BE RETURNED WITH THE PATIENT!!!**

DISTRIBUTION:
ORIGINAL - FILE IN UHR
GREEN - TO UHR PENDING ORIGINAL
CANARY - CONSULTANT
PINK - UM
GOLD - SPECIALTY SCHEDULER

PHYSICIAN REQUEST FOR SERVICES (RFS)  CDC 7243 (Rev. 11/02)

122a Faxed to Kim 7/20/05 1015A EC

6 of 16

Staff never interviewed me for this appeal at the first level. in violation of title 15 3084.5 (f) were in the first level was never waived and when I saw a doctor 7/27/05 I did say the pain medication was helping, but my back is still in pain and pain medication is not a cure for my problem it merely treats the symptoms. and the medication known to highly addictive it is to be used only until the problem is treated

[redacted]

Ester Burnett 8-6-05

If you had checked section "F" carefully you would have seen that section "F" was signed and dated so please stop Delaying my appeal But just to be safe I circled my signature and the date 9-8-05

**Inmate Burnett, V35245**
**Case No. SVSP-D-05-02623**
**Page 2**

going medical care and treatment as medically indicated by board certified physicians.

The appellant is advised that the scheduling for pain management is pending completion of a questionnaire, which is required by the telemedicine provider. The appellant is to be seen to complete his questionnaire no later than October February 14, 2005. After the completion of this document, the telemedicine nurse will schedule the appellant in the Telemedicine Pain Management Clinic.

**DECISION**: The appeal is Partially Granted.

The appellant is advised that this issue may be submitted for a Director's Level of Review if desired.

CHARLES DUDLEY LEE, MD
Health Care Manager
Salinas Valley State Prison

State of California — amc — Department of Corrections and Rehabilitation

3 of 16

# Memorandum

RECD NOV 07 2005

Date: October 6, 2005

To: Inmate Burnett, V35245
Salinas Valley State Prison

Subject: SECOND LEVEL APPEAL RESPONSE LOG NUMBER-SVSP-D-05-02623

**ISSUE**:

Appellant on June 22, 2005 was taken to see a neurologist at Salinas Valley State Prison Correctional Treatment Center. The appellant states that he was seen on Telemedicine. It is the appellant's position that no physical, mobility, or strength, or balance test was conducted. The appellant states that the neurologist did no make any recommendations that he only commented on surgery. It is the appellant's position that, as these did not take place, this will result in needless pain and suffering and injury.

Appellant requests on appeal that a physical evaluation/examination by a neurologist is immediately conducted.

**INTERVIEWED BY**: Dr. N. Adya on July 13, 2005.

**REGULATIONS**: The rules governing this issue are:

**CCR 3350.1 Provision of Medical Care and Definitions**
**CCR 3352Medical Authorization Review Committee**
**CCR 3354 Health Care Responsibilities and Limitations**

**SUMMARY OF INVESTIGATION**:

The First Level of Review (FLR) was completed on **July 27, 2005.** M. Byrne, Director of Nursing, was assigned to investigate this appeal at the Second Level of Review. All submitted documentation and supporting arguments have been considered. Additionally, a thorough examination has been conducted regarding the claim presented, and evaluated in accordance with Salinas Valley State Prison (SVSP) Operational Procedures (OP); the California Code of Regulations (CCR); and the Departmental Operations Manual (DOM).

The appellant was advised at the First Level of Review on July 27, 2005 that the Neurosurgery consultation was reviewed with the patient and the necessary recommendations were ordered including pain medication, a cane, and a consultation with a pain specialist. The appellant stated to the PCP that his pain is better. As such, the appellant was seen, evaluated, and is being provided on-

Oct 6, 2005

Mike Byrne, DON

Please read and sign. I got my information from Estela, who told me that she has been telling both you and Dr. Lee that this inmate needs the questionnaire completed for the last three months.

Also, I spoke with Dr. Bowman he said he needs a reminder to see and complete this questionnaire next Tuesday October 11, 2005 as he will work there. A voicemail was left w/ Estela to set up the inmate and remind Dr. Bowman to do the questionnaire.

You may want to advise her how to complete this, as she said she is not allowed to go the yards as she has not completed the an orientation to be in contact w/ inmates?

This is what you are signing in the appeal that the arrangements are in order.

Carolina



[redacted]

1 of 16

USE PATIENT PLATE

## INITIAL EVALUATION
(Physicians- *Please Dictate Template Type*)

Patient Email Address ____________

## UCD Anesthesia Pain Management Center
## PAIN QUESTIONNAIRE

Please complete this form today before your first appointment at the University of California, Davis Medical Center Anesthesia Pain Management Center. Your careful answers will help us to understand your pain problem and design the best treatment program for you. You may feel concerned about what happens to the information you provide, as much of it is personal. Our records are strictly confidential. No outsider is permitted to see your case record without your written permission unless we are required to do so by law (e.g., Workman's Compensation Claims)

| 1 | Referring Physician ____________ | Primary Care Physician (if not the same) ____________ |
|---|---|---|

| 1a | Dictate Mailing Address of Referring MD, PCP, and Work Comp |
|---|---|

Patient Information

| 2 | Burnett Ester ____________ Last Name First M.I. | 2a | Age 38 | 2b | Sex: M ☒ F ☐ |
|---|---|---|---|---|---|

Filled out by Ester Burnett 11-21-05

| 2c | Dictate Medical Record Number | 2d | Dictate Date of Birth 6-6-67 |
|---|---|---|---|

| 3 | **ABOUT YOUR PAIN (Diagnosis)** What is the main problem for which you are seeking treatment at the Pain Management Center? |
|---|---|

I want the Pain gone my back is in constant Pain

____________

PAIN LOCATION



Front Back

*Physicians- Dictate a narrative that includes the Chief Complaint/Diagnosis and Pain Location. Always begin "Patient is being evaluated for....."*

Please mark the location(s) of your pain on the diagrams above with an "X." If whole areas are painful, please shade in the painful area.

v. 4/1/2004

1

11 of 16

Ester Burnett, V-35245
California Men's Colony
P.O.BOX 8101
San Luis Obispo
Ca. 93409-8101

Chief Of Inmate Appeals
California Dept. Of Corrections
P.O.BOX 942883-0001
Sacramento, Ca.94283-0001

Dear/ Sir Madam,

I am in receipt of your letter of February 2006 in which you declared that you were returning all my appeals documents to me with no action on my medical complaint.

Ordinarily, I would consider such a letter as being the representation of exhaustion of all administrative remedies in my appeals process, freeing to seek legal redress in court. However, in the interest of due dilligence, and recognition that it is also entirely possible that you made a simple human error in your calculations, I am writing you this letter and sending back my appeals materials.

I strongly suggest you pay close attention to the CDC date stamps in section H, and also the date I signed and returned it to you. I will not belabor the dates here, look at it for yourself. 15 days from Nov, 9th would be November 24th. How is it that you came up with your 15 day screen out? Apparently, even the best among us are not above arithmetical mistakes. Your own conclusion has no basis in fact. You now have a chance to correcct that mistake.

This is a medical issue and I am not engaged in this appeals process frivolously and I am entitled to and I do expect that my appeal accorded the proper review necessary. There are Plata consent decree issues at bar here. It is rather an unfortunate fact that the CDC tends to wield the 15-day limit against inmates like a holy grail while freely flouting it's own much liberal time limits

Very Truly Yours

Ester Burnett

Dated:

Ester Burnett 2-20-06



[redacted]

12 of 14

# INMATE APPEAL ROUTE SLIP

To: CTC MD ADYA "D" Fac

Date: July 15, 2005

From: INMATE APPEALS OFFICE

Re: Appeal Log Number SVSP-D-05-02623 By Inmate BURNETT, V35245

Please assign this appeal to appropriate staff for FIRST level response. (I) interview

Appeal Issue: MEDICAL
Due Date: 08/24/2005
Special Needs:

STAFF INSTRUCTIONS: Per Director's Rule 3084.5(f) (2) first level appeal review requires a personal interview with the inmate unless the appeal is granted. This policy is not within the institution's jurisdiction and cannot be waived. Director's Rule 3084.5(f) (3) provides that a telephonic interview may be conducted if the inmate is not available in person.

Begin response with GRANTED, DENIED, PARTIALLY GRANTED or WITHDRAWN. When complete, return appeal to the Appeals Office. All first level appeals require signature of the Division Head. Appeals that are incomplete will be returned for appropriate completion.

Refer to D.O.M. 54100 for instructions.

T. Variz, CC-II / S. Gomez, CC-II(A)
Appeals Coordinator
Salinas Valley State Prison



[redacted]

B

14 of 16

**INMATE APPEAL ROUTE SLIP**

To: CTC Date: September 21, 2005

From: INMATE APPEALS OFFICE

Re: Appeal Log Number SVSP-D-05-02623 By Inmate BURNETT, V35245

Please assign this appeal to appropriate staff for SECOND level response.

Appeal Issue: MEDICAL
Due Date: 10/06/2005
Special Needs:

STAFF INSTRUCTIONS:
Second level appeals require a personal interview if not afforded at the first level. Begin your response with: GRANTED, DENIED, PARTIALLY GRANTED or WITHDRAWN. When complete, return to Appeals Office. Appeals that are incomplete will be returned to the responding staff for appropriate completion. Refer to D.O.M. 54100 for instructions.

T. VARIZ, CC-II / J. LUMAN, LT
Appeals Coordinator
Salinas Valley State Prison

State of California Department of Corrections and Rehabilitation

15 of 16

# INMATE / PAROLEE APPEAL SCREENING FORM

INMATE: Burnett CDC #: V35245 CDC HOUSING: 04-113

2nd ______________ 3rd ______________

## YOUR APPEAL IS BEING RETURNED TO YOU FOR THE FOLLOWING REASON(S):

[ ] 1. The action or decision being appealed is not within the jurisdiction of the department or this institution.

[ ] 2. You have submitted a duplicate appeal on the same issue. Check one:
- [ ] Your first appeal was screened out on __________ for __________ Appeal # __________
- [ ] Your first appeal is currently under review at the __________ level. Appeal # __________
- [ ] Your first appeal has been completed at the __________ level. Appeal # __________

[ ] 3. You are appealing an action:
[ ] not yet taken [ ] which has been completed [ ] Other: __________

[X] 4. You have not adequately completed the Inmate/Parolee form or attached the proper documents.
**Please attach the following items or explain why they are not available and send what you have:**

| | |
|---|---|
| [ ] CDC 115/Hearing Officer's Results | [ ] CDC 128C Medical Chrono |
| [ ] CDC 115 with IE/DA information | [ ] CDC 1819 Denied Publications |
| [ ] Supplemental Reports to CDC 115 | [ ] CDC 128G UCC / ICC / ICC-ASU |
| [ ] CDC 128 A [ ] CDC 128 B | |
| [ ] CDC 1030 Confidential Disclosure | [ ] Property Inventory Receipt |
| [ ] CDC 114D Lockup Order | [ ] CDC 143 Property Transfer Receipt |
| [ ] CDC 128G Ad/Seg ICC. | [ ] Cell Search Slip |
| [ ] CDC 128G CSR Endorsement Chrono | [ ] Receipts |
| [ ] CDC 839/840 Class/Reclass Score Sheet | [ ] Qtr. Pkg. Inventory Slip |
| [ ] CDC 7219 Medical Report | [ ] Failed to Complete Section __________ |
| [ ] CDC 7362 Health Care Request | [X] Sign & ~~Date~~ Section F |
| [ ] Lab Results Sheet | [ ] Emergency Not Warranted-CCR 3084.7 |
| [ ] Trust Account Statement | [ ] Other: **SEE COMMENTS BELOW** |

[ ] 5. The appeal exceeds 15 days working days time limit, CCR 3084.2(c), 3084.3(c)(6), & 3084.5(c)

[ ] 6. This appeal is [ ] unclear [ ] contains more than 1 additional page [ ] contains more than 1 issue
[ ] unreadable-rewrite in ink – this is a legal document & pencil/red ink do not copy well

[ ] 7. ABUSE WARNING [ ] you may submit only 1 appeal per seven (7) day period. ( ) Profanity/Obscene language.

[ ] 8. You may not submit an appeal on behalf of another inmate.

[ ] 9. Failed to reasonably demonstrate the decision, action, policy, or condition as having an adverse affect upon the inmate's welfare, per CCR 3084.1(a).

~PLEASE FOLLOW INSTRUCTIONS AND RETURN YOUR CDC 602 WITHIN 15 WORKING DAYS~

**Comments: You may write below or on back of this form to clarify or respond to above. Do not write on appeal to respond to this Screen Out form.**

If you had checked Section F carefully you would have see that section F was signed and dated so please stop delaying my appeal But just to be safe I'd circled my my signature and the date

**T. Variz, CCII**
**Appeals Coordinator**

**Date:** 8-9-05

This screening action may not be appealed. If you allege the above reason is inaccurate, then attach an explanation on a separate piece of paper – do not write any more on the appeal itself. Please return this form to the Appeals Coordinator with the necessary information.

**PERMANENT APPEAL ATTACHMENT - *DO NOT REMOVE***

[redacted] 132

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION ARNOLD SCHWARZENEGGER, GOVERNOR

INMATE APPEALS BRANCH
1515 S Street, Sacramento, CA 95814
P.O. Box 942883
Sacramento, CA 94283-0001

February 6, 2006

Burnett, CDC #V-35245
California Men's Colony
P.O. Box 8101
San Luis Obispo, CA 93409-8101

Re: Institution Appeal Log #SVSP-05-02623 Medical

Dear Mr. Burnett:

The enclosed documents are being returned to you for the following reasons:

An appellant must submit the appeal within 15 working days of the event or decision being appealed, or of receiving a lower level decision in accordance with CCR 3084.6(c).

Your assigned counselor, the Appeals Coordinator, or your Parole Agent can answer any questions you may have regarding the appeals process. Library staff can help you obtain any addresses you need.

N. GRANNIS, Chief
Inmate Appeals Branch

this appeal can't be time barred due to the fact I Just got it 11-20-06

****PERMANENT APPEAL ATTACHMENT-DO NOT REMOVE****

133. [redacted]

# Exhibit 99



[redacted]

Exhibit-99

| DATE | TIME | |
|---|---|---|
| 11-26-05 | 910 | Patient to be summoned to clinic for |
| | | 1) evaluation for 1845 |
| | | 2) serial BP reading mostly low 140's sys |
| | | 3) F/U recent sciatic exacerbation |
| 11/26/05 | 0930 | 3rd Floor Building officer called |
| | | and Reports I/M "up and about |
| | | unit and yard" without s/s of |
| | | "Distress" I/M out to yard paged |
| | | @ 0930 to Report to E Clinic - [illegible] |
| | | |
| | | HPTN as a disease entity explained to patient |
| | | strong F.H. HPTN Pt agrees to take |
| | | antihypertensive. |
| | | sciatic nerve irritation & natural |
| | | course explained to pt. Because he now |
| | | understands what to expect he will be less |
| | | troubled with future exacerbations. He was asked |
| | | by me about jack hammering & did so for about |
| | | 8 years in the past. Despite recent exacerbation |
| | | PE: gait normal able to walk on heels |
| | | ascend/descend stairs (to hospital) with stability |
| | | sl ↓ motor strength of right leg DTR ↓ bilaterally |
| | | upper arm strength (for bed lowering/lifting) excellent |

INSTITUTION

HOUSING UNIT

(Continued)

CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH

V35245

Burnett Ester

INTERDISCIPLINARY PROGRESS NOTES

CDC 7230 (Rev 04/03)

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS

Exhibit 100

Exhibit 100

| DATE | TIME | |
|---|---|---|
| 11·26·05 | | (continued) |
| | 1020am | |
| | | palpation of back hyper responsive |
| | | to muscular areas of bilateral lumbar area |
| | | |
| | | A) mild systolic hypertension |
| | | No need for lower tier |
| | | With upper motor strength, |
| | | I see no reason for non x-bed. |
| | | |
| | | P) Pt. was explained my opinion, as well as |
| | | why chronic use of narcotics is not |
| | | advisable, including tachyphylaxis / addiction |
| | | 1845 |

| INSTITUTION | HOUSING UNIT | CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH |
|---|---|---|
| | | V35245 Burnett. |

**INTERDISCIPLINARY PROGRESS NOTES**

CDC 7230 (Rev 04/03)
STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS

137.

[redacted]

Exhibit 102

Exhibit-102

**NOTE: SEND COPY OF PHYSICIAN'S ORDER FOR MEDICATION TO PHARMACY AFTER EACH ORDER IS SIGNED.**

| Order Date | Time | Problem # | Physician's Order and Medication (Orders must be dated, timed, and signed.) |
|---|---|---|---|
| 11-26-05 | | | Dyazide 1 Po QAM x 1/2 yr |
| 10:30 | | | |
| | | | CBC SMA-18 Hgb A1C any day |
| | | | |
| | | | Process 1845 |
| | | | Chrono: No verified disability |
| | | | |
| | | | Noted by D Epps LVN 11/26/05 |
| 12/2/05 | | | AF bid x 6 weeks |
| | | | M. [illegible] |
| | | | |
| 12/2/05 | | | Noted [illegible] |

| ALLERGIES | INSTITUTION | ROOM/WING |
|---|---|---|
| NKA | CMC-E | 7304 |

CDC NUMBER, NAME (LAST, FIRST, MI)

V35245
Burnet, E
06.06.47

Confidential
client information
See W & I Code, Sections 4514 and 5328

**PHYSICIAN'S ORDERS**

CDC 7221 (2/88)
STATE OF CALIFORNIA
OSP 05 90611
DEPARTMENT OF CORRECTIONS

[redacted] 139

Exhibit 103

Exhibit-103

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS

**DISABILITY PLACEMENT PROGRAM VERIFICATION (DPPV)**
CDC 1845 (Rev. 01/04)

*CHECK ALL APPLICABLE BOXES*

THIS FORM ONLY VERIFIES OR DISCONFIRMS CLAIMED PHYSICAL DISABILITIES LISTED IN SECTION B

| INMATE NAME: | CDC NUMBER: | INSTITUTION: | HOUSING ASSIGNMENT: | DATE FORM INITIATED: |
|---|---|---|---|---|
| Esron Burnett | V35245 | CMC E | 7304 | 11-26-05 |

*Sections A - B to be completed by licensed medical staff.*

**SECTION A: REASON FOR INITIATION OF FORM**

- ☒ Inmate self-identifies to staff
- ☐ Third party evaluation request
- ☐ Observation by staff
- ☐ Medical documentation or Central File information

**SECTION B: DISABILITY BEING EVALUATED**

- ☐ Blind/Vision Impaired
- ☐ Speech Impaired
- ☐ Deaf/Hearing Impaired
- ☒ Mobility Impaired

*Sections C - G to be completed by a physician only.*

**SECTION C: PERMANENT DISABILITIES IMPACTING PLACEMENT**

1. ☐ FULL TIME WHEELCHAIR USER - DPW
Requires wheelchair accessible housing and path of travel.
2. ☐ INTERMITTENT WHEELCHAIR USER - DPO
Requires lower bunk, wheelchair accessible path of travel and *does not require* wheelchair accessible cell.
3. ☐ MOBILITY IMPAIRMENT - With or Without Assistive Device (Wheelchairs shall not be prescribed) - DPM
Orthopedic, neurological or medical condition that substantially limits ambulation (cannot walk 100 yards on a level surface without pause). Requires lower bunk, no triple bunk, and no stairs in path of travel.
4. ☐ DEAF/HEARING IMPAIRMENT - DPH
Must rely on written communication, lip reading or signing as residual hearing, with assistive devices, will not enable them to hear, understand or localize emergency warnings or public address announcements.
5. ☐ BLIND/VISION IMPAIRMENT - DPV
Not correctable to central vision acuity of better than 20/200 with corrective lenses in at least one eye (See HOUSING RESTRICTIONS IN SECTION E).
6. ☐ SPEECH IMPAIRMENT - DPS
Does not communicate effectively speaking or in writing.

**SECTION D: PERMANENT DISABILITIES *NOT* IMPACTING PLACEMENT**

1. NO CORRESPONDING CATEGORY
2. NO CORRESPONDING CATEGORY
3. ☐ MOBILITY IMPAIRMENT (Lower Extremities) - DNM
Walks 100 yards without pause with or without assistive devices.
   - ☐ No Housing Restrictions
   - ☒ See HOUSING RESTRICTIONS in Section E
   - ☐ Requires relatively level terrain and no obstructions in path of travel. Do not place at: CCI, CMC-E, CRC, CTF-C, FSP, SCC I or II, SOL, or SQ. (CDC 128-C:__________)
4. ☐ HEARING IMPAIRMENT - DNH
With residual hearing at a functional level with hearing aid(s).
5. NO CORRESPONDING CATEGORY
6. ☐ SPEECH IMPAIRMENT - DNS
Does not communicate effectively speaking, but does when writing.

**SECTION E: ADDITIONAL MEDICAL INFORMATION**

CSR ALERT:

- ☐ Requires relatively level terrain and no obstructions in path of travel
- ☐ Complex medical needs affecting placement ☐ CDC 128-C __________

HEALTH CARE APPLIANCE / IDENTIFICATION VEST:

☐ Cane ☐ Crutch ☐ Walker ☐ Leg/Arm prosthesis ☐ Vest
☐ Other: __________ ☐ CDC 128-C(s) dated: __________

ASSISTANCE NEEDED WITH ACTIVITIES OF DAILY LIVING:

☐ Feeding or Eating ☐ Bathing ☐ Grooming ☐ W/C transferring
☐ Toileting ☐ Other: __________ ☐ CDC 128-C(s) dated: __________

OTHER DPP DESIGNATIONS:

☐ NONE ______ ______; ______ ______
CODE DATED CODE DATED

HOUSING RESTRICTIONS: ☒ Lower bunk ☐ No stairs ☐ No triple bunk CDC 128-C(s) dated: __________

**SECTION F: EXCLUSIONS**

- ☐ VERFICATION OF CLAIMED DISABILITY NOT CONFIRMED: My physical examination or other objective data DOES NOT SUPPORT *claimed* disability. (Explain in Comments Section and CDC 128-C dated __________).
- ☐ REMOVAL FROM A DPP CODE: Removal from previous DPP code: ______. (Explain in Comments Section and CDC 128-C dated: __________.)
- ☐ REMOVAL FROM ENTIRE PROGRAM: Removal from DPP code(s): __________. (Explain in Comments Section and CDC 128-C dated: __________.)

**SECTION G: EFFECTIVE COMMUNICATION FACTORS**

☐ Uses Sign Language Interpreter (SLI) ☐ Reads Braille ☐ Communicates with written notes ☐ Requires large print or magnifier
☐ Reads lips ☐ NO "EFFECTIVE COMMUNICATION" ISSUES OBSERVED OR DOCUMENTED IN THE UNIT HEALTH RECORD

PHYSICIAN'S COMMENTS: *(Focus on affected systems and functional limitations. No specific diagnosis or other confidential medical information.)*

No verified disability

| PHYSICIAN'S NAME (Print) | PHYSICIAN'S SIGNATURE | DATE SIGNED |
|---|---|---|
| [illegible], MD | [signature] | 11 26 05 |
| HEALTH CARE MANAGER'S / DESIGNEE'S NAME (Print) | HEALTH CARE MANAGER'S / DESIGNEE'S SIGNATURE | DATE SIGNED |
| | | |

NOTE: After review by the Health Care Manager or Chief Physician & Surgeon, health care staff shall retain green copy for the UHR, send the inmate copy via institutional mail, and route the original and remaining copies to the C&PR/RC CC-III for tracking and further distribution according to the instructions below.

DISTRIBUTION: Original - Top General Chrono Section of C-File; Green - Chrono Section, Unit Health Record Canary - C&PR/CC-III; Pink-CC-I; Gold-Inmate

[redacted] 141

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS
DISABILITY PLACEMENT PROGRAM VERFICATION (DPPV)
CDC 1845 (Rev. 01/04)

# GENERAL INSTRUCTIONS

This process does not require nor is it to result in the automatic screening of all inmates to identify disabilities. This process ensures standardization of CDC policy and procedures dealing with the verification of a disability, the refuting of a disability claimed by an inmate if necessary, and placement of inmates with disabilities listed in Section B of this form. The use of this form will be initiated only in response to one or more of the following actions as noted in Section A:

a) The inmate self-identifies or claims to have one of the disabilities listed in Section B;
b) Staff observes that the inmate may have one of the disabilities listed in Section B;
c) The health or central file record contains documentation regarding one of the disabilities listed in Section B; or
d) A third party (such as a family member) requests an evaluation of the inmate for a disability listed in Section B.

Identification of inmates who may meet the Disability Placement Program (DPP) parameters, will usually occur during reception center (RC) processing, but if an inmate appears to meet disability criteria indicated on the form, all of the institutions/facilities will use the DPPV. Any staff member can initiate a referral for verification by directing a CDC 128-B to the institution's/facility's health care services department.

Responsibility for verification of the disability through completion of the DPPV rests with the health care service physicians. The verifying physician shall follow the "Protocols for Verifying Disabilities" in Exhibit B of the Armstrong Remedial Plan or other official CDC document that includes protocols. Upon completing the DPPV, the physician shall sign in the signature block. Health care staff shall forward the completed DPPV to the Classification and Parole Representative (C&PR) or RC Correctional Counselor (CC)-III for tracking.

***COMPLETION OF THE FORM:*** Enter identifying information about the inmate and the date the DPPV was initiated.

SECTION A: Check the appropriate box to indicate the reason for initiating the form. Any licensed medical staff may complete sections A and B.

SECTION B: The licensed medical staff *shall* mark the category of disability being evaluated *every* time a CDC 1845 is completed.

SECTION C: A mark made in any of these boxes, indicates a need for special housing or programming and will result in placement in one of the designated institutions or facilities. NOTE: The word *permanent* is defined as a condition not expected to improve within six months. Check all boxes that apply using the definitions below:

*—IF THE INMATE:*

1. Uses a wheelchair full time due to a **permanent** condition and requires use of the wheelchair, both within and outside the assigned cell/housing unit, check box 1.
2. Has a permanent disability that requires the use of a wheelchair outside a cell (does not require use of a wheelchair inside a cell), requires lower bunk, wheelchair accessible path of travel and *does not* require wheelchair accessible housing, check box 2.
3. Due to orthopedic, neurological, or medical condition that substantially limits ambulation (cannot walk 100 yards on a level surface without pausing) and *does not* require a wheelchair, check box 3. This condition requires lower bunk, no triple bunk, and no stairs in path of travel.
4. Must rely on written communication, lip reading, or signing, because his/her residual hearing, even when augmented by aids, will not enable him/her to hear, understand, or localize an emergency warning or public address announcement, check box 4.
5. Is permanently blind or has a vision impairment not correctable to central vision acuity of better than 20/200 with corrective lenses, check box 5 and note any housing restrictions in Section E.
6. Has a permanent speech impairment resulting in indiscernible speech or NO speech and does not communicate effectively in writing, check box 6.

SECTION D: A mark made in any of these boxes will not necessarily result in the placement of the inmate in one of the designated institutions/facilities. The exception to this is if a disability in Section C exists. Check all boxes that apply using the definitions below: (Please note numbers 1, 2, and 5 indicate there are no corresponding categories, i.e., there are no DNW, DNO, or DNV categories.)

*—IF THE INMATE:*

1. Has a lower extremity ambulatory impairment but can walk 100 yards on a level surface without pausing with or without aids, check box number 3. If there are no housing restrictions, check the *"No housing restrictions"* box. If the condition requires a lower bunk, no triple bunk, or no stairs, check the *"See HOUSING RESTRICTIONS"* box and all applicable boxes in Section E *"HOUSING RESTRICTIONS."* If it is determined the inmate requires level terrain and no obstructions in the path of travel, check the corresponding box in Section D.3.
2. Has a hearing loss but follows conversation at normal speaking levels and can hear an emergency warning using a hearing aid(s), check box 2.
3. Has indiscernible or no speech but communicates effectively in writing, check box 4.

SECTION E: The physician shall complete this section based on Unit Health Record (UHR) review, observation of, and interaction with the inmate. Check all boxes that apply using the definitions below:

***—IF THE PHYSICIAN:***

--Finds the inmate is designated as DNM and requires placement in an institution with level terrain with no obstruction in the path of travel, the physician shall check the *"Requires relatively level terrain and no obstructions in path of travel"* box and complete a CDC 128-C. If the physician finds the inmate has a complex medical need that is better facilitated by placement in a more centralized institution to facilitate outside medical treatment, check the *"Complex medical needs affecting placement"* box and complete a CDC 128-C explaining the reason for this recommended placement.

--Finds the inmate needs assistance with activities of daily living, appropriate boxes are to be checked.

--Determines there are housing restrictions in conjunction with disabilities verified in Sections C or D, number 3, check the box listing the appropriate restriction.

--Prescribes an assistive device such as a cane, crutch, walker, etc., check the applicable box, enter the date of the supporting CDC 128-C(s) related to that prescription.

--Finds other valid CDC 1845's in the UHR indicating a disability other than the current review, enter the corresponding DPP code and date of the CDC 1845.

SECTION F: The physician is to check the appropriate box specifically to the stated check box as follows:

***—IF THE PHYSICIAN:***

--Cannot verify a claimed disability through an examination or objective clinical data in the UHR, check the category of disability box being evaluated in Section B and the first box in Section F. The physician shall not check this box for cases pending outside consultation.

--Finds inmate no longer qualifies for a previously verified disability (e.g., cataract surgery restores sight) but has another verified disability that keeps him/her in the DPP, check the second box in Section F and enter the DPP code from which the inmate is being removed on the line provided. Explain the reason for removal in the Comments Section and complete a CDC 128-C.

--Finds the inmate no longer has a previously verified disability or any other CDC 1845 disability and is to be removed from the DPP, check the third box in Section F, enter the DPP code(s) on the line provided, explain in the Comments section, complete a CDC 128-C explaining reasons for removal from the program, and enter the date of the CDC 128-C on the line provided.

SECTION G: If during the initial or subsequent examination(s), the physician discovers the need for a sign language interpreter or if an alternate form of communication is required, the physician shall check all applicable box(es). The physician might have to query the inmate for this information. If none of these factors exist, **and** there are no additional factors or information, mark the *"NO EFFECTIVE COMMUNICATION ISSUES OBSERVED OR DOCUMENTED IN THE UHR"* box. The physician shall print, sign, and date the form in the appropriate boxes.

COMMENTS SECTION: This section is to reflect notes, references, explanation of disabilities and any information not listed elsewhere on the DPPV. The physician is to reserve his/her comments focusing on affected systems and functional limitations. No specific diagnosis, impairments, or other confidential medical information is to be entered on this document.

DISTRIBUTION: The Health Care Manager or Chief Physician & Surgeon shall review the completed form before distribution. Health care staff shall place the green copy in the chrono section of the UHR, send gold copy to inmate via institution mail, and send original and remaining copies to C&PR/CC-III. The original shall be placed on top of the "General Chrono" section of the central file. The C&PR/CC-III shall retain the canary copy and forward the pink copy to the assigned CC-I.

# Exhibit-C

[redacted] Exhibit-C [redacted] 1of 2

D

**UCDAVIS**
*HEALTH SYSTEM*
***TELEMEDICINE***

June 22, 2005

RE: BURNETT, ESTER
MR#: 1767851
DOB: 06/06/1967
Date of Service: 06/22/2005
CDC#:V35245

Charles Dudley Lee, M.D.
Salinas Valley State Prison
~~P.O. Box 1020~~
~~Solidad, CA 93690-1020~~

07-01-05 14:52 RCVD

Dear Dr. Lee:

I saw per your request in Telemedicine Consultation, Mr. Ester Burnett on 06/22/2005.

Chief Complaint:
Low back pain radiating to his right leg, level 8 on a scale of 0 to 10.

History Of Present Illness:
This is a 38 year-old African-American male whose pain started nine years ago, maybe while playing football. Presently, the pain goes from his low back to his right buttock to his calf and sometimes to his heel. He has numbness, pins and needle feeling in his low back. It is worse with walking. His urination seems to be okay, although it is very frequent, up to four times per hour. He has had normal erections. It is of note that he had an MRI scan in 1997 which states that at that time he had radiation to his left leg.

Allergies:
None.

Medications:
Tramadol, ibuprofen, and Robaxin, all of which do not help very much. Further, he uses albuterol and triamcinolone for asthma, and Depakote, sertraline, Zoloft, and quetiapine for paranoid schizophrenia.

Premorbid History:
As noted above in his medications, that is asthma and paranoid schizophrenia.

Presurgical History:
None.

Family History:
His mother and father are alive and well.

Review Of Systems:
None.

The patient later told me that he had epidural steroid injections in 1996 or 1997, which helped him well at that time.

ORIGINAL



[redacted] 143

[redacted]

Exhibit-C [redacted] 2of2

RE: BURNETT, ESTER
MR#: 1767851

Page 2

I did not examine the patient this time. However, he could walk on his heels and toes.

I reviewed his MRI scan from 1997; it shows mild degenerative disk disease L4-5 and L5-S1, plus some midline bulges at the same levels.

His MRI scan of 03/11/2005 shows mild degenerative disk disease evidenced by loss of water, basically unchanged from eight years earlier and a far lateral disk L4-5 on the right side in the foramen.

The patient tells me that his low back pain is worse than his right leg pain, so it is fairly unlikely that surgery, which would consist of L4-5 diskectomy, especially right lateral would help him very much. It may help him for his right leg pain again, but this does not seem to be his major problem. In view of the effect of epidural steroids in the past, this would certainly be an option to try again. Because of his leg pain, he would like to walk with a cane, which of course would be fine with me and I would suggest to give him OxyContin 20 mg twice a day to see whether we can diminish his pain better.

Hoping to have provided you with enough information.

Sincerely,

J. PAUL MUIZELAAR, MD
PROFESSOR AND CHAIR
DIVISION OF
DEPARTMENT OF NEUROSURGERY
*THIS WAS ELECTRONICALLY SIGNED - 06/27/2005 10:18 AM PST BY:*

--

Navneet Adya, M.D.
Salinas Valley State Prison
7/8/05

JPM:js(ml006)

D: 06/22/2005 04:13 PM
T: 06/23/2005 09:39 AM
C#: 1084178

ORIGINAL

Exhibit C2



[redacted]

Exhibit-C2

| DATE | TIME | |
|---|---|---|
| | | (continued) |
| 6-27-05 | 915 | excellent lower motor strength |
| | | lower DTR WNL |
| | | easily bends over to remove shoe |
| | | appearance: not in any discomfort |
| | | or distress. |
| | A) | |
| | | No objective findings of functional |
| | | impairment due to a pain syndrome. |
| | | I am the 3rd physician that this |
| | | patient has sought Oxycontin/tramadol |
| | | following a football injury 9 yrs ago. |
| | | Patient does not require a cane for |
| | | stability. |
| | P | D/C |

INSTITUTION: CMC. E

HOUSING UNIT:

CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH

V35245
Burnett, Ester

DOB 6/6/67

INTERDISCIPLINARY PROGRESS NOTES

CDC 7230 (Rev 04/03)
STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS

146.

[redacted]

# Exhibit-[redacted]200

americans with disabilities act

(3) If the inmate believes any act of reprisal resulted from the grievance, an appeal of the alleged reprisal may be filed through the department's normal appeal process.

(j) Civil Addict or Releasee Appeal.

(1) Civil addicts or releasees may appeal a staff recommendation for exclusion from the civil addict program, unless the recommendation is based on a commitment to prison, deportation or releasee-at-large status.

(2) If an appeal is not received prior to the end of the 15th calendar day from an appellant's receipt of written notice of the recommendation to exclude, all prepared documentation shall be forwarded to the committing court.

(3) The second level review shall be the final review.

(4) Time constraints for releasee appeals are:

(A) The assistant regional parole administrator shall complete the first level review within ten working days.

(B) The regional parole administrator shall complete the second level review within 15 working days.

(k) Disability Grievances. An inmate or parolee with a permanent disability who is requesting a reasonable modification or accommodation who has a discrimination complaint or grievance based on a permanent disability shall follow the procedures described in section 3085. For the purpose of this section, permanent disability shall mean a disability/condition that is expected to last longer than six months.

(*l*) Movie/Video Selection or Exclusion Appeals.

(1) Movies/videos which have been given a rating of other than "G," "PG," or "PG-13" by the Motion Picture Association of America shall not be approved for general inmate viewing, and will not be accepted for appeal.

(2) The informal and first level of appeal shall be waived for appeals related to the selection or exclusion of a "G," "PG," or "PG-13" rated or non-rated movie/video for viewing.

(3) An appellant dissatisfied with the second level review decision may file the appeal at third level.

(m) Joint Venture Program Employer Related Grievances.

(1) Any current or former Joint Venture Program inmate-employee who believes he/she has a grievance regarding a wage and hour or retaliation claim against a Joint Venture Employer shall submit the written grievance to the Joint Venture Program Chief.

(2) The Joint Venture Program Chief shall attempt to resolve all complaints.

(3) Time frames for filing grievances will be governed by the Division of Labor Standards Enforcement's (DLSE) statutes of limitations, including but not limited to Labor Code Section 98.7 and Code of Civil Procedure Sections 337, 338 and 339, for the appropriate type of complaint.

(4) If the inmate is dissatisfied with the Joint Venture Program Chief's decision, the inmate may file a complaint with the Labor Commissioner.

NOTE: Authority cited: Section 5058 and 10006(b), Penal Code. Reference: Sections 832.5, 5054 and 10006(b), Penal Code; Section 19583.5, Government Code; *Wolff* v. *McDonnell* (1974) 418 U.S. 539, 558–560; Americans With Disabilities Act, Public Law 101-336, July 26, 1990, 104 Stat. 328; Section 35.107, Title 28, Code of Federal Regulations; Section 98.7, Labor Code; and Sections 337, 338 and 339, Code of Civil Procedure.

HISTORY:

1. New section filed 5-18-89 as an emergency; operative 5-18-89 (Register 89, No. 21). A Certificate of Compliance must be transmitted to OAL within 120 days or emergency language will be repealed on 9-15-89. For prior history, see section 3325(c).
2. Certificate of Compliance as to 5-18-89 order including amendment of subsections (a) and (d) transmitted to OAL 9-7-89 and filed 10-10-89 (Register 89, No. 41).
3. Editorial correction of printing errors in subsections (f)(1)(B) and (g)(2) (Register 92, No. 5).
4. Amendment of subsection (e)(4) and new subsections (h)(3), (i)(2)(c)1. and 2., and (k) filed 5-6-92 as an emergency; operative 5-6-92 (Register 92, No. 19). A Certificate of Compliance must be transmitted to OAL 9-3-92 or emergency language will be repealed by operation of law on the following day.
5. Certificate of Compliance as to 5-6-92 order including amendment of subsections (e)(4) and (i)(2)(C)1. transmitted to OAL 8-31-92 and filed 10-7-92 (Register 92, No. 41).
6. New subsection (l) and amendment of Note filed 4-7-95 as an emergency pursuant to Penal Code section 5058; operative 4-7-95 (Register 95, No. 14). A Certificate of Compliance must be transmitted to OAL by 9-14-95 or emergency language will be repealed by operation of law on the following day.
7. Certificate of Compliance as to 4-7-95 order transmitted to OAL 6-26-95 and filed 7-25-95 (Register 95, No. 30).
8. New subsections (m)–(m)(3) and amendment of Note filed 6-28-96 as an emergency; operative 6-28-96 (Register 96, No. 26). A Certificate of Compliance must be transmitted to OAL by 1-6-97 or emergency language will be repealed by operation of law on the following day.
9. Editorial correction of subsection (m)(3) (Register 96, No. 51).
10. New subsections (m)–(m)(3) and amendment of Note refiled 12-19-96 as an emergency; operative 12-19-96 (Register 96, No. 51). Pursuant to Penal Code section 5058(e), a Certificate of Compliance must be transmitted to OAL by 5-28-97 or emergency language will be repealed by operation of law on the following day.
11. Repealer of subsection (a)(1)(D), amendment of subsections (a)(2)(A), (b)(2), (d)(4), (d)(4)(A) and (e)(1), repealer of subsections (h) and (h)(1), renumbering of old subsections 3084.7(h)(2) and (h)(3) to new subsections 3391(b) and (c), subsection relettering, and amendment of newly designated subsection (k) filed 12-23-96 as an emergency; operative 12-23-96 (Register 96, No. 52). Pursuant to Penal Code section 5058(e), a Certificate of Compliance must be transmitted to OAL by 6-2-97, or emergency language will be repealed by operation of law on the following day.
12. Certificate of Compliance as to 12-19-96 order, incorporating relettering from 12-23-96 order and further amending section and Note, transmitted to OAL 4-14-97 and filed 5-23-97 (Register 97, No. 21).
13. Repealer of subsection (a)(1)(D), amendment of subsections (a)(2)(A), (b)(2), (d)(4), (d)(4)(A) and (e)(1), repealer of subsections (h) and (h)(1), renumbering of old subsections 3084.7(h)(2) and (h)(3) to new subsections 3391(b) and (c), subsection relettering, and amendment of newly designated subsection (k) refiled 5-29-97 as an emergency; operative 6-2-97 (Register 97, No. 22). A Certificate of Compliance must be transmitted to OAL by 9-30-97 or emergency language will be repealed by operation of law on the following day.
14. Editorial correction of subsection (j)(1) and History 13 (Register 97, No. 24).
15. Certificate of Compliance as to 5-29-97 order, including amendment of subsections (b)(2) and (k), transmitted to OAL 9-25-97 and filed 11-7-97 (Register 97, No. 45).
16. New subsections (m)–(m)(4) and amendment of Note filed 9-13-2005; operative 9-13-2005 pursuant to Government Code section 11343.4 (Register 2005, No. 37).

Exhibit-200

**3085. Americans With Disabilities Act.**

No qualified inmate or parolee with a disability, as defined in Title 42, U.S.C. section 12102 shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of the department, or be subjected to discrimination.

(a) CDC Form 1824 (1/95), Reasonable Modification Or Accommodation Request. If otherwise qualified or eligible, inmates or parolees with disabilities as defined in Title 42, U.S.C. section 12102 may request reasonable modification or accommodation to

(E) Second level review shall be conducted by the institution head, who may retain the appellant at the reception center as a second level re-view action and refer the appeal to the departmental review board for resolution. The board's decision shall constitute final review.

(F) If the appeal is denied at first or second level, the appellant may appeal at the third level.

(4) Involuntary transfer to the California Medical Facility or Atascadero State Hospital:

(A) Following a hearing on the psychiatric need for an involuntary transfer to the California Medical Facility or Atascadero State Hospital, the inmate shall be provided with a copy of the written decision pursuant to Section 3379(d).

(B) The inmate may appeal the written decision, directly to the third level, within 30 calendar days of receipt of the decision.

(C) A copy of the hearing decision shall be attached to the appeal.

(e) Lost or damaged personal property appeals.

(1) All property loss or damage arising from the same event or action shall be included in one appeal.

(2) Replacement or restoration of property.

(A) An attempt shall be made by staff to use local resources to substitute for, or replace lost property at no cost to the state, or to repair the item at institution expense.

(B) An appellant's refusal to accept repair, replacement, or substitution of like items and value shall be cause to deny the appeal.

(3) The document denying a property claim appeal at the third level shall inform the appellant of the right to file a claim directly with the board of control, and shall provide instructions for such filing.

(4) Reimbursement for loss. The reimbursement shall not exceed the limit imposed by property procedures and regulations (Subchapter 2, Article 9, Personal Property).

(A) Reimbursements for $100 or less shall require endorsement at either the second or third level of review.

(B) Reimbursements for more than $100 shall require both third level endorsement and Board of Control approval.

(C) Before payment of any granted claim, the appellant shall sign an Inmate/Parolee Board of Control Release Form, CDC Form 813 (rev. 2-86), discharging the state from further liability for the claim pursuant to Government Code section 965. The appellant shall be provided with a copy of the completed form.

(f) Re-Entry or Work Furlough Placement and Parole to County of Commitment Appeals. An inmate pending release to the community and dissatisfied with a parole staff decision regarding the release program or the location of placement may submit an appeal requesting administrative review of the decision.

(1) Re-entry or work furlough placement appeals.

(A) The informal level. Appeal of denial of placement into specific re-entry or work furlough locations shall be submitted by the appellant to the institution caseworker who prepared Section A of the Release Program Study, CDC Form 611 (rev. 10-88). The caseworker shall compare the assigned parole region's reasons for denial with the facts contained in the inmate's central file, interview the inmate, and record all information obtained on a CDC Form 128-B (rev. 4-74).

(B) The first level appeal shall be submitted to the appeals coordinator of the parole region where the denial of placement was made. A copy of the CDC Form 128-B (rev. 4-74) shall be attached to the appeal.

(C) The supervisor of the staff person who denied placement shall conduct the first level review and the regional parole administrator or designee shall conduct the any second level review.

(2) Return to county of commitment appeals.

(A) An appeal concerning parole to county of commitment shall not be accepted until the Release Program Study, CDC Form 611 (rev. 10-88), has been completed and returned to the institution.

(B) The appeal shall be sent to the appeals coordinator of the parole region where such study was completed. The informal level of review shall be waived.

(C) The assistant regional parole administrator shall provide the first level review and the regional parole administrator shall provide the second level review, if any.

(D) The inmate may appeal to third level if dissatisfied with second level response.

(g) Conditions of Parole Appeals. An inmate dissatisfied with conditions of parole imposed by departmental staff may submit an appeal requesting removal or change of the conditions.

(1) Within 15 working days following receipt of the decision outlining conditions of parole, the appellant shall submit the appeal form directly to the appeals coordinator of the parole region where the case is assigned.

(2) The informal and first level reviews shall be waived. The appeals coordinator shall forward the appeal to the regional parole administrator for second level review.

(3) An appellant dissatisfied with second level review decision, may file the appeal at third level.

(4) An appellant dissatisfied with a third level review decision may submit the appeal to the Board of Prison Terms pursuant to 15 CCR sections 2525 and 2526.

(h) Parole Period and Term Computation Appeals.

(1) Informal level review.

(A) The appellant shall submit the appeal to the records office for research and documenting of the relevant case facts. The appellant shall be provided a copy of the findings.

(B) The document recording denial of an appeal shall be hand-delivered to the appellant, who shall sign and date an Acknowledgement of Receipt, CDC Form 1031 (rev. 8-88).

(2) Formal appeal.

(A) The appellant may then submit to the appeals coordinator an appeal requesting a computation review hearing.

(B) First level review shall be waived. The computation review hearing shall constitute the second level of review.

(C) The case records manager or supervisor shall conduct a computation review hearing within 15 days following receipt of the appeal.

1. The inmate/parolee shall be notified at least 24 hours prior to the hearing via the CDC Form 1032 (Rev. 12/86), Notice of Time, Date and Place of Computation Review Hearing.

2. The hearing shall be held during the inmate's nonassigned hours.

(D) Upon staff determination an error exists which the department lacks authority to change, the appeal shall be granted and the appeal referred to the appropriate agency for disposition.

(E) The appellant shall be provided a copy of the Computation Review Hearing Decision, CDC Form 1033 (rev. 8-88), at the conclusion of the hearing.

(F) The appellant may submit the appeal to third level if dissatisfied with second level response.

(i) Prison Industry Authority Health and Safety Grievances.

(1) An appellant who believes a health or safety hazard exists in a prison industry operation shall submit the written grievance to the prison industry safety committee.

(2) If an industrial safety appeal is denied at the third level, the inmate may file an appeal with the labor commissioner as prescribed by the Division of Industrial Safety.

Exhibit-200



achieve access to a program, service, or activity offered by the facility, or may grieve an issue of alleged discrimination based on disability, by completing a CDC Form 1824. The inmate or parolee shall complete the front side of the form and forward it to the appeals coordinator's office. The form shall be screened in accordance with section 3084.3 screening criteria and, if it meets the initial screening criteria, is logged in the CDC Form 645 (7/77), Inmate/Parolee Appeals Log, with the status of a first level of review.

(b) If dissatisfied with the decision rendered on the CDC Form 1824, the appellant may, within 15 days of receipt of the decision, appeal to the second level of review by attaching the original request form, CDC 1824, to a CDC Form 602 (rev. 12-87), Inmate/Parolee Appeal Form, and completing section "F" of the CDC Form 602.

(c) Other provisions pertaining to inmate or parolee appeals not addressed in this section shall apply.

NOTE: Authority cited: section 5058, Penal Code. Reference: Section 5054, Penal Code; Americans With Disabilities Act, Public Law 101-336, July 26, 1990, 104 Stat. 328; and Sections 35.107 and 35.130, Title 28, Code of Federal Regulations.

HISTORY:

1. New section and forms filed 4-7-95 as an emergency pursuant to Penal Code section 5058; operative 4-7-95 (Register 95, No. 14). A Certificate of Compliance must be transmitted to OAL by 9-14-95 or emergency language will be repealed by operation of law on the following day.
2. Certificate of Compliance as to 4-7-95 order transmitted to OAL 6-26-95 and filed 7-25-95 (Register 95, No. 30).

STATE OF CALIFORNIA DEPARTMENT OF CORRECTIONS

**REASONABLE MODIFICATION OR ACCOMMODATION REQUEST**
**CDC 1824 (1/95)**

| INSTITUTION/PAROLE REGION: | LOG NUMBER: | CATEGORY: 18. ADA |
|---|---|---|

***NOTE:*** **THIS FORM IS TO BE USED ONLY BY INMATES/PAROLEES WITH DISABILITIES**

*In processing this request, it will be verified that the inmate/parolee has a disability which is covered under the Americans With Disabilities Act.*

| INMATE/PAROLEE'S NAME(PRINT) | CDC NUMBER | ASSIGNMENT | HOURS/WATCH | HOUSING |
|---|---|---|---|---|
| | | | | |

**In accordance with the provisions of the Americans With Disabilities Act (ADA), no qualified individuals with a disibility shall, on the basis of disability, be excluded from participation in, or be denied the benefits of the services, activities, or programs of a public entity, or be subjected to discrimination.**

**You may use this form to request specific reasonable modification or accommodation which, if granted, would enable you to participate in a service, activity or program offered by the Department/institution/facility, for which you are otherwise qualified/eligible to participate.**

**Submit this completed form to the institution or facility's Appeals Coordinator's Office. A decision will be rendered within 15 working days of receipt at the Appeals Coordinator's Office and the completed form will be returned to you.**

**If you do not agree with the decision on this form, you may pursue further review. The decision rendered on this form constitutes a decision at the FIRST LEVEL of review.**

**To proceed to SECOND LEVEL, attach this form to an Inmate/Parolee Appeal Form (CDC 602) and complete section "F" of the appeal form.**

**Submit the appeal with attachment to the Appeals Coordinator's Office within 15 days of your receipt of the decision rendered on this request form.**

**If you are not satisfied with the SECOND LEVEL review decision, you may request THIRD LEVEL review as instructed on the CDC 602.**

**MODIFICATION OR ACCOMMODATION REQUESTED**

DESCRIPTION OF DISABILITY:

WHAT VERIFICATION DO YOU HAVE OF YOUR DISABILITY?

DESCRIBE THE PROBLEM:

WHAT SPECIFIC MODIFICATION OR ACCOMMODATION IS REQUESTED?

INMATE/PAROLEE'S SIGNATURE DATE SIGNED

SAMPLE

# Exhibit 206

3270 General Policy
Article 2. Security

3. Certificate of Compliance as to 4-1-99 order, including amendment of first paragraph, transmitted to OAL 9-8-99 and filed 10-20-99 (Register 99, No. 43).

**3268.1. Reporting and Investigating the Use of Force.**

(a) Reporting Non-Deadly Force.

(1) An employee who uses or observes non-deadly force greater than verbal persuasion to overcome resistance or gain compliance with an order shall document that fact. The document shall identify any witnesses to the incident and describe the circumstances giving rise to the use of force, and the nature and extent of the force used. The employee shall provide the document to his or her immediate supervisor.

(2) The employee's immediate supervisor shall review the document to ensure that it is adequately prepared and to reach a judgment concerning the appropriateness of the force used. The supervisor shall document his or her conclusions and forward them with the employee's document through the designated chain of command, to the institution head for approval or follow-up action.

(b) Reporting Deadly Force.

(1) An employee who uses deadly force, whether on or off duty, shall ensure that a supervisory employee is notified of the incident without delay.

(2) The supervisor shall ensure that the chain of command is notified and all necessary health and safety, medical and security measures are initiated. If the incident is in an institution/facility, the supervisor shall go to the location and ensure that the scene is protected.

(3) The Assistant Director, Office of Internal Affairs, or designee shall designate an employee to be in charge of the investigation. The employee shall go to and take charge of the scene. The employee shall assemble the appropriate investigative staff and ensure that all necessary investigative procedures and coordination with affected law enforcement entities are accomplished. The product of the investigation will be a report to the Director with conclusions concerning the extent to which the use of force did or did not comply with the law. However, when the deadly force is used in the community, local law enforcement shall take charge of the scene.

(4) A Deadly Force Review Board (DFRB) shall be convened as soon as possible after the investigation is completed.

(A) The Director or designee shall designate the members of the DFRB.

(B) The DFRB shall be composed of at least four members. Three shall be non-departmental law enforcement professionals. One shall be either a Regional Administrator or a Regional Parole Administrator outside the region or jurisdiction where the deadly force was used. Additional members may be designated by the Director or designee.

(C) The DFRB shall examine all aspects of the incident to determine the extent to which the use of force complied with departmental policies and procedures, and to determine the need for policy, training and/or equipment modifications. The DFRB shall report its findings, in writing, to the Director for approval or follow-up action.

NOTE: Authority cited: section 5058, Penal Code. Reference: Sections 196, 835a, 2651, 2652, and 5054 Penal Code; and section 50 Civil Code.

HISTORY:

1. Renumbering of former section 3280 to new section 3268.2, including amendment of section heading, section and Note, filed 3-12-99 as an emergency; operative 4-1-99 (Register 99, No. 11). A Certificate of Compliance must be transmitted to OAL by 9-8-99 or emergency language will be repealed by operation of law on the following day pursuant to Penal Code section 5058(e)(1).
2. Editorial correction of History 1 (Register 99, No. 24).
3. Certificate of Compliance as to 4-1-99 order transmitted to OAL 9-8-99 and filed 10-20-99 (Register 99, No. 43).

**3268.2. Use of Restraints.**

(a) Mechanical means of physical restraint may be used only under the following circumstances:

(1) When transporting a person between locations.

(2) When a person's history, present behavior, apparent emotional state, or other conditions present a reasonable likelihood that he or she may become violent or attempt to escape.

(3) When directed by medical staff, to prevent a person from attempting suicide or inflicting injury to himself or herself.

(b) Mechanical restraints shall not be:

(1) Used as punishment.

(2) Placed around a person's neck.

(3) Applied in a way likely to cause undue physical discomfort or restrict blood flow or breathing, e.g., hog-tying.

(4) Used to secure a person to a fixed object, except as a temporary emergency measure. However, a person who is being transported shall not be locked in any manner to any part of the transporting vehicle.

(c) When mechanical restraint is required, handcuffs, alone or attached to a waist chain, will be the means of restraint normally used. However, additional mechanical restraint, including leg irons, additional chains, straight jackets, leather cuffs, or other specialized restraint equipment may be used when the circumstances indicate the need for the level of control that such devices will provide.

(d) Use of restraint equipment by direction of medical staff shall be fully documented in the institution medical file of the restrained inmate.

NOTE: Authority cited: section 5058, Penal Code. Reference: Sections 196, 835a, 2650, 2651, 2652, 2652.5 and 5054 Penal Code.

HISTORY:

1. Renumbering of former section 3280 to new section 3268.2, including amendment of section heading, section and Note, filed 3-12-99 as an emergency; operative 4-1-99 (Register 99, No. 11). A Certificate of Compliance must be transmitted to OAL by 9-8-99 or emergency language will be repealed by operation of law on the following day pursuant to Penal Code section 5058(e)(1).
2. Editorial correction of History 1 (Register 99, No. 24).
3. Certificate of Compliance as to 4-1-99 order transmitted to OAL 9-8-99 and filed 10-20-99 (Register 99, No. 43).

## Article 2. Security

**3270. General Policy.**

The primary objectives of the correctional institutions are to protect the public by safely keeping persons committed to the custody of the Director of Corrections, and to afford such persons with every reasonable opportunity and encouragement to participate in rehabilitative activities. Consistent effort will be made to insure the security of the institution and the effectiveness of the treatment programs within the framework of security and safety. Each employee must be trained to understand how physical facilities, degree of custody classification, personnel, and operative procedures affect the maintenance of inmate custody and security. The requirement of custodial security and of staff, inmate and public safety must take precedence over all other considerations in the operation of all the programs and activities of the institutions of the department.

Comment: Former DP-4201, policy, general.

**3270.1. Lethal Electrified Fences.**

(a) For the purposes of this section, a lethal electrified fence is a high voltage fence installed for the lethal infliction of injury to escaping inmates.

(b) Safety precautions shall be instituted to prevent accidental electrocution. These precautions shall include, but are not limited to, the following:

151a

NOTE: Authority cited: section 5058, Penal Code. Reference: section 5054, Penal Code.

HISTORY:

1. Amendment of section filed 12-19-91 as an emergency; operative 12-19-91 (Register 92, No. 4). A Certificate of Compliance must be transmitted to OAL 4-17-92 or emergency language will be repealed by operation of law on the following day.
2. Certificate of Compliance as to 12-19-91 order transmitted to OAL 4-17-92 and filed 6-1-92 (Register 92, No. 24).

**3265. Arts and Crafts Exhibits.**

(a) The public may be permitted to attend displays of inmate-made articles provided:

(1) Facility security shall not be jeopardized.

(2) Adequate facilities and staff are available to control against unauthorized visiting and introduction of contraband.

(3) The activity does not interfere with the normal facility operation.

NOTE: Authority cited: section 5058, Penal Code. Reference: section 5054, Penal Code.

HISTORY:

1. Order of Repeal of subsection (b) filed 6-3-85 by OAL pursuant to Government Code section 11349.7; effective thirtieth day thereafter (Register 85, No. 26).
2. Amendment of section filed 12-19-91 as an emergency; operative 12-19-91 (Register 92, No. 4). A Certificate of Compliance must be transmitted to OAL 4-17-92 or emergency language will be repealed by operation of law on the following day.
3. Certificate of Compliance as to 12-19-91 order transmitted to OAL 4-17-92 and filed 6-1-92 (Register 92, No. 24).

**3266. Inmate Contacts with the Public.**

Inmates shall not initiate any personal contact with the public except as specifically authorized. This does not preclude an inmate's courteous and appropriate response when contact is initiated by a member of the public.

NOTE: Authority cited: section 5058, Penal Code. Reference: Sections 4570 and 5054, Penal Code.

HISTORY:

1. Renumbering of former section 3072 to new section 3266, including amendment of section heading and text, and new Note filed 10-27-93; operative 11-26-93 (Register 93, No. 44).

**3267. Access of Public Officials to Facilities.**

(a) A public official, except as provided in (b) below, of another governmental department or agency who needs to interview staff or inmates or to conduct an inspection shall request permission of the institution head at least 24 hours before the date and time of their desired arrival, stating the purpose of the proposed visit. Upon their arrival, the official's access shall be subject to the following requirements:

(1) The official shall be required to produce their picture identification and consent to a search.

(2) The official shall be escorted by staff at all times within the facility's security area.

(3) Any equipment required by the official shall be searched and under the control of staff while it is within the facility's security area.

(b) An elected state official's access may be denied only during an emergency with the director's approval. Access by the guests or staff of such officials may be denied when they have not been previously approved by the institution head.

NOTE: Authority cited: section 5058, Penal Code. Reference: section 5054, Penal Code.

HISTORY:

1. New section filed 11-5-92; operative 12-7-92 (Register 92, No. 45).

## Article 1.5. Use of Force and Restraining Devices

**3268. Use of Force.**

The purpose of this section is to set forth Department of Corrections policy governing the use of force. The policy has its foundation in California Penal Code statutes and relevant case decisions.

(a) Definitions.

(1) Reasonable Force:

The force that an objective, trained and competent correctional employee, faced with similar facts and circumstances, would consider necessary and reasonable to subdue an attacker, overcome resistance, effect custody, or gain compliance with a lawful order.

(2) Unnecessary Force:

The use of force when none is required or appropriate.

(3) Excessive Force:

The use of more force than is objectively reasonable to accomplish a lawful purpose.

(4) Non-Deadly Force:

Any use of force that is not likely to result in death.

(5) Deadly Force:

Any use of force that is likely to result in death.

(6) Use of Force Options:

(A) The choices available to an employee when selecting a reasonable force option.

(B) The choices include, but are not necessarily limited to: verbal persuasion or orders; physical strength and holds; chemical agents and/or other immobilization devices; handheld batons; less-lethal weapons or firearms.

(1.) For the purposes of this section, a "less-lethal weapon" includes the 37 mm launcher and any other weapon when used to fire less-lethal projectiles.

(2.) For the purposes of this section, a "firearm" is a weapon used to fire lethal projectiles.

(b) It is the policy of the Department of Corrections to accomplish the custodial and correctional functions with minimal reliance on the use of force. Employees may use reasonable force as required in the performance of their duties, but unnecessary or excessive force shall not be used.

(c) The Department of Corrections recognizes the sanctity of human life. Therefore, deadly force will only be used when it is the reasonable force, as defined in section 3268(a)(1), and is needed to:

(1) Defend the employee or other persons from an immediate threat of death or great bodily injury.

(A) For the purposes of this section, "great bodily injury" means an injury that creates a substantial risk of death.

(2) Prevent an escape from custody.

(3) Stop acts such as riots or arson that constitute an immediate jeopardy to institutional security and, because of their magnitude, are likely to result in escapes or the death of other persons.

(4) Dispose of seriously injured or dangerous animals when no other disposition is practical.

(d) A firearm shall not be discharged if there is reason to believe that persons other than the intended target will be injured.

(e) Firearms may be discharged as a warning only in an institutional/facility setting and only when deadly force is permitted under section 3268(c).

NOTE: Authority cited: section 5058, Penal Code. Reference: Sections 196, 835a, 2651, 2652, and 5054 Penal Code; and section 50 Civil Code; *Whitley* v. *Albers* (1985) 475 U.S. 312, 106 S.Ct. 1078.

HISTORY:

1. New article 1.5 (sections 3268–3268.2) and section filed 3-12-99 as an emergency; operative 4-1-99 (Register 99, No. 11). A Certificate of Compliance must be transmitted to OAL by 9-8-99 or emergency language will be repealed by operation of law on the following day pursuant to Penal Code section 5058(e)(1).
2. Editorial correction of History 1 (Register 99, No. 24).

Exhibit 207

3004. Rights and Respect of others.

+ 3000.5. Rules of construction.

**3004. Rights and Respect of Others.**

(a) Inmates and parolees have the right to be treated respectfully, impartially, and fairly by all employees. Inmates and parolees have the responsibility to treat others in the same manner. Employees and inmates may use first names in conversation with each other when it is mutually acceptable to both parties.

(b) Inmates, parolees and employees will not openly display disrespect or contempt for others in any manner intended to or reasonably likely to disrupt orderly operations within the institutions or to incite or provoke violence.

(c) Inmates, parolees and employees will not subject other persons to any form of discrimination because of race, religion, nationality, sex, political belief, age, or physical or mental handicap.

HISTORY:

1. Amendment filed 2-24-77; effective thirtieth day thereafter (Register 77, No. 9).
2. Amendment of subsection (a) filed 9-30-77; effective thirtieth day thereafter (Register 77, No. 40).
3. New subsection (c) filed 4-18-80; effective thirtieth day thereafter (Register 80, No. 16).

**3005. Conduct.**

(a) Inmates and parolees shall obey all laws, regulations, and local procedures, and refrain from behavior which might lead to violence or disorder, or otherwise endangers facility, outside community or another person.

(b) Obeying Orders. Inmates and parolees must promptly and courteously obey written and verbal orders and instructions from department staff, and from employees of other agencies with authorized responsibility for the custody and supervision of inmates and parolees.

(c) Force or Violence. Inmates shall not willfully commit or assist another person in the commission of a violent injury to any person or persons, including self mutilation or attempted suicide, nor attempt or threaten the use of force or violence upon another person. Inmates shall not willfully attempt to incite others, either verbally or in writing, or by other deliberate action, to use force or violence upon another person.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Sections 242, 295–300.3, 2931 and 5054, Penal Code.

HISTORY:

1. Repealer and new section (b) filed 2-24-77; effective thirtieth day thereafter (Register 77, No. 9).
2. New subsection (c) filed 5-13-77; effective thirtieth day thereafter (Register 77, No. 20).
3. Amendment of subsection (c) filed 6-30-77 as an emergency; effective upon filing (Register 77, No. 27).
4. Amendment of subsection (c) filed 9-29-77 as an emergency; effective upon filing. Certificate of Compliance included (Register 77, No. 40).
5. Amendment filed 3-2-83; effective thirtieth day thereafter (Register 83, No. 12).
6. Change without regulatory effect amending subsection (a) filed 6-5-91 pursuant to section 100, title 1, California Code of Regulations (Register 91, No. 31).
7. Amendment of subsection (c) filed 5-5-95; operative 6-5-95 (Register 95, No. 18).
8. Amendment of Note filed 9-20-99 as an emergency; operative 9-20-99 (Register 99, No. 39). Pursuant to Penal Code section 5058(e) a Certificate of Compliance must be transmitted to OAL by 2-28-2000 or emergency language will be repealed by operation of law on the following day.
9. Certificate of Compliance as to 9-20-99 order transmitted to OAL 1-14-2000 and filed 2-22-2000 (Register 2000, No. 8).
10. Amendment of subsection (c) and amendment of Note filed 1-9-2004 as an emergency; operative 1-9-2004 (Register 2004, No. 2). Pursuant to Penal Code section 5058.3, a Certificate of Compliance must be transmitted to OAL by 6-17-2004 or emergency language will be repealed by operation of law on the following day.
11. Amendment of subsection (c) and amendment of Note refiled 6-17-2004 as an emergency; operative 6-17-2004 (Register 2004, No. 25). Pursuant to Penal Code section 5058.3, a Certificate of Compliance must be transmitted to OAL by 11-24-2004 or emergency language will be repealed by operation of law on the following day.
12. Certificate of Compliance as to 6-17-2004 order transmitted to OAL 11-16-2004 and filed 12-29-2004 (Register 2004, No. 53).

**3006. Contraband.**

Inmates may possess only the personal property, materials, supplies, items, commodities and substances, up to the maximum amount, received or obtained from authorized sources, as permitted in these regulations. Possession of contraband as defined in section 3000 may result in disciplinary action and confiscation of the contraband.

(a) Dangerous Property. Inmates may not possess or have under their control any weapons, explosives, explosive making material, poisons or any distructive devices, nor shall they possess or assist in circulating any writing or voice recording which describes the making of any weapons, explosives, poisons, or destructive devices.

(b) Money. Inmates may not possess money. If an inmate finds money and voluntarily surrenders it, and the rightful owner does not claim it within 30 days, it will be credited to the inmate's trust account.

(c) Except as authorized by the institution head, inmates shall not possess or have under their control any matter which contains or concerns any of the following:

(1) Any matter of a character tending to incite murder; arson; riot; or any form of violence or physical harm to any person, or any ethnic, gender, racial, religious, or other group.

(2) Blackmail or extortion.

(3) Contraband, or sending or receiving contraband.

(4) Plans to escape or assist in an escape.

(5) Plans to disrupt the order, or breach the security, of any facility.

(6) Plans for activities which violate the law, these regulations, or local procedures.

(7) Coded messages.

(8) A description of the making of any weapon, explosive, poison or destructive device.

(9) Illustrations, explanations, and/or descriptions of how to sabotage or disrupt computers, communications, or electronics.

(10) Diskettes.

(11) Catalogs, advertisements, brochures, and material whose primary purpose is to sell a product(s) or service(s) and when taken as a whole, lacks serious literary, artistic, political, educational, or scientific value.

(12) Maps depicting any area within a ten mile radius of a facility.

(13) Gambling or a lottery.

(14) Markings on the envelope which are obscene in nature as described in subsection (15) below.

(15) Obscene material and mail containing information concerning where, how, or from whom obscene material may be obtained.

(A) Obscene material means material taken as a whole, which to the average person, applying contemporary statewide standards, appeals to the prurient interest; and is material which taken as a whole, depicts or describes sexual conduct; and which, taken as a whole, lacks serious literary, artistic, political, or scientific value.

(B) When it appears from the nature of the matter or the circumstances of its dissemination, distribution, or exhibition that it appeals to deviant sexual groups.

(b) The order in which criteria are listed does not indicate their relative weight or importance.

(c) "Shall" is mandatory, "should" is advisory, and "may" is permissive.

(d) The past, present, or future tense includes the others.

(e) The masculine gender includes the feminine gender; the singular includes the plural.

(f) The time limits specified in these regulations do not create a right to have the specified action taken within the time limits. The time limits are directory, and the failure to meet them does not preclude taking the specified action beyond the time limits.

NOTE: Authority cited: section 5058 and Stats. 1992, ch. 695, sec. 45. Reference: Sections 3000 and 5054, Penal Code.

HISTORY:

1. New section filed 9-3-93; operative 9-3-93 pursuant to Government Code section 11346.2(d) (Register 93, No. 36).

### 3001. Subject to Regulations.

Regardless of commitment circumstances, every person confined or residing in facilities of the department is subject to the rules and regulations of the director, and to the procedures established by the warden, superintendent, or parole region administrator responsible for the operation of that facility. Persons on parole or civil addict outpatient status are subject to such director's rules, regulations and parole region procedures as may be applicable to such persons.

### 3001.5. Assignment to Caseworker.

Upon reception at a facility, each inmate shall be assigned a caseworker.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Sections 5054 and 5068, Penal Code.

HISTORY:

1. New section filed 10-15-92; operative 11-16-92 (Register 92, No. 42).

### 3002. Notice of Program, Behavioral, and Participation Expectations.

(a) Within 14 days of reception by the Department of Corrections or upon return to confinement in a departmental institution or facility, every inmate or parolee shall be issued a copy of the Rules and Regulations of the Director of Corrections and copies of all rule changes that have occurred since the last complete reprinting and reissue of the rules and regulations. Each inmate and parolee shall sign a receipt for the rules. The receipt shall be filed as a permanent record in the inmate's central file. In addition:

(1) Spanish language copies of the rules and regulations of the director shall be maintained at each reception center, institution and facility where inmates are confined. Notice shall be given in Spanish that a Spanish version of the rules is available for inspection. These rules shall be made available for review by Spanish speaking inmates who cannot read English.

(2) Within 14 days of transfer to another departmental institution or facility, the new arrival shall be given a written summary of local procedures governing the conduct and activities of inmates confined at that location and a summary of the range of work and training programs offered by and available at that institution or facility. The summary or summaries shall also include: procedures governing mail and visiting, the inmate's right to appeal and appeal procedures, the facility's basic daily schedule, and where and how additional procedural information of interest may be obtained. New arrivals shall also be given verbal staff instructions regarding the procedures.

Staff instructions shall also be given to newly received inmates regarding the possibility of receiving a one-third reduction of their sentence or minimum eligible parole date for refraining from acts or activities of misbehavior and by participating in assigned work and program activities.

(b) During regularly scheduled institution and reception center inmate orientation sessions each inmate or parolee shall be advised of the following:

(1) The ability to earn credits by participating in assigned work and program activities; and,

(2) The availability of work and program activities; and,

(3) The possible loss of credits resulting from acts or activities of misbehavior; and,

(4) The availability of and procedures for access to health care including daily sick call procedures.

(5) Reception centers shall incorporate the inmate's acknowledgement of the receipt of the summary of reception center work and program activities in the same form used as a receipt for issue of the rules and regulations to the inmate.

(6) When inmates are placed in specialized housing with specialized or limited program options and opportunities to participate, the initial classification committee shall explain the options and opportunities available to the inmate within that specialized unit. A copy of the committee's chrono reflecting the discussion shall be given to the inmate and a copy placed in the inmate's central file.

(7) The facility location where Board of Prison Terms' Rules may be reviewed by the inmate.

(8) Available institution social services.

(c) The issuance of rules and regulations and program information, summaries, and the inmate's receipt for same is required in order to comply with Sections 2080 and 2930 of the Penal Code. An inmate's refusal to sign a receipt for the issue of rules and regulations, work and program summaries, or work and program agreements or understandings, shall be noted by staff, and the receipt shall be filed in the inmate's central file. Refusal or failure to acknowledge the receipt of information shall not relieve the inmate from any responsibility to behave and participate as expected nor from the consequence for misbehavior or refusal or failure to participate.

(d) Each institution and reception center shall provide a means of advising inmates who cannot read English of the expectations contained in this section. The provisions shall include communication of the expectations to those inmates who also have impaired hearing.

NOTE: Authority cited: section 5058, Penal Code. Reference: Sections 2080, 2930, 2931 and 5054, Penal Code.

HISTORY:

1. Amendment filed 2-24-77; effective thirtieth day thereafter (Register 77, No. 9).
2. Amendment filed 5-13-77; effective thirtieth day thereafter (Register 77, No. 20).
3. Amendment filed 5-4-83; designated effective 6-1-83 pursuant to Government Code section 11346.2(d) (Register 83, No. 19).
4. Amendment of subsections (a), (b) and new subsection (d) filed 2-8-88; operative 3-9-88 (Register 88, No. 7).
5. Editorial correction of printing errors in subsections (a)(1) and (b)(3) (Register 92, No. 5).
6. New subsections (b)(7)–(8) filed 10-15-92; operative 11-16-92 (Register 92, No. 42).

### 3003. Threats Against Public Officials.

Any inmate away from a secure perimeter facility or parolee who makes a written or verbal threat against the life of any official specified in Penal Code section 76 with the intent and apparent ability to carry out the threat shall immediately be placed in custody at a jail or secure perimeter facility pending disposition of the charges.

NOTE: Authority cited: section 5058, Penal Code. Reference: Sections 76, 3056, 5054, and 6253, Penal Code.

HISTORY:

1. New section filed 10-18-93; operative 11-17-93 (Register 93, No. 43). For prior history, see Register 89, No. 41.

30. Definitions added for "Chaplain," "Religious Artifact," and "Sweat Lodge" and amendment of Note filed 11-1-93; operative 12-13-93 (Register 93, No. 45).
31. Amendment adding "Ex-Offender" filed 11-30-93; operative 12-30-93 (Register 93, No. 49).
32. Certificate of Compliance as to 7-29-93 order transmitted to OAL 11-18-93 and filed 12-31-93 (Register 94, No. 1).
33. Certificate of Compliance as to 10-18-93 order transmitted to OAL 2-15-94 and filed 3-16-94 (Register 94, No. 11).
34. Amendment of "Inmate", new definition "Serious injury", and amendment of Note filed 5-5-95; operative 6-5-95 (Register 95, No. 18).
35. Amendment of "Institution Head" filed 9-13-96 as an emergency; operative 9-13-96. A Certificate of Compliance must be transmitted to OAL by 2-24-97 or emergency language will be repealed by operation of law on the following day.
36. Amendment adding definition of "Certification" filed 11-22-96 as an emergency; operative 11-22-96 (Register 96, No. 47). A Certificate of Compliance must be transmitted to OAL by 5-1-97 pursuant to Penal Code section 5058(e) or emergency language will be repealed by operation of law on the following day.
37. Certificate of Compliance as to 9-13-96 order transmitted to OAL 11-22-96 and filed 1-6-97 (Register 97, No. 2).
38. Certificate of Compliance as to 11-22-96 order, including amendment of definition of "Certification," transmitted to OAL 3-20-97 and filed 5-1-97 (Register 97, No. 18).
39. Amendment adding definitions of "Lockdown" and "Restricted or controlled inmate movement" filed 10-16-97; operative 11-15-97 (Register 97, No. 42).
40. Amendment adding definition of "Program failure" filed 10-16-97 as an emergency; operative 10-16-97 (Register 97, No. 42). Pursuant to Penal Code section 5058(e), a Certificate of Compliance must be transmitted to OAL by 3-25-98 or emergency language will be repealed by operation of law on the following day.
41. Amendment adding definition of "Vexatious Litigant" and amending Note filed 11-12-97 as an emergency; operative 11-12-97 (Register 97, No. 46). A Certificate of Compliance must be transmitted to OAL by 3-13-98 or emergency language will be repealed by operation of law on the following day.
42. Editorial correction of definition of "Vexatious Litigant" and Histories 40 and 41 (Register 98, No. 18).
43. Amendment adding definition of "Vexatious Litigant" and amending Note refiled 4-29-98 as an emergency; operative 4-29-98 (Register 98, No. 18). A Certificate of Compliance must be transmitted to OAL by 10-6-98 or emergency language will be repealed by operation of law on the following day.
44. Certificate of Compliance as to 10-16-97 order, including removal of definition of "Program failure" to section 3062(n), transmitted to OAL 3-23-98 and filed 5-4-98 (Register 98, No. 19).
45. Certificate of Compliance as to 4-29-98 order, including further amendment of definition of "Vexatious Litigant" and Note, transmitted to OAL 6-12-98 and filed 7-21-98 (Register 98, No. 30).
46. Amendment adding new definitions of "Controlled Medication," "Controlled Substance," "Distribution" and "Laboratory" and amendment of Note filed 8-27-98 as an emergency; operative 8-27-98 (Register 98, No. 35). A Certificate of Compliance must be transmitted to OAL by 2-3-99 or emergency language will be repealed by operation of law on the following day,
47. Amendment filed 11-13-98 as an emergency; operative 11-13-98 (Register 98, No. 46). A Certificate of Compliance must be transmitted to OAL by 3-15-99 or emergency language will be repealed by operation of law on the following day.
48. Amendment adding new definitions of "Controlled Medication," "Controlled Substance," "Distribution" and "Laboratory" and amendment of Note refiled 2-3-99 as an emergency; operative 2-3-99 (Register 99, No. 6). Pursuant to Penal Code section 5058(e), a Certificate of Compliance must be transmitted to OAL by 7-13-99 or emergency language will be repealed by operation of law on the following day.
49. Certificate of Compliance as to 11-13-98 order transmitted to OAL 2-10-99 and filed 3-8-99 (Register 99, No. 11).
50. Certificate of Compliance as to 2-3-99 order transmitted to OAL 5-12-99 and filed 6-24-99 (Register 99, No. 26).
51. Amendment filed 3-27-2000 as an emergency; operative 3-27-2000 (Register 2000, No. 13). Pursuant to Penal Code section 5058(e), a Certificate of Compliance must be transmitted to OAL by 9-5-2000 or emergency language will be repealed by operation of law on the following day.
52. Amendment of definition of "Chronological History" filed 8-28-2000; operative 9-27-2000 (Register 2000, No. 35).
53. Certificate of Compliance as to 3-27-2000 order transmitted to OAL 9-5-2000; disapproval and order of repeal and deletion reinstating section as it existed prior to emergency amendment by operation of Government Code11346.1(f) filed 10-18-2000 (Register 2000, No. 42).
54. Amendment filed 10-19-2000 deemed an emergency pursuant to Penal Code section 5058(e); operative 10-19-2000 (Register 2000, No. 42). Pursuant to Penal Code section 5058(e), a Certificate of Compliance must be transmitted to OAL by 3-27-2001 or emergency language will be repealed by operation of law on the following day.
55. Amendment adding definition of "General Chrono" filed 11-16-2000; operative 12-16-2000 (Register 2000, No. 46).
56. Certificate of Compliance as to 10-19-2000 order, including further amendment of definitions of "Execution Type Murder," "High Notoriety" and "Public Interest Case," transmitted to OAL 3-27-2001 and filed 5-3-2001 (Register 2001, No. 18).
57. Amendment of definitions of "Firm" and "Small Business Firm" and amendment of Note filed 7-12-2002; operative 8-11-2002 (Register 2002, No. 28).
58. Amendment adding definition of "Street gang" and amendment of Note filed 8-27-2002 as an emergency; operative 8-27-2002 (Register 2002, No. 35). Pursuant to Penal Code section 5058.3 a Certificate of Compliance must be transmitted to OAL by 2-4-2003 or emergency language will be repealed by operation of law on the following day.
59. Certificate of Compliance as to 8-27-2002 order transmitted to OAL 1-21-2003 and filed 3-6-2003 (Register 2003, No. 10).
60. Amendment adding definitions of "Program failure" and "Significant work related disciplinary history" filed 1-9-2004 as an emergency; operative 1-9-2004 (Register 2004, No. 2). Pursuant to Penal Code section 5058.3, a Certificate of Compliance must be transmitted to OAL by 6-17-2004 or emergency language will be repealed by operation of law on the following day.
61. Amendment adding definitions of "Program failure" and "Significant work related disciplinary history" refiled 6-17-2004 as an emergency; operative 6-17-2004 (Register 2004, No. 25). Pursuant to Penal Code section 5058.3, a Certificate of Compliance must be transmitted to OAL by 11-24-2004 or emergency language will be repealed by operation of law on the following day.
62. Certificate of Compliance as to 6-17-2004 order transmitted to OAL 11-16-2004 and filed 12-29-2004 (Register 2004, No. 53).
63. New definition of "Religious Review Committee (RRC)" filed 1-17-2006 as an emergency; operative 1-17-2006 (Register 2006, No. 3). Pursuant to Penal Code section 5058.3, a Certificate of Compliance must be transmitted to OAL by 6-26-2006 or emergency language will be repealed by operation of law on the following day.
64. Amendment of definition of "Program failure" filed 6-9-2006; operative 7-9-2006 (Register 2006, No. 23).
65. Certificate of Compliance as to 1-17-2006 order transmitted to OAL 6-22-2006 and filed 7-27-2006 (Register 2006, No. 30).

**3000.5. Rules of Construction.**

The following rules of construction apply to these regulations, except where otherwise noted:

(a) The enumeration of some criteria for the making of discretionary decisions does not prohibit the application of other criteria reasonably related to the decision being made.

[redacted] 154.

determined against the person, repeatedly relitigates or attempts to relitigate in propria persona either; (a) the validity of the determination against the same defendant or defendants as to whom the litigation was finally determined or; (b) the cause of action, claim, controversy, or any of the issues of fact or law, determined or concluded by the final determination against the same defendant or defendants as to whom the litigation was finally determined; (3) in any litigation while acting in propria persona, repeatedly files unmeritorious motions, pleadings, or other papers, conducts unnecessary discovery, or engages in other tactics that are frivolous or solely intended to cause unnecessary delay; (4) has previously been declared to be a vexatious litigant by any state or federal court of record in any actions or proceeding based upon the same or substantially similar facts, transaction, or occurrence. Pursuant toIn re Bittaker,Writs of Habeas Corpus are not included under vexatious litigation.

Work Change Area means a portal controlled by staff and/or locking gates that is used to control access and includes the area where staff search inmates prior to permitting inmates in or out of adjacent areas such as Prison Industry Authority yards.

Worktime Credit means credit towards a prisoner's sentence for satisfactory performance in work, training or education programs.

NOTE: Authority cited: Sections 2717.3, 5058 and 5058.3, Penal Code; Section 10115.3(b), Public Contract Code; and Sections 4525(a), 4526 and 14837, Government Code. Reference: Sections 186.22, 243, 530, 532, 646.9, 653m, 832.5, 1389, 2080, 2081.5, 2600, 2601, 2700, 2717.1, 2717.6, 2932.5, 4570, 5009, 5054, 5068, and 7000 et seq., Penal Code; Sections 1132.4 and 1132.8, Labor Code; Sections 10106, 10108, 10108.5, 10115, 10115.1, 10115,2, 10115.3 and 10127, Public Contract Code; and Section 999, Military and Veterans Code; Section 391, Code of Civil Procedure; *In re Bittaker,* 55 Cal.App. 4th 1004, 64 Cal. Rptr. 2d 679; and Section 11007, Health and Safety Code.

HISTORY:

1. Amendment of subsection (a)(19) filed 12-1-78 as an emergency; designated effective 1-1-79 (Register 78, No. 48). For prior history, see Register 77, No. 40.
2. Certificate of Compliance filed 2-22-79 (Register 79, No. 8).
3. Amendment filed 11-20-79 as an emergency; designated effective 1-1-80 (Register 79, No. 47). A Certificate of Compliance must be filed within 120 days or emergency language will be repealed on 3-20-80.
4. Certificate of Compliance filed 2-15-80 (Register 80, No. 7).
5. Amendment filed 3-2-83: effective thirtieth day thereafter (Register 83, No. 12).
6. Change without regulatory effect repealing and adopting new section filed 10-29-90 pursuant to section 100, title 1, California Code of Regulations (Register 91, No. 6).
7. Amendment filed 11-28-90 as an emergency; operative 11-28-90 (Register 91, No. 6). A Certificate of Compliance must be transmitted to OAL by 3-28-91 or emergency language will be repealed by operation of law on the following day.
8. Amendment adding definitions of "disruptive group," "gang," and "prison gang" filed 5-20-91; operative 6-19-91 (Register 91, No. 26).
9. Amendment adding definition for "Media representative" filed 12-19-91 as an emergency; operative 12-19-91 (Register 92, No. 4).
10. Amendment adding definitions for "Disciplinary Free," "Inmate Match," and "Special Assignment" and amending Note filed 12-20-91 as an emergency; operative 12-20-91 (Register 92, No. 4). A Certificate of Compliance must be transmitted to OAL 4-20-92 or emergency language will be repealed by operation of law on the following day.
11. Amendment adding definition for "Case records file" and amendment of Note filed 12-20-91 as an emergency; operative 12-20-91 (Register 92, No. 4). A Certificate of Compliance must be transmitted to OAL 4-20-92 or emergency language will be repealed by operation of law on the following day.
12. Amendment adding definition for "Detainer" and amendment of Note filed 12-19-91 as an emergency; operative 12-19-91 (Register 92, No. 4). A Certificate of Compliance must be transmitted to OAL 4-17-92 or emergency language will be repealed by operation of law on the following day.
13. Amendment adding definitions for "Received Date," "Time Computation," and "Time Served" filed 12-20-91 as an emergency; operative 12-20-91 (Register 92, No. 4). A Certificate of Compliance must be transmitted to OAL 4-20-92 or emergency language will be repealed by operation of law on the following day.
14. Editorial correction of "Firm" and "Grievance" filed 12-20-91; operative 12-20-91 (Register 92, No. 4).
15. Amendment adding definition for "Terminal illness" filed 5-20-92; operative 5-20-92 (Register 92, No. 21). A Certificate of Compliance must be transmitted to OAL 9-17-92 or emergency language will be repealed by operation of law on the following day.
16. Editorial correction of printing error restoring inadvertently deleted definitions originally filed 12-20-91 (Register 92, No. 24).
17. Certificate of Compliance as to 12-20-91 order adding definition for "case records file" transmitted to OAL 4-15-92 and filed 5-27-92 (Register 92, No. 24).
18. Certificate of Compliance as to 12-29-91 order adding definitions for "Disciplinary Free," "Inmate Match," and "Special Assignment" transmitted to OAL 4-20-92 and filed 5-28-92 (Register 92, No. 24).
19. Certificate of Compliance as to 12-19-91 order adding definition of "Detainer" transmitted to OAL 4-20-92 and filed 5-28-92 (Register 92, No. 24).
20. Certificate of Compliance as to 12-19-91 order transmitted to OAL 4-17-92 and filed 6-1-92 (Register 92, No. 24).
21. Certificate of Compliance as to 12-20-91 order transmitted to OAL 4-20-92 and filed 6-2-92 (Register 92, No. 24).
22. Certificate of Compliance as to 5-20-92 order transmitted to OAL 9-9-92; disapproved by OAL and order of repeal of 5-20-92 order filed on 10-22-92 (Register 92, No. 43).
23. Amendment adding definition for "Terminal illness" refiled 10-23-92 as an emergency; operative 10-22-92 pursuant to Government Code section11346.1(h) (Register 92, No. 43). A Certificate of Compliance must be transmitted to OAL 2-23-93 or emergency language will be repealed by operation of law on the following day.
24. Amendment adding "Cumulative case summary," "Chronological history," "Legal status sheet," "Probation officer's report" and "Criminal identification and investigation report" and amendment of Note filed 11-5-92; operative 12-7-92 (Register 92, No. 45).
25. Change without regulatory effect amending "Immediate Family Members" filed 1-26-93 pursuant to section 100, title 1, California Code of Regulations (Register 93, No. 5).
26. Certificate of Compliance as to 10-23-92 order transmitted to OAL 12-18-92 and filed 2-3-93 (Register 93, No. 6).
27. Amendment adding "Harassment" and amendment of Note filed 7-29-93 as an emergency; operative 7-29-93 (Register 93, No. 31). A Certificate of Compliance must be transmitted to OAL 11-26-93 or emergency language will be repealed by operation of law on the following day.
28. Amendment filed 9-3-93; operative 9-3-93 pursuant to Government Code section 11346.2(d) (Register 93, No. 36).
29. Amendment of "Good Faith Effort," "Minority Business Enterprise," "Responsible Bidder" and "Women Business Enterprise" and Note and new definitions "Disabled Veteran Business Enterprise," "Goal," "Minority and/or Women and/or Disabled Veteran Business Enterprise focus paper," "Minority and/or Women and/or Disabled Veteran Business Enterprise focus paper and trade paper," "Project," "Subcontractor," and "Trade Paper" filed 10-18-93 as an emergency; operative 10-18-93 (Register 93, No. 43). A Certificate of Compliance must be transmitted to OAL by 2-15-94 or emergency language will be repealed by operation of law on the following day.

Exhibit 208

3291. Employee Law Enforcement & Peace Officer Personnel

2. Certificate of Compliance filed 11-21-78 (Register 78, No. 47).

**3290. Testing of Controlled Substances.**

(a) The department shall prescribe the products, equipment, and methods for testing suspected controlled substances. "Field" or on-site testing shall be conducted only by trained and certified personnel.

(b) Field tests may be performed on any suspected substance found on institution property or in the possession or under the control of any inmate, or in the possession or under the control of persons other than inmates who come on institution property.

(c) The securing of a urine sample from an inmate, for the purpose of testing for the presence of controlled substances shall be done for the following reasons:

(1) When there is reasonable cause to believe the inmate has possessed, distributed, used, or is under the influence of a controlled substance.

(2) When mandatory random testing is known to the inmate to be a condition for the inmate's participation in a specific program, assignment, or activity.

(3) As part of an authorized disposition of a disciplinary hearing.

(4) The inmate is selected by the institution's/facility's random drug testing selection process.

(d) Inmates must provide a urine sample when ordered to do so pursuant to these regulations, for the purpose of testing for the presence of controlled substances.

(e) Field testing shall be conducted for "screening" purposes only. Disciplinary action for possession of a controlled substance shall not include the loss of work/behavior credits unless a laboratory has confirmed that the suspected substance is in fact a controlled substance, or the inmate has admitted to possessing the controlled substance, accepts the results of a field test, and waives the requirement of testing by a laboratory, and has signed a document to that effect.

(f) The test results from a urine sample submitted for testing for the presence of an unauthorized controlled substance that has been confirmed as positive by a laboratory may be considered as sufficient evidence to charge the user with having had possession of the controlled substance.

(g) When evidence remaining after a field test or resulting from a field test is not suitable or sufficient for submission to a laboratory for confirmation of the field test, the field test results may be considered in a disciplinary hearing for possession of a controlled substance. Under such circumstances, a finding of guilty shall be based upon the preponderance of all evidence presented at the disciplinary hearing. Although no credit loss action may be taken, other authorized disciplinary actions may be taken, including the assessment of the mandatory one-year drug-testing period.

(h) "Field" or "laboratory" testing for sobriety or the use of alcoholic beverages, a controlled substance, unauthorized drug, or intoxicant is not required if other evidence corroborates use. Credit loss and other authorized disciplinary actions may be taken based on a preponderance of evidence and testimony.

(i) The identification of unauthorized controlled medication may be confirmed by a licensed pharmacist and that confirmation may be used as evidence in a disciplinary hearing. There shall be no requirement for laboratory testing of intact controlled medications when identification of the controlled medication has been confirmed by a pharmacist.

NOTE: Authority cited: section 5058, Penal Code. Reference: Sections 2932, 4573.6 and 5054, Penal Code.

HISTORY:

1. Renumbering of former section 3290 to section 3295 and new section 3290 filed 8-18-78; effective thirtieth day thereafter (Register 78, No. 33).
2. Amendment of subsections (a) and (e) and new subsection (h) filed 8-7-87 as an emergency; operative 8-7-87 (Register 87, No. 34). A Certificate of Compliance must be transmitted to OAL within 120 days or emergency language will be repealed on 12-7-87.
3. Certificate of Compliance as to 8-7-87 order transmitted to OAL 12-4-87; disapproved by OAL (Register 88, No. 16).
4. Amendment of subsections (a) and (e) and new subsection (h) filed 1-4-88 as an emergency; operative 1-4-88 (Register 88, No. 16). A Certificate of Compliance must be transmitted to OAL within 120 days or emergency language will be repealed on 5-3-88.
5. Certificate of Compliance as to 1-4-88 order transmitted to OAL 5-3-88; disapproved by OAL (Register 88, No. 24).
6. Amendment of subsections (a) and (e) and new subsection (h) filed 6-2-88 as an emergency; operative 6-2-88 (Register 88, No. 24). A Certificate of Compliance must be transmitted to OAL within 120 days or emergency language will be repealed on 9-30-88.
7. Certificate of Compliance transmitted to OAL 9-26-88 and filed 10-26-88 (Register 88, No. 50).
8. Amendment of subsections (c), (g), and (h) filed 6-2-95 as an emergency; operative 6-5-95 (Register 95, No. 22). A Certificate of Compliance must be transmitted to OAL by 11-12-95 pursuant to Penal Code section 5058(e)(1) or emergency language will be repealed by operation of law on the following day.
9. Certificate of Compliance as to 6-2-95 order transmitted to OAL 10-2-95 and filed 10-17-95 (Register 95, No. 42).
10. Amendment filed 8-27-98 as an emergency; operative 8-27-98 (Register 98, No. 35). A Certificate of Compliance must be transmitted to OAL by 2-3-99 or emergency language will be repealed by operation of law on the following day.
11. Amendment refiled 2-3-99 as an emergency, including further amendment of subsection (g); operative 2-3-99 (Register 99, No. 6). Pursuant to Penal Code section 5058(e), a Certificate of Compliance must be transmitted to OAL by 7-13-99 or emergency language will be repealed by operation of law on the following day.
12. Certificate of Compliance as to 2-3-99 order transmitted to OAL 5-12-99 and filed 6-24-99 (Register 99, No. 26).

**3291. Employee Law Enforcement and Peace Officer Personnel.**

(a) Law Enforcement Responsibility. All employees of the department shall be responsible to enforce laws, regulations and procedures, which govern the actions and activities of inmates, parolees and of persons who come into contact with inmates and parolees. Employees who are not designated as peace officers, whose normal assigned job duties do not require custody and supervision of inmates or parolees, or in situations where it would be inappropriate or unsafe to intervene in unauthorized actions or activities, shall notify or seek the assistance of other employees, including peace officer employees. In an emergency, all employees shall respond as directed by proper authority.

(b) Peace Officer Personnel. Peace officers are departmental employees holding peace officer positions as defined by law or as designated by the director of corrections. Non-peace-officer employees temporarily assigned to perform only the administrative duties of positions held by peace officers shall not be designated as peace officers.

(c) The peace officer authority of employees in (b) extends only to the authority necessary to perform the duties assigned to them, and as specifically authorized by the director in state emergency and mutual aid agreements. Employees designated in subsection 3291(b) are peace officers when performing the duties of their employment within this state, and retain that status outside this state when they are transporting prisoners or apprehending prisoners who have escaped.

(d) In addition to being designated peace officers as described in subsections 3291(b) and (c), parole agents' peace officer authority extends to the enforcement of conditions of parole

(3) An inmate's presence is not required during routine inspections of living quarters and property when the inmate is not or would not otherwise be present. During special inspections or searches initiated because the inmate is suspected of having a specific item or items of contraband in his or her quarters or property, the inmate should be permitted to observe the search when it is reasonably possible and safe to do so.

(4) The inmate will be given a written notice for any item(s) of personal and authorized state-issued property removed from his or her quarters during an inspection and the disposition made of such property. The notice will also list any contraband picked up or any breach of security noted during the inspection, and the follow-up action intended by the inspecting officer.

(b) An inmate is subject to an inspection of his or her person, either clothed or unclothed, when there is a substantial reason to believe the inmate may have unauthorized or dangerous items concealed on his or her person, or that he or she may have been involved in an altercation of any kind. Such inspections may also be a routine requirement for inmate movement into or out of high security risk areas. Random or spot-check inspections of inmates may also be authorized by the institution head to prevent possession and movement of unauthorized or dangerous items and substances into, out of, or within the institution. Visual daily inspections of inmates shall be made to ensure compliance with departmental grooming standards. All such inspections shall be conducted in a professional manner which avoids embarrassment or indignity to the inmate. Whenever possible, unclothed body inspections of inmates shall be conducted outside the view of others.

(1) Correctional employees, other than qualified medical staff, shall not conduct unclothed body inspections of inmates of the opposite sex except under emergency conditions with life or death consequences.

(2) Routine inspections of clothed male inmates may be performed by employees of either sex.

(3) Body inspection of clothed female inmates shall be conducted by female correctional employees only, except in emergency situations requiring the immediate search of inmates to avoid the threat of death, escape, or great bodily injury. In such emergency situations, male correctional employees may conduct clothed body inspections only until sufficient numbers of female correctional employees are available to assume critical body search duties.

(4) Male correctional employees shall not, under any circumstances, perform non-emergency body searches of female inmates.

(5) Any inspection of body cavities, other than visual or metal detector inspections, will be conducted in a medical setting under the direct supervision of a physician. Any physical intrusion into body cavities must be performed by a physician, and then only after all less obtrusive methods have failed to bring the inspection to a conclusion.

(c) Inspections of inmate cell or living areas, property, work areas, and body shall be conducted on an unannounced, random basis as directed by the institution head. Such inspections shall be conducted no more frequently than necessary to control contraband, recover missing or stolen property, or maintain proper security of the institution.

(d) A written record shall be maintained of the disposition of contraband and stolen or missing property confiscated as the result of cell, property, or body inspections.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Section 5054, Penal Code; and *Jordan* v. *Gardner*, 986 F.2d 1521.

HISTORY:

1. Amendment filed 5-13-77; effective thirtieth day thereafter (Register 77, No. 20).
2. Amendment of subsection (a)(3) filed 2-22-79; effective thirtieth day thereafter (Register 79, No. 8).
3. Amendment of subsection (b)(1) filed 8-22-79; effective thirtieth day thereafter (Register 79, No. 34).
4. Amendment of subsection (b) and new subsection (c) and (d) filed 2-8-88; operative 3-9-88 (Register 88, No. 7).
5. Editorial correction of printing error in subsection (b) (Register 92, No. 5).
6. Amendment of subsections (b) and (c) filed 10-16-97 as an emergency; operative 10-16-97 (Register 97, No. 42). Pursuant to Penal Code section 5058(e), a Certificate of Compliance must be transmitted to OAL by 3-25-97 or emergency language will be repealed by operation of law on the following day.
7. Certificate of Compliance as to 10-16-97 order transmitted to OAL 3-23-98 and filed 5-4-98 (Register 98, No. 19).
8. Amendment of subsection (b)(1), new subsections (b)(2)–(4), subsection renumbering and amendment of Note filed 5-26-2005 as an emergency; operative 5-26-2005 (Register 2005, No. 21). Pursuant to Penal Code section 5058(e), a Certificate of Compliance must be transmitted to OAL by 11-2-2005 or emergency language will be repealed by operation of law on the following day.
9. Certificate of Compliance as to 5-26-2005 order transmitted to OAL 9-28-2005 and filed 11-1-2005 (Register 2005, No. 44).

**3288. Notice to Public.**

(a) Warning signs will be posted at the entrance to all public and business roadways onto the grounds of institutions, camps and other department facilities where inmates or parolees are housed, and at all sally ports and pedestrian entrances into such facilities. The signs will be in both English and Spanish and will, at a minimum, display the following information:

(1) The name of the institution, camp or facility, and the fact that it is a facility of the California Department of Corrections.

(2) The items that cannot be brought onto institution grounds. Model language: It is unlawful to bring alcohol, drugs, weapons, explosives, tear gas or tear gas weapons onto prison property.

(3) A warning that entrance on the property constitutes consent to be searched. Model language: By entering these grounds you consent to the search of your person, property and vehicle.

(b) Entrance roadway signs and the lettering will be of sufficient size to attract attention and be easily read by passing motorists. Smaller but conspicuous signs will be posted at sally ports and pedestrian entrances.

NOTE: Authority cited: section 5058, Penal Code. Reference: section 5054, Penal Code.

HISTORY:

1. New section filed 3-22-78; effective thirtieth day thereafter (Register 78, No. 12).
2. Amendment of subsection (a)(2) filed 4-18-80; effective thirtieth day thereafter (Register 80, No. 16).

**3289. Trespass.**

(a) All areas of institutions including buildings and grounds are closed to the general public, including employees of the department during their off-duty hours, at all times except for the purpose of conducting lawful business and engaging in activities authorized in advance by the warden, superintendent or official in charge. Entry on institution property for unauthorized purposes will be considered trespass as provided in section 602(j) of the Penal Code.

(b) Without regard for the reasons an individual or group may have entered institution property, refusal or failure to leave the property when requested to do so by the warden, superintendent, official in charge or by an official authorized to act for the warden, superintendent or official in charge, will be considered trespass as provided in section 602(p) of the Penal Code.

NOTE: Authority cited: section 5058, Penal Code. Reference: section 5054, Penal Code.

HISTORY:

1. New section filed 8-1-78 as an emergency; effective upon filing (Register 78, No. 31).

3291



imposed upon persons on parole in this state and to violations of any penal provisions of law which is discovered in the course of their employment.

(e) In addition to being designated peace officers as described in subsections 3291(b) and (c), the peace officer authority of agents of the department's law enforcement liaison unit extends throughout the state while performing their primary job duties, including the investigation and apprehension of parole violators and the investigation of the violation of any penal provisions of law which is discovered in the course of their employment, and to coordination of the department's law enforcement activities with those of other law enforcement and criminal justice agencies.

(f) In addition to being designated peace officers as described in subsections 3291(b) and (c), the authority of peace officer members of the Office of Internal Affairs, who meet the training standards described in PC section 830.2(d)(2), extends throughout the state while they are performing their primary job duties, including criminal investigations of departmental personnel and the coordination of those activities with other criminal justice agencies.

NOTE: Authority cited: Sections 830.5(f) and 5058, Penal Code. Reference: Sections 830.2(d), 830.5(a) and (b), Penal Code.

HISTORY:

1. New section filed 8-22-79; effective thirtieth day thereafter (Register 79, No. 34).
2. Amendment of subsection (b) filed 12-18-80 as an emergency; effective upon filing (Register 80, No. 51). A Certificate of Compliance must be transmitted to OAL within 120 days or emergency language will be repealed on 4-17-81.
3. Order of Repeal of 12-18-80 order filed 12-26-80 by OAL pursuant to Government Code section 11349.6 (Register 80, No. 52).
4. Amendment of subsection (b) filed 9-24-81; effective thirtieth day thereafter (Register 81, No. 39).
5. Amendment of subsection (b) filed 10-27-82; effective thirtieth day thereafter (Register 82, No. 44).
6. Amendment of section heading and Note filed 2-14-2001; operative 3-16-2001 (Register 2001, No. 7).

### 3292. Arrest and Detention.

(a) It is the policy of the department to arrest and detain civilians only when their unlawful actions or activities present an immediate and significant threat to the custody and control of inmates, parolees, employees and the public.

(b) It is the policy of the department to only effect the arrest and detention of a civilian when there is sufficient cause to believe that the individual's unlawful action or activity is deliberate and intended for a purpose described in (a). Suspicion of unlawful actions or activities will not be cause for the arrest and detention of an individual, but may be cause for ordering or escorting the individual off departmental property or institution grounds, and for referral to local authorities.

(c) Wardens, superintendents and administrators of institutions and facilities which house inmates or parolees will establish and maintain up-to-date local procedures reflecting the policies set forth in this section. Such local procedures will include provisions for informing individuals of their rights and for referral of cases to local authorities. Such procedures will be reviewed annually by the administrator, and will be made available for departmental audit and for inspection as a public record when requested.

NOTE: Authority cited: section 5058, Penal Code. Reference: section 5054, Penal Code.

HISTORY:

1. New section filed 8-22-79; effective thirtieth day thereafter (Register 79, No. 34).

### 3293. Polygraph Examinations.

(a) Polygraph examinations may be administered by departmental staff to inmates, parolees, and employees in the course of an investigation of official matters, under the following conditions:

(1) The examinee has, without coercion, signed a written statement of consent to the examination.

(2) The polygraph examiner is a Law Enforcement Liaison Unit staff member.

(3) The Assistant Director, Law Enforcement Liaison Unit, has approved the examination.

(b) Polygraph examinations shall not be used as an alternative to regulatory requirements for determining a person's guilt or innocence of charges in disciplinary matters.

NOTE: Authority cited: section 5058, Penal Code. Reference: section 3307, Government Code; section 5054, Penal Code; and *Long Beach City Employee's Association* v. *City of Long Beach* (1986) 41 Cal.3rd 937, 227 Cal.Rptr. 90.

HISTORY:

1. New section filed 2-27-89; operative 3-29-89 (Register 89, No. 10).
2. Change without regulatory effect of subsections (a) and (b) pursuant to section 100, title 1, California Code of Regulations filed 2-21-90 (Register 90, No. 11).
3. Change without regulatory effect amending section filed 10-29-90 pursuant to section 100, title 1, California Code of Regulations (Register 91, No. 6).

### 3294.1. Inmate Operation of a Motor Vehicles.

Notwithstanding provisions of the Vehicle Code, inmates shall not drive any vehicle on a public road except in extreme emergency, when taking a Department of Motor Vehicles' Driver's test, or when their use of a personal vehicle is specifically authorized. Inmates may drive a state vehicle on off highway work projects or on facility grounds only when specifically authorized by staff or by the inmate's work supervisor.

NOTE: Authority cited: section 5058, Penal Code. Reference: Sections 4570 and 5054, Penal Code.

HISTORY:

1. Renumbering of former section 3073 to new section 3294.1, including amendment of section and section heading filed 10-27-93; operative 11-26-93 (Register 93, No. 44).

### 3294.5. Inmate Name Change.

(a) All inmate or parolee requests for a legal name change shall initially be reviewed by the Warden or Regional Parole Administrator who shall either recommend approval for a legal name change or deny the request for a legal name change.

(b) If the request is denied, the Warden or Regional Parole Administrator shall respond to the inmate or parolee in writing with the reasons for denial. A copy of the denial shall be placed in the miscellaneous section of the inmate/parolee's central file.

(c) If the Warden finds reasons that exist to warrant an inmate's request for a name change, then the Warden shall forward the request to the Institutions Division Regional Administrator, along with a memorandum listing the reasons for recommending approval. A copy of the memorandum shall be placed in the miscellaneous section of the inmate's central file.

(d) If the Regional Parole Administrator finds reasons that exist to warrant a parolee's request for a name change, then the Regional Parole Administrator shall forward the request to the Assistant Deputy Director, Parole and Community Services Division (P&CSD), along with a memorandum listing the reasons for recommending approval. A copy of the memorandum shall be placed in the miscellaneous section of the parolee's central file.

(e) If the Institutions Division Regional Administrator or the Assistant Deputy Director, P&CSD, agrees with the recommendation to approve the request for a name change of an inmate or parolee, a letter shall be forwarded to the court explaining why the Department is recommending approval for a name change, along with the inmate/parolee's request. A copy of the letter shall be placed in the miscellaneous section of the inmate/parolee's central file.

(f) If the Institutions Division Regional Administrator or the Assistant Deputy Director, P&CSD, denies the request for a name change of an inmate or parolee, a letter shall be forwarded to the inmate or parolee with the reasons for denial. A copy of the letter shall be placed in the miscellaneous section of the inmate/parolee's central file.

(g) Upon receiving final approval from the court with the ordered name change and receiving departmental approval, the Correctional Case Records Manager shall notify the facility mailroom and visiting room of the name change if the offender is incarcerated; or shall notify the agent of record if the offender is on parole. The court order shall be placed in the miscellaneous section of the inmate/parolee's central file, along with other documents related to the request for a name change.

(h) The mailroom and visiting room staff of the facility shall update their records to reflect the additional name of the inmate.

(i) The original commitment name of the inmate or parolee shall remain on all departmental records and shall continue to be used on all departmental records.

(j) The new legal name change shall be entered into the Offender Based Information System (OBIS) under the section "Also Committed As."

(k) The inmate shall be notified to inform all persons who may visit or write him/her that they must use the inmate's departmental identification number when using the inmate's new name.

(*l*) If the court ordered name change is received without departmental approval, this clearly indicates that the inmate/parolee has not followed proper procedure to legally change his/her name. In this case, the Warden or Regional Parole Administrator shall notify the issuing court in writing that the name change cannot legally be changed without the Director's approval pursuant to the Code of Civil Procedure, section 1279.5. A copy of the letter shall be placed in the miscellaneous section of the inmate/parolee's central file and a copy shall be provided to the inmate/parolee.

NOTE: Authority cited: section 5058, Penal Code. Reference: section 5054, Penal Code; section 1279.5, Code of Civil Procedure.

HISTORY:

1. New section filed 1-3-95 as an emergency; operative 1-3-95 (Register 95, No. 1). A Certificate of Compliance must be transmitted to OAL 6-12-95 or emergency language will be repealed by operation of law on the following day.
2. Certificate of Compliance as to 1-3-95 order including amendment of subsection (*l*) transmitted to OAL 5-3-95 and filed 6-14-95 (Register 95, No. 24).

## Article 3. Escapes

### 3295. Duty of Employees to Prevent Escapes.

It is the duty of every employee to do everything possible to prevent the escape of an inmate.

Comment: Former DP-4301, duty of employees to prevent escapes.

HISTORY:

1. Renumbering of section 3290 to section 3295 filed 8-18-78; effective thirtieth day thereafter (Register 78, No. 33).

### 3296. Escape Pursuit Plan.

Each warden and superintendent must have in effect at all times a plan of operations for the reporting of escapes, and for the pursuit and apprehension of escapees. Each employee must be instructed in the general and special procedures that he or she is to follow. Such plans must be in writing and be reviewed annually by the warden or superintendent.

Comment: Former DP-4302, escape pursuit plan.

HISTORY:

1. Renumbering of section 3291 to section 3296 filed 8-18-78; effective thirtieth day thereafter (Register 78, No. 33).

### 3297. Air Space Management.

(a) Staff and inmates shall be notified and warning signs posted to indicate that any inmate who without authorization moves toward an aircraft on or near facility property may be fired upon to prevent an escape.

(b) If an aircraft enters a facility's air space for an apparent escape attempt, staff shall act to prevent any escape.

(1) Firearms shall not be used to bring down or disable an aircraft in flight.

(2) If the aircraft is on the ground on or near facility property, staff shall take any action necessary, including use of firearms, to disable the aircraft.

(3) Return fire may be directed at an attacker within an aircraft if no other means is available to save the lives of innocent or uninvolved persons.

(4) Inmate failure to comply with orders to move away from any grounded aircraft shall be considered an attempt to escape.

NOTE: Authority cited: section 5058, Penal Code. Reference: Sections 835a and 5054, Penal Code.

HISTORY:

1. New section filed 12-20-91 as an emergency; operative 12-20-91 (Register 92, No. 4). A Certificate of Compliance must be transmitted to OAL 4-20-92 or emergency language will be repealed by operation of law on the following day.

## Article 4. Disorders and Emergencies

### 3300. Prevention of Disorders.

It is the duty of every employee to do everything possible to prevent disorders. Each employee must be trained to be familiar with the procedures for handling disorders. Disorders and other emergencies must be reported to supervisory staff at the earliest possible moment. Whenever a disorder occurs, a prompt investigation will be made by the warden or superintendent.

Comment: Former DP-4401, prevention of disorders.

### 3301. Disturbance Control Plan.

Each warden or superintendent must have in effect at all times a plan, approved by the director, for meeting emergencies, such as riots, strikes, attacks upon inmates, visitors or staff, explosions or fires, suicides or attempted suicides, and accidental injuries to inmates or visitors or employees. This plan must include procedures for requesting assistance from outside the institution when circumstances warrant.

Comment: Former DP-4402, disturbance control plan.

### 3302. Emergency Preparedness Plan.

(a) Each warden and superintendent must have in effect at all times a plan approved by the director for meeting emergencies delineated and required by the California Emergency Services Act of 1970.

(b) This plan will include, as a minimum, emergency measures to be taken to prepare for and respond to the following types of emergency situations:

(1) War.
(2) Earthquakes.
(3) Seismic sea waves;
(4) Flood;
(5) Fire;
(6) Civil Disturbances;
(7) Accident, transportation-industrial, and;
(8) Pollution.

(c) A separate Employee Protection Plan will be developed in accordance with the California Emergency Services Act. Two copies of this plan will be attached to the emergency preparedness plan when that plan is submitted to the director for approval.

(d) Emergency preparedness plans and the employee protection plan will be revised and updated by the warden or superintendent and be submitted to the director for approval biennially.

Exhibit 209

3391 Employee conduct

(1) Dentist.
(2) Chief dentist.
(3) Staff psychiatrist.
(4) Senior psychiatrist.
(5) Chief psychiatrist, correctional facility.
(6) Staff psychologist (counseling or clinical).
(7) Senior psychologist.
(8) Chief psychologist.
(9) Physician and surgeon.
(10) Chief physician and surgeon.
(11) Chief medical officer, correctional institution.
(12) Assistant superintendent, psychiatric services, correctional facility.
(13) Deputy superintendent, clinical services, correctional facility.
(14) Chief, medical services, correctional program.
(15) Correctional case records (complete series).

(b) Background investigation clearances are not required prior to appointment to classifications in (a) above.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Section 5054, Penal Code.

HISTORY:

1. New section filed 11-30-93; operative 12-30-93 (Register 93, No. [redacted]). For prior history, see Register 85, No. 26).

### 3391. Employee Conduct.

(a) Employees shall be alert, courteous, and professional in their dealings with inmates, parolees, fellow employees, visitors and members of the public. Inmates and parolees shall be addressed by their proper names, and never by derogatory or slang reference. Prison numbers shall be used only with names to summon inmates via public address systems. Employees shall not use indecent, abusive, profane, or otherwise improper language while on duty. Irresponsible or unethical conduct or conduct reflecting discredit on themselves or the department, either on or off duty, shall be avoided by all employees.

(b) An allegation by a non-inmate of misconduct by a departmental peace officer as defined in section 3291(b) is a citizen's complaint pursuant to Penal Code section 832.5. Citizen's complaints alleging misconduct of a departmental peace officer shall be filed within twelve months of the alleged misconduct.

(c) Persons other than an inmate, parolee or staff who allege misconduct of a departmental peace officer shall submit a written complaint to the institution head or parole administrator of the area in which the peace officer is employed.

(d) Citizens filing complaints alleging misconduct of a departmental peace officer employed by this department are required to read and sign the following statement:

YOU HAVE THE RIGHT TO MAKE A COMPLAINT AGAINST A POLICE OFFICER [this includes a departmental peace officer] FOR ANY IMPROPER POLICE [or peace] OFFICER CONDUCT. CALIFORNIA LAW REQUIRES THIS AGENCY TO HAVE A PROCEDURE TO INVESTIGATE CITIZENS' [or inmates'/parolees'] COMPLAINTS. YOU HAVE A RIGHT TO A WRITTEN DESCRIPTION OF THIS PROCEDURE. THIS AGENCY MAY FIND AFTER INVESTIGATION THAT THERE IS NOT ENOUGH EVIDENCE TO WARRANT ACTION ON YOUR COMPLAINT; EVEN IF THAT IS THE CASE, YOU HAVE THE RIGHT TO MAKE THE COMPLAINT AND HAVE IT INVESTIGATED IF YOU BELIEVE AN OFFICER BEHAVED IMPROPERLY. CITIZEN [or inmate/parolee] COMPLAINTS AND ANY REPORTS OR FINDINGS RELATING TO COMPLAINTS MUST BE RETAINED BY THIS AGENCY FOR AT LEAST FIVE YEARS.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Sections 148.6, 832.5, 5054 and 6250–6253, Penal Code, *Chaker* v. *Crogan* (9th Cir 2005) 428 F. 3d 1215.

HISTORY:

1. Amendment filed 2-8-88; operative 3-9-88 (Register 88, No.7).
2. Editorial correction of History 1. (Register 96, No. 52).
3. Amendment of section heading, amendment adding new subsection (a) designator, renumbering and amendment of old subsections 3084.7(h)(2) and (h)(3) to new subsection 3391(b) and (c), new subsection (d), and amendment of Note filed 12-23-96 as an emergency; Operative 12-23-96 (Register 96, No. 52). Pursuant to Penal Code section 5058(e), a Certificate of Compliance must be transmitted to OAL by 6-2-97, or emergency language will be repealed by operation of law on the following day.
4. Amendment of section heading, amendment adding new subsection (a) designator, renumbering and amendment of old subsections 3084.7(h)(2) and (h)(3) to new subsections 3391(b) and (c), new subsection (d), and amendment of Note refilled 5-29-97 as an emergency; operative 6-2-97 (Register 97, No. 22). A Certificate of Compliance must be transmitted to OAL by 9-30-97 or emergency language will be repealed by operation of law on the following day.
5. Editorial correction of History 4 (Register 97, No. 24).
6. Certificate of Compliance as to 5-29-97 order, including amendment of subsections (b) and (d), transmitted to OAL 9-25-97 and filed 11-7-97 (Register 97, No. 45).
7. Amendment of subsection (d) and amendment of Note filed 11-3-2006 as an emergency; operative 11-3-2006 (Register 2006, No. 44). Pursuant to Penal Code section 5058.3, a Certificate of Compliance must be transmitted to OAL by 4-12-2007 or emergency language will be repealed by operation of law on the following day.
8. Certificate of Compliance as to 11-3-2006 order transmitted to OAL 3-12-2007 and filed 4-19-2007 (Register 2007, No. 16).

### 3392. Punctuality.

Employees must report for duty promptly at the time directed and not leave work assignments before completion of their scheduled workday or tour of duty, except with their supervisor's permission. If for any reason an employee is unable to report for duty, the employee must notify his or her supervisor at the earliest possible moment.

Comment: Former DR-5203, punctuality of employees.

### 3393. Uniforms, Badges, and Insignia.

(a) All peace officer personnel shall wear uniforms and insignia as prescribed by the director, unless specifically excepted by the warden, superintendent, or regional parole administrator. Personnel shall not wear a department uniform into any bar, tavern, gambling hall or nightclub, except in the performance of assigned duties.

(b) Uniformed peace officer personnel shall wear the official department badge as a standard item of uniform attire. Exceptions may be authorized by the warden, superintendent, regional parole administrator, or department division head to whom such employees report. All personnel appointed to positions designated as peace officers in Section 3291 are authorized to possess and carry an official Department of Corrections badge. It is unlawful for any person, including a department employee who is not a peace officer, to wear, exhibit or use the department badge or a facsimile of the badge without specific authority to do so.

(c) All uniformed peace officer personnel shall wear a clearly displayed nameplate as a standard item of uniform attire. Any employees having contact with inmates and the general public may also be required to wear a nameplate while on duty, as determined by the warden, superintendent, division head, or parole regional administrator to whom the employee reports.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Section 830.10, Penal Code.

HISTORY:

1. Amendment filed 7-29-76; effective thirtieth day thereafter (Register 76, No. 31).
2. Repealer of subsection (d) and new subsections (d), (e) and (f) filed 3-22-78; effective thirtieth day thereafter (Register 78, No. 12).

# SUBCHAPTER 5. PERSONNEL

## Article 1. Wardens, Superintendents, Parole Region Administrators

**3380. Chief Executive Officer.**

(a) The warden or superintendent of an institution of the department is the chief executive officer of that institution, and is responsible for the custody, treatment, training and discipline of all inmates under his or her charge.

(b) Parole region administrators are the chief executive officer of their respective parole regions, and are responsible for the supervision of all parolees and furloughees assigned to the region, and to the districts, units and community correctional centers under the region's jurisdiction.

(c) Subject to the approval of the Director of Corrections, wardens, superintendents and parole region administrators will establish such operational plans and procedures as are required by the director for implementation of regulations and as may otherwise be required for their respective operations. Such procedures will apply only to the inmates, parolees and personnel under the administrator.

(d) Copies of institution and parole region operational plans and procedures requiring the director's review and approval will be submitted to central office on a scheduled basis. A copy of each currently approved plan will be maintained in the department's policy documentation files. Operational procedures which do not require the director's review and approval do not need to be submitted to central office unless requested. In compliance with the Public Records Act, departmental regulations and procedures, as well as institution and parole region operational plans and procedures of a nonconfidential nature, will be made available for public examination at any administrative office of the department where such information is maintained.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Section 5054, Penal Code and Section 6253, Government Code.

HISTORY:

1. Amendment of subsection (d) filed 8-22-79; effective thirtieth day thereafter (Register 79, No. 34).

**3381. Absence.**

Wardens, superintendents and parole region administrators will obtain the director's approval before voluntarily absenting themselves from duty for more than one regular state workday. Each warden, superintendent and parole region administrator will submit for the director's approval the names and titles of three top-ranking subordinates who will serve in the administrator's place during temporary absences. The persons named will be designated as first, second and third alternate, to serve as acting warden, superintendent or region administrator. While so acting, the person designated has the same authority and power as the warden, superintendent or region administrator.

Comment: Former DP-5102, absence from institution.

**3382. Incident Reports.**

(a) Any event or activity occurring within the jurisdiction of institutions or parole regions which may be of immediate interest or concern to the department, or of special interest to other governmental agencies or the news media will be immediately reported by institution and region staff by telephone to the office of the director or to the departmental duty officer. Wardens and superintendents will submit a written report of the incident to the director within 72 hours of the verbal notice. Parole regions will submit written reports as instructed by the Deputy Director, Parole and Community Services Division.

(b) Incidents to be reported include, but are not limited to all serious crimes such as homicide or severe assaults upon or by inmates, parolees or employees, escapes, and sensational activities or events such as riots, strikes, demonstrations, disturbances, or disruption of essential services, and significant damage or destruction of state property.

HISTORY:

1. Amendment filed 2-24-77; effective thirtieth day thereafter (Register 77, No. 9).

**3383. State of Emergency.**

(a) A state of emergency shall exist when the institution head or Regional Parole Administrator/Assistant Deputy Director, Parole and Community Services Division (P&CSD), temporarily suspends any nonessential operation, procedure, service or function, and the normal time limits or schedules for such activity in order to prevent, contain, or control a disturbance.

(b) Approval of the director or director's designee is required when:

(1) A lockdown of all housing units/sub-facilities within a facility's security perimeter is to exceed 24 hours.

(2) A lockdown of fewer than all housing units/sub-facilities within a facility's security perimeter is to exceed 72 hours.

(3) The suspension of a facility's major program or operation is to exceed 72 hours; e.g., an academic or vocational program, visiting program, yard operation, or dining room operation.

(c) During a state of emergency the institution head or Regional Parole Administrator/Assistant Deputy Director, P&CSD, may authorize the postponement of nonessential administrative decisions, actions, and the normal time requirements for such decisions and actions as deemed necessary because of the emergency. This may include, but is not limited to, classification committee hearings, disciplinary proceedings, and the review and action on appeals.

(d) During a state of emergency, the cause and effect shall be constantly reviewed and evaluated by the institution head or Regional Parole Administrator/Assistant Deputy Director, P&CSD through appropriate staff. The facility's affected areas, programs, and operations shall be returned to normal as soon as the institution head or Regional Parole Administrator/Assistant Deputy Director, P&CSD, determines that it is safe to do so. Upon termination of a state of emergency, the normal schedules and time frames for administrative decisions and actions pertaining to affected inmates will resume.

NOTE: Authority cited: Section 11152, Government Code; Section 5058, Penal Code. Reference: Section 5054, Penal Code.

HISTORY:

1. New section filed 3-22-78; effective thirtieth day thereafter (Register 78, No. 12).
2. Change without regulatory effect amending section and adding Note filed 3-21-95 pursuant to Section 100, Title 1, California Code of Regulations (Register 95, No. 12).
3. Amendment filed 10-16-97; operative 11-15-97 (Register 97, No. 42).

**3384. Administrative Visitation.**

Wardens and superintendents or a designated staff member acting in that capacity, the chief custodial officer, the chief medical officer, and other administrative and management staff, will visit institution living and activity areas at least weekly.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Section 5054, Penal Code.

HISTORY:

1. New section filed 4-18-80; effective thirtieth day thereafter (Register 80, No. 16).

## Article 2. Employees

**3390. Background Investigations.**

(a) Background investigations on applicants for non-peace officer classifications shall be limited to applicants applying for the following classifications:

Exhibit-213

Title 15 338D Chief Executive officer

Exhibit 213



# SUBCHAPTER 5. PERSONNEL

## Article 1. Wardens, Superintendents, Parole Region Administrators

Exhibit 213

### 3380. Chief Executive Officer.

(a) The warden or superintendent of an institution of the department is the chief executive officer of that institution, and is responsible for the custody, treatment, training and discipline of all inmates under his or her charge.

(b) Parole region administrators are the chief executive officer of their respective parole regions, and are responsible for the supervision of all parolees and furloughees assigned to the region, and to the districts, units and community correctional centers under the region's jurisdiction.

(c) Subject to the approval of the Director of Corrections, wardens, superintendents and parole region administrators will establish such operational plans and procedures as are required by the director for implementation of regulations and as may otherwise be required for their respective operations. Such procedures will apply only to the inmates, parolees and personnel under the administrator.

(d) Copies of institution and parole region operational plans and procedures requiring the director's review and approval will be submitted to central office on a scheduled basis. A copy of each currently approved plan will be maintained in the department's policy documentation files. Operational procedures which do not require the director's review and approval do not need to be submitted to central office unless requested. In compliance with the Public Records Act, departmental regulations and procedures, as well as institution and parole region operational plans and procedures of a nonconfidential nature, will be made available for public examination at any administrative office of the department where such information is maintained.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Section 5054, Penal Code and Section 6253, Government Code.

HISTORY:

1. Amendment of subsection (d) filed 8-22-79; effective thirtieth day thereafter (Register 79, No. 34).

### 3381. Absence.

Wardens, superintendents and parole region administrators will obtain the director's approval before voluntarily absenting themselves from duty for more than one regular state workday. Each warden, superintendent and parole region administrator will submit for the director's approval the names and titles of three top-ranking subordinates who will serve in the administrator's place during temporary absences. The persons named will be designated as first, second and third alternate, to serve as acting warden, superintendent or region administrator. While so acting, the person designated has the same authority and power as the warden, superintendent or region administrator.

Comment: Former DP-5102, absence from institution.

### 3382. Incident Reports.

(a) Any event or activity occurring within the jurisdiction of institutions or parole regions which may be of immediate interest or concern to the department, or of special interest to other governmental agencies or the news media will be immediately reported by institution and region staff by telephone to the office of the director or to the departmental duty officer. Wardens and superintendents will submit a written report of the incident to the director within 72 hours of the verbal notice. Parole regions will submit written reports as instructed by the Deputy Director, Parole and Community Services Division.

(b) Incidents to be reported include, but are not limited to all serious crimes such as homicide or severe assaults upon or by inmates, parolees or employees, escapes, and sensational activities or events such as riots, strikes, demonstrations, disturbances, or disruption of essential services, and significant damage or destruction of state property.

HISTORY:

1. Amendment filed 2-24-77; effective thirtieth day thereafter (Register 77, No. 9).

### 3383. State of Emergency.

(a) A state of emergency shall exist when the institution head or Regional Parole Administrator/Assistant Deputy Director, Parole and Community Services Division (P&CSD), temporarily suspends any nonessential operation, procedure, service or function, and the normal time limits or schedules for such activity in order to prevent, contain, or control a disturbance.

(b) Approval of the director or director's designee is required when:

(1) A lockdown of all housing units/sub-facilities within a facility's security perimeter is to exceed 24 hours.

(2) A lockdown of fewer than all housing units/sub-facilities within a facility's security perimeter is to exceed 72 hours.

(3) The suspension of a facility's major program or operation is to exceed 72 hours; e.g., an academic or vocational program, visiting program, yard operation, or dining room operation.

(c) During a state of emergency the institution head or Regional Parole Administrator/Assistant Deputy Director, P&CSD, may authorize the postponement of nonessential administrative decisions, actions, and the normal time requirements for such decisions and actions as deemed necessary because of the emergency. This may include, but is not limited to, classification committee hearings, disciplinary proceedings, and the review and action on appeals.

(d) During a state of emergency, the cause and effect shall be constantly reviewed and evaluated by the institution head or Regional Parole Administrator/Assistant Deputy Director, P&CSD through appropriate staff. The facility's affected areas, programs, and operations shall be returned to normal as soon as the institution head or Regional Parole Administrator/Assistant Deputy Director, P&CSD, determines that it is safe to do so. Upon termination of a state of emergency, the normal schedules and time frames for administrative decisions and actions pertaining to affected inmates will resume.

NOTE: Authority cited: Section 11152, Government Code; Section 5058, Penal Code. Reference: Section 5054, Penal Code.

HISTORY:

1. New section filed 3-22-78; effective thirtieth day thereafter (Register 78, No. 12).
2. Change without regulatory effect amending section and adding Note filed 3-21-95 pursuant to Section 100, Title 1, California Code of Regulations (Register 95, No. 12).
3. Amendment filed 10-16-97; operative 11-15-97 (Register 97, No. 42).

### 3384. Administrative Visitation.

Wardens and superintendents or a designated staff member acting in that capacity, the chief custodial officer, the chief medical officer, and other administrative and management staff, will visit institution living and activity areas at least weekly.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Section 5054, Penal Code.

HISTORY:

1. New section filed 4-18-80; effective thirtieth day thereafter (Register 80, No. 16).

## Article 2. Employees

### 3390. Background Investigations.

(a) Background investigations on applicants for non-peace officer classifications shall be limited to applicants applying for the following classifications:

(1) Dentist.
(2) Chief dentist.
(3) Staff psychiatrist.
(4) Senior psychiatrist.
(5) Chief psychiatrist, correctional facility.
(6) Staff psychologist (counseling or clinical).
(7) Senior psychologist.
(8) Chief psychologist.
(9) Physician and surgeon.
(10) Chief physician and surgeon.
(11) Chief medical officer, correctional institution.
(12) Assistant superintendent, psychiatric services, correctional facility.
(13) Deputy superintendent, clinical services, correctional facility.
(14) Chief, medical services, correctional program.
(15) Correctional case records (complete series).

(b) Background investigation clearances are not required prior to appointment to classifications in (a) above.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Section 5054, Penal Code.

HISTORY:
1. New section filed 11-30-93; operative 12-30-93 (Register 93, No. 49). For prior history, see Register 85, No. 26).

**3391. Employee Conduct.**

(a) Employees shall be alert, courteous, and professional in their dealings with inmates, parolees, fellow employees, visitors and members of the public. Inmates and parolees shall be addressed by their proper names, and never by derogatory or slang reference. Prison numbers shall be used only with names to summon inmates via public address systems. Employees shall not use indecent, abusive, profane, or otherwise improper language while on duty. Irresponsible or unethical conduct or conduct reflecting discredit on themselves or the department, either on or off duty, shall be avoided by all employees.

(b) An allegation by a non-inmate of misconduct by a departmental peace officer as defined in section 3291(b) is a citizen's complaint pursuant to Penal Code section 832.5. Citizen's complaints alleging misconduct of a departmental peace officer shall be filed within twelve months of the alleged misconduct.

(c) Persons other than an inmate, parolee or staff who allege misconduct of a departmental peace officer shall submit a written complaint to the institution head or parole administrator of the area in which the peace officer is employed.

(d) Citizens filing complaints alleging misconduct of a departmental peace officer employed by this department are required to read and sign the following statement:

YOU HAVE THE RIGHT TO MAKE A COMPLAINT AGAINST A POLICE OFFICER [this includes a departmental peace officer] FOR ANY IMPROPER POLICE [or peace] OFFICER CONDUCT. CALIFORNIA LAW REQUIRES THIS AGENCY TO HAVE A PROCEDURE TO INVESTIGATE CITIZENS' [or inmates'/parolees'] COMPLAINTS. YOU HAVE A RIGHT TO A WRITTEN DESCRIPTION OF THIS PROCEDURE. THIS AGENCY MAY FIND AFTER INVESTIGATION THAT THERE IS NOT ENOUGH EVIDENCE TO WARRANT ACTION ON YOUR COMPLAINT; EVEN IF THAT IS THE CASE, YOU HAVE THE RIGHT TO MAKE THE COMPLAINT AND HAVE IT INVESTIGATED IF YOU BELIEVE AN OFFICER BEHAVED IMPROPERLY. CITIZEN [or inmate/parolee] COMPLAINTS AND ANY REPORTS OR FINDINGS RELATING TO COMPLAINTS MUST BE RETAINED BY THIS AGENCY FOR AT LEAST FIVE YEARS.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Sections 148.6, 832.5, 5054 and 6250–6253, Penal Code, *Chaker* v. *Crogan* (9th Cir 2005) 428 F. 3d 1215.

HISTORY:
1. Amendment filed 2-8-88; operative 3-9-88 (Register 88, No.7).
2. Editorial correction of History 1 (Register 96, No. 52).
3. Amendment of section heading, amendment adding new subsection (a) designator, renumbering and amendment of old subsections 3084.7(h)(2) and (h)(3) to new subsection 3391(b) and (c), new subsection (d), and amendment of Note filed 12-23-96 as an emergency; Operative 12-23-96 (Register 96, No. 52). Pursuant to Penal Code section 5058(e), a Certificate of Compliance must be transmitted to OAL by 6-2-97, or emergency language will be repealed by operation of law on the following day.
4. Amendment of section heading, amendment adding new subsection (a) designator, renumbering and amendment of old subsections 3084.7(h)(2) and (h)(3) to new subsections 3391(b) and (c), new subsection (d), and amendment of Note refilled 5-29-97 as an emergency; operative 6-2-97 (Register 97, No. 22). A Certificate of Compliance must be transmitted to OAL by 9-30-97 or emergency language will be repealed by operation of law on the following day.
5. Editorial correction of History 4 (Register 97, No. 24).
6. Certificate of Compliance as to 5-29-97 order, including amendment of subsections (b) and (d), transmitted to OAL 9-25-97 and filed 11-7-97 (Register 97, No. 45).
7. Amendment of subsection (d) and amendment of Note filed 11-3-2006 as an emergency; operative 11-3-2006 (Register 2006, No. 44). Pursuant to Penal Code section 5058.3, a Certificate of Compliance must be transmitted to OAL by 4-12-2007 or emergency language will be repealed by operation of law on the following day.
8. Certificate of Compliance as to 11-3-2006 order transmitted to OAL 3-12-2007 and filed 4-19-2007 (Register 2007, No. 16).

**3392. Punctuality.**

Employees must report for duty promptly at the time directed and not leave work assignments before completion of their scheduled workday or tour of duty, except with their supervisor's permission. If for any reason an employee is unable to report for duty, the employee must notify his or her supervisor at the earliest possible moment.

Comment: Former DR-5203, punctuality of employees.

**3393. Uniforms, Badges, and Insignia.**

(a) All peace officer personnel shall wear uniforms and insignia as prescribed by the director, unless specifically excepted by the warden, superintendent, or regional parole administrator. Personnel shall not wear a department uniform into any bar, tavern, gambling hall or nightclub, except in the performance of assigned duties.

(b) Uniformed peace officer personnel shall wear the official department badge as a standard item of uniform attire. Exceptions may be authorized by the warden, superintendent, regional parole administrator, or department division head to whom such employees report. All personnel appointed to positions designated as peace officers in Section 3291 are authorized to possess and carry an official Department of Corrections badge. It is unlawful for any person, including a department employee who is not a peace officer, to wear, exhibit or use the department badge or a facsimile of the badge without specific authority to do so.

(c) All uniformed peace officer personnel shall wear a clearly displayed nameplate as a standard item of uniform attire. Any employees having contact with inmates and the general public may also be required to wear a nameplate while on duty, as determined by the warden, superintendent, division head, or parole regional administrator to whom the employee reports.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Section 830.10, Penal Code.

HISTORY:
1. Amendment filed 7-29-76; effective thirtieth day thereafter (Register 76, No. 31).
2. Repealer of subsection (d) and new subsections (d), (e) and (f) filed 3-22-78; effective thirtieth day thereafter (Register 78, No. 12).

# Exhibit G

STIPULATION FOR INJUNCTION RELIEF (PLATA VS. DAVIS) NO. C 01-1351 TEH

BILL LOCKYER, Attorney General
of the State of California
PETER J. SIGGINS,
Chief Deputy Attorney General
ROBERT R. ANDERSON
Chief Assistant Attorney General
PAUL D. GIFFORD
Senior Assistant Attorney General
JOHN M. APPELBAUM, SBN 149643
Supervising Deputy Attorney General
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 445-2389
Fax: (916) 324-5205

Attorneys for Defendants Davis, Gage, Presley,
Alameida, and Pickett
CA2001CS0001

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCIANO PLATA, et al., Plaintiffs, v. GRAY DAVIS, et al. Defendants. | No. C-01-1351 TEH STIPULATION FOR INJUNCTIVE RELIEF |

## INTRODUCTION

1. The parties enter into this stipulation to address issues pertaining to medical care services provided by the California Department of Corrections (CDC). Th plaintiffs are California state prisoners who have serious medical needs. The defendant include the Governor, Director of Finance, Youth and Adult Correctional Agency Secretary, Director of Corrections, and Deputy Director, Health Care Services Division and are sued in their official and individual capacities as state officials responsible for tl operation of the CDC and its health care delivery system.

2. This action was filed by plaintiffs on April 5, 2001, and an amended

complaint was filed on August 20, 2001. The action alleges that plaintiffs are not receiving constitutionally adequate medical care as required by the Eighth Amendment to the U.S. Constitution and that defendants are not complying with the Americans with Disabilities Act (ADA) and § 504 of the Rehabilitation Act.

3. The parties have conducted informal negotiations since July 1999, in an effort to resolve plaintiffs' demand that medical services be improved. Those negotiations have been undertaken at arm's length and in good faith between plaintiffs' counsel and high ranking state officials and their counsel. The parties have reached agreement on procedures that the parties will follow in this case for resolving disputes concerning the constitutional adequacy of medical services. The parties freely, voluntarily, and knowingly with the advice of counsel enter into this Stipulation for that purpose.

WHEREAS, a dispute exists between the parties as to the extent to which CDC's provision of inmate-medical care meets constitutionally-mandated minimum standards;

WHEREAS, this dispute arose over the course of the last fifteen years, and culminated in plaintiffs filing this statewide-medical class action;

WHEREAS, the Governor of the State of California over the past three years has allocated substantial new resources to improve the medical system and is committed to continuing the improvements to meet applicable standards;

WHEREAS, this stipulation is intended to be narrowly drawn to meet those applicable standards.

A. <u>Terms and Conditions</u>

4. The CDC shall implement Health Care Services Division Policies and Procedures (Policies and Procedures), to be filed with the Court on February 15, 2002. Defendants shall make all reasonable efforts to secure the funding necessary to impler the Policies and Procedures. The Policies and Procedures are designed to meet or excee

the minimum level of care necessary to fulfill the defendants' obligation to plaintiffs under the Eighth Amendment of the United States Constitution. It is the intent of this Stipulation to require defendants to provide only the minimum level of medical care required under the Eighth Amendment. Nothing in this stipulation shall be construed to require more of the defendants than is necessary to enforce the Eighth Amendment of th United States Constitution. Any disputes as to whether defendants' Policies and Procedures and the Audit Instrument will satisfy their obligations under the Eighth Amendment shall be resolved pursuant to the dispute resolution procedures set forth in ¶ 26-28

5. The CDC shall implement the Policies and Procedures at each prison pursuant to the following schedule, which may be rearranged for the purpose of groupin or clustering improvements pursuant to ¶ 24 below:

| | |
|---|---|
| Calendar Year[1] 2003: | Northern California Women's Facility, Valley State Prison Women, California State Prison - Corcoran; High Desert St Prison, California State Prison - Sacramento, and Salinas Valley State Prison.[2] |
| Calendar Year 2004: | California Correctional Institution, Mule Creek State Prisor San Quentin State Prison, Substance Abuse Treatment Facility, and California State Prison - Solano. |
| Calendar Year 2005: | Centinela State Prison, California Institute for Men, California Men's Colony, California Medical Facility, and North Kern State Prison - II (Delano II). |
| Calendar Year 2006: | California Rehabilitation Center, Deuel Vocational Center, Folsom State Prison, California State Prison - Los Angeles County, and Pleasant Valley State Prison. |

---

1. The Calendar Year begins on January 1st and ends on December 31st.

2. If, pursuant to ¶ 8, below, the district court determines that prisoners at the California Institution for Women and the Central California Women's Facility are part the plaintiff class, the Policies and Procedures shall be implemented at these prisons in Calendar Year 2003.

1650 3

[redacted] G3

| | |
|---|---|
| Calendar Year 2007: | California Correctional Center, Calipatria State Prison, Chuckawalla Valley State Prison, North Kern State Prison, and Richard J. Donovan Correctional Facility. |
| Calendar Year 2008: | Avenal State Prison, Correctional Training Facility, Ironwooc State Prison, Sierra Conservation Center, and California State Prison - Wasco. |

Prior to Calendar Year 2003, CDC shall initiate appropriate hiring procedures to hire medical staff for employment beginning January 1st.

6. Beginning January 1, 2003 defendants shall implement the followin practices or procedures at each institution:

a. Registered Nurses shall staff the emergency clinics 24 hours per day every day.

b. Inter-institution transfers shall occur pursuant to the protocol established in the Policies and Procedures.

c. Treatment protocols set forth in the Policies and Procedures will be implemented at all institutions subject to the availability of additional resources.

d. A priority ducat system consistent with CDC regulations sha be instituted.

e. Outpatient special diets will be available for patients with liver and kidney end-stage organ failure.

7. The parties understand and agree that the 602/inmate-grievance procedure is an integral part of the provision of essential medical care and is integrated into the Policies and Procedures. Accordingly, the parties agree that, in the first instance all complaints regarding medical care to an individual inmate, except those requiring urgent medical care, shall be submitted to defendants after utilizing the inmate grievanc procedure. If after the appeal has reached the third director's level of review and all administrative relief has been exhausted, or the CDC has not responded to the inmate's appeal within 30 days at the Director's level of review and plaintiffs contend that the grievance process has failed to adequately address the problem, plaintiffs may bring th

medical care concern to the attention of defense counsel, who shall respond in writing within 30 days. Plaintiffs' counsel may also contact the Chief Medical Officers at the institutions to inquire about the care furnished to particular inmates on a monthly basis. Defendants' counsel shall be notified about such contacts.

8. The parties agree that this action shall be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure and that the class consists of all prisoners in the custody of the CDC with serious medical needs, except those incarcerated at Pelican Bay State Prison. The parties disagree about whether prisoners incarcerated at the California Institution for Women (CIW) and the Central California Women's Facility (CCWF), previously litigated in a class action entitled *Shumate v. Wilson* (E.D. Cal.) CIV S-95-0619 WBS JFM P, should be members of the class. To resolve this dispute defendants shall move within sixty days after this Stipulation is approved by the Court for an order determining whether prisoners at CC\ and CIW should be excluded from the class on the sole ground that they are not similai situated to plaintiffs because of the previously litigated class action entitled. The moti will not otherwise alter the burden of proof under Rule 23 or create a presumption concerning their inclusion.

B. Access to Information

9. Subject to the limitations set forth in this Stipulation, plaintiffs' couns and the experts shall have reasonable access to the institutions, staff, inmates and documents necessary to properly evaluate the adequacy of the medical care delivery system and the proposed remedies therefor, including the Policies and Procedures and Audit Instrument, the schedule and other items required by this Stipulation. The parti shall cooperate so that plaintiffs' counsel and the experts have reasonable access to information reasonably necessary to perform their responsibilities required by this Stipulation without unduly burdening defendants.

10. Plaintiffs' counsel and defendants shall negotiate a discovery plan fo. informal discovery that shall provide to plaintiffs' counsel information from the Department of Corrections' headquarters and from individual institutions about the medical services available to members of the plaintiffs' class, the adequacy of any remedial measures proposed or undertaken by defendants, and defendants' compliance with this Stipulation. Periodic monthly meetings will be scheduled between defendants' and plaintiffs' counsel to discuss stipulation implementation and access to information.

11. The discovery plan shall include, but not be limited to, access to the following documents and other material subject to a protective order agreed to by the parties:

a. The complete medical files of members of the plaintiff class as reasonably necessary;

b. Internal reviews and audits of the medical services provided to members of the plaintiffs' class, including QMAT and 602 survey;

c. Non-privileged documents that relate to the amount budgeted for providing medical care to prisoners. No documents reflecting the budget for any particular upcoming budget year shall be discoverable until after the release of the Governor's Budget. This is not intended to prohibit the production of policy and planning documents.

d. Documents maintained at individual institutions and memoranda transmitted to CDC headquarters from individual institutions that are reasonably relevar to assessing defendants' compliance, including but not limited to;

(1) All audits of medical care,

(2) Emergency Response Drill Reports,

(3) Summary of Emergency Responses,

(4) Medical Staff Vacancy Reports,

(5) Medical Staff Training Statistics,

(6) Inter-institution Transfer Log for medical transfers,

(7) Key indicator reports as are available,

(8) Medical related inmate appeals (602's) and responses, a

(9) Medical Log Books

e. Plaintiffs shall not have access to personnel files.

f. The parties have been unable to agree on whether plaintiffs must provided with the minutes of continuous quality improvement meetings, including attachments, and death reviews, utilization management data logs, and other peer review documents. The parties agree the Court will decide this issue.

g. Plaintiffs' counsel shall be given access to CDC training related implementation of this Stipulation for the first year that any such training is offered on any medical topic.

12. Plaintiffs' counsel and their medical consultants shall have the opportunity to conduct no more than one tour at an institution per calendar quarter, wi maximum of 40 tours in total for all institutions each calendar year. Tours shall be scheduled in a manner consistent with the requirements of this Stipulation and genera in accordance with the priorities established by the schedule promulgated pursuant to Plaintiffs' counsel may resume tours based upon a finding of substantial noncomplian pursuant to ¶ 15 .

13. Tours by plaintiffs' counsel shall include reasonable access to hous units and all facilities where medical services are provided. Defendants shall make reasonable efforts to make available for interview departmental, custodial, clinical an program staff that have direct or indirect responsibility for providing medical service class members. Defendants shall direct institution staff to reasonably cooperate with plaintiffs' counsel and the experts in obtaining the necessary information. Plaintiffs' counsel shall be able to have reasonable brief discussions with inmates during the tou and shall be able to provide business cards with their name and address for distributi specified individual inmates. Defendants will also continuously post notices informi

all inmates at each institution that complaints regarding the provision of medical care n be sent to counsel for the plaintiff class in this case. Defendants also shall provide plaintiffs' counsel reasonable access to confidential interviews with inmates before or after the tours, during regular business hours without regard to regular visiting hours a days. Upon a request by plaintiffs' counsel at least two weeks prior to the tour, defendants shall make available for inspection and/or copying the medical files of specified inmates. If the need arises within one week prior to the tour, plaintiffs couns may designate additional medical files for inspection and/or copying.

14. If any party fails to make himself or herself, an employee, or an age reasonably available for interview and the parties agree, the other party may depose th party, the employee, or agent who has not been made available. If the parties are unal to agree, the court may order such deposition of the party, employee, or agent if such deposition is reasonably necessary to the conduct of the litigation.

15. Plaintiffs' counsel and their medical consultants will cease tours a institution after a particular institution has been found to be in substantial compliance set forth in ¶ 22, below. Tours may resume at a particular institution if the experts fir or in the event a party disagrees with the experts, the Court finds there has not been substantial compliance on the part of defendants, provided that such tours shall be lin to the issue or components not found to be in substantial compliance. Non-compliar may be corrected by substantial compliance with the existing Policies and Procedure by modifying the Policies, Procedures and Audit Instrument pursuant to ¶ 24 and complying with the Policies and Procedures as modified. Any disputes about wheth institution is in substantial compliance shall be resolved pursuant to the procedures s forth in ¶¶ 26-28, below.

## C. Independent Court Experts

16. The parties agree to jointly request that the Court appoint experts pursuant to Federal Rules of Evidence, Rule 706 to advise the Court on the adequac

implementation of defendants' Policies and Procedures and any other matter that appropriately may be the subject of the experts' testimony. The parties shall propose to the Court that the experts' duties specified in Exhibit A shall be provided to the experts pursuant to Rule 706(a). The experts shall be entitled to reasonable compensation in an amount approved by the Court and the costs for each expert shall be borne by defendants.

17. The parties agree that the Court should appoint Joe Göldenson, M.D., Michael Puisis and Maddie LaMarre as Rule 706 experts. In the event that any of these experts can no longer serve, the parties shall attempt to agree on a replacement(s) within 30 days. In the event the parties cannot agree, they shall nominate experts in accordance with Rule 706 of the Federal Rules of Evidence. The parties understand and agree that the court may appoint a mutually agreeable fourth expert in the future. In the event that the parties are unable to agree on a fourth expert, the court may appoint a fourth expert in accordance with Rule 706 of the Federal Rules of Evidence.

18. With reasonable notice and subject to the limitations set forth in this Stipulation, the Court experts shall have reasonable access to all parts of any institution, all relevant documents, all individuals (including unprivileged interviews with staff or inmates), medical meetings, proceedings and programs to the extent that such access is reasonably needed to fulfill his or her obligations. If both parties agree, the court expert may hire additional personnel, at defendants' expense, to assist them in performing their duties. If both parties cannot agree, the court may authorize the hiring of additional personnel, at defendants' expense, upon a showing by the court experts that such additional personnel are reasonably necessary to the performance of their duties.

D. <u>Compliance</u>

19. Defendants shall audit each prison's compliance with the Policies and Procedures consistent with the schedule set forth in ¶ 5, above.

20. Compliance with the Policies and Procedures shall be audited by using an Audit Instrument which will be filed on February 15, 2002. This Audit Instrument

will be developed by the CDC in consultation with the independent court experts and plaintiffs' counsel. The parties recognize that this instrument has not been tested and m: need to be modified to properly reflect the degree of actual compliance. No later than January 15, 2004, the parties and the independent court experts shall meet and confer about the need to modify the audit instrument. If all parties agree, the instrument shall t modified. Any dispute about the need for modification shall be resolved pursuant to paragraph 18 of the Stipulation for Injunctive Relief.

21. The audit shall be conducted as follows:

a. No less than 180 Unit Health Records will be reviewed.

b. The records shall be selected at random, but the selection sha be stratified so that each category in the audit instrument is adequately represented.

c. If defendants disagree with the appropriateness of an expert's answer to any question(s) in the audit instrument relating t quality of medical care, the question(s) shall be reviewed by both expert physicians and shall only count against complian if both experts agree.

22. A prison is in substantial compliance when all of the following conditions are satisfied:

a. The prison receives a score of 85% or higher on an audit conducted by the Court experts of the implementation of the Policies and Procedures using the Audit Instrument identifie ¶ 20. No score less than 85% shall be considered to satisfy t requirement, except that the experts shall have the discretior find a prison providing adequate medical care in complianc it achieves a score of no less than 75%. The score shall be calculated by averaging all of the indicators in the audit instrument.

b. In determining substantial compliance, the experts will have tc ascertain whether medical assessments or treatment plans provided to inmates comply with the Policies and Procedures. The medical assessment or treatment plan provided to the inmate shall be deemed adequate and appropriate under these policies and procedures only under any one of the following conditions:

(1) The assessment or treatment plan is consistent with guidelines specifically adopted in the policies and procedures; or

(2) The practitioner documents in the medical not that he/she is deviating from adopted policies and procedures and that such deviation is consistent with the community standard; or

(3) Where no treatment guidelines are specifically adopted in these policies and procedures, the assessment or plan is consistent with the community standard.[3]

In those instances in which a court expert finds that an assessment or treatment plan does not comply with communit standards, defendants may request that the question(s) be reviewed by both expert physicians and shall only count agair compliance if both experts agree.

c. The prison is conducting minimally adequate death reviews a quality management proceedings.

---

3. As it is used here and throughout the policies and procedures, the phrase "community standard" means the standard of care imposed under the laws of the State c California upon health care providers licensed to practice in California.

d. The prison generally has tracking, scheduling and medicatio administration systems adequately in place.

e. At least two experts have not concluded that there is a pattern or practice that is likely to result in serious problems and those problems are not being adequately addressed.

23. Defendants shall notify plaintiffs and the court experts in writing whe they believe an institution has achieved substantial compliance. Within 60 days of such notification, the experts shall conduct an audit to determine substantial compliance. If t experts find substantial compliance, the experts shall return a year later, or as soon thereafter as possible, to determine whether the institution has maintained substantial compliance.

E. Modification

24. Defendants may modify the Policies and Procedures, and the Audit Instrument at any time, provided that as modified the Policies and Procedures and the Audit Instrument will meet or exceed the minimum level of care necessary to fulfill defendants' obligation to plaintiffs under the Eighth Amendment of the United States Constitution. Defendants will provide plaintiffs' attorneys with a copy of the original Policies and Procedures or the Audit Instrument, the modified version and a strikeout version with the changes at least 30 days prior to implementation. In an emergency or when such delay will adversely affect the provision of medical care, notice will be provided as soon as possible, but no later than the date the policy is implemented. If th plaintiffs determine that the modifications conflict with any of the provisions of this Stipulation, they shall cooperate with the defendants to reconcile the conflict. Any disputes about whether the modifications will satisfy defendants' obligations under the Eighth Amendment shall be resolved pursuant to the dispute resolution procedures set forth in ¶¶ 26-28.

25. Plaintiffs also may seek to modify the Policies and Procedures and t Audit Instrument at any time to secure the minimum level of medical care necessary tc fulfill the defendants' obligation to plaintiffs under the Eighth Amendment of the Unit States Constitution. Plaintiffs must submit the proposed modification to defendants. disputes as to whether defendants' Policies and Procedures, and the Audit Instrument must be modified to satisfy their obligations under the Eighth Amendment shall be resolved pursuant to the dispute resolution provisions set forth in ¶¶ 26-28.

F. Dispute Resolution

26. If plaintiffs contend that the Policies, Procedures and Audit Instrum as written or as modified, or any component thereof will not provide for the minimum level of medical care necessary to fulfill the defendants' obligations to plaintiffs under Eighth Amendment of the United States Constitution, plaintiffs shall provide defendar with a brief description of the perceived deficiencies and a request that the parties ente into negotiations to resolve the question as to whether defendants' Policies, Procedure: and Audit Instrument satisfies the minimum requirements of the Eighth Amendment. Upon receipt of plaintiffs' request for negotiations, any party may inform the Court's experts of the area of disagreement and request that the experts evaluate the issue and prepare a report.

27. At the option of any party, the parties shall conduct negotiations on issue in dispute. Such negotiations may include the Court's experts, and a person satisfactory to the parties may at the election of either party, mediate any unresolved issues. If the parties cannot agree on a mediator, the administrator of a private dispute resolution service, such as JAMS will choose a mediator. Defendants shall pay the co of any private mediator. The substance of the mediation and any statements made by party, an employee of a party, or an agent of a party are confidential and not admissibl any subsequent proceeding. The Experts' report(s) shall be admissible as evidence at request of any party in any judicial proceeding in this case.

28. If the process set forth in the preceding paragraph fails to resolve the issue of whether defendants' Policies and Procedures and Audit Instrument, either as written or as modified, provides for a level of medical care sufficient to meet the minimum requirements of the Eighth Amendment of the United States Constitution, either party shall have the option of seeking relief from the Court. If the court determine that defendants' Policies and Procedures and the Audit Instrument either as written or as modified, does not provide a level of medical care sufficient to meet the minimum requirements of the Eighth Amendment of the United States Constitution, the Court may grant relief as authorized under the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626(a), which provides, in pertinent part: "The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."

G. **Enforcement**

29. The Court shall find that this Stipulation satisfies the requirements of 18 U.S.C. § 3626(a)(1)(A) and shall retain jurisdiction to enforce its terms. The Court shall have the power to enforce the Stipulation through specific performance and all ot remedies permitted by law. Neither the fact of this stipulation nor any statements contained herein may be used in any other case or administrative proceeding, except defendants, CDC, or employees thereof reserve the right to use this Stipulation and the language herein to assert issue preclusion and res judicata in other litigation seeking cl or systemic relief. When these legal defenses are raised, defendants will send copies o such complaints to plaintiffs' counsel at the Prison Law Office.

30. If plaintiffs believe that defendants are not complying with some or of the Stipulation, or any of the acts required by the Policies and Procedures produced pursuant to Stipulation, they shall notify defendants of the perceived problems. Defendants shall investigate the allegations and respond within 30 calendar days. If

plaintiffs are not satisfied with defendants' response, the parties shall conduct negotiatic to resolve the issue. The negotiations may include the Court's experts, and a person satisfactory to the parties may at the election of either party, mediate any unresolved issues. If the parties cannot agree on a mediator, the administrator of a private dispute resolution service, such as JAMS, will choose a mediator. Defendants shall pay the cos of any private mediator. The substance of the mediation and any statements made by a party, an employee of a party, or an agent of a party shall be confidential and not admissible in any subsequent proceeding. The Experts' report(s) shall be admissible as evidence at the request of either party in any judicial proceeding in this case. If the parties are unable to resolve the issue by negotiation or mediation, the court shall determine whether defendants are substantially complying with some or all of the Stipulation, or any of the acts required by the Policies and Procedures.

## H. Termination

31. Notwithstanding the Prison Litigation Reform Act or any other law, defendants may move to vacate this Stipulation and dismiss the case on the ground tha each institution subject to this stipulation has been found to be in substantial complianc under ¶¶ 22-23. Non-compliance may be corrected by compliance with the existing Policies and Procedures or by modifying the Policies and Procedures pursuant to ¶ 24 complying with the Policies and Procedures as modified. The parties shall attempt to negotiate any disputes about defendants' compliance pursuant to ¶¶ 26-28, and either party may invoke the enforcement process set forth in ¶ 29-30. The final determinatio of such a dispute shall rest with the Court.

## I. Attorneys Fees and Costs

32. Plaintiffs may apply for reasonable attorney's fees to which they are entitled. Defendants shall pay plaintiffs for 90% of the work performed in connection with this Stipulation at hourly rates set forth under the PLRA, 42 USC § 1997e(d).

Defendants shall pay plaintiffs for 10% of the work performed in connection with this Stipulation at hourly rates set forth under the ADA and §504 of the Rehabilitation Act.

J. Construction of Stipulation.

33. This Stipulation reflects the entire agreement of the parties and supersedes any prior written or oral agreements between them. No extrinsic evidence whatsoever may be introduced in any judicial proceeding to provide the meaning or construction of this Stipulation. Any modification to the terms of this Stipulation must in writing and be signed by a representative of the Department of Corrections and attorneys for the plaintiffs to be effective or enforceable.

34. This Stipulation shall be governed by and be construed according to California law. The parties waive any common law or statutory rule of construction tha ambiguity should be construed against the drafter of this Stipulation, and agree that the language in all parts of this Stipulation shall in all cases be construed as a whole, according to its fair meaning.

35. This Stipulation shall be valid and binding upon, and faithfully kept, observed, performed and be enforceable by and against the parties, their successors anc assigns and the plaintiff class.

36. The obligations governed by this Stipulation are severable. If for an reason a part of this Stipulation is determined to be invalid or unenforceable, such a determination shall not affect the remainder.

//

//

//

//

//

//

//

37. The waiver by one party of any provision or breach of this Stipulation shall not be deemed a waiver of any other provision or breach of this Stipulation.

**IT IS SO STIPULATED AND AGREED.**

Dated: 1-25-02

DONALD SPECTER
Attorney for plaintiffs

Dated: 1-2-02

ROBERT PRESLEY
Secretary for the Youth and Adult Correctional Agency

Dated: 1/2/02

EDWARD S. ALAMEIDA, JR.
Director, California Department of Corrections

Dated: 1·2·02

PETER J. SIGGINS
Chief Deputy Attorney General
Attorney for Defendants Davis and Ga

Dated: 1·2·02

BILL LOCKYER, Attorney General
of the State of California
PETER J. SIGGINS, Chief
Deputy Attorney General
ROBERT R. ANDERSON, Chief
Assistant Attorney General
PAUL D. GIFFORD, Senior
Assistant Attorney General

PETER J. SIGGINS
Chief Deputy Attorney General

Attorneys for Defendants Davis, Ga[illegible]
Presley, Alameida, and Pickett

THE COURT SO FINDS AND IT IS SO ORDERED.

Dated: ______________

THELTON E. HENDERSON
United States District Judge

# Exhibit

# H

LOS ANGELES TIMES, ORANGE COUNTY EDITION, SAN DIEGO TRIBUNE

ARTICLES IN RE CDCR HEALTH CARE CRISIS

# Prisons Ordered to Pay Doctors

By JENIFER WARREN
*Times Staff Writer*

SACRAMENTO — Managers of California's beleaguered prison system received a double dose of bad news Thursday as a federal judge ordered them to pay tens of millions of dollars owed to doctors who treat inmates and the state launched an audit of their agency.

Some of the doctors have not been paid in four years. Some of their contracts have lapsed. And some who deliver cardiology, radiology, oncology and a wide range of other services to prisoners are no longer responding when called.

U.S. District Judge Thelton E. Henderson, who recently put the state's prison healthcare system in the hands of a federal receiver, ordered that outstanding doctor bills, which total more than $58 million, be paid within two months.

Henderson also had harsh words for corrections leaders,

[See Prisons, Page B8]

**RELATED STORY**

**Personal look:** A judge inspects state execution chamber. **B3**

[Prisons, from Page B1]

saying they have stuck "their collective heads in the sand" instead of resolving the medical contracting mess.

"Predictably," he said, "this stunning example of the state's bureaucratic inaction . . . is now culminating in a crisis."

State Controller Steve Westly also weighed in, saying that his office will audit the Department of Corrections and Rehabilitation to determine why prison healthcare is so poor despite a doubling of funding since 2000.

Lax medical care in California lockups is blamed for an average of 64 preventable deaths a year. Disturbed by the deaths and the lack of progress in resolving the healthcare problems, Henderson named the federal receiver to take over inmate medical care — a $1.2-billion-a-year operation — earlier this year.

"The taxpayers have nothing to show for the billions spent on prison healthcare," said Westly, a Democratic candidate for governor. "Instead, we've seen the first federal takeover of a state agency in California history. My audit will get to the bottom of this management meltdown and ensure that the people of California get a full accounting of their tax dollars."

Westly said that according to the Kaiser Family Foundation, it costs $3,850 per year to provide health insurance to the average California worker. The state spends $7,000 per inmate per year on healthcare, he said.

Doctors and lawyers who represent inmates applauded the judge's order, saying that it would save lives. But one physician who has treated inmates for a decade, Dr. John G. Henry, said the prisons could have trouble hiring outside doctors in the future because of the delinquent payments.

Henry, a general surgeon in Templeton, about 20 miles north of San Luis Obispo, said he had not been paid since September. Inmates at Avenal State Prison in the San Joaquin Valley make up about 40% of his caseload. Until recently he was performing about 20 surgeries a month on prisoners with gallstones, appendicitis, hernias and the like.

But about six weeks ago, the anesthesiologists at Twin Cities Community Hospital in Templeton stopped taking inmate cases — except emergencies such as appendectomies — because of nonpayment by the state. Henry had to follow their lead.

"I won't tell you how much I'm owed, but it's a lot," Henry said. "Nobody wants to stop providing care, but this is ridiculous. We can't keep working for free."

In a statement, the department's healthcare chief, Peter Farber-Szekrenyi, said officials had been working for six months to "streamline" the contracting process and payment of medical providers.

He said he looked forward to working with receiver Robert Sillen to comply with the judge's order, which also directed that the state alter its contracting procedures and hire and train analysts to monitor contracts and ensure that doctors get paid on time.

A lawyer with the Prison Law Office, a nonprofit firm whose lawsuit over inmate healthcare led to the receivership, said the judge's order had come none too soon.

In visits to several prisons recently, attorney Steve Fama said he learned of scores of inmates who had been approved for visits to outside specialists but could get no appointments because of contract disputes.

In one case, a doctor who saw an inmate at the state prison in Lancaster found a large tumor that was causing "massive destruction of the left hip," Fama said, quoting from a doctor's report. The physician called it a problem of "great magnitude" and referred the inmate for an immediate visit to an oncologist.

"But five weeks later, they still couldn't get an appointment," Fama said.

The situation was as dire at Salinas Valley Prison when he visited the facility March 1, Fama said. Records showed that among those patients with "extremely serious" conditions still awaiting appointments were three with cardiac problems, two with lung masses and two with infectious disease symptoms, he said.

182

41

# Prison System Fails an Ill Man

Michael O'Doherty, 25, looked like he'd been hit by a truck. When state corrections officers delivered him to a parole office in Pasadena late Wednesday morning, his eyes were swollen shut. He had facial bruises the color of eggplant and a head the size of a pumpkin.

O'Doherty, who is mentally ill and hears voices, had repeatedly beaten himself while serving time at the state prison in Tracy. In Pasadena, parole officials were shocked by his appearance and stunned that he would be driven to their office, a ride of roughly six hours, rather than to a hospital.

"He was in really bad shape," said one. "We were all pretty perplexed at his condition. In my opinion, it was unacceptable."

Another parole official had never seen anything like it.

"I've never seen anyone come out of prison like that who wasn't transported medically."

The parole officers drove O'Doherty to County-USC Medical Center for examination. Doctors found no serious damage, but that didn't calm O'Doherty's father, who is accusing prison officials of failing to protect his son and then dumping him "like garbage" in Pasadena.

"It's just ludicrous," said Dennis McCarthy, a Los Angeles resident who accompanied his son to the hospital and put him on the phone with me after O'Doherty was moved to the psychiatric emergency room.

"I kept feeling like a ghost was telling me, 'If you don't start hitting yourself, I'll never let you alone,'" O'Doherty said. "When I hit myself harder, he left."

He told me no other inmates and no guards struck him. He estimated that he had clobbered himself with his own fists on five or six occasions since March 27 while in his cell.

"They looked in and tried to tell me to stop," O'Doherty said. "I stopped for a little while, but when they left, I started doing it again."

That's what his father can't understand: why a mentally ill inmate was allowed to keep beating himself without prison officials putting a stop to it. Couldn't they medicate him? Watch him more closely? Put him in restraints?

Lt. Mike Quaglia, public information officer at the Tracy prison, said the Department of Corrections and Rehabilitation is conducting an investigation out of Sacramento. But Quaglia says it appears that Tracy prison officials did what they could and that "appropriate protocol was taken with this inmate."

But he didn't have a good explanation for why O'Doherty, who was taken to the prison Feb. 12, was housed with the general population.

Given the nature of his disease, that was like throwing him to the wolves. O'Doherty was diagnosed years ago as paranoid schizophrenic, his father says. And, as with many people who have psychiatric problems, his behavior had landed him in the L.A. County Jail's mental ward after arrests for drug abuse and physical outbursts. So why wasn't he sent to the psych unit at Tracy?

Quaglia said it doesn't appear that his staff was aware of O'Doherty's psychiatric history and that no records were available at the time to inform them.

How could that be? I asked.

"That's just the nature of the beast," he said.

Unacceptable, but not surprising. The prison system is under court oversight following class-action lawsuits over the medical and mental health care of inmates.

Quaglia said O'Doherty was screened upon admission and seemed normal.

For anyone who's wondering, that means nothing. Mentally ill people don't always seem mentally ill, so a quick little checkup isn't going to reveal anything.

[See Lopez, Page B10]

Los Angeles Times
CALIFORNIA
ORANGE COUNTY EDITION
Saturday, April 5, 2008

# Mentally Ill Man's Condition Shows Prison System's Woes

[Lopez, from Page B1]

"There didn't appear to be a problem at that point," Quaglia said, "and actually he functioned fine in our general population until the 27th of March."

That's when O'Doherty got violent.

"He told the psychiatric staff that he had been striking himself," Quaglia said, and O'Doherty was then transferred to the mental health unit, where he was monitored every half hour and was seen hitting himself again.

On Sunday, his injuries were bad enough that he was transported to an outside hospital for examination and found to have no broken bones. He was returned to prison and placed in a cell, where he was under constant surveillance but hit himself again.

"At that point he was ... evaluated by psychiatric staff and given some medication," said Quaglia, who added that to his knowledge, no restraints were used to keep O'Doherty from beating himself.

Two days after the last known beating, O'Doherty was driven to Pasadena.

"How can they make the conclusion that nothing inappropriate happened?" asked Steve Fama of the Prison Law Office, which filed the lawsuits that led to the court monitoring. "Something inappropriate did happen. Look at the photos."



Dennis McCarthy

*Michael O'Doherty, who has schizophrenia, was allowed to beat himself in prison.*

The pictures raise serious questions, Fama said, as to whether appropriate decisions were made regarding "the use of restraints, the medication th was provided and the superv sion Mr. O'Doherty was unde

Fama did offer a word in d fense of the prisons officials. They're overwhelmed, he sai trying to run massively overcrowded and archaic facilitie Adding to the challenge is th presence of roughly 30,000 me tally ill patients statewide, m of them severely disabled, wh arguably shouldn't be in pris to begin with.

McCarthy hit the skids ye ago, and his son was adopted a Pasadena family, taking the last name O'Doherty. But McCarthy pulled himself together years ago, reentered hi son's life and has been trying desperately to get him treatment and keep him out of jail.

"This has been my passio now for five years — how unf it is to have these kids in pris McCarthy said. "I mean, thes are sick, sick kids, and they a kids. They get mentally ill an they get shoved into jail and they get abused and go unmedicated. It's horrible."

*Reach the columnist at steve.lopez@latimes.com and read previous columns at www.latimes.com/lopez.*

(42)

183

Los Angeles Times
CALIFORNIA
ORANGE COUNTY EDITION
Sunday, February 12, 2006
latimes.com/california

# Prison Health Chief Chosen

## A judge picks a Santa Clara County official to take over inmate care, shifting power from the state to the federal level.

By JENIFER WARREN
*Times Staff Writer*

SACRAMENTO — Ending a nationwide search, a federal judge has picked the top health official in Santa Clara County to take charge of California's deeply troubled prison healthcare system, sources familiar with the selection process said Saturday.

Bob Sillen, 63, is expected to be formally appointed as a federal receiver on Tuesday by U.S. District Judge Thelton Henderson. The San Francisco judge decided to act after concluding last July that "extreme measures" were needed to fix a system that kills one inmate each week through medical incompetence or neglect.

The move effectively shifts power from state to federal authorities for all decisions related to inmate care — including medical staffing, treatment standards and contracts with outside hospitals. Legal scholars said the appointment marks the first time a government operation of this size has been placed under a federal receiver.

This week, the sources said, Henderson will issue an order detailing the powers Sillen will have in managing the system, which provides healthcare for 168,000 inmates and employs 6,000 people in 33 prisons.

Details of Henderson's order remain guarded. The sources spoke to The Times on condition of anonymity because they were not authorized to discuss it.

A spokesman for the state Department of Corrections and Rehabilitation, Todd Slosek, said officials "look forward to working with whomever the judge picks to help us manage healthcare in our prisons."

Sillen was out of town and could not be reached Saturday. On Friday, he abruptly announced his resignation as director of the Santa Clara Valley Health and Hospital System, a medical and mental-health care empire with 6,200 employees and a $1.4-billion budget.

Although he declined to reveal his plans, Sillen told the San Jose Mercury News that his new

[See Prisons, Page B5]

[Prisons, from Page B1]

job would be announced this week and would involve "a major turnaround effort" related to nonprofit healthcare.

Healthcare providers who have worked with Sillen described him as hard-nosed, blunt, extremely competent, and a lifelong crusader for quality healthcare for the poor.

They said he arrived in 1979 to head a hospital — Santa Clara Valley Medical Center — that was beset by fiscal distress, low staff morale and other problems, and turned it into one of the most respected in the state.

"He is one of the most progressive, innovative and aggressive public health administrators I've known," said Rhonda McClinton Brown, director of a coalition of community clinics in Santa Clara County.

McClinton Brown predicted that in his new job as czar of state prison healthcare, Sillen will "rip it apart and clean it up and put it back together again."

Though McClinton Brown called him adept at dealing with public officials, others have described Sillen as controversial, and pushy in his determination to provide quality medical care to the poor and uninsured.

In a 1994 interview with the San Jose Business Journal, Sillen described himself as "a pragmatist with a heavy ideological overlay."

"Some people think I'm absolutely a pain in the ass," he said in another 1994 interview, with the Mercury News. "But that's OK. God forbid one goes through life . . . not doing anything meaningful enough for anyone to care about. That'd be terrible."

Sillen was raised in New York and graduated from the University of Denver in 1965. He went to work for the U.S. Public Health Service.

He later obtained a master's degree in public health at Yale University and became a hospital administrator. Through the 1970s, he held top positions at the University of California Medical Center in San Diego.

Since 1993, he has overseen a network in Santa Clara County that includes a hospital, community clinics, the public health department, and mental-health and drug-abuse programs.

Sillen also has joint responsibility with corrections officials

for healthcare in Santa Clar County jails and juvenile facil ties. A grand jury report in Apr concluded that the county pro vided high-quality care for i adult inmates, but found tha the cost was high compared wit what was spent on medical ber efits for a comparable number c county employees.

In Santa Clara, Sillen earne an annual salary of $244,12 making him the county's to paid public official. As receive he is expected to be paid consic erably more during a tenure tha would last several years.

Henderson, the federal judg announced his decision to nam a receiver last summer, after series of hearings during whic court-appointed experts decrie healthcare conditions in priso medical facilities. They testifie as part of a lawsuit challengir the quality of inmate healthcar

The case was settled in 200 when the state agreed to ove haul inmate healthcare an phase in improvements by 200 But the experts found few sigr of progress, testifying that filth conditions, ill-trained and n glectful doctors and a dearth c staff added up to a pattern c preventable deaths that one wi ness said was unlike anything h had ever seen.

To help him find a qualifie receiver, Henderson hired a international search firm, Kor Ferry International Inc., whic developed a list of candidate Henderson picked Sillen fro four finalists.

The California receivershi experts say, is unprecedented i its scale. In 1995 the District c Columbia's jails were assigned t a receiver for five years, but tha system had only 1,700 inmate The state prisons hold nearly 1C times that number.

In Texas, a lawsuit in th 1970s led a federal judge to ap point a special master as a mon tor, but a receiver's powers ar far greater, involving the day-t day management of the system

Adult prisons are not the onl piece of California's correction system under court supervisio The state's juvenile facilitie home to about 3,000 offender are under the supervision of special master, who monito compliance with court-ordere improvements in inmate medica care, mental-health care, educa tion and other areas.

ORANGE COUNTY EDITION

Los Angeles Times

On The Internet: WWW.LATIMES.COM TUESDAY, NOVEMBER 15, 2005

# State Urged to Address Prison Care

A report to a federal judge says doctors must get raises and medical workers must be recruited and retained or the crisis will worsen.

By JENIFER WARREN
*Times Staff Writer*

SACRAMENTO — California inmates will continue to die from neglect and incompetence unless the state immediately raises doctors' salaries and takes other steps to recruit and retain prison medical workers, a report to a federal judge concluded Monday.

The report also suggested that leaders of the state's foundering correctional healthcare system are incapable of reversing the "meltdown" and said Gov. Arnold Schwarzenegger must appoint a strike team to do the job.

Without such high-level attention — along with a series of court orders mandating changes — the state's prison healthcare system "may simply collapse," said the report by correctional expert John Hagar.

His 33-page report sums up what inmates and their advocates have been saying for weeks: Conditions have worsened since U.S. District Judge Thelton Henderson, describing a system plagued by "an unconscionable degree of suffering and death," decided to put prison medical care in the hands of a receiver.

Since that unusual June 30 decision, efforts to find someone qualified to run a $1.1-billion healthcare bureaucracy that serves 165,000 prisoners and employs 6,000 people have failed.

Recognizing the extraordinary challenges posed by the job, Henderson brought in a professional search firm, Korn/Ferry International, to find and recom-[illegible]

To address problems in the interim, he appointed Hagar to identify the most urgent problems and suggest immediate measures to help save lives.

On Monday, Hagar said vacancies among medical staff had worsened in recent months, in part because as many as 60 doctors had left in disgust after the state began requiring that they undergo performance evaluations at UC San Diego Medical Center.

The doctors contended the testing was unfair because it lacked objective standards with which to assess performance.

Several prisons now operate with a physician vacancy rate of 50% or higher — not accounting for doctors who are incompetent and need to be replaced, Hagar said. At Pleasant Valley State Prison, off Interstate 5 in Coalinga, there is one staff doctor for about 6,000 inmates.

During a series of hearings held by Henderson over the summer, experts cited inadequate staffing as one important cause of preventable deaths in California prisons, where an ill inmate dies once a week, on average.

"It's just mind-boggling that the state knowingly operates a facility with 6,000 prisoners and one doctor," said Donald Specter of the Prison Law Office, a nonprofit firm that sued the state over inmate medical care. "Prisoners are dying because they simply can't get treatment for their illnesses."

With many prisons located in remote locations, the Department of Corrections and Rehabilitation has for years struggled with recruiting and retaining qualified physicians and nurses.

To combat the staffing problem, Hagar said, the state must offer substantial salary increases, raising the pay of doctors to at least $150,000 annually. Though that falls below market state doctors receive a generous benefit and retirement package.

Hagar also recommends streamlining the hiring process for physicians and nurses, which now can take as long as six months because of regulations that slow the pace of security and credential checks, and require managers to give a list of staff physicians notification of every opening.

Calling the hiring procedure "completely broken," Hagar recommends that candidates be assessed — and either accepted or rejected — within 10 days of submitting a written application.

"That's terrific news," said Gary Robinson, executive director of the Union of American Physicians and Dentists, which represents doctors at state prisons. "The way it is now, the department keeps applicants hanging for months. The good ones get tired of waiting and take another job."

To retain doctors, Hagar recommends that the department create an orientation program to smooth their transition into prison medicine.

Corrections Secretary Roderick Q. Hickman said Hagar was essentially recommending what department officials had sought to do months ago — bring in outside experts to help them resolve the healthcare crisis.

"Had the legislators let us move forward last April with our plan to bring in outside consultants," he said, officials "would have saved the taxpayers millions of dollars and accelerated the resolution of this long-standing departmental shortfall."

185



# Lawyers Go Behind Bars as Guardians of Prisoner Rights

By MAURA DOLAN
*Times Staff Writer*

SAN FRANCISCO — They exposed the state's locking up of juvenile offenders for 23 hours at a stretch in cells smeared with blood and feces.

They helped spark an unprecedented federal court takeover of California's prison healthcare system after revealing that prisoners were dying because of medical neglect.

They ended the practice of placing mentally ill prisoners in extreme isolation.

The Prison Law Office, a nonprofit group of lawyers who labor in the shadow of San Quentin Prison, has in recent years scored a string of court victories felt in nearly every corner of California's teeming prisons.

"There is almost no aspect of California corrections, adult or juvenile, that is not subject to a court order, and almost all of those are the result of suits brought by the Prison Law Office," said Barry Krisberg, president of the National Council on Crime and Delinquency.

Although its lawyers are underpaid by law firm standards and represent wildly unpopular clients, the group has become a litigation powerhouse so successful that the state in recent years has chosen to fold rather than fight it.

Why, then, do the lawyers seem more frustrated than triumphant?

They complain that the pace

[See Prisons, Page A16]

186.

H5

# Nonprofit Law Office Works to Protect Inmates

[*Prisons, from Page A1*]

of change in California's prisons and youth correctional facilities is achingly slow, that court orders and negotiated settlements take years to achieve and mark only the start of reform.

As they trudge from prison to prison to make sure that promised improvements are in place, they say they must continually remind themselves of what they have accomplished during the group's 30 years of legal advocacy.

"People aren't shot dead anymore; let's start with that one," said Steve Fama, 49, who has worked at the Prison Law Office for 20 years. "During the late '80s to mid-'90s, the number of prisoners shot dead in California was staggeringly disproportionate to the number shot dead in all the other state prisons combined."

*'A lot of them realize you're their only hope, the only thing that stands between them and the guard.'*

**Don Specter,** director of the Prison Law Office

The 10 lawyers, dressed in jeans and T-shirts, work in a cluster of modest offices on San Francisco Bay. They receive as many as 100 letters a day from inmates asking for help.

"The kind of cases the Prison Law Office has litigated involve a guy sticking his arm through the food slot and a guard breaking his arm, people crawling up the stairs to parole hearings because there were no provisions for people with disabilities and inmates on psychotropic drugs dying because their cells overheated," said Sue Burrell, an attorney for the Youth Law Center, a public interest law firm.

In a lawsuit against the Cal[illegible]fornia Youth Authority, th[illegible] Prison Law Office complained:

"Rehabilitation cannot su[illegible]ceed when the classroom is [illegible] cage and wards live in consta[illegible] fear of physical and sexual vi[illegible]lence from CYA staff and oth[illegible] wards."

In a repo[illegible] stemming from [illegible] lawsuit the offi[illegible] helped bring, [illegible] court-appointed monitor four[illegible] that the Depar[illegible]ment of Corre[illegible]tions and Reh[illegible]bilitation w[illegible] refusing to disc[illegible]pline guards for s[illegible]rious miscondu[illegible] at Pelican Bay, [illegible] super-maximum security prison.

"Some corre[illegible]tional officers e[illegible] up acquiring [illegible] prisoner's mentality: They for[illegible] gangs, align with gangs a[illegible] spread the code of silence," t[illegible] monitor, John Hagar, wrote.

Earlier this year, U.S. Distri[illegible] Judge Thelton Henderson [illegible]ported that at least 34 inmat[illegible] had died recently because of [illegible]glect, incompetence and "ev[illegible] cruelty" by medical staff. He[illegible]derson's action followed a la[illegible]suit by the Prison Law Office.

On a tour of medical faciliti[illegible] at San Quentin, the judge [illegible]served a dentist who neith[illegible] washed his hands nor chang[illegible] his gloves after placing his han[illegible] in patients' mouths.

"On average, an inmate in o[illegible] of California's prisons needles[illegible] dies every six to seven days d[illegible] to constitutional deficiencies

HG 1870



ROBERT DURELL Los Angeles Times

...AL ADVOCACY: *Don Specter, center, is director of the Prison Law Office near San Quentin; among its members are lawyers ...ama, left, and Sara Norman. The nonprofit group receives up to 100 letters a day from California inmates seeking help.*

... medical delivery system," ...derson said.

The Prison Law Office was es-...ished when memories of the ... at Attica Correctional Fa-... in New York were still fresh. ...971 uprising, in which 43 ...

tion boom, the prisons are at roughly 193% of their design capacity, frustrating efforts to improve conditions.

Don Specter, 53, director of the Prison Law Office, said sentencing laws need to be revised to ...

heard her. Eventually, she resorted to "banging and banging and banging on the door."

The inmate was "perfectly nice," and they laughed about the incident, she said. Her point was that prison rules are "utterly ...

...ic," Prod said.

The Prison Law Office has benefited from significant free help from some of the state's top private law firms.

"They pick their shots," said ...

1880

H2

mates asking for help.

"The kind of cases the Prison Law Office has litigated involve a guy sticking his arm through the food slot and a guard breaking his arm, people crawling up the stairs to parole hearings because there were no provisions for people with disabilities and inmates on psychotropic drugs dying because their cells overheated," said Sue Burrell, an attorney for the Youth Law Center, a public

cruelty" by medical staff. Henderson's action followed a lawsuit by the Prison Law Office.

On a tour of medical facilities at San Quentin, the judge observed a dentist who neither washed his hands nor changed his gloves after placing his hands in patients' mouths.

"On average, an inmate in one of California's prisons needlessly dies every six to seven days due to constitutional deficiencies in

American prisons and spu widespread calls for reform.

But the passage of year minished the power of At and the impulse for reform way to laws instituting har and harsher prison senter The inmate population ploded.

From 1983 to 1995, the n ber of California inmates from 30,000 to 160,000. Despit unprecedented prison const



crowded, conditions that violate the Constitution's ban on cruel and unusual punishment will persist, he said.

During the lawyers' visits to the prisons, the inmates tend to be appreciative.

"A lot of them realize you're their only hope, the only thing that stands between them and the guard," Specter said.

The lawyers have complained that prison rules sometimes make meetings with their clients difficult.

Sara Norman, 37, another lawyer in the office, recalled her irritation when guards at a youth correctional center in Stockton forced her to wear a bulky green stab-proof vest during a tour.

Talking to wards through their food slots, Norman said, she apologized for the vest. "That is not the way I want to be interacting with them," she said.

Alison Hardy, 44, also an office lawyer, said she vigorously objected when guards at the California Men's Colony in San Luis Obispo insisted that she could meet with prisoners only if they were shackled. The guards prevailed.

Yet a prison guard once locked Norman into a plexiglass cell with an unshackled convicted murderer on death row.

After the interview concluded, Norman called out to the guards to let her out. No one

... they generally have good relations with prison staff, although their litigation record has caused some resentment.

When the state loses a case, it must pay the Prison Law Office reasonable attorney fees, which is how the office pays for itself.

Lance Corcoran, executive vice president of the prison guards' union, complained that taxpayers are bearing the expense.

He said the Prison Law Office has "incredible power" and faulted the Department of Corrections and Rehabilitation for doing "a very poor job of defending" itself.

Jerold A. Prod, an administrative law judge and former chief counsel for the state corrections department, described the Prison Law Office as "probably a cut above the average public interest legal organization." He also observed that the lawyers could be "blinded by their cause."

He recalled a time when the group wanted work opportunities to be equal for male and female inmates, even though the men vastly outnumbered the women behind bars and the female inmates, he said, mostly wanted to go to beauty school.

"The fastest way to start a riot at the California Institution for Women at that time was to shut down the cosmetology clin-

worked with the office.

The group knows its way around Sacramento. Specter, often described as unassuming, is reputed to be a fierce negotiator.

"He comes across as a very gentle, quiet person, but man, get out of the way," said Burrell of the Youth Law Center.

Bruce Slavin, general counsel for the corrections department who has dealt with the Prison Law Office for 20 years, said relations with their lawyers have become "less confrontational" and "less adversarial" over the years.

"If the Prison Law Office brings a complaint to me, they are usually going to be accurate in identifying the problem," Slavin said. "Their solution may not be the same as our solution."

Specter said Gov. Arnold Schwarzenegger "has a commitment to prison reform that no other governor has had" but still has failed to make any significant reforms.

"The governor gets creamed by the victims' rights activists and the prison guards and starts to sound more and more like [former Gov.] Pete Wilson," Specter said.

Even when the governor has signed onto a reform, months may pass before the prisons adopt it, the lawyers said.

Fama, the group's 20-year veteran, recalled his frustration during a recent visit to monitor implementation of reforms at a Southern California prison. He discovered that a logbook intended to ensure that emergency medical supplies were in place had been provided only the day before his visit. The prison was supposed to have had the book months earlier.

Fama said his aggravation eventually gave way to hope: Although progress was slow, his visit had made a difference.

**DVD It**

Enhance your DVD viewing possibilities with looks at what's new, hot and soon-to-be-released. Find it Tuesdays in Calendar.

05ED064-HEBE

To enjoy convenient home delivery, visit myaccount.latimes.com or call 1-800-LA TIMES.

Los Angeles Times
*Find yourself in The Times*

190.

H9

ORANGE COUNTY EDITION
Los Angeles Times
On The Internet: www.LATIMES.com TUESDAY, OCTOBER 11, 2005

# Lawyers Go Behind Bars as Guardians of Prisoner Rights

By Maura Dolan
*Times Staff Writer*

SAN FRANCISCO — They exposed the state's locking up of juvenile offenders for 23 hours at a stretch in cells smeared with blood and feces.

They helped spark an unprecedented federal court takeover of California's prison healthcare system after revealing that prisoners were dying because of medical neglect.

They ended the practice of placing mentally ill prisoners in extreme isolation.

The Prison Law Office, a nonprofit group of lawyers who labor in the shadow of San Quentin Prison, has in recent years scored a string of court victories felt in nearly every corner of California's teeming prisons.

"There is almost no aspect of California corrections, adult or juvenile, that is not subject to a court order, and almost all of those are the result of suits brought by the Prison Law Office," said Barry Krisberg, president of the National Council on Crime and Delinquency.

Although its lawyers are underpaid by law firm standards and represent wildly unpopular clients, the group has become a litigation powerhouse so successful that the state in recent years has chosen to fold rather than fight it.

Why, then, do the lawyers seem more frustrated than triumphant?

They complain that the pace of change in California's prisons and youth correctional facilities is achingly slow, that court orders and negotiated settlements take years to achieve and mark only the start of reform.

As they trudge from prison to prison to make sure that promised improvements are in place, they say they must continually remind themselves of what they have accomplished during the group's 30 years of legal advocacy.

"People aren't shot dead anymore; let's start with that one," said Steve Fama, 49, who has worked at the Prison Law Office for 20 years. "During the late '80s to mid-'90s, the number of prisoners shot dead in California was staggeringly disproportionate to the number shot dead in all the other state prisons combined."

The 10 lawyers, dressed in jeans and T-shirts, work in a cluster of modest offices on San Francisco Bay. They receive as many as 100 letters a day from inmates asking for help.

"The kind of cases the Prison Law Office has litigated involve a guy sticking his arm through the food slot and a guard breaking his arm, people crawling up the stairs to parole hearings because there were no provisions for people with disabilities and inmates on psychotropic drugs dying because their cells overheated," said Sue Burrell, an attorney for the Youth Law Center, a public interest law firm.

In a lawsuit against the California Youth Authority, the Prison Law Office complained:

"Rehabilitation cannot succeed when the classroom is a cage and wards live in constant fear of physical and sexual violence from CYA staff and other wards."

In a report stemming from a lawsuit the office helped bring, a court-appointed monitor found that the Department of Corrections and Rehabilitation was refusing to discipline guards for serious misconduct at Pelican Bay, a super-maximum security prison.

"Some correctional officers end up acquiring a prisoner's mentality: They form gangs, align with gangs and spread the code of silence," the monitor, John Hagar, wrote.

Earlier this year, U.S. District Judge Thelton Henderson reported that at least 34 inmates had died recently because of neglect, incompetence and "even cruelty" by medical staff. Henderson's action followed a lawsuit by the Prison Law Office.

On a tour of medical facilities at San Quentin, the judge observed a dentist who neither washed his hands nor changed his gloves after placing his hands in patients' mouths.

"On average, an inmate in one of California's prisons needlessly dies every six to seven days due to constitutional deficiencies in the . . . medical delivery system," Henderson said.

The Prison Law Office was established when memories of the siege at Attica Correctional Facility in New York were still fresh. The 1971 uprising, in which 43 were killed, raised public awareness of brutality and racism in American prisons and spurred widespread calls for reform.

> *'A lot of them realize you're their only hope, the only thing that stands between them and the guard.'*
>
> Don Specter, director of the Prison Law Office

But the passage of years diminished the power of Attica, and the impulse for reform gave way to laws instituting harsher and harsher prison sentences. The inmate population exploded.

From 1983 to 1995, the number of California inmates rose from 30,000 to 160,000. Despite an unprecedented prison construction boom, the prisons are at roughly 193% of their design capacity, frustrating efforts to improve conditions.

Don Specter, 53, director of the Prison Law Office, said sentencing laws need to be revised to reduce the numbers behind bars. As long as the prisons are overcrowded, conditions that violate the Constitution's ban on cruel and unusual punishment will persist, he said.

During the lawyers' visits to the prisons, the inmates tend to be appreciative.

"A lot of them realize you're their only hope, the only thing that stands between them and the guard," Specter said.

The lawyers have complained that prison rules sometimes make meetings with their clients difficult.

Sara Norman, 37, another lawyer in the office, recalled her irritation when guards at a youth correctional center in Stockton forced her to wear a bulky green stab-proof vest during a tour.

Talking to wards through their food slots, Norman said, she apologized for the vest. "That is not the way I want to be interacting with them," she said.

Alison Hardy, 44, also an office lawyer, said she vigorously objected when guards at the California Men's Colony in San Luis Obispo insisted that she could meet with prisoners only if they were shackled. The guards prevailed.

Yet a prison guard once locked Norman into a plexiglass cell with an unshackled convicted murderer on death row.

After the interview concluded, Norman called out to the guards to let her out. No one heard her. Eventually, she resorted to "banging and banging and banging on the door."

The inmate was "perfectly nice," and they laughed about the incident, she said. Her point was that prison rules are "utterly arbitrary."

The lawyers said they generally have good relations with prison staff, although their litigation record has caused some resentment.

When the state loses a case, it must pay the Prison Law Office reasonable attorney fees, which is how the office pays for itself.

Lance Corcoran, executive vice president of the prison guards' union, complained that taxpayers are bearing the expense.

He said the Prison Law Office has "incredible power" and faulted the Department of Corrections and Rehabilitation for doing "a very poor job of defending" itself.

Jerold A. Prod, an administrative law judge and former chief counsel for the state corrections department, described the Prison Law Office as "probably cut above the average public interest legal organization." He also observed that the lawyers could be "blinded by their cause."

He recalled a time when the group wanted work opportunities to be equal for male and female inmates, even though the men vastly outnumbered the women behind bars and the female inmates, he said, mostly wanted to go to beauty school.

"The fastest way to start riot at the California Institution for Women at that time was to shut down the cosmetology clinic," Prod said.

The Prison Law Office has benefited from significant free help from some of the state's top private law firms.

"They pick their shots," said Richard B. Ulmer Jr., a partner at Latham & Watkins who has worked with the office.

The group knows its way around Sacramento. Specter is often described as unassuming and is reputed to be a fierce negotiator.

"He comes across as a very gentle, quiet person, but man get out of the way," said Burrell of the Youth Law Center.

Bruce Slavin, general counsel for the corrections department who has dealt with the Prison Law Office for 20 years, said relations with their lawyers have become "less confrontational" and "less adversarial" over the years.

"If the Prison Law Office brings a complaint to me, they are usually going to be accurate in identifying the problem," Slavin said. "Their solution may not be the same as our solution."

Specter said Gov. Arnold Schwarzenegger "has a commitment to prison reform that no other governor has had" but still has failed to make any significant reforms.

"The governor gets creamed by the victims' rights activists and the prison guards and starts to sound more and more like [former Gov.] Pete Wilson," Specter said.

Even when the governor has signed onto a reform, months may pass before the prison adopt it, the lawyers said.

Fama, the group's 20-year veteran, recalled his frustration during a recent visit to monitor implementation of reforms at a Southern California prison. He discovered that a logbook intended to ensure that emergency medical supplies were in place had been provided only the day before his visit. The prison was supposed to have had the book months earlier.

Fama said his aggravation eventually gave way to hope. Although progress was slow, his visit had made a difference.

191.

SUNDAY
OCTOBER 9, 2005

The San Diego Union-Tribune.

CITY FINAL
$1.75

# Prison doctor faulted for 3 deaths

ASSOCIATED PRESS

SAN JOSE — A doctor at San Quentin State Prison was placed on paid administrative leave after three inmates died under his care, according to published reports.

Garen Vong of San Francisco is allegedly the physician described in federal court documents as "Dr. X" in connection with three preventable deaths, according to the *San Jose Mercury News*.

Vong was placed on leave Feb. 3, four days after the death of the third patient, who had been diagnosed with bronchitis, but died shortly afterward from massive bleeding into his lungs.

"It was another example, not only of bad medical care, but information was known about a physician who was dangerous and responsible for patients dying," said Dr. Joe Goldenson, San Francisco's jail health services director, who reviewed the patient's file at the request of the judge.

The San Diego Union-Tribune • Saturday, July 9, 2005

# CALIFORNIA & THE WEST

## Prison warden removed in health care morass

SACRAMENTO — San Quentin State Prison Warden Jill Brown was removed from her post after the prison system's independent inspector general found she discouraged her medical staff from cooperating with attorneys in a major inmate health care lawsuit.

"My observation is she inherited a big mess at San Quentin, and prisoners were suffering," Alison Hardy, a lawyer for the Prison Law Office, which represents inmates in the class-action lawsuit, said Thursday. "She wasn't able to lead the prison out of a bad problem."

U.S. District Judge Thelton Henderson last week took control of the entire Department of Corrections and Rehabilitation health care system four months after a team of national medical experts reported that conditions at San Quentin are so appalling that it's dangerous to house new and sick inmates there.

[redacted] 193. *Associated Press*

The San Diego Union-Tribune

TUESDAY JULY 5, 2005

COUNTY FINAL 50¢

# GUARDIANS OF THE GUARDED

## Prison Law Office has been effective at improving conditions for state's inmates

By Steve Schmidt
STAFF WRITER

SAN RAFAEL — From her office near San Francisco Bay, Alison Hardy fights for the rights of thugs, gangsters, carjackers and others doing time in state prison.

Got a problem with that?

The 44-year-old attorney knows some Californians do. She has run into those who "resent when prisoners get any attention. They are not comfortable with it."

Hardy works at the Prison Law Office, a team of Bay Area lawyers trying to protect the civil rights of California inmates and improve conditions behind prison walls.

Some consider them invaluable watchdogs, others meddling mollycoddlers. Either way, the Marin County organization has emerged as a legal powerhouse.

A case in point: A federal judge said Thursday he will place inmate health care operations in receivership, declaring the state prison medical system "terribly broken."

U.S. District Judge Thelton Henderson recently said an appointed overseer would have the latitude to reform the Department of Correction's "dysfunctional" health care program.

The unusual move stems from a lawsuit filed in 2000 by the Prison Law Office that documented a pattern of poor inmate care within many of the state's 33 prisons.

It's also the latest, and one of the biggest, in a string of courtroom successes for the inmate-rights group.

While media attention has been focused in recent years on the power of the California's union for prison guards, the law office arguably has had as much impact on day-to-day operations within one of the nation's largest correctional systems.

The union represents the guards; the Bay Area legal team the guarded.

"I have a great and grudging respect for them," said Lance Corcoran, spokesman for the California Correctional Peace Officers Association, the prison guards' union. He said the legal team is highly effective at "painting inmates as victims."

Through a series of successful lawsuits, the law office has repeatedly put state corrections officials on the defensive, forcing them to initiate major, and often costly, improvements on a wide range of issues, from the psychiatric care of inmates to use of force by guards.

Harriet Salarno, president of Crime Victims United of California, believes the law group has a "liberal" agenda that is out of step with most residents.

She doesn't oppose the humane treatment of prisoners, but is upset the law office focuses on helping convicts rather than protecting the public from more crime.

"They're great lawyers, oh gosh. They're defense lawyers," she said, dismissively.

Don Specter, longtime executive director of the law office, makes no apologies. He said if the state did its job right, his legal team wouldn't be so busy.

"It's a question of a state Department of Corrections that can't shoot straight sometimes, let alone think straight," he said.

Few dispute California's $7 billion adult and youth correctional system is a mess.

Gov. Arnold Schwarzenegger and his corrections policy director, Roderick Q. Hickman, said they inherited a system grossly inefficient and ill-equipped to prepare inmates for life after prison.

The governor recently signed a prison reorganization bill intended to spur a host of reforms within California's youth and adult lockups.

From their small, bay-front ofice near San Quentin State Prison, Specter and nine other attorneys on staff at the Prison Law Office get an intimate perspective of life behind bars.

They receive as many as 150 handwritten letters a day from inmates statewide, from Pelican Bay State Prison near Oregon to Donovan Correctional Facility in Otay Mesa.

Some claim they are ill and can't get basic medical attention. Others allege mistreatment by the prison staff. All are looking to lawyers such as Hardy for help.

"We need each other, sister," one inmate recently wrote.

For Prison Law Office lawyers, why someone landed in prison isn't important. What matters is that California uphold its legal and ethical obligations. The U.S. Supreme Court, for instance, has ruled prisoners have a constitutional right to health care.

"If you take away a person's liberty and make it impossible for them to care for themselves, then society has to ensure they get the basic medical care they need," Hardy said.

The law office was created in 1976 by a group of lawyers alarmed by conditions at San Quentin, California's oldest lockup.

Taxpayers keep the office in business. As part of a series of court settlements and orders, the state has paid millions of dollars in attorneys fees to the nonprofit organization.

In the last 20 years, problems facing the prisons have multiplied, largely due to runaway growth and poor management. California opened 21 prisons between 1984 and 1997 and Kern Valley State Prison, California's 33rd, opened June 15.

"The system grew too fast, too quickly and without concern for inmate services," said Specter.

Medical care is a prime example, he said. A class-action lawsuit filed by the group in 2000 documented a pattern of mismanagement and neglect behind bars, including a lack of medical supervision and a failure to treat many prisoners with chronic diseases.

In 2002, the state settled with the Prison Law Office: Corrections officials agreed to phase in a host of medical care improvements statewide.

But in May, Henderson, the federal judge, said despite the "best efforts of (current medical administrators), little progress is being made."

Siding with Prison Law Office attorneys, Henderson moved to place the inmate-care system in receivership. He is expected to appoint a receiver during a hearing Friday.

Corrections officials say efforts to improve medical care have been stymied by their inability to hire and retain enough qualified physicians and other medical staff.

At the same time, the rate of illness within the prison population runs high. Hepatitis C, a liver disease, is among the more common ailments behind bars.

Meanwhile, federal and state courts continue to monitor California's progress in at least seven cases initiated by Prison Law Office lawyers.

The state, for example, must maintain adequate services for inmates with physical disabilities and psychiatric problems. And in January, the state signed an agreement with the law office to overhaul youth correctional facilities.

Bruce Slavin, lead attorney for the California Youth & Adult Correctional Agency, said the relationship between state officials and the Prison Law Office has become less confrontational and more constructive in recent years.

He said the Schwarzenegger administration has been forthcoming about the problems facing the prison system and the need to correct them.

Specter agrees. "While other administrations have tried to hide the ball or minimize issues, they have been very candid," he said.

But he says the jury is out on whether corrections officials can deliver on promises of fundamental reform.

"Hickman and the governor are saying the right things," said Specter, 53. "But the measure of success is action and not words, and we haven't really seen that.

"Every time we win a case it's a bittersweet victory because it means the conditions were so bad it shocked the conscience of the court ... It would be better if we didn't have to bring these lawsuits at all."

ORANGE COUNTY EDITION

Los Angeles Times

On The Internet: WWW.LATIMES.COM FRIDAY, JULY 1, 2005 COPYRIGHT 2005 / 136 PAGES / DC 50¢ Designated Areas Higher

# U.S. to Seize State Prison Health System

A federal judge, citing experts' reports of fatal incompetence and neglect, will name a receiver for the $1.1-billion program.

By JENIFER WARREN
*Times Staff Writer*

SAN FRANCISCO — A federal judge said Thursday that he would seize control of prison healthcare from the state and place it under a receiver, declaring that "extreme measures" were needed to fix a system that kills one inmate each week through medical incompetence or neglect.

U.S. District Judge Thelton Henderson said that despite repeated warnings from his court and the "good intentions" of some state officials, the Department of Corrections continues to allow sick prisoners to die "for no acceptable reason." The judge said he would soon issue a written order outlining details of the receivership and begin discussing potential receivers with lawyers in the case.

Attorneys on both sides called the decision historic, saying they believed it marks the first time in the nation that a government operation the size of California's prison medical care system is to be placed under a federal receiver.

In 1995 the District of Columbia's jails were assigned to a receiver for five years. That system has 1,700 inmates. The California Department of Corrections' healthcare network serves more than 163,000 prisoners, employs 6,000 workers and has an annual budget of $1.1 billion.

Henderson, in a quietly passionate 25-minute speech from the bench, said "horrifying details" presented in a series of hearings he convened over the last month had filled him with a sense of urgency.

He said he believed "nothing short of a receiver" could halt the deaths and other harm inflicted on California convicts who fall ill.

The judge said he was especially alarmed by the "uncontested statistic," provided by a court-appointed expert, "that a prisoner needlessly dies an average of roughly once a week."

Henderson said that anyone "would have to be shocked, as I certainly was," by that fact.

By putting the system in receivership, Henderson effectively shifts power for all decisions related to inmate care — from how many nurses should work a given shift to when a cancer patient receives treatment at a community hospital — to the federal court.

The receiver, who will report directly to the judge, will be empowered to order fixes now delayed or thwarted by Civil Service rules, collective bargaining agreements and bureaucratic red tape, lawyers said.

Attorneys said they could not speculate how long the receivership might last or what it would cost. Henderson said it would certainly be a "multiyear effort."

Bruce Slavin, who as general counsel for the Youth and Adult Correctional Agency is the top lawyer for the state's $7-billion correctional system, said "it will not be cheap." But he expressed hope that under a receiver, there would be better management of healthcare spending.

Margita Thompson, spokeswoman for Gov. Arnold Schwarzenegger, said the administration would cooperate with a receiver.

"We look forward to working with the receiver to create a sustainable healthcare system," she said.

Adult prisons are not the only piece of California's correctional system receiving outside oversight. The California Youth Authority, which houses about 3,000 of the state's most troubled juvenile offenders, is under the supervision of a special master, who monitors compliance with court-ordered improvements in inmate medical care, mental healthcare, education and other areas.

State Sen. Gloria Romero (D-Los Angeles), chairwoman of an oversight committee on corrections, attended the hearing and applauded the judge's decision.

"This is the right thing to do, the only thing to do," Romero said.

"We invest $1.1 billion in this [healthcare] system every year," she added, "and it's incredible to me that we don't get better results."

An attorney for the inmate plaintiffs, who claimed in a 2001 class-action lawsuit that prison healthcare amounted to unconstitutionally cruel and unusual punishment, called Henderson's ruling "everything we asked for" and a beacon of hope for his clients.

"As the judge said ... the magnitude of the suffering could not be ignored," said Donald Specter, director of the Prison Law Office, a nonprofit firm taking the lead role in the case.

Corrections officials did not oppose appointing a receiver, though they described it in legal briefs as "a highly intrusive remedy" that should be a last resort. Slavin said Thursday that the department had recently made progress in firing incompetent doctors, hiring nurses and addressing other woes.

"The question of fixing healthcare is not one of whether but when," he said. "The administration has always been committed to getting it fixed. This [receivership] speeds it up."

Henderson's ruling was based on testimony from court-appointed experts who have been inspecting prison medical facilities as part of the lawsuit.

The case was settled in 2002, when the state agreed to overhaul inmate healthcare and phase in improvements by 2008.

Among the changes mandated by the settlement were the creation of a triage system to identify the sickest inmates and ensure they did not wait long to see a doctor and a program allowing prisoners with chronic conditions to be more carefully monitored.

The experts found few signs of progress and provided the court with chilling examples illustrating filthy conditions, ill-trained and neglectful doctors and a pattern of preventable deaths that one expert called "macabre" and unlike anything he had ever seen before.

The expert, correctional healthcare authority Dr. Michael Puisis, said medical treatment amounted to "almost anarchy" at some prisons, where disorganized or missing patient records mean that "medical providers are reduced to guessing or repeating tests and treatment already done."

Puisis, editor of a textbook on medical care in prisons, said inmates needing diagnostic tests faced extreme delays that imperiled their lives. Such delays could be caused by transportation snafus, scheduling errors, prison emergencies and a variety of other circumstances.

In one instance, a patient at Pleasant Valley State Prison near Bakersfield who needed a colonoscopy waited nearly a year and then could not undergo the test because his "mass was so large, the scope could not be passed through," according to a written summary of Puisis' testimony.

He also cited the case of an inmate at Salinas Valley State Prison who had suffered a neck injury in a fight and could not move his legs. After sticking needles in his legs, "the doctor said the patient was faking and moved his head from side to side."

The inmate is now paralyzed, and it is unclear whether the paralysis resulted from the fight or the doctor's inappropriate actions, according to a summary of Puisis' testimony in a legal brief.

In appointing a receiver, Henderson acknowledged that he was taking "perhaps the most extreme measure available" to him.

But, he added, "this court has tried to use lesser measures, and all agree that those lesser measures have failed."

A receiver still must be selected — someone with a blend of financial, correctional and medical experience suitable for the massive job.

The judge underscored this point by remarking that the perfect candidate would be someone who has operated Kaiser Permanente and "also has an MBA from Stanford or Cal and is a former warden."

Specter has asked the judge to name a temporary receiver while a search is made for a permanent one. State officials oppose an interim receiver, saying the right person can be hired within a few months.

Henderson said he is inclined to appoint a temporary receiver, because lives are at stake.

195.

The San Diego
Union-Tribune.
FRIDAY
JULY 1, 2005
SOUTH COUNTY
50¢

# Prison health care to be turned over to outside monitor

**By Don Thompson**
ASSOCIATED PRESS

SACRAMENTO — A federal judge said yesterday he'll appoint an independent authority to oversee California's prison health care system, which is so plagued with problems that an inmate a week dies of neglect or maltreatment.

U.S. District Judge Thelton Henderson called the system, the nation's largest for inmate health care, "terribly broken" in issuing his decision.

"We're dealing literally with life and death," he said.

State Senate Majority Leader Gloria Romero, D-Los Angeles, said the federal receivership is unprecedented in scale because California's prison system is so large, spanning 163,000 inmates and 33 prisons.

She expects reforms to take several years.

"There has been a quarter-century of neglect when it comes to health care for inmates," Romero said.

"It's a billion-dollar failure at this point," she said. "Corrections has not proved itself able to adequately deal with the challenges."

Henderson is expected to appoint a receiver during a hearing July 8, when he also will set the scope, authority and duration of the receivership.

The judge could choose one or more receivers from among candidates suggested by the state prison system and attorneys for the plaintiffs.

"The judge has recognized the ongoing risk of death and harm to patients is unconstitutional and basically horrifying," said Alison Hardy, an attorney with the nonprofit Prison Law Office, which represents the plaintiffs.

The suit was filed against the governor and corrections officials by the Prison Law Office in 2001 and settled shortly after.

The two sides have been sparring over implementing the settlement.

Henderson, ruling in San Francisco in the class-action lawsuit, said he may appoint a temporary receiver until a permanent one can be found. The prison system will oppose a temporary appointment and has begun seeking candidates for a permanent position, spokesman Todd Slosek said.

"We want to fix the system and fix it now," he said.

California Youth and Adult Corrections Secretary Roderick Hickman welcomed the ruling and said it must provide "a sustainable solution" to problems that have led to repeated lawsuits.

"The taxpayers of this state can't afford to keep paying for repeated lawsuits that result from the same kinds of problems such as inadequate health care, poor mental health treatment and insufficient staffing," Hickman said.

Henderson's decision comes as Gov. Arnold Schwarzenegger's reorganization of the prison system takes effect today.

Top prison officials had acknowledged they can't manage the inmate medical system and had been counting on consultants and the reorganization to make improvements.

Schwarzenegger's reshuffling is the largest in three decades and is part of his effort to restructure state government.

Los Angeles Times

CALIFORNIA

ORANGE COUNTY EDITION

Sunday, May 29, 2005 latimes.com/california

# Care for Mentally Ill Inmates Scrutinized

## The federal judge who in 1995 ordered prisons to make improvements is alarmed by failures at Corcoran. He orders a review of staff attitudes.

By DAN MORAIN
*Times Staff Writer*

SACRAMENTO — U.S. District Judge Lawrence K. Karlton of Sacramento, who 10 years ago ordered state prisons to improve their care of mentally ill inmates, became alarmed this year by reports of repeated failures in such care at Corcoran prison.

In March, Karlton ordered a review of employee attitudes toward the mentally ill at the prison and required the institution to provide him monthly reports of guards' use of force against mentally ill inmates.

Karlton is presiding over an ongoing 1990 class-action lawsuit that challenges the quality of mental-health care in the state prison system. In a separate suit, U.S. District Judge Thelton Henderson in San Francisco this month threatened to impose a receiver to oversee general healthcare in the state prisons.

About 20% of the 163,000 inmates in California state prisons are diagnosed with some form of mental illness.

Karlton issued his new order in March, after a special master whom he had appointed to oversee the situation reported that Corcoran's program for mentally ill inmates was "exceedingly troubled."

In one cellblock, inmates were confined naked and without mattresses or blankets, wrote Special Master J. Michael Keating Jr.

The staff response to inmates who failed to take medications was erratic, and the care of psychotic inmates in the highest-security housing units was "simply unacceptable," Keating wrote.

"Some renegade elements of custody staff . . . apparently took it upon themselves to apply their own benighted version of how best to handle seriously mentally disordered inmates," the report said.

Keating's report said that although a fourth of Corcoran's 5,000 prisoners are mentally ill, they accounted for half of the inmates upon whom officers used force. The report prompted Karlton to order that Corcoran review its use-of-force policy.

Gov. Arnold Schwarzenegger is proposing to spend an extra $5 million to hire additional mental health staff to comply with Karlton's latest order.

Roderick Q. Hickman, the state's top prisons official, said recently that he had not reviewed Keating's report and was unaware of the problems cited at Corcoran.

197.

The San Diego
Union-Tribune.
WEDNESDAY
MAY 11, 2005
SOUTH COUNTY
50¢

# Judge seeks oversight of prisons; Schwarzenegger OKs overhaul bill

## Lack of care blamed in prisoners' deaths

**By Don Thompson**
ASSOCIATED PRESS

FOLSOM — A federal judge yesterday moved to place the state prison system's troubled health care operations into receivership, complicating a massive prison overhaul bill signed into law hours earlier by Gov. Arnold Schwarzenegger.

U.S. District Judge Thelton Henderson, ruling in a class-action lawsuit brought against the California Department of Corrections, said the state's 162,000 prisoners "are being subjected to an unconstitutional system fraught with medical neglect and malfeasance."

Poor care has been blamed for the deaths of more than two dozen inmates.

"Defendants have conceded a significant number of prisoners have died as a direct result of this lack of care, and it is clear to the court that more are sure to suffer and die if the system is not immediately overhauled," he said.

Henderson's ruling, in San Francisco, came after Schwarzenegger appeared at Folsom State Prison to sign into law the most sweeping overhaul in three decades of the nation's largest prison system.

Schwarzenegger's signature was expected. The Republican governor has been calling for major changes to the $7 billion-a-year system since shortly after he took office in November 2003. He helped craft a bipartisan solution through months of negotiations with the Democrat-controlled Legislature.

"When I came into office, we faced some very serious problems with our correctional system . . . and the more we looked at the problems, the more we realized that the first step that we must take is to reorganize the whole agency," Schwarzenegger said.

The law restructures the bureaucracy of the 32-prison system and concentrates power with a corrections czar, Youth and Adult Corrections Secretary Roderick Hickman.

Schwarzenegger said attention must turn to several changes: improving the health care system targeted by the judge yesterday; overhauling a youth corrections system experts described as Draconian; and fixing a rehabilitation system so flawed the majority of ex-convicts are soon back behind prison walls.

It's unclear what effect Henderson's ruling will have on the governor's overall reform plan, since it could take control of the health care system out of the state's hands.

Top prison officials have acknowledged they can't manage the inmate medical system, and are counting on consultants and the legislation the governor signed yesterday to make improvements. A prison department spokesman said it isn't known if the state would oppose a receiver.

The judge said he'll appoint a receiver to force improvements unless the Department of Corrections persuades him not to. Another hearing on the matter is set for July 11.



Gov. Arnold Schwarzenegger walked out of Folsom State Prison yesterday with state Sen. Elaine Alquist, D-Santa Clara (left), Roderick Hickman, corrections secretary (third from right), and state Sen. Gloria Romero, D-Los Angeles. *Associated Press*

198.

Los Angeles Times

Thursday, April 14, 2005

# Prison Clinics Called Dirty, Deadly

## A report by court-appointed monitors says healthcare at San Quentin is so bad it is dangerous, sometimes fatal, to inmates.

By JORDAN RAU
*Times Staff Writer*

SACRAMENTO — Despite a court order to improve medical care for inmates, San Quentin State Prison's health facilities and treatment practices are so harrowingly bad that many sick prisoners should not be taken there at all, independent examiners have concluded.

The court-appointed experts inspected the medical records of 10 inmates who died over the last few years in California's oldest and best known prison and concluded that in each case, the treatment "showed serious problems" and "most deaths were preventable."

Doctors and nurses misdiagnosed illnesses, gave patients the wrong medications, neglected them for months and even years or delayed sending them to emergency rooms until they were fatally ill, the experts discovered.

The examiners watched a dentist examine inmate after inmate while wearing the same pair of gloves. Records were in such disarray that doctors reported that they could not find medical files for at least 30% of the inmates they examined.

Based on visits to the prison earlier this year, the experts' April 8 report documented filthy clinics and patient housing. Dental examinations are done in a place without light or water; inmates are initially evaluated in a room without a sink for washing hands; nurses until recently used a broom closet as an examination room; and wheelchair-bound patients cannot roll into the hospital cells on their own because the doors are too narrow.

"We found a facility so old, antiquated, dirty, poorly staffed, poorly maintained, with inadequate medical space and equipment and overcrowded that it is our opinion that it is dangerous to house people there with certain medical conditions and also dangerous to use this facility as an intake facility," the experts wrote.

The examiners found less dreadful but nonetheless extensive shortcomings with the medical care at Salinas Valley State Prison and the California State Prison at Sacramento, in

[See Prisons, Page B6]

[Prisons, from Page B1]

Folsom. Although they found improvements, the visits uncovered some of the same management problems that plague San Quentin, including a lack of basic medical equipment, dirty facilities and a culture of indifference among some senior medical staff.

Taken together, the site reports raise major questions about California's compliance with the settlement of a lawsuit charging that inmate medical care was so poor it amounted to cruel and unusual punishment.

The case was settled in 2002 and is being overseen by U.S. District Court Judge Thelton Henderson in San Francisco, who appointed the monitors. Under the terms of the settlement, the state's prisons should already be making improvements, and must complete them by 2008.

Henderson, who last year threatened to appoint a receiver to take over the entire state Department of Corrections, discussed the reports Wednesday in Sacramento with the medical experts, state prisons commissioner Roderick Hickman and, separately, state Sen. Gloria Romero (D-Los Angeles), chairwoman of a Senate panel investigating state prisons.

Todd Slosek, a corrections spokesman, said department officials will be prepared to discuss the problems at a hearing Romero has set for today on the broader topic of prison healthcare costs.

"We're currently working with the courts to address the issues raised by the experts," he said, adding that the department has developed a remedial plan for the deficiencies found at San Quentin.

Romero said the reports make her question whether the prison system is capable of reforming itself. She noted that while $1 billion of the $7-billion annual prison budget is spent on healthcare, the reports suggest that much of this money is squandered.

"What these reports reflect is there has been a culture of negligence by the bureaucracies across the various administrations in terms of addressing the most basic healthcare needs of inmates," Romero said.

The monitors — who include doctors and nurses with experience in prison healthcare — raised the same concerns about the overcrowded San Quentin prison, which is supposed to house no more than 3,317 inmates but has a population hovering around 6,000. They noted the incredibly low expectations of the staff, who would refer to "the San Quentin way" and say that they were "making do with the hand we've been dealt" when discussing the prison's inferior clinics and equipment.

The experts also noted that the prison emerged only within the last decade from a previous federal order to improve medical care.

"The system of organizational structure within the [California Department of Corrections] that permitted this facility to deteriorate over the past 10 years to the state described in this report must be addressed as well," they wrote. "These problems have not occurred overnight."

Among the problems at San Quentin identified by the examiners:

- Three patients who later died had been seen by the same doctor, who the experts said failed to properly treat patients with clear signs of extreme illness and did not refer them for emergency care "until their conditions had deteriorated to the point where their deaths were inevitable." The doctor, who was not named in the report, was placed on administrative leave after the third death.
- One patient identified as having "extremely high blood pressure" was "basically neglected for over a year and a half" until he died.
- Another patient who died of renal failure was not correctly diagnosed for "an extended period" and then was not given dialysis. He was also given medicines that were not safe for him.
- A diabetic inmate with a foot problem was housed in the mental health unit because there were no empty beds in the medical unit. There, his shoes were taken away, as is customarily done with psychotic and suicidal patients, even though his bare foot was then made more vulnerable to damage.

The experts found less serious but still inadequate conditions at Salinas. Their report said the corrections department had increased doctors' hours to reduce the backlog of untreated inmates.

Still, the experts concluded that high nurse and medical assistant turnover and vacancies undermined prompt examinations, with appointments often rescheduled and new patients not being referred to physicians.

"The fact that healthcare staff has difficulty obtaining basic medical supplies for clinic operations is completely unacceptable, and helps explain staff exasperation and frequent turnover," the experts wrote.

199.

# Forum

LOS ANGELES DAILY JOURNAL • WEDNESDAY, MARCH 30, 2005 • PAGE 6

## Dark Tales May Lie Beneath 'Outrageous' Prisoner Claims

By Robert L. Bastian Jr.

What is otherwise a dry subject — technical analysis of statutorily imposed administrative exhaustion requirements in a prisoner rights case — can, nonetheless, be subtly critical to upholding the rule of law and preserving crucial civil liberties. If the devil is found in details, angels sometimes reside in results.

In *Ngo v. Woodward*, 2005 DJDAR 3445, a 9th U.S. Circuit Court of Appeals panel recently reversed dismissal of a prisoner's civil case challenging conditions of his confinement. The lower court reasoned that, by earlier presenting an untimely prison appeal, the prisoner failed to exhaust his administrative remedies, thereby running afoul of a precondition of his lawsuit set by the Prison Litigation Reform Act of 1995. By contrast, the reviewing court held that the alleged procedural default at the administrative level did not defeat his otherwise presumptively actionable claims.

Such small victories are important ones in California, where politicians across the political spectrum have acknowledged that the state's $6 billion prison behemoth is essentially dysfunctional. Part of the reason the prison archipelago has failed is that, even as it grew beyond accountability to state authorities, the Supreme Court and Congress lost interest in monitoring whether even minimum federal rights are accorded prisoners.

The Prison Litigation Reform Act of 1995, which the *Ngo* court interprets, was a disgraceful legislative act by a distracted and inattentive Congress. Generally, the act was designed to reduce federal court "micromanagement" of prisons and reduce "the flood" of prisoner litigation. Despite the act's impact on more than 1 million prisoners at the time, there is little legislative activity supporting it.

There was no committee markup or judiciary committee report explaining the proposal. Instead, it was merely attached as a rider to an omnibus appropriations bill and signed into law.

In support of the act, the National Association of Attorneys General solicited lists of outrageously frivolous lawsuits from its members to encourage the act's enactment and then disseminated them to the press.

Three of the most widely disseminated were: an inmate who sued because there were no salad bars or brunches on weekends and holidays; an inmate who sued because his prison towels were white instead of his preferred beige; and an inmate claiming cruel and inhuman punishment because he received one jar of chunky and one jar of creamy peanut butter after ordering two jars of chunky from the prison canteen.

To balance such cherry-picking, they might have looked at what was happening at Corcoran, around the same time: guards setting up fights among inmates, then shooting them; guards greeting busloads of prisoners with a gauntlet of beatings; or placing inmates in cells with known cellie rapists, ostensibly as a form of punishment.

Prison staff who, in resisting this culture were ultimately fired for their efforts, referred to the warden at the time, now deceased, as "Mushroom George." It was because, regarding such matters, "he liked to be kept in the dark."

By contrast, the suspicions of Judge Jon O. Newman of the 2nd U.S. Circuit Court of Appeals were justified when he followed up on the National Association of Attorneys General claims, hyped as their favorite frivolous lawsuits. Newman said, "I was skeptical of the



experience in 24 years as a federal judge that what the attorneys general described was at all 'typical' of prisoner litigation." *Pro Se Litigation: Looking for Needles in Haystacks* 62 Brook L. Rev. 519 (1996).

What he found after obtaining and reviewing the court documents was the following:

Regarding the "salad bar" case, 43 prisoners had filed a 27-page complaint "alleging major prison deficiencies including overcrowding, forced confinement of prisoners with contagious diseases, lack of proper ventilation, lack of sufficient food, and food contaminated by rodents." The prisoners' reference, in passing, to a salad bar was in the context of the bar's availability to other prisoners within the system and the guards at that particular facility.

Regarding the "beige towel" case, what really happened is that a package including a jacket and towels from the prisoner's family was confiscated and he was disciplined with loss of privileges. According to the complaint, the confiscation "cause[d] a burden on my family who work hard and had to make sacrifices to buy me the items mention[ed] in the claim."

Finally, regarding the "chunky peanut butter" case, what really happened was that the prisoner's meager account had been debited when the prison guard willingly took back the wrong kind of peanut butter and then cynically reneged on his promise to give the prisoner the correct product.

Clichés regarding micromanagement and floods were, thus, supported with mythical anecdotes. Nonetheless, journalists such as George Will latched onto one or more of these fables to fan public support, or more accurately, a drowsy public consent to the legisla-

In his 1921 tome Public Opinion, Walter Lippman offered the deepest insight on the subject:

"There is another reason, besides economy of effort, why we so often hold to our stereotypes when we might pursue a more disinterested vision. The systems of stereotypes may be the core of our personal tradition, the defenses of our position in society. ... In that world people and things have their well-known places, and do certain expected things. We feel at home there. We fit in. We are members."

Lippman adds: "Our stereotyped world is not necessarily the world we should like it to be. It is simply the kind of world we expect it to be. If events correspond there is a sense of familiarity, and we feel that we are moving with the movement of events."

"No wonder, then," he concludes, "that any disturbance of the stereotypes seems like an attack upon the foundations of the universe."

The photos from Abu Ghraib were such a disturbance. The cognitively dissonant images upset an otherwise favorable image of how Americans handle such custodial situations. Not surprisingly, one of the defense secretary's first acts in response was to ban unauthorized use of cameras.

Currently, the only uncompromised lens into the California prison system is the wheat-among-chaff of prisoners' civil complaints in federal court.

At this point, it would be foolish to place trust in correctional staff, subject as they are to a well-demonstrated code of silence; the current departmental leadership, which only tolerated the continued independence of the office of internal investigations under transitory political pressure; or the legislative and executive branches of state government who, until now, have been reliably outmaneuvered or won over by the guard's powerful union.

In California prisons, prisoners must present their "602" administrative appeals within 15 days of the challenged event to the correctional officer responsible. In some cases, depending upon how prison officials interpret their own rules, that means the inmate hands an administrative appeal to guards who actually sexually assaulted or beat them. This is a system designed almost to ensure retaliation against complaining victims.

The *Ngo* court, demonstrating wisdom borne of judicial experience, noted:

"In a prison grievance system, the trust between prisoners and the administration is minimal at best, and nonexistent at worst. As is, prison grievance procedures are sufficiently difficult for prisoners to comply with. Judicial imposition of the procedural default doctrine on suits brought under the PLRA, coupled with the relatively short filing periods for prisoner grievances, might very well preclude prisoner litigants with meritorious claims from ever bringing suit. Not even proponents of the PLRA wanted to bar worthy claims."

In short, *Ngo* satisfies Congressional intent, refrains from adding procedural doctrine not explicit in the statute and, most importantly, helps preserve the integrity of the limited lens into the netherworld of California prisons. *Ngo* promotes the rule of law and interposes a proper role for federal courts.

The postscript is that this will result in more work for the federal courts. This is, however, only fitting, for there is much that must be done.

Robert L. Bastian Jr. is a partner with the Offices of Bastian & Dini in Los Angeles

CALIFORNIA & THE WEST

The San Diego Union-Tribune • Thursday, September 30, 2004

# Health-care costs at state's prisons double in 5 years

**By Don Thompson**
ASSOCIATED PRESS

SACRAMENTO — Health-care costs at California's prisons have nearly doubled in five years even as inmates die at the hands of unqualified doctors, senators said yesterday at another hearing into the state's corrections system.

In one case in February, a 72-year-old inmate starved to death in front of health-care workers.

In June, a 41-year-old inmate died six days after having a wisdom tooth pulled and after being shuttled for more than two hours to medical care instead of being rushed to either of two closer hospitals.

"My nephew, Anthony Shumake, had a tooth pulled and now he is dead," the Rev. Andre Shumake told senators. Anthony Shumake "was given a prison sentence, not a death sentence.... No one should have a tooth pulled and die in this day and age."

Shumake's fate shows the worst of the system that wastes millions of dollars a year but still has poor results, said Sen. Jackie Speier, D-Daly City.

California should emulate the federal prison system, which has cut per-inmate spending amid rising medical costs, senators said at the hearing.

While they downplayed suggestions by Gov. Arnold Schwarzenegger's Corrections Independent Review Panel to privatize inmate health care in cooperation with the University of California, they said private and university experts should be recruited to recommend reforms.

Taxpayers will spend $1 billion this year to provide health services to the 164,000 inmates in the nation's largest state prison system, the fastest-growing component of the state's annual $6 billion corrections budget.

For all that money, inmates receive poor care often by doctors untrained for the positions they hold, according to a recent audit. Twenty percent of those physicians have malpractice or disciplinary problems.

Speier, who heads a government oversight committee, co-chaired yesterday's hearing with Sen. Gloria Romero, D-Los Angeles.

Their joint hearing is the seventh in 18 months on a system where management and spending is out of control, say auditors, national experts, Senate witnesses and a federal court monitor.

The administration, which says reforms are under way, recently settled the latest in a series of lawsuits over inmate health care.

Recommendations by the prison review panel headed by former Gov. George Deukmejian are under review by the administration — though not quickly enough, the senators said.

It's a complicated problem, Romero said, because inmates are frequently in poor health, and diseases such as tuberculosis, AIDS and hepatitis can spread easily. Also, care must be provided in remote locations under extraordinary security restrictions. Inmates frequently are mentally ill or drug addicted, and strict sentencing laws are turning some prisons into "nursing homes" for geriatric patients.

California fights these problems with a "mind-blowing" lack of modern medical technology, including virtually nonexistent use of computers, the Internet, even cell phones and voice mail that can stall coordination and communication across the system, testified Dr. Jacqueline Tulsky of the University of California San Francisco. 2016

H20

LOS ANGELES TIMES

B4 THURSDAY, SEPTEMBER 30, 2004 OC

# Relatives of Dead Inmate to Sue State

The man died after having a tooth pulled. Legislators hold a hearing on prison healthcare and criticize the system's quality.

By JENIFER WARREN
*Times Staff Writer*

SACRAMENTO — The family of a California inmate who died after he had a tooth pulled said Wednesday that they were suing the state over his death, as two legislators held a Capitol hearing to investigate why prison healthcare remains poor but increasingly expensive.

Relatives of Anthony Shumake, 41, said they would file a wrongful-death lawsuit because a medical pathologist's report showed that he died of complications from the extraction.

The report from the San Joaquin County coroner's office showed that Shumake died June 28 after his airway was constricted by an abscess in his throat. In an interview, Dr. Robert Lawrence, a pathologist, said a "rip-roaring infection" had caused extensive swelling, reducing air flow.

"The airway was not sufficiently open to allow a free flow of oxygen," Lawrence said. "The lack of oxygen caused the heart to go into a fatal rhythm."

Shumake's relatives said other inmates told them that they had tried to get medical help for Shumake in the days after the dental work, as his neck turned red and swollen and he complained of continuing pain. But those requests, they said, went unheeded at Solano State Prison in Vacaville until he fell into respiratory distress and an ambulance was finally called.

Prison officials would not comment on the case, saying that an internal investigation was underway.

"It's been very hard for our family to see a healthy young man have a tooth pulled and then wind up dead," said the Rev. Andre Shumake, the inmate's uncle and a neighborhood activist in the Bay Area city of Richmond. "Anthony was given a prison sentence, not a death sentence. These men may be inmates, but they're human beings."

The Shumake family traveled to Sacramento for a hearing that examined healthcare in the $6-billion California correctional system. Among the topics covered were reports from the California Medical Board, which licenses and disciplines doctors, that showed that one in five prison physicians had a blemished record or had been sued for malpractice.

That 20% rate is almost five times the figure statewide, the board said. Legislators called it unacceptable and indicative of a system in distress.

"To put it very bluntly and very simply, the healthcare system at the California Department of Corrections is sick," said state Sen. Jackie Speier (D-Hillsborough).

Sen. Gloria Romero (D-Los Angeles), co-chairwoman, with Speier, of the hearing, agreed. "The sad fact is California has been growing its inmate population but has failed to provide adequate healthcare for those we lock away," she said.

Under questioning by the senators, corrections officials acknowledged that major problems remain with the network of clinics, hospitals, treatment centers and outside medical contractors that cares for the state's 164,000 inmates.

Dr. Renee Kanan, chief of healthcare for the system, said that "historically, our modus operandi has been very reactive. We've had plenty of fragmented exit strategies, but we've never had a comprehensive strategic plan."

But progress has been made, she said, since a class-action lawsuit, which was settled in 2002, alleged that California's prison healthcare amounted to cruel and unusual punishment.

The changes include tighter screening and monitoring of physicians and creation of an oversight committee to track healthcare costs, which have nearly doubled over the last five years and could hit $1 billion this year.

"We know we have many challenges in our efforts to provide quality healthcare," Corrections Director Jeanne Woodford testified. "We want to fix what this committee has called a broken system . . . and become known as a state that uses the best practices in all aspects of its healthcare system."

Speier and Romero, who have conducted hearings focused on problems in the prisons, did not appear to be patient. They said that the Department of Corrections had been sued over healthcare numerous times over the last two decades, and that it seemed as if only court-imposed mandates had forced change.

Speier asked why the federal government had been able to reduce its prison healthcare costs while the state's costs had soared — a question to which she received no clear answer.

"The scratching of heads is no longer acceptable," Speier said. "It is time to realize what [the prisons'] healthcare policies and practices are costing each and every Californian."

One major challenge facing prison doctors is the condition of patients. Inmates tend to be sicker than the population at large, often because of unhealthy habits and a lack of medical care earlier in life. One in five has a serious mental illness; one-third are infected with hepatitis C. The rate of HIV/AIDS in prison is five times higher than the national average.



Los Angeles Times

*'To put it very bluntly and very simply, the healthcare system at the*

Dr. Jacqueline Tulsky, a professor at UC San Francisco Medical School who has studied prison healthcare, described the average California inmate as a 40-year-old male who is a high school dropout with alcohol addiction, a history of crack cocaine use and mild depression. His medical problems probably include hypertension, diabetes, elevated cholesterol levels and mild arthritis. Periodically, he needs treatment for injuries incurred on the prison yard.

"No healthcare plan in this state," Tulsky said, "has the severity of illnesses you find in the Department of Corrections."

Several prison doctors cited other crucial differences, including a shabby infrastructure that makes practicing medicine difficult at best. Dr. Scott Anderson, who works at the California Medical Facility, a prison in Vacaville, said physicians sometimes lack essentials as basic as an examining table, soap and towels with which to dry their hands.

A severe shortage of nurses and medical technical assistants, who provide security as well as clinical help, also affects care, he said. And perhaps the greatest problem facing prison physicians is technological: the absence of computers to track inmate medical records, view X-rays and help with medical decisions.

Corrections officials agree that working conditions are not ideal. They said that plans to give each prison doctor competency testing should root out those unfit to practice.

Doctors who testified criticized the plan, warning that it could have the paradoxical effect of driving good doctors out of the system. Anderson said he considered his board certification in specialties such as rheumatology and geriatrics a sufficient validation of his skills.

"I certainly don't want to practice with doctors who are not competent," Anderson said. "But I'm troubled by the thought of going through testing that might be arbitrary, capricious . . . and may lead to a dark mark on our record that would follow us for life."

ORANGE COUNTY EDITION

Wednesday, August 11, 2004 latimes.com/califo

# Scathing Report on Prison Doctor

## A panel of experts ordered by court to review state system calls physician quality 'seriously deficient'

By Tim Reiterman
*Times Staff Writer*

SAN FRANCISCO — Incompetent doctors, including some with a history of substance abuse or mental health problems, have been hired by California's prison system and have contributed to serious deficiencies in healthcare for inmates, according to a federal court report released Tuesday.

At one facility, half of the eight doctors had prior criminal charges, loss of privileges at community hospitals or mental health problems, the panel said. At another, seven of 20 doctors had similar problems.

"There appears to be an emerging pattern of inadequate and seriously deficient physician quality" in prisons, a panel of experts said in a letter to U.S. District Judge Thelton Henderson, who ordered the report as part of a civil rights suit alleging substandard medical care for inmates.

A panel of two doctors and a nurse practitioner conducted reviews of medical treatment at about half a dozen of the state's 32 prisons. They concluded in a July 16 letter to the judge that the department had hired many incompetent doctors with a history of problems, then failed to monitor them, putting inmates at serious risk of injury or death.

"The only requirement for hiring is a medical license," said the letter.

California Department of Corrections officials said they were formulating a plan that would improve prison medical services, the fastest-growing part of the $5.7-billion state prison budget.

"There will be remedial training and greater clinical supervision ... and a stricter adherence to department policies," said spokeswoman Margot Bach. "The department ... takes the healthcare of inmates very [...]ously."

The panel concluded [...] many doctors were not tr[...] to administer the treatm[...] they were providing inm[...] some with serious illnesses. [...] report did not name the pri[...] or the doctors.

"An incompetent retired [...]dio-thoracic surgeon man[...] complex internal medicine [...]tients and makes serious [...] threatening mistakes on a [...]tinual basis," the report said[...]

The panel also cited the [...] of an obstetrician who was [...]

[See Doctors, Pag[...]

# State Prison Doctors Called 'Seriously Deficient'

[Doctors, from Page B1]

aging HIV patients and a neurosurgeon who was seeing patients with internal medicine problems, although he was not trained to read electrocardiograms used in internal medicine.

"It could be named the Keystone Docs," said state Sen. Jackie Speier (D-Hillsborough), who has scheduled hearings on the corrections healthcare system for next month. "If it was a want ad, it would say something like, 'Bad doctors apply here. No one turned away.' "

The prison healthcare budget for this fiscal year is $879 million. Officials say rising costs are a result of the growing and aging inmate population, as well as increased spending for prescription drugs, medical treatment and court-mandated services.

The Corrections Department agreed 2½ years ago to settle a lawsuit brought by the Prison Law Office, a Marin County civil rights group, on behalf of the state's 163,000 inmates. That plan is projected to cost tens of millions of dollars a year, and, among other things, calls for putting nurses in prison clinics around the clock.

The findings by Henderson's medical panel surprised even Don Spector, executive director of the Prison Law Office. "It was worse than we thought," he said. "We always knew there were physicians who had no business practicing medicine, but we did not know it was this pervasive."

Henderson is expected to hold a conference on the panel's report and the state's remedial plans this month.

The report described a system in which individual prisons operated with great autonomy and little oversight. The corrections official in Sacramento with final word on hiring was not a doctor. Only one of the prisons reviewed had its chief physician and surgeon's position filled — and that doctor was an ophthalmologist who was training doctors in internal medicine.

At individual prisons, the report found, doctors with training deficiencies were hiring and overseeing the work of other prison physicians. "At one of the facilities reviewed, the vice chairman of the committee that oversees credentialing is an obstetrician who had lost his license for seven years for incompetence and alcoholism," said the report, adding that he oversees doctors practicing internal medicine although he has no experience in that area.

The union that represents about 600 prison doctors, dentists and psychologists blamed quality problems on cost cutting by the state, which has led to the hiring of contract physicians rather than civil service doctors.

"Contract doctors are most of the problem," said Dr. Robert Weinmann, president of the Union of American Physicians and Dentists. "We have a recalcitrant state system. They want to hire and fire locally at will with no benefits."

The panel and Spector of the Prison Law Office gave high marks to the new acting head of the state's prison healthcare services, Dr. Renee Kanan.

But, Spector added, "she is one person in a gigantic system with more bureaucratic hurdles than you can imagine."

B-4 The San Diego Union-Tribune • Monday, August 23, 2004

# Report rips quality of medical staffs at state prisons

## Compliance with settlement sought

By Clea Benson
THE SACRAMENTO BEE

Half the doctors at one California prison health-care facility have faced criminal charges, have been kicked out of other hospitals or have suffered from mental health problems that interfered with their work.

At another prison health unit, one-third of the physicians have had problems with substance abuse, incompetence or mental health. Some have had their licenses suspended.

Those findings were released this month in a damning report on the quality of the medical practitioners in California's $1 billion-a-year prison health system. The report, commissioned by the federal courts to see how well the California Department of Corrections was complying with a legal settlement, was written by a group of medical experts who visited prison health units.

The experts found poorly trained doctors often treating patients in areas in which they had no expertise.

At one prison facility, a doctor specializing in pregnancy was assigned to treat HIV patients.

At a second prison, the report found, "an incompetent retired cardiothoracic surgeon manages complex internal medicine patients and makes serious life-threatening mistakes on a continuing basis."

One doctor had so little training he didn't know how to operate an asthma inhaler. At one prison, an eye doctor was in charge of the internal medicine staff.

Although problems with health care in California's state prisons have been well-documented, the reports released mark the first time the medical staffs have been scrutinized, said Don Specter, a lawyer with the Prison Law Office who represented inmates in the class-action lawsuit that led to the court settlement.

"Doctors need to be assigned to positions consistent with their training and education, and the one's that shouldn't be practicing medicine at all should not be practicing, and new physicians who are competent should be hired immediately," Specter said.

At the same time, Specter and other prison watchdogs credited the department's medical director, Dr. Renee Kanan, with working to make improvements.

"Dr. Kanan is working very hard, and is doing the best she can with a very difficult bureaucracy ... and grossly inadequate resources," Specter said.

Margot Bach, a Department of Corrections spokeswoman, said the state is working with the courts and the Prison Law Office to make improvements suggested in the report.

"We are looking at a process to gauge the effectiveness and skill of medical staff, remedial training, greater supervision, adherence to policy and procedure, as well as a plan for more efficient oversight of some of the more complex (medical) cases," Bach said.

State Sen. Jackie Speier, D-Hillsborough, who has been holding hearings on the troubled prison system, said she wanted to call on managed health care organizations to consult with the Department of Corrections.

"I want them to loan us their executives," Speier, said. "It's what they do for a living. It's not what the (Department of Corrections) does."

As for the report, she said, "It's the worst of all possible worlds. You've got a system financially out of control. ... To add to that, you have a system that doesn't work."

204.

# Exhibit

# BX

CALIFORNIA CODE OF REGULATIONS: MEDICAL AND DENTAL PROVISIONS

Exhibit – B6 also inside

## Article 8. Medical and Dental Services

### 3350. Provision of Medical Care and Definitions.

(a) The department shall only provide medical services for inmates, which are based on medical necessity and supported by outcome data as effective medical care. In the absence of available outcome data for a specific case, treatment will be based on the judgment of the physician that the treatment is considered effective for the purpose intended and is supported by diagnostic information and consultations with appropriate specialists. Treatments for conditions, which might otherwise be excluded, may be allowed pursuant to section 3350.1(d).

(b) For the purposes of this article, the following definitions apply:

(1) Medically Necessary means health care services that are determined by the attending physician to be reasonable and necessary to protect life, prevent significant illness or disability, or alleviate severe pain, and are supported by health outcome data as being effective medical care.

(2) Outcome Study means the definition, collection and analysis of comparable data, based on variations in treatment, concerning patient health assessment for purposes of improving outcomes and identifying cost-effective alternatives.

(3) Outcome Data mean statistics such as diagnoses, procedures, discharge status, length of hospital stay, morbidity and mortality of patients, that are collected and evaluated using science-based methodologies and expert clinical judgment for purposes of outcome studies.

(4) Severe pain means a degree of discomfort that significantly disables the patient from reasonable independent function.

(5) Significant illness and disability means any medical condition that causes or may cause if left untreated a severe limitation of function or ability to perform the daily activities of life or that may cause premature death.

NOTE: Authority cited: section 5058, Penal Code. Reference: section 5054, Penal Code.

HISTORY:

1. Repealer of Article 8 (Sections 3370–3372) and new Article 8 (Sections 3350–3359) filed 4-18-80; effective thirtieth day thereafter (Register 80, No. 16). For prior history see Register 77, No. 9.
2. Amendment of article heading, section heading and text filed 7-2-93; operative 8-2-93 (Register 93, No. 27).
3. Amendment of section heading, relocation of Subsections 3350(a)–(c) to 3350.2(a)–(c), and new Subsections (a)–(b)(3) filed 2-17-95 as an emergency; operative 3-1-95 (Register 95, No. 9). This regulatory action was deemed an emergency pursuant to section 5058(e) of the Penal Code and remains in effect for 160 days. A Certificate of Compliance must be transmitted to OAL by 8-8-95 or emergency language will be repealed by operation of law on the following day.
4. Amendment refiled 8-7-95 as an emergency; operative 8-7-95 (Register 95, No. 32). This regulatory action was deemed an emergency pursuant to section 5058(e) of the Penal Code and remains in effect for 160 days. A Certificate of Compliance must be transmitted to OAL by 1-16-96 or emergency language will be repealed by operation of law on the following day.
5. Reinstatement of section as it existed prior to emergency amendment filed 2-17-95 by operation of Government Code section 11346.1(f) (Register 96, No. 8).
6. Amendment of section heading, renumbering of subsections 3350(a)–(c) to 3350.2(a)–(c), and new subsections (a)–(b)(3) filed 2-21-96 as an emergency; operative 2-21-96 (Register 96, No. 8). A Certificate of Compliance must be transmitted to OAL by 6-20-96 or emergency language will be repealed by operation of law on the following day.
7. Certificate of Compliance as to 2-21-96 order including amendment of subsection (a) and new subsections (b)(4) and (b)(5) transmitted to OAL 6-18-96 and filed 7-9-96 (Register 96, No. 28).

### 3350.1. Medical Treatment/Service Exclusions.

(a) Treatment refers to attempted curative treatment and does not preclude palliative therapies to alleviate serious debilitating conditions such as pain management and nutritional support. Treatment shall not be provided for the following conditions:

(1) Conditions that improve on their own without treatment. Examples include, but are not limited to:

(A) Common cold.
(B) Mononucleosis.
(C) Viral hepatitis A.
(D) Viral pharyngitis.
(E) Mild sprains.

(2) Conditions that are not readily amenable to treatment, including, but not limited to, those which may be made worse by treatment with conventional medication or surgery, and those that are so advanced in the disease process that the outcome would not change with existing conventional or heroic treatment regimens. Examples include, but are not limited to:

(A) Multiple organ transplants.
(B) Temporomandibular joint dysfunction.
(C) Grossly metastatic cancer.

(3) Conditions that are cosmetic. Examples include, but are not limited to:

(A) Removal of tattoos.
(B) Removal of nontoxic goiter.
(C) Breast reduction or enlargement.
(D) Penile implants.

(b) Surgery not medically necessary shall not be provided. Examples include, but are not limited to:

(1) Castration.
(2) Vaginoplasty (except for Cystocele or Rectocele).
(3) Vasectomy.
(4) Tubal ligation.

(c) Services that have no established outcome on morbidity or improved mortality for acute health conditions shall not be provided. Examples include, but are not limited to:

(1) Acupuncture.
(2) Orthoptics.
(3) Pleoptics.

(d) Treatment for those conditions that are excluded within these regulations may be provided in cases where all of the following criteria are met:

(1) The inmate's attending physician prescribes the treatment.

(2) The service is approved by the medical authorization review committee and the health care review committee. The decision of the review committees to approve an otherwise excluded service shall be based on:

(A) Available health care outcome data supporting the effectiveness of the services as medical treatment.

(B) Other factors, such as:

1. Coexisting medical problems.
2. Acuity.
3. Length of the inmate's sentence.
4. Availability of the service.
5. Cost.

NOTE: Authority cited: section 5058, Penal Code. Reference: section 5054, Penal Code.

HISTORY:

1. New section, including relocation and amendment of old subsection 3354.1(a) to 3350.1(b), filed 2-17-95 as an emergency; operative 3-1-95 (Register 95, No. 9). This regulatory action was deemed an emergency pursuant to section 5058(e) of the Penal Code and remains in effect for 160 days. A Certificate of Compliance must be transmitted to OAL by 8-8-95 or emergency language will be repealed by operation of law on the following day.

2. New section refiled 8-7-95 as an emergency; operative 8-7-95 (Register 95, No. 32). This regulatory action was deemed an emergency pursuant to section 5058(e) of the Penal Code and remains in effect for 160 days. A Certificate of Compliance must be transmitted to OAL by 1-16-96 or emergency language will be repealed by operation of law on the following day.
3. Reinstatement of section as it existed prior to emergency amendment filed 2-17-95 by operation of Government Code section 11346.1(f) (Register 96, No. 8).
4. New section, including renumbering and amendment of former subsection 3354.1(a) to 3350.1(b), filed 2-21-96 as an emergency; operative 2-21-96 (Register 96, No. 8). A Certificate of Compliance must be transmitted to OAL by 6-20-96 or emergency language will be repealed by operation of law on the following day.
5. Certificate of Compliance as to 2-21-96 order including amendment of subsection (a), repealer of subsection (d)(2) and subsection renumbering, amendment of newly designated subsection (d)(2), repealer of newly designated subsection (d)(2)(A) and subsection relettering, and amendment of newly designated subsection (d)(2)(A) transmitted to OAL 6-18-96 and filed 7-9-96 (Register 96, No. 28).

**3350.2. Off-Site Health Care Treatment.**

(a) Each facility shall maintain contractual arrangements with local off-site agencies for those health services deemed to be medically necessary as defined in section 3350(b)(1), and that are not provided within the facility. Such services may include medical, surgical, laboratory, radiological, dental, and other specialized services likely to be required for an inmate's health care.

(b) When necessary services are not available for an inmate within a facility, the facility's chief medical or dental officer may request the institution head's approval to temporarily place that inmate in a community medical facility for such services.

(c) In an extreme emergency when a physician is not on duty or immediately available, the senior custodial officer on duty may, with assistance of on-duty health care staff, place an inmate in a community medical facility. Such emergency action shall be reported to the facility's administrative and medical officers-of-the-day as soon as possible.

NOTE: Authority cited: section 5058, Penal Code. Reference: section 5054, Penal Code.

HISTORY:
1. New section, including relocation and amendment of old subsections 3350(a)–(c) to 3350.2(a)–(c), filed 2-17-95 as an emergency; operative 3-1-95 (Register 95, No. 9). This regulatory action was deemed an emergency pursuant to section 5058(e) of the Penal Code and remains in effect for 160 days. A Certificate of Compliance must be transmitted to OAL by 8-8-95 or emergency language will be repealed by operation of law on the following day.
2. New section refiled 8-7-95 as an emergency; operative 8-7-95 (Register 95, No. 32). This regulatory action was deemed an emergency pursuant to section 5058(e) of the Penal Code and remains in effect for 160 days. A Certificate of Compliance must be transmitted to OAL by 1-16-96 or emergency language will be repealed by operation of law on the following day.
3. Reinstatement of section as it existed prior to emergency amendment filed 2-17-95 by operation of Government Code section 11346.1(f) (Register 96, No. 8).
4. New section, including renumbering and amendment of former subsection 3350(a)–(c) to 3350.2(a)–(c), filed 2-21-96 as an emergency; operative 2-21-96 (Register 96, No. 8). A Certificate of Compliance must be transmitted to OAL by 6-20-96 or emergency language will be repealed by operation of law on the following day.
5. Certificate of Compliance as to 2-21-96 order transmitted to OAL 6-18-96 and filed 7-9-96 (Register 96, No. 28).

**3351. Inmate Refusal of Treatment.**

(a) Health care treatment, including medication, shall not be forced over the objections of: a mentally competent inmate; the guardian of a mentally incompetent inmate; or a responsible relative of a minor inmate, except in an emergency, or as required to complete the examination or tests for tuberculosis infection, or to implement the treatment for tuberculosis disease, or unless the provisions of Probate Code Sections 3200 et seq. or the procedures set forth in *Keyhea* v. *Rushen*, Solano County Superior Court No. 67432, Order Granting Plaintiffs' Motion for Clarification and Modification of Injunction and Permanent Injunction, filed October 31, 1986, hereby incorporated by reference, are followed. An emergency exists when there is a sudden, marked change in an inmate's condition so that action is immediately necessary for the preservation of life or the prevention of serious bodily harm to the inmate or others, and it is impracticable to first obtain consent. When an inmate has executed an advance directive, pursuant to Probate Code Sections 4600–4779 relating to the Durable Power of Attorney for Health Care, and Health and Safety Code Sections 7185–7194.5 relating to the Natural Death Act, health care staff shall act in accordance with the provisions of that advance directive, as provided by law.

(b) An inmate may accept or decline any or all portions of a recommended dental treatment plan. The inmate's decision is reversible at any time and shall not prejudice future treatments. Refusals shall be documented for inclusion in the inmate's health record.

NOTE: Authority cited: section 5058, Penal Code. Reference: Sections 2600, 5054, and 7570 et seq., Penal Code; Sections 3200 et seq., Probate Code; *Thor* v. *Superior Court* (Andrews) (1993) 21 Cal.Rptr.2d 357; *Keyhea* v. *Rushen*, Solano County Superior Court No. 67432, Order Granting Plantiffs' Motion for Clarification and Modification of Injunction and Permanent Injunction, filed October 31, 1986; sections 4600–4779, Probate Code; and sections 7185–7194.5, Health and Safety Code.

HISTORY:
1. Amendment of section heading and text filed 7-2-93; operative 8-2-93 (Register 93, No. 27).
2. Amendment of section and Note filed 1-3-95 as an emergency; operative 1-3-95 (Register 95, No. 1). A Certificate of Compliance must be transmitted to OAL 6-12-95 or emergency language will be repealed by operation of law on the following day.
3. Amendment of section and Note filed 2-17-95 as an emergency; operative 3-1-95 (Register 95, No. 9). This regulatory action was deemed an emergency pursuant to section 5058(e) of the Penal Code and remains in effect for 160 days. A Certificate of Compliance must be transmitted to OAL by 8-8-95 or emergency language will be repealed by operation of law on the following day.
4. Certificate of Compliance as to 1-3-95 order including amendment of subsection (a) and Note transmitted to OAL 6-12-95 and filed 7-25-95 (Register 95, No. 30).
5. Amendment of section and Note refiled 8-7-95 as an emergency; operative 8-7-95 (Register 95, No. 32). This regulatory action was deemed an emergency pursuant to section 5058(e) of the Penal Code and remains in effect for 160 days. A Certificate of Compliance must be transmitted to OAL by 1-16-96 or emergency language will be repealed by operation of law on the following day.
6. Reinstatement of section as it existed prior to emergency amendment filed 2-17-95 by operation of Government Code section 11346.1(f) (Register 96, No. 8).
7. Amendment of section and Note filed 2-21-96 as an emergency; operative 2-21-96 (Register 96, No. 8). A Certificate of Compliance must be transmitted to OAL by 6-20-96 or emergency language will be repealed by operation of law on the following day.
8. Certificate of Compliance as to 2-21-96 order transmitted to OAL 6-18-96 and filed 7-9-96 (Register 96, No. 28).

**3352. Medical Authorization Review Committee.**

(a) A medical authorization review (MAR) committee shall be established within each correctional treatment center's (CTC) service area. The committee shall meet as often as necessary to approve or disapprove requests for medical services otherwise excluded by these regulations.

(b) The committee shall:

1. Be composed of representatives from the health care staff of each institution within the CTC's service area.

2. Consist of not less than three service area staff physicians.

(c) Committee decisions shall be based on criteria established in section 3350.1(d). Committee decisions shall be documented in the inmate's health record. Those cases that receive committee approval, shall be forwarded along with all supporting documentation to the health care review (HCR) committee. The treating physician shall notify the inmate of the committee's decision.,

NOTE: Authority cited: section 5058, Penal Code. Reference: section 5054, Penal Code.

HISTORY:

1. Amendment of section heading and text filed 7-2-93; operative 8-2-93 (Register 93, No. 27).
2. Amendment filed 1-3-95 as an emergency; operative 1-3-95 (Register 95, No. 1). A Certificate of Compliance must be transmitted to OAL 6-12-95 or emergency language will be repealed by operation of law on the following day.
3. Amendment filed 2-17-95 as an emergency; operative 3-1-95 (Register 95, No. 9). This regulatory action was deemed an emergency pursuant to section 5058(e) of the Penal Code and remains in effect for 160 days. A Certificate of Compliance must be transmitted to OAL by 8-8-95 or emergency language will be repealed by operation of law on the following day.
4. Amendment refiled 8-7-95 as an emergency; operative 8-7-95 (Register 95, No. 32). This regulatory action was deemed an emergency pursuant to section 5058(e) of the Penal Code and remains in effect for 160 days. A Certificate of Compliance must be transmitted to OAL by 1-16-96 or emergency language will be repealed by operation of law on the following day.
5. Reinstatement of section as it existed prior to emergency amendment filed 2-17-95 by operation of Government Code section 11346.1(f) (Register 96, No. 8).
6. Amendment filed 2-21-96 as an emergency; operative 2-21-96 (Register 96, No. 8). A Certificate of Compliance must be transmitted to OAL by 6-20-96 or emergency language will be repealed by operation of law on the following day.
7. Renumbering of former section 3352 to new section 3353 filed 7-9-96; operative 7-9-96 (Register 96, No. 28).
8. New section filed 7-9-96; operative 7-9-96 (Register 96, No. 28).

### 3352.1. Health Care Review Committee.

(a) The health care review (HCR) committee shall meet as often as necessary to review cases approved by the MAR committee for services otherwise excluded by these criteria in section 3350.1(d).

(b) The HCR Committee shall consist of, but not be limited to, the following:

1. Assistant Deputy Director, Operations Health Care Services Division (HCSD).

2. Chief Medical Officer, Health Policy, HCSD.

3. Assistant Deputy Director, Program Development, HCSD.

4. Two selected specialist physicians.

5. Nonvoting utilization management nurse, as necessary.

(c) Decisions to approve or deny an excluded service requires at least one Assistant Deputy Director, HCSD, or designee be in attendance. All decisions shall be documented in the inmate's health record. The treating physician shall notify the inmate of the committee's decision.

NOTE: Authority cited: section 5058, Penal Code. Reference: section 5054, Penal Code.

HISTORY:

1. New section filed 7-9-96; operative 7-9-96 (Register 96, No. 28).

### 3353. Informed Consent Requirement.

When unusual, serious or major health care procedures are indicated and time and circumstances permit, the inmate's specific written informed consent shall be obtained before treatment is undertaken, except as otherwise provided in Sections 3351 and 3364. If the inmate or the inmate's guardian or responsible relative objects to the recommended treatment, such objection shall be documented for inclusion in the inmate's health record.

NOTE: Authority cited: section 5058, Penal Code. Reference: section 5054, Penal Code.

HISTORY:

1. Amendment of section heading and text filed 7-2-93; operative 8-2-93 (Register 93, No. 27).
2. Amendment filed 2-17-95 as an emergency; operative 3-1-95 (Register 95, No. 9). This regulatory action was deemed an emergency pursuant to section 5058(e) of the Penal Code and remains in effect for 160 days. A Certificate of Compliance must be transmitted to OAL by 8-8-95 or emergency language will be repealed by operation of law on the following day.
3. Amendment refiled 8-7-95 as an emergency; operative 8-7-95 (Register 95, No. 32). This regulatory action was deemed an emergency pursuant to section 5058(e) of the Penal Code and remains in effect for 160 days. A Certificate of Compliance must be transmitted to OAL by 1-16-96 or emergency language will be repealed by operation of law on the following day.
4. Reinstatement of section as it existed prior to emergency amendment filed 2-17-95 by operation of Government Code section 11346.1(f) (Register 96, No. 8).
5. Amendment filed 2-21-96 as an emergency; operative 2-21-96 (Register 96, No. 8). A Certificate of Compliance must be transmitted to OAL by 6-20-96 or emergency language will be repealed by operation of law on the following day.
6. Certificate of Compliance as to 2-21-96 order including renumbering of former section 3352 to section 3353 and renumbering of former section 3353 to new section 3353.1 transmitted to OAL 6-18-96 and filed 7-9-96 (Register 96, No. 28).

### 3353.1. Capacity for Informed Consent.

An inmate shall be considered capable of giving informed consent if in the opinion of health care staff the inmate is:

(a) Aware that there is a physiological disorder for which treatment or medication is recommended.

(b) Able to understand the nature, purpose and alternatives of the recommended treatment, medication, or health care procedures.

(c) Able to understand and reasonably discuss the possible side effects and any hazards associated with the recommended treatment, medication, or health care procedures. An inmate shall not be deemed incapable of informed consent solely because of being diagnosed as mentally disordered, abnormal, or mentally defective.

NOTE: Authority cited: section 5058, Penal Code. Reference: section 5054, Penal Code.

HISTORY:

1. Amendment of section heading and text filed 7-2-93; operative 8-2-93 (Register 93, No. 27).
2. Amendment filed 2-17-95 as an emergency; operative 3-1-95 (Register 95, No. 9). This regulatory action was deemed an emergency pursuant to section 5058(e) of the Penal Code and remains in effect for 160 days. A Certificate of Compliance must be transmitted to OAL by 8-8-95 or emergency language will be repealed by operation of law on the following day.
3. Certificate of Compliance as to 2-21-96 order including renumbering of former section 3353 to new section 3353.1 transmitted to OAL 6-18-96 and filed 7-9-96 (Register 96, No. 28).

### 3354. Health Care Responsibilities and Limitations.

(a) Authorized Staff. Only facility-employed health care staff, contractors paid to perform health services for the facility, or persons employed as health care consultants shall be permitted, within the scope of their licensure, to diagnose illness or, prescribe medication and health care treatment for inmates. No other personnel or inmates may do so.

(b) Inmate Workers. Only trained or certified inmates shall operate health care equipment. Inmates shall not be permitted to:

(1) Schedule appointments.

(2) Determine another inmate's access to health care services.

(3) Obtain blood samples.

(4) Administer blood.

(5) Introduce or discontinue intravenous infusions.

(6) Have access to surgical instruments, syringes, needles, medications, or health records except as otherwise specified in these regulations.

(7) Perform any task identified as a health care responsibility.

(c) Private Consultants. Health care personnel not employed by the department are not authorized to order treatment for an inmate. Such persons may offer opinions and recommendations for consideration by department health care staff as follows: An inmate or an inmate's responsible guardian or relative, or an attorney or other interested person wanting the inmate examined by a private physician, shall submit a written request to the institution head. The institution head shall, after consulting with the facility's chief medical officer grant the request unless convinced that specific case factors warrant denial. The fact of and reasons for such denial, and notice of the right to appeal the decision in writing to the director, shall be documented and given to the inmate or the person requesting the outside health care service. Costs of such private consultations or examinations shall be paid by the inmate or the person requesting the service.

(d) Emergency Health Care Attention. If an inmate is away from a facility for authorized reasons, such as assignment to a camp or transportation between institutions, becomes seriously ill or injured, emergency health-care attention by available resources shall be obtained by the official in charge. Community physicians and hospitals shall be used if the inmate's condition does not permit prompt return to a department medical facility.

(e) Medical Sick Call. Each department facility confining inmates shall schedule times and locations for providing routine medical attention to general population inmates. A medical doctor, registered nurse, or medical technical assistant shall make daily visits to each nongeneral population housing unit to provide medical attention to inmates unable to use the sick call services provided for general population inmates. Staff conducting sick call shall screen medical problems appearing to require further medical attention and shall evaluate requests for appointments with other medical staff. A facility physician shall personally visit each specialized housing unit at least once each week.

(f) Dental Sick Call. Routine dental treatment shall not be provided during sick call. Inmates requesting dental treatment shall be evaluated and scheduled into one of the following categories:

(1) Urgent or emergency care category. Inmates in considerable pain or with an acute illness requiring immediate dental service. Such inmates shall be provided treatment as soon as possible.

(2) Immediate care category. Inmates whose dental condition prevents them from carrying out a daily work assignment. Such inmates shall be treated within 48 hours by a dentist during normal clinic hours.

(3) Routine care category. Inmates whose dental condition does not require immediate treatment by a dentist. Such inmates shall be scheduled in chronological order, and, when practical, appointments shall be scheduled to avoid interference with the inmate's work training incentive program hours.

NOTE: Authority cited: section 5058, Penal Code. Reference: section 5054, Penal Code.

HISTORY:

1. Amendment of section heading and text filed 7-2-93; operative 8-2-93 (Register 93, No. 27).
2. Amendment of subsections (a), (b)(6)–(7), (c) and (d) filed 2-17-95 as an emergency; operative 3-1-95 (Register 95, No. 9). This regulatory action was deemed an emergency pursuant to section 5058(e) of the Penal Code and remains in effect for 160 days. A Certificate of Compliance must be transmitted to OAL by 8-8-95 or emergency language will be repealed by operation of law on the following day.
3. Amendment of subsections (a), (b)(6)–(7), (c) and (d) refiled 8-7-95 as an emergency; operative 8-7-95 (Register 95, No. 32). This regulatory action was deemed an emergency pursuant to section 5058(e) of the Penal Code and remains in effect for 160 days. A Certificate of Compliance must be transmitted to OAL by 1-16-96 or emergency language will be repealed by operation of law on the following day.
4. Reinstatement of section as it existed prior to emergency amendment filed 2-17-95 by operation of Government Code section 11346.1(f) (Register 96, No. 8).
5. Amendment of section heading and subsections (a), (b)(6)–(7), (c) and (d) filed 2-21-96 as an emergency; operative 2-21-96 (Register 96, No. 8). A Certificate of Compliance must be transmitted to OAL by 6-20-96 or emergency language will be repealed by operation of law on the following day.
6. Certificate of Compliance as to 2-21-96 order transmitted to OAL 6-18-96 and filed 7-9-96 (Register 96, No. 28).

### 3354.1. Elective Surgery.

Repealed.

NOTE: Authority cited: section 5058, Penal Code. Reference: section 5054, Penal Code.

HISTORY:

1. New section filed 7-2-93; operative 8-2-93 (Register 93, No. 27).
2. Repealer, including relocation of subsection 3354.1(a) to 3350.1(b), filed 2-17-95 as an emergency; operative 3-1-95 (Register 95, No. 9). This regulatory action was deemed an emergency pursuant to section 5058(e) of the Penal Code and remains in effect for 160 days. A Certificate of Compliance must be transmitted to OAL by 8-8-95 or emergency language will be repealed by operation of law on the following day.
3. Repealer refiled 8-7-95 as an emergency; operative 8-7-95 (Register 95, No. 32). This regulatory action was deemed an emergency pursuant to section 5058(e) of the Penal Code and remains in effect for 160 days. A Certificate of Compliance must be transmitted to OAL by 1-16-96 or emergency language will be repealed by operation of law on the following day.
4. Reinstatement of section as it existed prior to emergency amendment filed 2-17-95 by operation of Government Code section 11346.1(f) (Register 96, No. 8).
5. Repealer, including renumbering and amendment of subsections 3354.1(a) to 3350.1(b), filed 2-21-96 as an emergency; operative 2-21-96 (Register 96, No. 8). A Certificate of Compliance must be transmitted to OAL by 6-20-96 or emergency language will be repealed by operation of law on the following day.
6. Certificate of Compliance as to 2-21-96 order transmitted to OAL 6-18-96 and filed 7-9-96 (Register 96, No. 28).

### 3354.2. Inmate Copayment for Health Care Services.

(a) The terms below are defined for the purposes of this section:

(1) Inmate-initiated means that the inmate sought health care service through Department staff, or reported to health care staff for consultation and/or treatment without having first been contacted or scheduled by health care staff.

(2) Health care services means medical, mental health, dental, pharmaceutical, diagnostic and ancillary services to identify, diagnose, evaluate, and treat a medical, psychiatric, or dental condition.

(3) Health care staff means those persons licensed by the state to provide health care services, who are either employed by the Department or are under contract with the Department to provide health care services.

(b) Inmates shall be provided an opportunity to report an illness or any other health problem and receive an evaluation of the condition and medically necessary treatment and follow-up by health care staff.

(c) Inmates shall be charged and inmates shall pay a fee of five dollars ($5.00) for each inmate-initiated health care visit. The fee for this visit shall:

(1) Cover the evaluation, assessment, and medically necessary treatment, including follow-up services that relate to the initial condition and which are determined by health care staff to be necessary.

(2) Be charged to the trust account of the inmate. When the inmate is without sufficient funds at the time of the charge, and remains without sufficient funds for 30 days after this time, the inmate shall not be charged for any remaining balance of the fee.

(3) Be waived for the following:

(A) Emergencies: any medical or dental condition for which evaluation and therapy, as determined by health care staff, are immediately necessary to prevent death, severe or permanent disability, or to alleviate or lessen objectively apparent and disabling pain. Signs of objectively apparent and disabling pain may include, but are not limited to, visible injuries, high blood pressure, rapid heart rate, sweating, pallor, involuntary muscle spasms, nausea and vomiting, high fever, and facial swelling. Emergency also includes, as determined by health care staff, necessary crisis intervention for inmates suffering from situational crises or acute episodes of mental illness.

(B) Diagnosis and treatment of communicable disease conditions as outlined in Title 17, Chapter 4, Subchapter 1, section 2500 of the California Code of Regulations, including human immunodeficiency virus and Acquired Immunodeficiency Syndrome.

(C) Diagnosis and necessary mental health treatment for which there is a clinical determination of mental illness.

(D) Follow-up health care services defined as any request or recommendation by a member of the health care staff to provide subsequent health care services.

(E) Health care services necessary to comply with state law and/or regulations that shall include, but not be limited to, annual testing for tuberculosis.

(F) Reception center health screening and evaluation.

(G) Inpatient services, extended care, or skilled nursing services.

NOTE: Authority cited: section 5007.5 and 5058, Penal Code. Reference: section 5054, Penal Code.

HISTORY:

1. New section filed 9-21-94 as an emergency; operative 9-21-94 (Register 94, No. 38). A Certificate of Compliance must be transmitted to OAL by 1-19-95 or emergency language will be repealed by operation of law on the following day.
2. Certificate of Compliance as to 9-21-94 order transmitted to OAL 1-18-95 and filed 2-27-95 (Register 95, No. 9).

### 3355. Health Care Examinations.

(a) Initial Examination. Every person newly committed or returned to the custody of the Director of Corrections shall be examined by medical staff for contagious diseases, illness, or other health problems within 24 hours of arrival.

(b) Transfers. Inmates received on transfer from other facilities shall be interviewed by health care staff at the receiving facility within 24 hours of arrival. The health record of each new arrival shall be reviewed to determine the need for previously prescribed medications or continuing treatment for unusual or chronic health problems. Sending facility health care staff shall notify the receiving facility and any anticipated layover facilities regarding any inmate's need, as in the case of diabetics, for maintenance medications while en route and after arrival.

(c) Camp Assignment. Inmates shall be personally screened by a medical officer before receiving medical clearance for assignment to a camp or firefighting assignment. Such inmate shall be in generally good health and physically capable of strenuous and prolonged heavy labor without danger to the inmate's health and safety or the safety of others when involved in hazardous work such as forest firefighting. Exceptions: An inmate may be assigned to light duty, nonhazardous work in a camp if a department physician specifically approves such assignment.

(d) Releases. Each inmate shall be personally screened by health care staff prior to release to parole or discharge from a facility. Staff conducting such screening shall alert the inmate's parole agent regarding any current health problems and shall provide the inmate with any necessary maintenance medication until the releasee can obtain medication in the community.

NOTE: Authority cited: section 5058, Penal Code. Reference: section 5054, Penal Code.

HISTORY:

1. Amendment filed 7-2-93; operative 8-2-93 (Register 93, No. 27).
2. Amendment of section heading and subsections (b) and (d) filed 2-17-95 as an emergency; operative 3-1-95 (Register 95, No. 9). This regulatory action was deemed an emergency pursuant to section 5058(e) of the Penal Code and remains in effect for 160 days. A Certificate of Compliance must be transmitted to OAL by 8-8-95 or emergency language will be repealed by operation of law on the following day.
3. Amendment of section heading and subsections (b) and (d) refiled 8-7-95 as an emergency; operative 8-7-95 (Register 95, No. 32). This regulatory action was deemed an emergency pursuant to section 5058(e) of the Penal Code and remains in effect for 160 days. A Certificate of Compliance must be transmitted to OAL by 1-16-96 or emergency language will be repealed by operation of law on the following day.
4. Reinstatement of section as it existed prior to emergency amendment filed 2-17-95 by operation of Government Code section 11346.1(f) (Register 96, No. 8).
5. Amendment of section heading and subsections (b) and (d) filed 2-21-96 as an emergency; operative 2-21-96 (Register 96, No. 8). A Certificate of Compliance must be transmitted to OAL by 6-20-96 or emergency language will be repealed by operation of law on the following day.
6. Certificate of Compliance as to 2-21-96 order including amendment of subsection (b) transmitted to OAL 6-18-96 and filed 7-9-96 (Register 96, No. 28).

### 3355.1. Dental Examinations.

(a) Reception Centers. Inmates shall, during screening at a reception center, be provided only limited dental services necessary to meet basic needs. Such services shall include but are not limited to treatment of injuries, acute infection, severe pain, or spontaneous bleeding, and repairs to dental prosthetic appliances.

(b) Assigned Facility. Each newly committed inmate shall within 14 days following transfer from a reception center to a program facility receive a complete examination by a dentist who shall develop an individual treatment plan for the inmate.

(1) When a treatment plan is proposed, the inmate shall be provided an explanation of its advantages and disadvantages.

(2) Each inmate's dental health history shall be documented at the time of initial examination and signed by the inmate and witnessed by a dental staff member. Such history shall be available and updated at each dental visit.

(3) An inmate unwilling to practice personal oral hygiene shall receive only that care necessary to relieve pain or treat infection. Routine treatment of nonacute oral conditions resulting from the inmate's neglect shall not be undertaken.

(c) Reexamination. Each inmate under 50 years of age shall be examined at least once every two years. All other inmates shall be examined annually.

(d) Restraints. If an inmate requiring dental treatment also requires use of restraint gear, such restraints shall be selected to enable sitting in a dental chair and shall remain in place during the treatment. Exceptions require concurrence of the dentist, the escorting officer, and a lieutenant.

NOTE: Authority cited: section 5058, Penal Code. Reference: section 5054, Penal Code.



85

# CHAPTER 9 — HEALTH CARE SERVICES

## ARTICLE 1 — NURSING SERVICES PROGRAM

*Effective June 16, 1995*

**93040.1 Policy**

Each facility shall plan for and provide quality nursing care that is commensurate with that provided in community health facilities.

Each facility shall establish an organized nursing services department to ensure the provision of quality nursing care.

**93040.2 Purpose**

The nursing services department shall be an organized system for the provision of individualized patient care based upon established standards of care utilizing the nursing process, i.e., assessment, planning, intervention, and evaluation.

Each facility shall establish written standards of care, that are consistent with the Department's Office of Health Care Services objectives and community care standards. These standards of care shall be utilized in planning, providing, and evaluating nursing care.

**93040.3 Responsibility for Health Care Services**

The CMO or other physician director shall be responsible for all health care services at each facility.

**93040.4 Responsibility of the Director of Nursing Services**

The nursing services department shall be directed by a qualified RN with training and experience in nursing administration and supervision.

- All Department general acute care hospitals shall be under the direction of a Supervising Nurse II/III. The Supervising Nurse II/III shall not serve as charge nurse.
- All Department infirmaries may be directed by either a Supervising Nurse II or an SRN as determined by patient care needs.

The nurse services director shall have authority and responsibility for all nursing services in the facility. The responsibility and accountability of the nursing services to the medical staff and administration shall be defined.

**93040.5 Nursing Services Licensure and Certification**

Each facility shall establish a method for verifying the current licensure of each RN, LVN, and MTA. Only those with current licensure shall be assigned patient care duties in hospitals or infirmaries.

Nurses working in expanded roles, i.e., nurse practitioners and nurse anesthetists, shall maintain current, appropriate certification.

**93040.6 Nursing Services Organization**

Nursing services shall be organized and staffed to ensure the supervision and coordination of nursing care by an RN.

All provisions of nursing care shall be under the supervision of an RN.

A sufficient number of RNs and MTAs shall be on duty at all times to provide nursing care according to patient needs.

**93040.7 Nursing Services Organizational Plan**

An organizational chart shall be developed defining lines of authority and accountability for each level and service of nursing staff.

**93040.8 Nursing Services Procedures**

Each facility shall develop and maintain written policies and procedures for the safe and effective provision of quality nursing care.

Nursing policies and procedures shall be developed in coordination with all departments and established for every patient service area.

Policies shall be approved by the governing body. Procedures shall be approved by the medical staff and administration.

Each nursing service employee shall be trained in the policies and procedures during orientation and whenever new policies or procedures are established.

Nursing policies and procedures shall be reviewed annually and revised as required to reflect current standards of nursing practice.

**93040.8.1 Nursing Services Procedural Guidelines**

Each nursing policy and procedure shall:

- Be established in writing.
- Identify the classification of staff approved to perform the procedure.
- Include a list of required equipment/supplies.
- Indicate any precautions or required special observations.
- Provide an easily understood, detailed, step-by-step procedure.
- State medical record and other documentation requirements.
- Include the dates of approval and revision.

**93040.9 Nursing Scope of Practice**

Each RN shall perform their duties according to the scope of practice as stated in the B&PC 2725, "Practice of Nursing Defined."

Specifically selected and trained RNs may perform beyond the normal scope of practice only by utilizing standardized procedures as defined in B&PC 2725(d)(2). Each standardized procedure shall be developed and supervised by a committee on interdisciplinary practice. Each standardized procedure shall be developed according to the California Board of Registered Nurses, "Standardized Procedure Guidelines."

Each MTA shall perform their duties according to the "Scope of Regulation," B&PC Article 2, 2959.

MTAs may perform patient care activities only under the direction of a physician or an RN.

**93040.10 Nursing Services Staff Development Program**

Each facility shall plan and conduct an ongoing nursing staff development program to ensure appropriate training of all nursing staff.

**93040.10.1 Components of a Nursing Services Staff Development Program**

Each staff development program shall include the following:

- Written attainable educational goals and objectives.
- An annual training plan.
- An orientation program for all newly hired nursing staff which includes orientation to all applicable institutional policies and procedures, to the medical services areas, and to the specific job assignment.
- Continuing IST based upon identified educational needs.
- An annual or more frequent review for all nursing staff of cardio-pulmonary resuscitation and infection control procedures.
- Specific area training for nursing staff required to work in specialized patient care areas, i.e., surgery, emergency, psychiatry, and hemodialysis.
- Training of nursing staff who are required to perform procedures which require additional training, i.e., intravenous fluid administration, cardiac monitoring, standardized procedures.
- An annual evaluation of the nursing education program for compliance with the standards of care and educational goals and objectives.

**93040.10.2 Nursing Services Continuing Education Courses**

Nursing staff shall participate in outside educational programs when required training cannot otherwise be obtained. Records of such training should be retained by the nursing services director or nurse instructor.

Facilities that employ a qualified nurse instructor may obtain approval from the Board of Registered Nurses and Board of Vocational Nurse and Psychiatric Technician Examiners to provide continuing education credit for nursing staff training.

# Exhibit BB

Summary of medical care improvements Required by the Plata court order



[redacted]

Exhibit-BB

# Summary of Medical Care Improvements Required by the Plata Court Order

Reception Center: Improved new arrival screening; physical exam by doctor required within 14 days.

Sick Call: A registered nurse (RN) must review sick call slips every day to determine urgent or emergency problems and must do a face-to-face interview with patients within one working day of receiving the sick call slip. Sick call with the clinic doctor within one day to two weeks, depending on the seriousness of the problem. Priority ducats will be issued for appointments.

Specialty Clinics and Consultations: Specialty appointments must be completed within 14 to 90 days of approval depending on seriousness of problem; prisoners waiting for a specialty appointment must be seen by a doctor every 30 days. Follow-up appointment with clinic doctor within 14 days of appointment.

Urgent / Emergency Response: A RN must be available on-site at all times; a RN or a physician must decide every case of urgent or emergency care, through either a face to face evaluation or a phone call with the inmate-patient.

Infirmary Care: New procedures established for operation of correctional treatment centers and outpatient medical units; follow-up appointment with primary care physician required within three working days of discharge.

Preventive Care: Cancer screening and other preventive services as recommended by the United States Preventive Services Task Force.

Chronic Care: Patients with chronic medical conditions (for example, diabetes or heart disease) must be identified and enrolled in chronic care program in which they are seen by a doctor at least every 90 days (unless the condition is well-controlled) for evaluation and treatment with standardized guidelines.

Diagnostic Services: Routine blood tests required to be drawn within 10 days; routine x-rays to be completed within 30 days (one business day for urgent requests); patient required to be notified of blood test results.

Medication: Formulary prescriptions to be filled immediately if an emergency or urgent, or within 24 hours if routine; adequate pharmacy staffing and space required; medication renewal and refill system required.

Medical Diets: Required for end-stage liver and kidney organ patients; nourishment bags and diet supplements available to others as medically necessary.

(over)

Transfers: Patients must be transferred with medical record and new confidential summary of medical status. Completion of pending specialty or consultation appointments required at new prison within 30 days of original appointment date. Medical chronos remain in effect after transfer.

Quality Monitoring: Each prison required to undertake continuous program to monitor compliance; CDC central office required to regularly monitor each prison's compliance with medical policies and procedures consistent with the implementation schedule below. Special procedures established for review of every death.

Schedule for Improvements:

By January 1, 2003, at all prisons: (1) around-the-clock nursing coverage; (2) transfer protocols to be used; (3) priority ducats for medical appointments; (4) medical diets for kidney or liver end-stage organ failure patients; (5) new treatment protocols if money and staff available.

All other improvements under the following schedule;

2003: Valley State, Corcoran, High Desert, CSP-Sacramento, Salinas Valley, CIW and CCWF
2004: CCI, Mule Creek, San Quentin, SATF, and PVSP
2005: Centinela, CIM, CMC, CMF, and RJD
2006: CRC, DVI, Folsom, CSP-Los Angeles (Lancaster), and CSP-Solano
2007: CCC, Calipatria, Chuckawalla, North Kern, North Kern II
2008: Avenal, CTF, Ironwood, SCC, and Wasco

Exhibit- R

marciano Plata, VS. arnold Schwarzenegger

Case 3:01-cv-01351-TEH Document 780 Filed 07/23/2007 Page 1 of 11

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARCIANO PLATA, et al.,

Plaintiffs,

v.

ARNOLD SCHWARZENEGGER, et al.,

Defendants.

NO. C01-1351 TEH

ORDER GRANTING PLAINTIFFS' MOTION TO CONVENE THREE-JUDGE COURT

This matter came before the Court on Wednesday, June 27, 2007, on Plaintiffs' motion to convene a three-judge court to consider issuing a prisoner release order pursuant to 18 U.S.C. § 3626(a)(3). The motion was heard jointly with a similar motion in *Coleman v. Schwarzenegger*, Case No. Civ. S-90-0520 LKK JFM, a case presided over by the Honorable Lawrence K. Karlton in the United States District Court for the Eastern District of California. After carefully considering all of the written and oral arguments presented to the Court in this case, including those contained in the parties' initial briefs filed in November and December 2006 and presented at the January 8, 2007 hearing, the Court now GRANTS Plaintiffs' motion for the reasons discussed below.

**LEGAL STANDARD**

The Prison Litigation Reform Act ("PLRA") provides that:

> no court shall enter a prisoner release order unless –
>
> (i) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the

215.

> Federal right sought to be remedied through the prisoner release order; and
>
> (ii) the defendant has had a reasonable amount of time to comply with the previous court orders.

18 U.S.C. § 3626(a)(3)(A). The term "prisoner release order" does not necessarily mean an order requiring the release of inmates; instead, the PLRA broadly defines the term as including "any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison." 18 U.S.C. § 3626(g)(4).

"A party seeking a prisoner release order in Federal court shall file with any request for such relief, a request for a three-judge court and materials sufficient to demonstrate that the requirements of subparagraph (A) have been met." 18 U.S.C. § 3626(a)(3)(C). A judge may also sua sponte request that a three-judge court be convened, provided that the requirements of subparagraph (A) have been met and the court "believes that a prison release order should be considered." 18 U.S.C. § 3626(a)(3)(D).

The PLRA provides that a three-judge court may only enter a prisoner release order "if the court finds by clear and convincing evidence that – (i) crowding is the primary cause of the violation of a Federal right; and (ii) no other relief will remedy the violation of the Federal right." 18 U.S.C. § 3626(a)(3)(E). However, the statute does not require a district court deciding whether to convene a three-judge court to consider the likelihood that these criteria for entering a prisoner release order will ultimately be satisfied, and neither the parties' papers nor this Court's independent research revealed any authority for the proposition that such criteria must be considered at this stage of the proceedings. Thus, the Court's analysis in deciding Plaintiffs' motion necessarily focuses on the requirements of 18 U.S.C. § 3626(a)(3)(A). For purposes of deciding this motion, the Court therefore does not consider, for example, whether overcrowding is the primary cause of the unconstitutional nature of the delivery of medical health care in prisons, nor does the Court consider at this time the type of relief that a three-judge court might impose if it finds that a prisoner release order is warranted.

United States District Court
For the Northern District of California

**PROCEDURAL HISTORY**[1]

Plaintiffs filed their motion on November 13, 2006, and the Court heard argument on January 8, 2007. Following the hearing, the parties submitted supplemental briefs at the Court's request, and the Court issued an order on Plaintiffs' motion on February 15, 2007. In that order, the Court set Plaintiffs' motion for a further hearing on June 11, 2007, and also directed the Receiver to report to the Court his assessment of how "overcrowding is interfering with his ability to successfully remedy the constitutional violations at issue." Feb. 15, 2007 Order at 4-5. The Court also directed the State to file a report with the Court discussing: (1) specific, concrete measures the State "has taken, is taking, or is planning to take" to reduce the number of inmates confined in state prisons over the next two years; (2) an estimate of when the Governor anticipated rescinding his October 2006 emergency proclamation regarding prison overcrowding; and (3) the current total population of inmates confined by the California Department of Corrections and Rehabilitation ("CDCR"). *Id.* The Receiver and the State timely filed their reports on May 15 and 16, 2007, respectively, and the parties submitted timely responses to those reports on May 29, 2007.[2]

On June 6, 2007, this Court vacated the June 11 hearing and scheduled Plaintiffs' motion for a joint hearing with a similar motion in *Coleman* on June 27, 2007, to be held at the United States District Court in Sacramento. The Court also granted the Receiver's June 4 request to file a supplemental report on overcrowding, which the Receiver filed on June 11, 2007. The parties were given leave to respond to the Receiver's supplemental report by June 18, 2007. Defendants filed a timely response, but Plaintiffs chose not to file a response.

---

[1]The factual background and procedural history of this case have been well-documented elsewhere. *See, e.g.*, Oct. 3, 2005 Findings of Fact & Conclusions of Law Re: Appointment of Receiver. The Court focuses its attention in this order on the procedural history of Plaintiffs' motion to convene a three-judge court.

[2]In his May 15 report, the Receiver also recommended three remedial courses of action. Those recommendations are not discussed in this order because the Court agrees with the Receiver that the "recommendations . . . should be addressed independently of plaintiff's [sic] request for a population cap." Receiver's Request for Permission to File Mot. to Implement Recommendations in Overcrowding Report at 3. The Receiver's request to file a motion to implement his three recommendations remains pending, and the Court will issue a separate order addressing that request at a later time.

United States District Court
For the Northern District of California

Subsequent to the motion hearing, the CDCR Expert Panel on Adult Offender Reentry and Recidivism Reduction Programs published their "Report to the California State Legislature: A Roadmap for Effective Offender Programming in California," which Defendants submitted via a request for judicial notice on July 2, 2007. The following day, this Court ordered the parties to file supplemental briefs explaining "how, if at all, the courts should consider the expert panel's report in resolving the pending motions to convene a three-judge court." July 3, 2007 Order Requesting Add'l Briefing on Pls.' Mot. to Convene Three-Judge Court at 2. Defendants and Plaintiffs filed timely supplemental briefs on July 11 and 17, 2007, respectively.

The Court also received an amicus brief from Californians United for a Responsible Budget ("CURB") on June 13, 2007, and a supplemental amicus brief from the California Correctional Peace Officers Association ("CCPOA") on June 18, 2007. Although neither of these organizations sought leave to file amicus briefs, the Court nonetheless reviewed their arguments, including the oral arguments presented by the CCPOA, in considering Plaintiffs' motion.[3] The Court finds, however, that both amici raise arguments that concern whether a three-judge court should ultimately enter a prisoner release order and not whether this Court should request that a three-judge court be convened. Consequently, the amici's arguments are more appropriately addressed to any three-judge court that is convened, rather than to this Court at this time. CCPOA, in fact, candidly states in its supplemental amicus brief that it "does not purport to speak to constitutional violations or the question of whether a prisoner release order would remedy constitutional violations or even what such an order would look like," CCPOA Suppl. Amicus Br. at 5, and its arguments thus may not even be relevant to a three-judge court considering whether a prisoner release order should be entered.

[3]The Court granted CCPOA leave to file an amicus brief on Plaintiffs' motion on December 5, 2006, and CCPOA filed an amicus brief on December 11, 2006. CCPOA failed to seek leave from the Court to file a supplemental amicus brief and instead simply filed its supplemental brief with the Court. Similarly, although CURB included a request for leave in its amicus brief, it filed its brief without waiting for the Court to grant that request for leave.

Case 3:01-cv-01351-TEH Document 730 Filed 07/23/2007 Page 5 of 11

**DISCUSSION**

In its February 15, 2007 order, this Court found that the remedial orders stipulated to by the parties and issued by the Court in June 2002 and September 2004 constituted "order[s] for less intrusive relief that [have] failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order." 18 U.S.C. § 3626(a)(3)(A)(i). At the June 27, 2007 hearing, Defendants urged this Court to reconsider this finding, arguing that the order appointing the Receiver was a "culminating order" in this case and must be considered in determining whether to convene a three-judge court. The Court agrees with Defendants that the presence of the Receiver makes this case unique and, in fact, previously explained that Plaintiffs' motion "must be considered in the unique context of the recently initiated Receivership." Feb. 15, 2007 Order at 3. However, as Defendants acknowledged at the hearing, the stipulated orders from June 2002 and September 2004 are not irrelevant, and the Court continues to find them to be sufficient to satisfy the first requirement for convening a three-judge court. There can be no question that these orders were previously entered by the Court and constituted considerably less intrusive relief than a prisoner release order.

Moreover, as the Court noted in its order finding the appointment of a receiver to be appropriate, "[t]he Court has given defendants every reasonable opportunity to bring its prison medical system up to constitutional standards, and it is beyond reasonable dispute that the State has failed." Oct. 3, 2005 Findings of Fact & Conclusions of Law Re: Appointment of Receiver at 1. Similarly, the Court explained that it "has attempted to move defendants toward meeting constitutional standards by issuing a series of court orders with detailed objectives and measures. Unfortunately, defendants have repeatedly delayed their progress and ultimately failed to achieve even a semblance of compliance" with the June 13, 2002 stipulated order for injunctive relief or the September 17, 2004 stipulated order regarding the quality of patient care. *Id.* at 27. Thus, not only is it clear that the Court has previously entered orders for less intrusive relief; it is equally clear that Defendants have had a "reasonable amount of time" to comply with the June 2002 and September 2004 orders. 18 U.S.C. § 3626(a)(3)(A)(ii).

United States District Court
For the Northern District of California

217.

The only remaining question is how to interpret the "reasonable amount of time" requirement in the context of this case, where the Court appointed the Receiver to take control from Defendants over the medical health care system in California's prisons. It is true that the Receiver did not commence his duties until April 2006, and it is also true that the Receiver has only recently filed his proposed Plan of Action and is not due to file his final Plan of Action until November 2007. However, Defendants' position would essentially have this Court wait years to see if the Receiver's Plan of Action is able to remedy the constitutional deficiencies in this case, and the Court has already determined that such delay is neither necessary nor appropriate. Feb. 15, 2007 Order at 4. While the Court agrees that the Receiver has made much progress since his appointment, that fact does not render irrelevant the previous five years of complete and utter failure by Defendants to cure the constitutional deficiencies in their delivery of medical health care to prisoners. "Where life and death hang[] in the balance, courts must act to ensure that constitutional violations are cured sooner rather than later," *id.* at 3, and Defendants have already been given ample opportunity to attempt to bring the delivery of medical care to prisoners up to constitutional standards. It is beyond reason that a willing and competent institution would not be able to show – over a period of several years and with this Court virtually screaming at every step of the way – significant improvements in the hiring of medical personnel, the furnishing of adequate medical facilities, and the development of thoughtful and comprehensive plans for managing the delivery of medical health care. Yet that is precisely what has happened in this case, and it is why the appointment of the Receiver ultimately became necessary. To use the words of Defendants' counsel at the June 27, 2007 hearing, the appointment order was a "culminating order," and this Court finds it more reasonable to view such an order as the end of a series of less intrusive orders that failed to bring about any meaningful reform, rather than as a new beginning that requires this Court to wait more time, potentially years, to see whether the Receiver's plans will succeed or fail.

Had the Receiver reported to the Court that he did not view overcrowding to be a substantial impediment to implementing the reforms required in this case, the Court may well



United States District Court
For the Northern District of California

have reached a different conclusion regarding the appropriateness of convening a three-judge court to consider a prisoner release order. However, quite to the contrary, the Receiver's reports indicate that overcrowding is a serious problem that impacts, for example, his ability to develop adequate reception centers and health facilities because of the high numbers of inmate transfers and the inadequate amount of available health care beds and other physical space. Receiver's Report Re: Overcrowding at 26-28. Overcrowding also negatively impacts the Receiver's ability to hire and retain competent medical and managerial staff. *Id.* at 24-26. Beyond that, the Receiver reports that:

> Every element of the Plan of Action faces crowding related obstacles. Furthermore, overcrowding does not only adversely impact the Receiver's substantive plans, it also adversely impacts on the very process of implementing remedies because overcrowding, and the resulting day to day operational chaos of the CDCR, creates regular "crisis" situations which call for action on the part of the Receivership and take time, energy, and person power away from important remedial programs.

*Id.* at 28-29. Although the Receiver asserts that his "Plan of Action will work" because "[f]ailure is not an option," and that "those . . . who think that population controls will solve California's prison health care problems . . . are simply wrong," he also explains that "[p]opulation limits may help effectuate a more timely and cost effective remedial process." *Id.* at 41, 42.

Tellingly, the Receiver's concerns about the impacts of overcrowding on his ability to reform the medical health care delivery system became even stronger in the weeks following his initial report. In his supplemental report, filed just four weeks after his initial report, the Receiver concluded that: "Mission changes, yard flips, and prison-to-prison transfers, aggravated by the limited alternatives imposed by overcrowding, are now assuming a size, scope and frequency that will *clearly* extend the timeframes and costs of the receivership and *may render adequate medical care impossible*, especially for patients who require longer term chronic care." Receiver's Suppl. Report Re: Overcrowding at 10 (emphases added). While the Court appreciates Defendants' statements that greater coordination between the State and the Receiver will alleviate some of the Receiver's concerns, such sentiments only

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

underscore the Receiver's expressed concerns that overcrowding presents serious problems not only because of the substantive ways in which it interferes with delivery of medical care, but also because of the amount of time and attention the Receiver must devote to dealing with crowding-related issues. It is clear to the Court that the crowded conditions of California's prisons, which are now packed well beyond their intended capacity, are having – and in the absence of any intervening remedial action, will continue to have – a serious impact on the Receiver's ability to complete the job for which he was appointed: namely, to eliminate the unconstitutional conditions surrounding delivery of inmate medical health care.

The Court acknowledges that the State has recently attempted to take action to reduce prison crowding through Assembly Bill 900 ("AB 900"), which Governor Schwarzenegger signed into law on May 3, 2007. Even assuming that the provisions of this legislation were to be timely implemented, however – which the Court has doubts about given the history of delays in this case, the highly controversial and political nature of the subject matter, and the conflicts that may sometimes arise between meeting constitutional standards and the tough-on-crime approach to law enforcement espoused by some members of the California Legislature – it is unclear whether the legislation would reduce the impacts of overcrowding in any meaningful way. For instance, Defendants' own estimates show only a slight projected reduction in the male inmate population: from approximately 162,848 male inmates in May 2007 to 159,939 male inmates in March 2008, and back up to 162,674 male inmates in March 2009 – a net projected decrease of less than 200 inmates over two years. May 16, 2007 Kernan Decl. ¶¶ 5, 12. Defendants do not discuss any projected reduction to the current (as of May 2007) female inmate population of 12,141, which leads this Court to believe that there will be no significant reduction in the female inmate population either. *See id.* ¶ 5 (projecting female inmate population of 12,200 in March 2008 and 12,562 in March 2009, without taking into account "the impact [of] AB 900 and other population reduction strategies" planned by the State). In addition, Defendants failed to respond to the Receiver's analysis that the State's plans to create more in-fill beds under AB 900 "does nothing to address the serious levels of crowding within the CDCR's most dangerous high security

United States District Court
For the Northern District of California

prisons" because only 190 in-fill beds are proposed for Level III, Level IV, and Security Housing Unit ("SHU") inmates, whereas the State itself projects an increase of 7710 inmates at these security levels between the 2007-08 and 2011-12 fiscal years. Receiver's Report Re: Overcrowding at 39; *id.* at Ex. 26. Beyond that, AB 900 fails to address the critical component of staffing – made even more critical by the undisputed fact that California's prison system is currently severely understaffed in terms of both medical and correctional officers – and fails to allocate adequate space for delivering health care, *id.* at 36-38.

In any event, the Court need not determine at this stage of the proceedings whether AB 900 will prove to be effective at reducing crowding sufficiently so that it no longer has a deleterious impact on the Receiver's ability to develop a constitutionally adequate medical health care system in California's prisons. As Plaintiffs correctly argue, AB 900 and the Receiver's Plan of Action may proceed simultaneously with a three-judge court's consideration of the necessity for a prisoner release order. The same is true for any other reforms being considered by the State, including those raised by the CDCR's expert panel report. If, for example, the reforms in the expert panel report were actually implemented and reduced levels of prison crowding as estimated, then a three-judge court may find that a prisoner release order is not warranted. However, it would be premature for this Court to make any determination at this time as to whether Plaintiffs will ultimately be able to bear their burden of convincing a three-judge court "by clear and convincing evidence" that "crowding is the primary cause" of the deprivation of constitutionally adequate medical health care and that "no other relief will remedy" that deprivation. 18 U.S.C. § 3626(a)(3)(E). To grant Plaintiffs' motion to convene a three-judge court, this Court need only find that the two components of 18 U.S.C. § 3626(a)(3)(A) are satisfied – a finding the Court reaches for all of the reasons discussed above and in its February 15, 2007 order.[4]

[4]Although no party raised this issue, it is unclear whether the requirement that the court "believe[] that a prison release order should be considered" applies to courts ruling on motions to convene a three-judge court brought by a party or only to courts considering a request to convene a three-judge court sua sponte. 18 U.S.C. § 3626(a)(3)(D). However, the Court need not decide that legal question because it concludes for all of the reasons discussed in this order that a prisoner release order should be considered, and the requirement, if it applies, is therefore satisfied.

**CONCLUSION**

As this Court has repeatedly stated, this case is unique because of the unprecedented size and scope of the Receivership, the appointment of which Defendants acknowledged was necessary given their own repeated failed attempts at meaningful reform. Of relevance to the pending motion, this case is also somewhat unique in that even Defendants acknowledge the seriousness of the overcrowding problem, which led the Governor to declare a state of emergency in California's prisons in October 2006. While there remains dispute over whether crowded conditions are the primary cause of the constitutional problems with the medical health care system in California prisons, or whether any relief other than a prisoner release order will remedy the constitutional deprivations in this case, there can be no dispute that overcrowding is at least part of the problem. The record is equally clear that the Receiver will be unable to eliminate the constitutional deficiencies at issue in this case in a reasonable amount of time unless something is done to address the crowded conditions in California's prisons. This Court therefore believes that a three-judge court should consider whether a prisoner release order is warranted under 18 U.S.C. § 3626(a)(3)(E).

Accordingly, and because this Court finds that the conditions specified in 18 U.S.C. § 3626(a)(3)(A) have been satisfied, IT IS HEREBY ORDERED that Plaintiffs' motion to convene a three-judge court to consider a prisoner release order is GRANTED. The Clerk shall serve a copy of this order on the Chief Judge of the United States Court of Appeals for the Ninth Circuit to satisfy the notification requirement of 28 U.S.C. § 2284(b)(1). For purposes of judicial economy and avoiding the risk of inconsistent judgments, the Court recommends that this case be assigned to the same three-judge court convened to consider the issuance of a prisoner release order in *Coleman v. Schwarzenegger*, Case No. CIV S-90-0520 LKK JFM (E.D. Cal.).

Although the Court has ordered that a three-judge court be convened, it also continues to encourage the parties to attempt an informal resolution of the issues raised by Plaintiffs' motion. Contrary to the views expressed by the *Coleman* plaintiffs' counsel at the June 27, 2007 hearing, a prisoner release order would, indeed, be a radical step, particularly given the

size of California's prison system. Such a step may not be necessary if, for example, the parties, in conjunction with the Receiver, were able to reach agreement that Plaintiffs' motion has become moot because AB 900 or any other subsequent action by the State removed overcrowding as a major impediment to bringing the delivery of inmate medical health care up to constitutional standards. This Court would like nothing more than to have the three-judge court be able to enter a consent judgment without the need for a prisoner release order. *See Roberts v. County of Mahoning*, Case No. 4:03 CV 2329, 2007 WL 1655505 (N.D. Ohio June 4, 2007) (case where three-judge court was convened but in which the parties reached agreement prior to the scheduled hearing on whether to issue a prisoner release order). However, unless and until such agreement is reached, the Court is convinced that a three-judge court's consideration of a prisoner release order remains warranted, and that it presents the most appropriate forum under the PLRA in which to weigh the impact of crowded conditions on the ability of the Receiver and Defendants to develop a constitutionally adequate inmate medical health care system.

**IT IS SO ORDERED.**

Dated: 07/23/07

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT

United States District Court
For the Northern District of California

To: Felix

#136

Exhibit-V

RaLPh COLEman VS. aRNOLD Schwarzenegger

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

Plaintiffs, No. CIV-S-90-0520 LKK JFM P

vs.

ARNOLD SCHWARZENEGGER, et al.,

Defendants. ORDER

______________________________/

Plaintiffs are a class of state prisoners with serious mental disorders proceeding through counsel in the remedial phase of this class action lawsuit. By order filed September 13, 1995, this court found defendants in violation of the Eighth Amendment with respect to the provision of constitutionally adequate mental health care to inmates incarcerated in the California Department of Corrections, now known as the California Department of Corrections and Rehabilitation ("CDCR"). On December 11, 1995, this court appointed J. Michael Keating, Jr. as the Special Master to oversee the development of remedies for the systemic constitutional violation and to monitor implementation of court-approved remedies. This action has been in the remedial phase for almost twelve years.

This matter is before the court on plaintiffs' motion to convene a three-judge panel to limit the prison population in the CDCR, pursuant to 28 U.S.C. § 2284 and 18 U.S.C. §

3626(a)(3). The court initially heard argument on plaintiffs' motion on December 11, 2006, after which it continued the hearing to June 4, 2007. The matter was subsequently continued to June 27, 2007, and the court heard oral argument on that day.[1]

On July 2, 2007, defendants filed a document entitled, "Defendants' Further Statement Addressing Plaintiffs' Motion to Convene a Three-Judge Panel to Address Population Issues." Therein, defendants requested that the court take judicial notice of a report to the California Legislature from the CDCR's expert panel on Adult Offender Reentry and Recidivism Reduction Programs entitled, "A Roadmap for Effective Offender Programming in California" (hereafter "Roadmap"). By order filed July 3, 2007, the parties were directed to file additional briefing addressing how, if at all, the court should consider this report in resolving plaintiffs' motion. That briefing was completed on July 18, 2007.

## ANALYSIS

### I. Standards

Section 3626(a)(3)(C) of Title 18 of the United States Code authorizes a party to a civil action concerning prison conditions to file a request for a prisoner release order. As defined by the statute, a prisoner release order "includes any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison." 18 U.S.C. § 3626(g)(4). A prisoner release order may "be entered only by a three-judge court in accordance with section 2284 of title 28," if other statutory requirements have been met. 18 U.S.C. § 3626(a)(3)(B). A request for a prisoner release order must be accompanied by a request for a three-judge court and "materials sufficient to demonstrate that" the statutory requirements for issuance of such an order have been met. 18 U.S.C. § 3626(a)(3)(C).

/////

---

[1] The June 27, 2007 hearing was a joint hearing with the court in Plata v. Schwarzenegger, Case No. Civ. 01-1351 TEH (N.D.Cal.). See Order filed June 7, 2007.

> A prisoner release order may not be issued unless--
>
> (i) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order; and
>
> (ii) the defendant has had a reasonable amount of time to comply with the previous court orders.

18 U.S.C. § 3626(a)(3)(A)(i)-(ii). If these requirements are met, "a Federal judge before whom a civil action with respect to prison conditions is pending who believes that a prison release order should be considered may sua sponte request the convening of a three-judge court to determine whether a prisoner release order should be entered." 18 U.S.C. § 3626(a)(3)(D). The three-judge court "shall enter a prisoner release order only if the court finds by clear and convincing evidence that--

> (i) crowding is the primary cause of the violation of the Federal right; and
>
> (ii) no other relief will remedy the violation of the Federal right.

18 U.S.C. § 3626(a)(3)(E).

II. Analysis

A. The Federal Right Sought to Be Remedied

The federal right at issue in this action is the Eighth Amendment guarantee of constitutionally adequate mental health care for individuals with serious mental disorders who are incarcerated in the California Department of Corrections and Rehabilitation. See Coleman v. Wilson, 912 F. Supp. 1282, 1297-98 (E.D. Cal. 1995) (citing, inter alia, Farmer v. Brennan, 511 U.S. 825, 832 (1994) and Helling v. McKinney, 509 U.S. 25, 31-32 (1993)).

/////

/////

/////

/////

B. Orders for Less Intrusive Relief

This court's September 13, 1995 order identified four broad elements required for a constitutionally adequate prison mental health care system:[2] (1) proper screening to identify individuals with serious mental disorders both at the time of their admission to CDCR and over the course of their incarceration, Coleman, 912 F. Supp. at 1305; (2) competent staff in sufficient numbers "'to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders,'" id. at 1306-8 (quoting Balla v. Idaho State Bd. of Corr., 595 F. Supp. 1558, 1577 (D. Idaho 1984)); (3) timely access to appropriate levels of care, including both beds and programs, and appropriate medication, id. at 1309-13; and (4) an adequate medical record system, id. at 1314-15. A fifth component of an adequate mental health care system, suicide prevention, was found adequate in design but deficient in implementation due to chronic understaffing, id. at 1315.

Since February of 1996, this court has issued at least seventy-seven substantive orders to defendants in an effort to bring the CDCR's mental health care delivery system into compliance with the requirements of the Eighth Amendment.[3] Taken together, these orders have contained directives aimed at all of the aforementioned requirements for a constitutionally adequate mental health care delivery system. In addition, the Special Master and his staff have spent hundreds of thousands of hours working with the parties to develop program guidelines for a constitutionally adequate system and monitoring defendants' implementation of those guidelines. During the same period of time, the Special Master has filed seventeen semi-annual monitoring reports and fifty-five other reports reflecting the results of these efforts.

---

[2] As the court noted in that order, in a class action of this magnitude "[f]ocusing on the trees presents the danger of forgetting that what is being examined is the condition of the forest." Coleman, 912 F. Supp. at 1305 n. 28. Sadly, that cautionary note remains as applicable to the issues at bar as it was twelve years ago.

[3] See Orders filed February 7, 1996 and onward. There are simply too many orders to list.

C. Failure to Remedy Violation of the Constitutional Right At Issue

As noted above in section II (B), for more than eleven years this court has issued numerous orders in an effort to bring California's prison mental health care system into compliance with the Eighth Amendment. Among the most significant of those orders has been the directive to defendants to work with the Special Master and his staff to develop and implement remedial plans for the delivery of constitutionally adequate mental health care to class members.

At the time the remedial phase of this action began, the timelines established for development of plans and protocols were relatively short and the parties met those timelines with little need for adjustment. The remedial plans and protocols were provisionally approved by this court on June 27, 1997. Thereafter, the Special Master, his staff, and the parties turned their attention to implementing the system contained in the plans.

Through 2005, the record in this action reflected slow but evident progress toward constitutional compliance. Between 1997, when the court gave provisional approval to the plans and protocols for delivery of mental health care, and 2005, some prisons in California came into sufficient compliance with the provisionally approved remedial plans and protocols that the Special Master and his staff were able to reduce the number of monitoring visits to those prisons. Defendants also developed a screening system that provided adequate identification of mentally ill inmates both on admission to, and during incarceration in, the State prison system. Moreover, while staffing shortages were never completely alleviated, defendants managed, through the use of aggressive recruitment and retention strategies, salary increases, and use of contract staff, to keep the vacancy rate among mental health staff at a nearly acceptable level.

On February 3, 2006, defendants filed a Revised Program Guide for the delivery of mental health care to inmates in the CDCR. On the same day, the Special Master filed a report and recommendation in which he recommended that the court give final approval to "95 percent of the revised Program Guide that the parties and the Special Master agree to and initiate

a process for resolving the five percent of the remaining issues that continue to elude resolution." Special Master's Report and Recommendations on Defendants' Revised Program Guide, filed February 3, 2006, at 4. By order filed March 3, 2006, the court gave final approval to the undisputed provisions of the Revised Program Guide and ordered their immediate implementation. See Order filed March 3, 2006, at 1.

In spite of the commendable progress described above, defendants' mental health care delivery system has not come into compliance with the Eighth Amendment at any point since this action began. Several prisons remain notable exceptions to the progress made at others, and delays in access to care at the highest level of need -- mental health crisis beds, acute inpatient care, and intermediate inpatient care -- have plagued the CDCR throughout the course of this litigation. Moreover, defendants' efforts at long-range planning for the delivery of mental health care continues to be hampered by inadequacies in the capture and collection of data and the use of outdated methodologies to interpret that data.[4]

The semi-annual reports of the Special Master filed since March 2006 show a significant and thus very troubling reversal of the progress made by defendants in maintaining adequate staffing and access to necessary levels of care. In the Sixteenth Round Monitoring Report, filed December 15, 2006, the Special Master reported that "vacancies among clinicians continued to climb during the monitoring period." See Sixteenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols, filed December 14 and 15, 2006, at 390-96. The Special Master also reported that "[t]ransfers of inmates to more intensive levels of mental health programming and treatment became increasingly erratic during the monitoring period. Delays in transfers, especially to the most intensive treatment programs for inmates at the highest custody levels, became endemic. . ." Id. at 413.

---

[4] The inability to engage in adequate long-range planning for the delivery of mental health care has plagued the CDCR throughout the course of this litigation.

The report on staffing vacancies in the most recent monitoring report is even more grim than the one that preceded it. See Seventeenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols, Part C, filed June 13, 2007, at 161-64. The Special Master also now reports that "access to higher levels of care was generally inadequate" during this monitoring period. Id. at 174-78.

Similarly, on May 31, 2007, the Special Master reported that programming space, beds for mentally ill inmates, and staffing levels have all been "impacted seriously by overcrowding." Special Master's Response to Court's May 17, 2007 Request for Information, filed May 31, 2007, at 4-14 ("Special Master's May 31, 2007 Response"). The staffing shortages alone mean that the CDCR only has enough staff "to provide full mental health services to roughly two-thirds of its mental health caseload, or two-thirds of required services to its full caseload, or, probably more realistically, some combination of reduced services to some segments of the caseload that can be covered with a third less clinicians than required." Id. at 11-12. While acknowledging the difficulties in quantifying precisely the scope of the unmet mental health needs, the Special Master reports that,

> defendants cannot meet at least a substantial portion, amounting in some loose amalgam to about 33 percent, of acknowledged mental health needs with current staffing resources. Insufficient intensive mental health treatment beds and a chronic lack of programming space for mental health treatment contribute further to defendants' inability to meet required mental health services. All three deficiencies are unquestionably exacerbated by overcrowding.

Id. at 14. With a mental health caseload of almost 33,000 inmates, id. at 2, this level of unmet needs is unconscionable.[5]

The orders of this court issued from 1995 through the present have failed to remedy the constitutionally inadequate delivery of mental health care to CDCR inmates.

/////

---

[5] These recent reports are enough to answer the defendants' contention that the court's recent orders will rectify the slide backward.

That failure appears to be directly attributable to overcrowding and the consequent inability to staff the caseload.

D. Time for Compliance

It has been almost twelve years since this court found widespread violations of the Eighth Amendment in the delivery of mental health care to the members of the plaintiff class. As discussed in sections II (B) and II (C) of this order, for more than eleven years this court has issued numerous orders directed at bringing California's prison mental health care system into constitutional compliance, and the system still falls woefully short of meeting the requirements of the Eighth Amendment. Defendants have had more than sufficient time to comply with the mandate required by the court's 1995 order and the numerous orders issued since then.

E. Whether A Prisoner Release Order Should Be Considered

For the reasons set forth in sections II (A), (B), and (C), this record amply reflects the showing required by 18 U.S.C. § 3626(a)(3)(A)(i)-(ii). This court therefore turns to consideration of whether a prisoner release order should be considered. See 18 U.S.C. § 3626(a)(3)(D). In this regard, assuming any showing is required at this stage, the standard is whether a release order may be appropriate. The final decision will rest with the three-judge panel.

There is no dispute that prisons in California are seriously and dangerously overcrowded. The Governor of California has repeatedly and eloquently noted the public emergency caused by overcrowded prison conditions, and the CDCR's website contains several photographs of overcrowding at five of the State's prisons taken in August 2006.[6]

In June 2004, an independent panel appointed by Governor Schwarzenegger found significant overcrowding in the CDCR. See June 2004 Report of the Corrections Independent Review Panel at 123-25, Ex. D to Declaration of Michael W. Bien in Support of

---

[6] See http://www.cdcr.ca.gov/communications/prisonovercrowding.html

Plaintiffs' Motion to Convene a Three Judge Panel to Limit the Prison Population. The panel discussed three different levels of population capacity: design capacity, operable capacity, and "maximum 'safe and reasonable' capacity." Id. at 123-24. It observed that "operable capacity, which takes into account space needed for effective programming in addition to safety and security, is greater than design capacity, but far less than maximum safe and reasonable capacity." Id. at 124. "Maximum 'safe and reasonable' capacity" is defined as "the maximum number of inmates who can safely and reasonably be housed in the prison system. Id.[7] The panel reported that the CDCR had determined that the "maximum safe and reasonable capacity of the State's male prisons is 137,764 male inmates." Id. at 124. Based on the April 2004 population figures available to the panel, it found that the prison system then exceeded the maximum "safe and reasonable" capacity of the system for male inmates by 4,000 inmates and exceeded the "operable capacity" of the prison system by 30,000 inmates. Id.[8]

By early 2006, the impact of severe prison overcrowding on the remedial efforts in this case was becoming evident in the record. See, e.g., Fifteenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols, filed January 23, 2006, at 396-97 ("Whatever progress was reported in the preceding round of review, or in the early part of the current review, in the timeliness of transfer of [Mental Health Services Delivery System] ("MHSDS") inmates out of reception into general population has been largely cancelled by the recently escalating growth in the overall CDCR population and the concomitantly increasing number of MHSDS inmates in reception."). Since then, the impact of overcrowding has become even more clear. See, e.g., Special Master's

---

[7] The plaintiffs' contention that defendants have attempted to meet the overcrowding issue by redefining the measure of crowding is not without apparent justification.

[8] The Roadmap, filed by defendants on July 2, 2007, also describes the California prison system as "dangerously overcrowded" and its first recommendation is that the CDCR "reduce overcrowding in its prison facilities and parole offices." Roadmap, at viii, 10.

Supplemental Report on the Status and Sufficiency of Defendants' Interim and Long Term Plans for the Provision of Acute and Intermediate Inpatient Beds and Mental Health Crisis Beds, filed September 11, 2006, at 11 ("The sudden addition of an unanticipated 1,300 inmates to a correctional system perilously close to 200 percent of its design capacity and a commensurately overstressed mental health care delivery system operating way beyond its capacity represents an unexpected, projection-rattling variable.").

Following the initial hearing on the instant motion, the court continued the matter for six months. See Order filed December 12, 2006. That continuance was for the purpose of allowing the State to develop its own solution to the overcrowding crisis. During that six month period, the California Legislature enacted Assembly Bill 900 ("AB 900"), and the bill was signed into law by Governor Schwarzenegger. The legislation calls for, inter alia, construction of 24,000 new prison beds in Phase I of its implementation, and 16,000 new prison beds in Phase II. Defendants aver that 12,000 of the Phase I beds "will be completed in 2009." Declaration of Deborah Hysen in Support of Defendants' Supplemental Brief in Opposition to Plaintiffs' Motion for Referral to a Three-Judge Panel, filed May 24, 2007, at ¶ 8. Construction funds for Phase II are tied to progress in specific areas, including construction, rehabilitation programs, management planning, and parole review. The legislation also calls for transfer of 8,000 inmates to out of state prisons by March 2009, with continued transfers as needed until July 2011. Defendants contend that the passage of AB 900 renders unnecessary and inappropriate referral of this matter to a three-judge panel.

As of May 11, 2007, the prison population in California totaled 174,989 inmates, of which approximately 162,848 are male and 12,141 are female. See Special Master's May 31, 2007 Response, at 2. Defendants estimate that the male prison population in California[9] will be 159,939 male inmates in March 2008 and 162,674 male inmates in March 2009. Declaration of

---

[9] These numbers do not include inmates who will be transferred out of state. See Kernan Declaration, at ¶ 23.

Scott Kernan in Support of Defendants' Supplemental Brief in Opposition to Plaintiffs' Motion for Referral to a Three Judge Panel, filed May 24, 2007, at ¶ 22. The record suggests there will be no appreciable change in the prison population in the next two years.

Defendants plan to add 12,000 prison "in-fill" beds by 2009. See Hysen Declaration, at ¶ 8. According to defendants, "[i]n-fill beds will provide additional capacity at existing prisons in a way that ensures proper facilities, support and services." Id. It is not at all clear, however, that an additional 12,000 beds, even if timely completed, will alleviate the population crisis. As noted above, in June 2004 the independent panel on corrections found that a male inmate population of approximately 141,000 exceeded by 4,000 the "safe and reasonable" capacity of the California prison system and by 30,000 the system's "operable" capacity. The male prison population projected for March 2009 is over 162,000 inmates and exceeds the population analyzed in the 2004 report by approximately 21,000 inmates, or 9,000 more inmates than new beds planned. Moreover, of course, this utterly fails to address the critical question of staffing.

AB 900 provides for the construction of 8,000 medical and mental health beds as a "high priority." Hysen Declaration, at ¶ 10. Defendants, however, are unable to adequately staff the mental health beds that presently exist and are experiencing severe staffing shortages at every level of the mental health care delivery system. See Seventeenth Monitoring Report, Part C, at 161-64. From all that presently appears, new beds will not alleviate this problem but will aggravate it.

AB 900 also includes provisions for rehabilitation programs and planning. See Declaration of Joan Petersilia, Ph.D. in Support of Defendants' Supplemental Brief in Opposition to Plaintiffs' Motion for Referral to a Three-Judge Panel, filed May 24, 2007. Defendants have formed an Expert Panel and a Rehabilitation Strike Team to review existing rehabilitation programs and make recommendations for improvement of those programs. Id. at ¶¶ 3-5. Defendants "anticipate" that "if CDCR fully implements" these recommendations, the

rate of parolees returning to custody could decrease by as much as 10%, or 8,100 inmates. Id. at ¶ 10.

Plaintiffs challenge, inter alia, the representations made by defendants concerning the impact of this provision of AB 900 on prison overcrowding. To this end, plaintiffs have presented the declaration of an individual with thirty years in corrections planning and research who is a member of the Expert Panel referred to in Dr. Petersilia's declaration. See Declaration of James Austin, Ph.D. in Support of Plaintiffs' Supplemental Reply Brief, filed June 1, 2007. In his declaration, Dr. Austin contends, inter alia, that Dr. Petersilia's estimate is incorrect for a number of reasons and that even if 8,100 parolees do not violate their parole that will only save 2,000 beds per year. Austin Declaration, at ¶ 16. Dr. Austin also opines that "under the best of circumstances it would take two to five years to design and begin to operate rehabilitation services." Id.

The Roadmap, filed by defendants on July 2, 2007, "provides an assessment of the state of correctional programming in California's adult prison and parole systems" and "includes recommendations intended to guide California in creating a model rehabilitation programming system." Roadmap, at vii. The panel suggests that if all of the recommendations contained in the Roadmap are adopted, "the state may significantly reduce the large number of parolees who are currently violating their parole conditions and being returned to prison." Id. at xiv. The Roadmap also contains recommended "strategies that would reduce the number of prison beds that California needs by 42,000 to 48,000." Id. The Roadmap contains a two year timeline for implementing its major programming recommendations. Id. at 54 and Appendix K. Indeed, "resolving" prison overcrowding is described as a "precondition" to these efforts. Id. at xv.

It is clear that the Roadmap represents a preliminary, rather than an advanced, stage of implementation of this aspect of AB 900. See, e.g., Decl. of Joan Petersilia in Support of Defendants' Additional Briefing On Plaintiffs' Motion to Convene Three-Judge Court, at ¶

12. While parts of the Roadmap may be appropriate for consideration by a three-judge court, neither it, nor any of the other material presented by defendants, contain a sufficiently immediate response to the crisis in prison overcrowding that is presently preventing the delivery of constitutionally adequate mental health care to members of the plaintiff class.

Review of the record before this court shows that, through AB 900, the State of California has responded to the prison overcrowding crisis with legislation that requires the construction of thousands of beds to increase the capacity of the prison system, development and staffing of rehabilitation programs to reduce recidivism, and transfer of 8,000 inmates out of state. For the reasons discussed supra, none of these efforts will have any appreciable impact on the severely overcrowded prisons in California for at least two years, if then.

As the Special Master reported on May 31, 2007, "[o]ver the past 11-plus years, much has been achieved, and many of the achievements have succumbed to the inexorably rising tide of population, leaving behind growing frustration and despair." Special Master's May 31, 2007 Response, at 17. Given the almost twelve years that this case has been in its remedial phase, and given the constitutional considerations at stake, the direction in which the State has at present chosen to go by enacting AB 900 simply fails to address in any timely way relief from the overcrowding crisis and its attendant impact.

After careful review of the record in this action, this court has come, with extreme reluctance but firm conviction, to the conclusion that the overcrowding crisis in the CDCR is preventing the delivery of constitutionally adequate mental health care to the plaintiff class and, therefore, that some form of limitation on the inmate population must be considered. For all of the foregoing reasons, plaintiffs' motion will be granted and the court will forthwith request the convening of a three-judge panel pursuant to 18 U.S.C. § 3626(a)(3) and 28 U.S.C. § 2284.

In accordance with the above, IT IS HEREBY ORDERED that plaintiffs' November 13, 2006 motion to convene a three-judge panel to limit the prison population is granted pursuant to 18 U.S.C. § 3626 (a)(3)(A). The Clerk of the Court is directed to serve a

copy of this order on the Chief Judge of the United States Court of Appeals for the Ninth Circuit. Moreover, for purposes of judicial economy and avoiding the risk of inconsistent judgment, the court recommends that the instant case be assigned to the same three-judge panel requested by the court in Plata v. Schwarzenegger, Case No. CIV 01-1351 TEH (N.D. Cal.). The court wishes to again observe that overcrowding is the State's problem and in the interim, the court again urges the State to find its own solution to the crisis.

DATED: July 23, 2007.

Lawrence K. Karlton

LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

Exhibit 300

Plata V. Schwarzenegger

Service: **Get by LEXSEE®**
Citation: **329 F.3d 1101**

*329 F.3d 1101, *; 2003 U.S. App. LEXIS 10437, **;*
*55 Fed. R. Serv. 3d (Callaghan) 812; 2003 Cal. Daily Op. Service 4403*

MARCIANO PLATA; OTIS SHAW; RAY STODERD; JOSEPH LONG; LESLIE RHOADES; GILBERT AVILES; PAUL DECASAS; STEVEN BAUTISTA, and all others similarly situated; RAYMOND JOHNS; ELIJAH J. SANDOVAL; GARY ALAN SMITH; CLIFFORD MYELLE, Plaintiffs-Appellees, v. GREY DAVIS; B. TIMOTHY GAGE; ROBERT PRESLEY; SUSANN STEINBERG, Defendants-Appellants, and DANIEL THOR; MTA COOPER; T. BUI; DONALD CALVO; SHANKAR RAMAN; BRIAN YEE; D. SMITH; M. A. VAN PELT; BHAVIESH SHAH; ANDREW WONG; DANIEL FULLER; MICHAEL SONGER; M. LEVIN; JOSEPH SIEGEL; EDGAR CASTILLO; MOHAN SUNDARESON; CLINTON; SANFORD HEPPS; STEPHEN WYMAN; L. RICHNAK; RICHARD SANDHAM; C. PARK; TERESA ROCHA, Acting Director Department of Corrections, Defendants.

No. 02-16161

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

329 F.3d 1101; 2003 U.S. App. LEXIS 10437; 55 Fed. R. Serv. 3d (Callaghan) 812; 2003 Cal. Daily Op. Service 4403; 2003 Daily Journal DAR 5666

March 12, 2003, Argued and Submitted, San Francisco, California
May 27, 2003, Filed

**SUBSEQUENT HISTORY:** Later proceeding at Plata v. Schwarzenegger, 2005 U.S. Dist. LEXIS 8878 (N.D. Cal., May 10, 2005)

**PRIOR HISTORY: [**1]** Appeal from the United States District Court for the Northern District of California. D.C. No. CV-01-01351-TEH. Thelton E. Henderson, District Judge, Presiding.

**DISPOSITION:** Appeal dismissed for lack of jurisdiction.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Defendant individuals appealed an order of the United States District Court for the Northern District of California, which denied their motion to exclude certain members of plaintiff class.

**OVERVIEW:** The court concluded that it lacked jurisdiction over the appeal. The order from the individuals appealed was not a final order under 28 U.S.C.S. § 1292(a)(1). The order was best interpreted as a decision to maintain or expand the grant of class certification, comparable to class certification orders. Further, the order lacked the practical effect of granting or denying injunctive relief, though the order had the practical effect of modifying the composition of the class. It did not grant or deny injunctive relief by its terms, and it could not have continued, modified, or dissolved any injunctive relief because, at the time the order was entered, no injunctive relief was in place. Finally, jurisdiction did not exist under § 1292(b) and Fed. R. Civ. P. 23. Although the individuals filed a notice of appeal within 10 working days of the entry of the order appealed from, the notice did not purport to be a petition for interlocutory appeal. Moreover, it failed to meet the criteria for such petitions established by Fed. R. App. P. 5(b).

**OUTCOME:** The appeal was dismissed.

230.

**CORE TERMS:** inmate, injunctive relief, practical effect, final order, medical care, class action, chronic, medication, injunction, screening, settlement, staff, interlocutory appeal, sick

call, immediately appealable, interlocutory order, modifying, prisoners, medical staff, order appealed, consent decree, reviewable, permission, referrals, confined, triage, dental, decree, confidentiality, training

**LexisNexis(R) Headnotes** ♦ Hide Headnotes

Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders

*HN1* Class certification orders generally are not immediately appealable. More Like This Headnote

Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders

*HN2* 28 U.S.C.S. § 1292(a)(1) allows courts of appeal to review interlocutory orders granting, continuing, modifying, refusing or dissolving or refusing to dissolve or modify injunctions. More Like This Headnote | *Shepardize:* Restrict By Headnote

Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders

*HN3* For an interlocutory order to be immediately appealable under 28 U.S.C.S. § 1292(a)(1), a litigant must show (1) that the interlocutory order of the district court might have a serious, perhaps irreparable, consequence, and (2) that the order can be effectually challenged only by immediate appeal. More Like This Headnote | *Shepardize:* Restrict By Headnote

Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders

*HN4* The court may use its discretion to permit an appeal pursuant to Fed. R. Civ. P. 23(f) only if application is made within 10 days after entry of the order. More Like This Headnote

Civil Procedure > Appeals > Appellate Jurisdiction

*HN5* Fed. R. App. P. 5(b)(1) requires that a petition for permission to appeal contain: the facts necessary to understand the question presented; the question itself; the relief sought; the reasons why the appeal should be allowed and is authorized by statute or rule; and an attached copy of the order, decree, or judgment complained of and any related opinion or memorandum, and any order stating the district court's permission to appeal or finding that the necessary conditions are met. More Like This Headnote

Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders

*HN6* See 28 U.S.C.S. § 1292(b).

**COUNSEL:** John M. Applebaum, Supervising Deputy Attorney General, Sacramento, California, for the defendants-appellants.

Donald Specter, Prison Law Office, San Quentin, California, and Caroline N. Mitchell, Pillsbury Winthrop LLP, San Francisco, California, for the plaintiffs-appellees.

**JUDGES:** Before: John T. Noonan, A. Wallace Tashima, and Kim McLane Wardlaw, Circuit Judges. Opinion by Judge Wardlaw.

**OPINIONBY:** Kim McLane Wardlaw

**OPINION:**

**[*1103]** WARDLAW, Circuit Judge:

This is an appeal from an interlocutory order denying defendants' motion to exclude certain members from the plaintiff class. A stipulated judgment was entered thereafter, from which defendants did not appeal. Because the order appealed from is not a final order under 28

U.S.C. § 1291, lacked the practical effect of granting or denying injunctive relief, and defendants took no other steps to preserve a right of appeal as to it, we dismiss the appeal for lack of jurisdiction.

**I. Background**

**A. *Shumate* litigation**

On April 4, 1995, present **[**2]** and future inmates confined at the California Institution for Women ("CIW") in Frontera, California, and at the Central California Women's Facility ("CCWF") in Chowchilla, California, filed a class action against numerous defendants, including most significantly the Governor of California, the California Director of Finance, the Secretary of the Youth and Adult Correctional Agency, the Director of the California Department of Corrections ("CDC"), and the Deputy Director for Health Care Services for the Department of Corrections, in the United States District Court, Eastern District of California. *Shumate v. Wilson*, No. CIV S-95-0619 (E.D. Cal. 2000). The *Shumate* plaintiffs sought injunctive relief to remedy alleged "policies, practices, acts, and omissions evidenc[ing] and constitut[ing] deliberate indifference to the rights of prisoners and violat[ing] the Cruel and Unusual Punishment Clause of the Eighth Amendment." The complaint alleged that defendants furnished inadequate sick call, triage, emergency care, nurses, urgent care, chronic care, specialty referrals, medical screenings, follow-up care, examinations and tests, medical equipment, medications, specialty diets, **[**3]** terminal care, health education, dental care, and grievance procedures, and that the provision of medical care featured unreasonable delays and disruptions in medication.

On January 12, 1996, the district court certified a plaintiff class, defined as all persons suffering from, or at risk of developing, serious illness or injury, excluding mental disorders, who were then or would be in the future confined at CIW and CCWF. It also certified a subclass, defined as all persons who were then or would be in the future confined at CIW and CCWF and who were diagnosed as HIV positive. After two years of litigation and negotiation, on August 11, 1997, the parties entered into a court-approved settlement agreeing to independent audits of the CIW and CCWF health-care systems to determine their compliance with the parties' settlement provisions as to 56 aspects of care. n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 The 56 specific areas addressed in the settlement agreement were:

> medical screening, privacy of medical information at screening; medical staff collection of health service request forms; MTAs' performance within the scope of their licenses; sick call request submissions; 24-hour triage by RNs; health care staff evaluation of sick call request forms; waiting time for sick call; maintenance of the ER equipment; RN availability in the ER; ambulance response time; compliance with Skilled Nursing Facility licensing and Outpatient Housing Unit policies; medical staff response to call buttons and RNs' regularly scheduled rounds; placement of inmates in conformance with Skilled Nursing Facility and Outpatient Facility policies; custodial staff's performance of medical functions; standards for determining whether an inmate should be housed in the Skilled Nursing Facility; receipt and review of diagnostic tests; implementation of a chronic care program; assessment of inmates with chronic diseases for which CDC had no guidelines to determine whether chronic care enrollment was indicated; implementation of TB control guidelines; availability of a public health RN and an infectious diseases consultant; maintenance of full health care staff; maintenance of on-call physician 24 hours a day 7 days a week; availability of palliative treatment; whether medical authorization review decisions were documented in records and inmates consulted; posting of posters concerning preventative care; conversions of medical records into a single record; prompt filing of medical records; forms for release of information to outside providers;

131.

continuity of medications; availability of medical supplies and equipment; availability of physical therapy; special medical diets; dental services availability; dental services and timeliness; physical examinations; social workers for terminally ill; staff training for mental care; implementation of quality assessment and improvement program; training regarding HIV confidentiality; and pill lines and confidentiality.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[**4]**

**[*1104]** On December 20, 1999, the independent assessor issued a final report stating that CIW and CCWF substantially complied with the *Shumate* settlement terms, meeting criteria for 44 of the parties' 56 settlement provisions. The assessor noted seven areas of concern that precluded a finding of full compliance: 1) bus screenings, medication continuity, and physician referrals; 2) the wait for sick call; 3) the integration of diagnostic testing results into regular chronic care; 4) educational and preventative aspects of chronic care; 5) mental health staff at CCWF; 6) HIV-positive medication distribution at CIW; and 7) CIW's physical therapy program. On August 21, 2000, pursuant to the parties' stipulation and Federal Rule of Civil Procedure 41(a)(1)(ii), the district court dismissed the *Shumate* class action with prejudice.

Following the dismissal, in February 2002, Dr. Ronald Shansky, a physician and consultant for the CDC, audited CIW's and CCWF's compliance with the *Shumate* settlement provisions. After examining medical records, log books, policies, procedures, and meeting minutes, and observing health services furnished to CIW and CCWF inmates, Dr. Shansky found eleven **[**5]** areas of non-compliance at CIW and only two at CCWF. n2 He opined that the deficiencies at CIW and CCWF were easily correctable.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 The areas of concern at CIW included inadequate medical screening at reception; the lack of face-to-face triage by RNs within 24 hours of receipt of sick-call slips; inadequate maintenance of ER equipment and supplies; instances of ER responses containing documentation by an MTA without adequate high-licensure review; inability to locate ER response review committee minutes; records lacking documentation of lab result discussion with patients; loose filing and misfiling of reports; missing ER supplies and equipment; non-functioning call buttons in the Out-patient Housing Unit, inadequate supervision ensuring confidentiality in pill lines; and inmates found performing clerical duties in the medical area. The two areas of non-compliance at CCWF concerned incorrect filings in some medical records and the lack of a dental quality assurance program.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**B. *Plata* class action [**6]**

A year after *Shumate* was dismissed, on August 20, 2001, ten male California inmates filed a complaint against many of the same defendants as in *Shumate*, alleging that the CDC's inadequate medical care system violated the Cruel and Unusual Punishment Clause of the Eighth Amendment, as well as the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and section 504 of the **[*1105]** Rehabilitation Act, 29 U.S.C. § 794. These allegations are virtually identical to those raised in *Shumate*. n3

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 The *Plata* class alleges that:

> the CDC has insufficient numbers of qualified medical staff; medical personnel lack training and supervision; medical records are disorganized and incomplete; the medical screening of incoming prisoners is lacking; there are delays and failures in accessing medical care, including referrals to see specialists; laboratory and other medical tests are frequently delayed; responses to emergencies are untimely; correctional officers frequently interfere with the provision of medical care; quality control procedures are lacking; established protocols for dealing with chronic illnesses are lacking; inmates are not informed of potential side effects of medications; competent, sufficient medical staff are difficult to recruit and retain; necessary medical care is often denied based solely on an inmate's expected release date; defendants lack sufficient knowledge about the medical care system to properly monitor and improve it; and the administrative grievance system often does not provide timely or adequate responses to complaints about medical care.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[**7]**

On January 28, 2002, the parties stipulated to injunctive relief. The stipulation called for the CDC to implement Health Care Services Division Policies and Procedures "designed to meet or exceed the minimum level of care necessary to fulfill the defendants' obligation to plaintiffs under the Eighth Amendment of the United States Constitution." Under the stipulation, CDC institutions became subject to a schedule of audits to determine their compliance with the Policies and Procedures. They are also required to provide access to records, information, housing, and persons including staff and inmates.

The stipulation's enforcement provisions provide that "[t]he court shall find that this Stipulation satisfies the requirements of 18 U.S.C. § 3626(a)(1)(A) and shall retain jurisdiction to enforce its terms." The parties agreed to disagree as to whether the stipulated relief would apply to inmates at CIW and CCWF but that upon motion by defendants the district court would resolve the question:

> The parties disagree about whether prisoners incarcerated at the California Institution for Women (CIW) and the Central California Women's Facility (CCWF), previously **[**8]** litigated in a class action entitled *Shumate v. Wilson* (E.D. Cal.) CIV S-95-0619 WBS JFM P, should be members of the class. To resolve this dispute defendants shall move within sixty days after this Stipulation is approved by the Court for an order determining whether prisoners at CCWF and CIW should be excluded from the class on the sole ground that they are not similarly situated to plaintiffs because of the previously litigated class action entitled. The motion will not otherwise alter the burden of proof under Rule 23 or create a presumption concerning their inclusion.

The parties did not provide for appeal of the district court's order by either the plaintiff class or defendant.

As provided in the stipulation, defendants moved on March 19, 2002 to exclude CIW and CCWF inmates from the plaintiff class. On May 21, 2002, following briefing and a hearing, the district court denied defendants' motion, ordering that the CIW and CCWF inmates be included in the class. Defendants filed a notice of appeal from that order on June 3, 2002. The district court held a fairness hearing on the class settlement on June 13, 2002, and

2320

entered a final order adopting the class action stipulation **[**9]** on June 20, 2002. That final order was not appealed by either side.

**II. Discussion**

Defendants assert that we have jurisdiction over this matter pursuant to 28 U.S.C. § 1292 **[*1106]** and Federal Rule of Civil Procedure 23(f). Because defendants' appeal has no relation to either receiverships, *see* 28 U.S.C. § 1292(a)(2), or to rights in admiralty, *see* 28 U.S.C. § 1292(a)(3), we must examine whether the order appealed from had the practical effect of granting or denying an injunction so as to support jurisdiction under 28 U.S.C. § 1292(a)(1). We hold that it did not. Nor is jurisdiction sustainable under either 28 U.S.C. § 1292(b) or Federal Rule of Civil Procedure 23(f), because defendants failed to request permission to file an interlocutory appeal. Therefore, we lack jurisdiction over this appeal.

**A. Jurisdiction under § 1292(a)(1)**

The parties recognize that the district court's order denying exclusion of the CIW and CCWF inmates from the plaintiff class was not a final order for purposes of appeal. This order is best interpreted as a decision **[**10]** to maintain or expand the grant of class certification, comparable to class certification orders. *HN1*Class certification orders generally are not immediately appealable. *Bauman v. United States Dist. Court*, 557 F.2d 650, 663 (9th Cir. 1977) (Hufstedler, J., concurring) ("[G]enerally an order certifying a class action is a non-appealable interlocutory order.); *see also* Schwarzer, Tashima, & Wagstaffe, California Practice Guide: Federal Civil Procedure Before Trial §§ 10-620, 10-621 (2002); James Wm. Moore et al., Moore's Federal Practice § 23.61[9][b] (3d ed. 2002).

Defendants nevertheless suggest that we have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) because the district court's order had the practical effect of granting or denying injunctive relief. *HN2*Section 1292(a)(1) allows courts of appeal to review interlocutory orders "granting, continuing, modifying, refusing or dissolving . . . or refusing to dissolve or modify injunctions . . . ." Although defendants acknowledge that the order they appealed from does not technically grant, deny, modify, refuse, or dissolve an injunction, they cite a line of cases beginning with *Carson v. American Brands, Inc.*, 450 U.S. 79, 67 L. Ed. 2d 59, 101 S. Ct. 993 (1981), **[**11]** which permit appellate jurisdiction over orders that have the "practical effect" of granting, denying, or modifying injunctive relief. *Id.* at 83.

In *Carson*, the Supreme Court considered whether § 1292(a)(1) jurisdiction existed to review a district court order denying the entry of a stipulated consent decree. Reasoning that "the proposed decree would have permanently enjoined respondents from discriminating against black employees," *id.* at 84, and required other prospective relief, the Court concluded that although the "decree did not in terms 'refuse an injunction,' it nonetheless had the practical effect of doing so," *id.* at 83. It made clear, however, that *HN3*"[f]or an interlocutory order to be immediately appealable under § 1292(a)(1), . . . a litigant must show . . . [1] that [the] interlocutory order of the district court might have a 'serious, perhaps irreparable, consequence,' and [2] that the order can be 'effectually challenged' only by immediate appeal . . . ." *Id.* at 84 (quoting *Baltimore Contractors, Inc. v. Bodinger*, 348 U.S. 176, 181, 99 L. Ed. 233, 75 S. Ct. 249 (1955)); **[**12]** *see also* *Paige v. California*, 102 F.3d 1035, 1038 (9th Cir. 1996) (acknowledging that § 1292(a)(1) "does permit appeals from orders that have the 'practical effect' of denying an injunction, provided that the would-be appellant shows that the order 'might have a serious, perhaps irreparable, consequence' " (quoting *Shee Atika v. Sealaska Corp.*, 39 F.3d 247, 249 (9th Cir. 1994))); *Thompson v. Enomoto*, 815 F.2d 1323, 1326-27 (9th Cir. 1987) (reiterating *Carson*'s § 1292(a)(1) jurisdictional analysis).

**[*1107]** While the order at issue had the practical effect of modifying the composition of the plaintiff class, it could not possibly have had the practical effect of establishing or modifying injunctive relief. First, it did not grant or deny any injunctive relief by its terms. Second, it could not have continued, modified, or dissolved any injunctive relief, because at the time the order was entered no injunctive relief was in place. Appellants' novel

characterization of the order before us ignores the simple fact that there was no court-ordered relief in this case until the district court approved the parties' stipulation for injunctive **[**13]** relief on June 20, 2002, seventeen days after defendants filed their appeal. All of the cases cited by defendants address the grant, denial, or modification of court-ordered injunctive relief such as a consent decree, *see* Carson, 450 U.S. at 83-84; Paige, 102 F.3d at 1038 (involving district court's interim order promoting non-white law enforcement officers at a specified rate); *Thompson*, 815 F.2d at 1326-27 (involving consent decree ordering various changes in prison conditions).

Citing *Paige*, appellants alternatively suggest that the district court's order is immediately appealable because it is "inextricably bound up" with an immediately appealable order. *Paige*, however, is inapposite. There, a reviewable final order granting injunctive relief was properly appealed. Noting that we "have held our jurisdiction under § 1292(a)(1) extends only to the 'matters inextricably bound up with the injunctive order from which the appeal is taken,'" we concluded that our jurisdiction extended to the class-certification order because the injunction at issue provided class-wide relief and could not be upheld "without also upholding the **[**14]** certification of the class." *Id.* Unlike in *Paige*, appellants did not appeal from the final order granting injunctive relief. Had they done so, they would be better situated to urge that the inclusion of CIW and CCWF in the class is an issue "inextricably intertwined" with a properly reviewable final order.

**B. Jurisdiction under § 1292(b) and Rule 23(f)**

Although appellants appear to have abandoned their opening brief's suggestion that we may assert jurisdiction pursuant to Federal Rule of Civil Procedure 23(f), this argument would be unavailing in any event. Appellants did not apply to either the district court or us for permission to file an interlocutory appeal. HN4 We may use our discretion to permit an appeal pursuant to Rule 23(f) only if "application is made . . . within ten days after entry of the order." Although appellants filed a notice of appeal within ten working days of the entry of the order appealed from, it did not purport to be a petition for interlocutory appeal. Moreover, it fails to meet the criteria for such petitions established by Federal Rule of Appellate Procedure 5(b). n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 HN5 Federal Rule of Appellate Procedure 5(b)(1) requires that a petition for permission to appeal contain: the facts necessary to understand the question presented; the question itself; the relief sought; the reasons why the appeal should be allowed and is authorized by statute or rule; and an attached copy of the order, decree, or judgment complained of and any related opinion or memorandum, and any order stating the district court's permission to appeal or finding that the necessary conditions are met.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[**15]**

Nor did appellants comply with the terms of 28 U.S.C. § 1292(b), which provides for application to the district court for permission to seek an interlocutory appeal. n5 We therefore lack jurisdiction **[*1108]** under either Rule 23(f) or § 1292(b) to entertain this appeal.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 28 U.S.C. § 1292(b) provides that:

> HN6 [w]hen a district judge, in making a civil action an order not otherwise

233

appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**III. Conclusion [**16]**

Because there is no reviewable final order properly before us and none of the prerequisites for interlocutory appeal has been met, we lack jurisdiction over this appeal.

**DISMISSED.**

Service: **Get by LEXSEE®**
Citation: **329 F.3d 1101**
View: Full
Date/Time: Wednesday, October 5, 2005 - 6:46 PM EDT

* Signal Legend:
- Warning: Negative treatment is indicated
- Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available

* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Exhibit 301

MARCIANO PLata, et, al., V ARNOLD Schwarzenegger

Page 10 of 14 last Paragraph

[Prisoner's] release from Penitentary because of unconstitutional conditions of confinement.

Source: Legal > / . . . / > CA Federal & State Cases, Combined
Terms: name(plata) and date geq (10/05/2003) (Edit Search | Suggest Terms for My Search)

Select for FOCUS™ or Delivery

*2005 U.S. Dist. LEXIS 8878, **

MARCIANO **PLATA,** et al., Plaintiffs, v. ARNOLD SCHWARZENEGGER, et al., Defendants.

NO. C01-1351TEH, CLASS ACTION

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

2005 U.S. Dist. LEXIS 8878

**May** 10, 2005, Decided

**PRIOR HISTORY:** Plata v. Davis, 329 F.3d 1101, 2003 U.S. App. LEXIS 10437 (9th Cir. Cal., 2003)

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff inmates challenged, as violative of the Eighth Amendment to the U.S. Constitution, the deplorable conditions of medical care and treatment in the California prison system managed by defendant State officials. The court, on finding that the State was not in compliance with the implementation of improvements in its health care delivery system, considered potential remedies to the situation.

**OVERVIEW:** The court noted that the State officials were faced with a highly dysfunctional, largely decrepit, overly bureaucratic, and politically driven prison system, inherited from past administrations, that could not be corrected by conventional methods. 162,000 prisoners were being subjected to a system fraught with medical neglect and malfeasance, which had resulted in many deaths due to inept care. The court was compelled to take it upon itself to construct a remedy that would cure the violations as soon as possible, and after considering the range of options available, the appointment of an interim receiver to manage the delivery of health care services was considered. Although a court order had been in place for several years, expert evaluators concluded that, at San Quentin, overall compliance with the court orders was essentially nonexistent. Budget, personnel, contracts, procurement, information systems, physical plant, and space issues posed fundamental barriers to compliance. A receiver whose appointment would be limited to the area of health care delivery would be considered, and the State was given a chance to respond to the proposed order.

**OUTCOME:** An order to show cause why a receiver with authority over the delivery of health care services in the prison system should not be appointed was issued.

**CORE TERMS:** receiver, prison, prisoner, contempt, delivery, receivership, entity, medical care, health care, nurse, supervision, appointment of a receiver, appointment, appointing, personnel, neglect, crisis, cell, civil contempt, consent decree, medical staff, prison system, patient, effective, estimate, nursing, hiring, adequate remedy, non-compliance, evidentiary

**LexisNexis(R) Headnotes** Hide Headnotes

Constitutional Law > Civil Rights Enforcement > Prisoners > Confinement Conditions

HN1 While lawful incarceration necessarily operates to deprive prisoners of certain rights and privileges they otherwise would enjoy in free society, prisoners do not lose all their civil rights. Rather, fundamental civil rights follow the prisoner through the 235.

prison gate. When a state takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being. The rationale for this principle is simple enough: when the state, by the affirmative exercise of its power, so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs, such as, food, clothing, shelter, medical care, and reasonable safety, it transgresses the substantive limits on state action set by the Due Process Clause. More Like This Headnote

Criminal Law & Procedure > Sentencing > Capital Punishment > Cruel & Unusual Punishment
HN2 Eighth Amendment claims of cruel and unusual punishment in prison are judged under the deliberate indifference standard, rather than the lower standard of whether the state's actions were reasonably related to legitimate penological interests. More Like This Headnote

Constitutional Law > Bill of Rights
Governments > Courts > Authority to Adjudicate
HN3 Federal courts possess whatever powers are necessary to remedy constitutional violations. That equitable power includes the capacity to appoint a receiver. At the same time, federal courts must be mindful of the interests of state and local authorities in managing their own affairs. As such, they must exercise restraint, using the least possible power adequate to the end proposed. More Like This Headnote

Constitutional Law > Bill of Rights
HN4 Where federal constitutional rights have been traduced, principles of restraint, including comity, separation of powers and pragmatic caution are dissolved. More Like This Headnote

Civil Procedure > Entry of Judgments > Consent Decrees
HN5 A consent decree is enforceable as a judicial decree and is subject to the rules generally applicable to other judgments and decrees. A federal court's power to enforce a consent decree is no less than the power to enforce any other judgment. More Like This Headnote

Constitutional Law > Civil Rights Enforcement > Prisoners > Prison Litigation Reform Act
HN6 The Prison Litigation Reform Act, 18 U.S.C.S. § 3626(a)(1)(A), codifies the federal court's authority to issue prospective relief that fully remedies a constitutional violation, while mandating that the relief not be overly broad. More Like This Headnote

Constitutional Law > Civil Rights Enforcement > Prisoners > Prison Litigation Reform Act
HN7 See 18 U.S.C.S. § 3626(a)(1)(A).

Constitutional Law > Civil Rights Enforcement > Prisoners > Confinement Conditions
HN8 The deference due prison administrators by courts is implicated primarily by questions relating to institutional security of a type not raised in the context of health-related conditions. More Like This Headnote

Civil Procedure > Remedies > Receiverships
HN9 Courts are empowered to appoint receivers to take over state or local institutions if necessary to enforce a court order. More Like This Headnote

Civil Procedure > Injunctions > Preliminary & Temporary Injunctions
Civil Procedure > Remedies > Receiverships
Civil Procedure > Sanctions > Contempt
HN10 Where more traditional remedies, such as contempt proceedings or injunctions, are inadequate under the circumstances, a court acting with its equitable powers is justified, particularly in aid of an outstanding injunction, in implementing less

common remedies, such as a receivership, so as to achieve compliance with a constitutional mandate. More Like This Headnote

Civil Procedure > Remedies > Receiverships

HN11 Courts resort to the appointment of receivers when two essential conditions are met: there is a grave and immediate threat or actuality of harm to plaintiffs, and the use of less extreme measures of remediation have been exhausted or prove futile. Additionally, courts have considered the following related factors: (1) whether continued insistence that compliance with the court's orders would lead only to confrontation and delay; (2) whether there is a lack of leadership to turn the tide within a reasonable period of time; (3) whether there is bad faith; (4) whether resources are being wasted; and (5) whether a receiver is likely to provide a relatively quick and efficient remedy. More Like This Headnote

Civil Procedure > Jurisdiction > Equity Jurisdiction

HN12 A district court has the responsibility to use its broad and flexible equitable powers to implement a remedy that, while sensitive to the burdens that can result from a decree and the practical limitations involved, promises, realistically to work now. More Like This Headnote

Civil Procedure > Sanctions > Contempt

HN13 Civil contempt occurs when a party disobeys a court order by failure to take all reasonable steps within the party's power to comply. Initially, the evidence must show, by a clear and convincing standard, that the alleged contemnors violated a specific and definite order of the court. The burden then shifts to the contemnors to demonstrate why they were unable to comply. To satisfy that burden, contemnors must show that they took every reasonable step to comply. The issue is whether defendants have performed all reasonable steps within their power to insure compliance. More Like This Headnote

Civil Procedure > Sanctions > Contempt

HN14 The purpose of civil contempt is remedial, not punitive. As such, the failure to comply need not be wilful or intentional, and good faith is not a defense. Intent is irrelevant. Where every reasonable effort has been made to comply, however, a few technical or inadvertent violations will not support a finding of contempt. Nor is contempt appropriate if the party's action is based on a good faith and reasonable interpretation of the decree. More Like This Headnote

**COUNSEL:** [*1] For Marciano Plata, Otis Shaw, Ray Stoderd, Joseph Long, Leslie Rhoades, Gilbert Aviles, Paul Decasas, Steven Bautista and all others similarly situated, Raymond Johns, Plaintiffs: Donald Howard Specter, Sara Linda Norman, Steven Fama, Prison Law Office, San Quentin, CA; Caroline N. Mitchell, Shawn Hanson, JONES DAY, San Francisco, CA; John Morrisey, Warren E. George, Bingham McCutchen LLP, Los Angeles, CA.

For Clifford Myelle, Plaintiff: Donald Howard Specter, Sara Linda Norman, Steven Fama, Prison Law Office, San Quentin, CA; Caroline N. Mitchell, JONES DAY, San Francisco, CA; John Morrisey, Warren E. George, Bingham McCutchen LLP, Los Angeles, CA.

For Edward Alameida, in his official capacity as Director of the California Department of Corrections, Defendant: Michael James Williams, Williams Walston LLP, San Francisco, CA.

For Governor Arnold Schwarzenegger, Defendant: Maria G. Chan, Attorney General's Office, Sacramento, CA.

**JUDGES:** THELTON E. HENDERSON, UNITED STATES DISTRICT JUDGE. 2360

**OPINIONBY:** THELTON E. HENDERSON

**OPINION: ORDER TO SHOW CAUSE RE CIVIL CONTEMPT AND APPOINTMENT OF INTERIM RECEIVER**

**INTRODUCTION**

In the four years since this case was filed, which **[*2]** includes the year and a half that this Court has been meeting with the parties on a regular basis, two things have become ever increasingly clear: (1) the Governor has appointed, and the State has hired, a number of dedicated individuals to tackle the difficult task of addressing the crisis in the delivery of health care in the California Department of Corrections ("CDC"), and, (2) despite the best efforts of these individuals, little real progress is being made. The problem of a highly dysfunctional, largely decrepit, overly bureaucratic, and politically driven prison system, which these defendants have inherited from past administrations, is too far gone to be corrected by conventional methods.

The prison medical delivery system is in such a blatant state of crisis that in recent days defendants have publicly conceded their inability to find and implement on their own solutions that will meet constitutional standards. The State's failure has created a vacuum of leadership, and utter disarray in the management, supervision, and delivery of care in the Department of Corrections' medical system.

Defendants have devised a long-term strategy to contract out health care management and **[*3]** much of the delivery of care. However, full implementation of that plan is, by defendants' own estimates, years away. In the meantime, roughly 162,000 prisoners are being subjected to an unconstitutional system fraught with medical neglect and malfeasance. Defendants themselves have conceded that a significant number of prisoners have died as a direct result of this lack of care, and it is clear to the Court that more are sure to suffer and die if the system is not immediately overhauled.

In light of this crisis and defendants' concession that the constitutional violations will not be corrected for a long time to come, the Court is compelled to take it upon itself to construct a remedy that will cure the violations as soon as possible. Having considered the range of options available, the Court believes that the appointment of an interim receiver to manage the CDC's delivery of health care services may be necessary. Therefore, the Court issues this Order requiring defendants to show cause why a receiver is not the appropriate remedy and, if not, why not. Defendants also shall address the issue of contempt, which may be procedurally necessary as a predicate to the appointment of a **[*4]** receiver.

**BACKGROUND**

Plaintiffs filed this class action on April 5, 2001, alleging that defendants were providing constitutionally inadequate medical care at all California state prisons. Defendants agreed to enter a consent decree and to implement comprehensive new medical care policies and procedures at all institutions. *See* June 13, 2002 Stipulation for Injunctive Relief. The Stipulated Injunction provides: "The Court shall have the power to enforce the Stipulation through specific performance and all other remedies permitted by law." It also provides that it "shall be binding upon, and faithfully kept, observed, performed and be enforceable by and against the parties." Defendants also agreed to the court appointment of medical and nursing experts to assist with the remedial process. *See* June 13, 2002 Order Appointing Experts.

Since entry of the Stipulated Injunction in June 2002, the most notable characteristic of this case has been defendants' failure to achieve any substantial progress in bringing the medical care system even close to minimal constitutional standards. Given the scale of the California prison system, defendants were ordered to implement new policies **[*5]** and procedures on a staggered basis, with seven prisons to complete implementation in 2003, and five additional prisons for each succeeding year until state-wide completion is achieved. To date, not a single prison has successfully completed implementation.

Even more disturbing, the court experts submitted a report on July 16, 2004 which found an "emerging pattern of inadequate and seriously deficient physician quality in CDC facilities." July 16, 2004 Report (part 2) at 1. For example, the Report described a situation in which a retired surgeon made "serious life-threatening mistakes on a continual basis." The Report also identified various systemic problems, including inadequate peer review and the need for greater centralization of physician supervision, credentialing and discipline.

In response, defendants agreed to address the very serious -- literally life and death-issues identified in the Report through a Stipulated Order Re Quality of Patient Care and Staffing, which this Court approved on September 17, 2004 ("Patient Care Order"). The Patient Care Order requires defendants to engage an independent entity to (a) evaluate the competency of physicians employed by the CDC and **[*6]** (b) provide training to those physicians found to be deficient. n1 It also requires defendants to undertake certain measures with respect to the treatment of high-risk patients, to develop proposals regarding physician and nursing classifications and supervision, and to fund and fill Quality Management Assistance Teams ("QMAT") and other support positions. Defendants essentially have failed to meet the terms of the Patient Care Order, and the few QMAT doctors available have had to be diverted to provide care and supervision on a crisis basis rather than engaging in the evaluation and training roles for which they were hired.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 Unfortunately, the Union of American Physicians and Dentists ("UAPD") has resisted efforts to improve the quality of its member physicians and to remove those who are incompetent or unwilling to meet professional standards. On May 2, 2005, the UAPD filed suit in the Superior Court of Sacramento County attempting to block defendants' efforts in this regard.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

In an effort to bring the maximum **[*7]** degree of attention and focus to this problem, the Court has been meeting with the parties on a monthly basis. In February 2005, the Court requested that the court experts provide a verbal report as to their findings thus far. The report was shocking. The experts reported that they observed widespread evidence of medical malpractice and neglect. When they attempted to review a backlog of 193 death records, the experts encountered prisons where the inmates' medical records could not even be located. Among the records they were able to review, the experts found 34 of the deaths highly problematic, with multiple instances of incompetence, indifference, neglect, and even cruelty by medical staff. As just one example among many, a prisoner was identified with extremely high blood pressure, was placed on medication in 2002, and was not seen again for a year and a half, at which point he was found unconscious and then died. The experts concluded that the widespread problems they observed resulted from a combination of physician error and "a totally broken system."

Following the experts' verbal report, the Court decided to visit one of the prisons to gain a first-hand understanding of the **[*8]** situation. The Court toured San Quentin prison on February 10, 2005. To provide some context, San Quentin was supposed to have been "rolled out" over a year earlier (i.e. it was in the first group of institutions scheduled to achieve compliance in 2003), and it has been the subject of a number of past federal and state court orders. Nonetheless, the result of the tour was horrifying. Even the most simple and basic elements of a minimally adequate medical system were obviously lacking. For example, the main medical examining room lacked any means of sanitation -- there was no sink and no alcohol gel -- where roughly one hundred men per day undergo medical screening, and the Court observed that the dentist neither washed his hands nor changed his gloves after treating patients into whose mouths he had placed his hands. There can be no excuse for such failures, especially given the risk of infection that is obvious even to a lay person. It does not take a budget change proposal, a strategic plan, or the hiring of new personnel to 2370

keep a medical room sanitary.

Further, the Outpatient Housing Unit (OHU) is far too small for San Quentin's population. San Quentin has a rated capacity of **[*9]** 3,317 individuals, but currently houses approximately 6,000 men. The OHU has 32 cells, but 22 are reserved for mental health patients, and of the 10 remaining for medical purposes some are permanently used for disabled inmates. This near non-existence of OHU beds is unquestionably insufficient, especially given that San Quentin processes approximately 400 new prisoners per week, some of whom are unstable and need continuous monitoring. Moreover, the OHU was in deplorable condition. The cells were dirty, the nursing station is beyond sight or sound of the cells, and there is no examination room on the unit so that examinations are often performed on the cell floors or even through the food slots.

The pharmacy was in almost complete disarray (with unlabeled cardboard boxes piled in no particular order, antiquated and dirty computers, wiring suspended like a drunken spider's web, and extremely frustrated nurses and technicians), and there was an obvious shortage of medical supervisory and line staff. Additionally, the overcrowding mentioned above has resulted in prisoners being housed en masse (over 350 prisoners in double-bunks from wall to wall) in what was once a gymnasium, and along **[*10]** the first-floor corridors of five-tier units where they are subjected to having feces and urine flung at them from above, and where water continually seeps from the walls and collects in pools on the floors. It is beyond the Court's understanding how the State of California could allow an institution to sink into such deplorable condition.

Subsequently, the court experts issued two reports detailing the problems at San Quentin based on their extensive reviews of the institution. These reports have been made a matter of public record. In short, the experts "found a facility so old, antiquated, dirty, poorly staffed, poorly maintained, with inadequate medical space and equipment and over-crowded that it is our opinion that it is dangerous to house people there with certain medical conditions and is also dangerous to use this facility as an intake facility." Medical Experts' Report on San Quentin, April 8, 2005, at 2. The reports include numerous detailed examples of medical neglect and malfeasance. As just one example, the experts found a stack of hundreds of health services request forms on a nurse's desk waiting to be logged, triaged, or prioritized; many of these were for medication **[*11]** refill. The triage nurse position had been vacant for over a month, during which time the forms simply accumulated. The contract nurse assigned to the area commented, "Some of these guys are either dead or better, one of the two." Nursing Experts' Report on San Quentin, April 9, 2005, at 4.

The experts thus concluded with respect to San Quentin that "overall compliance with the Stipulated Order and subsequent Court Orders was non-existent." *Id.* In fact, the experts stated that "there has been indifference to beginning the process required in the Stipulated Order." *Id.* Unfortunately, the court experts' recent informal report to the Court indicates that many of the issues identified in the February visits of the experts and the Court have yet to be adequately addressed. The experts further have advised the Court that while San Quentin may be the worst of the 32 state prisons in terms of the condition of the physical plant, it is paralleled by a number of other prisons in terms of physician and nurse vacancies, incompetent medical staff, lack of supervision, and all other aspects of medical care delivery. n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 In just the past week, the court experts informally reported that their recent visit to Pleasant Valley State Prison revealed alarming deficiencies on a scale similar to San Quentin.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [*12]

The Court has held two status conferences with the parties subsequent to the San Quentin

tour. The Court has encouraged defendants to treat this situation as a state of emergency, to break out of the "business as usual" mind-set, and to take extreme measures to break through any bureaucratic or other barriers that are preventing implementation of the Stipulated Order. The Court also explained that it has a mandate to ensure that the Constitution is respected, and that on the strata of constitutional priorities, the preservation of life is the highest. At the March status conference, the Court instructed the parties to meet and confer, including the experts if necessary, to construct a plan for defendants to meet their deadlines and provide sufficient resources to meet their obligations under the Stipulated Injunction. The parties were unable to devise the requested plan, and defendants explained that doing so was an impossible task for them.

Nevertheless, defendants provided the Court with a document entitled "Strategies to Improve Program Compliance: Inmate Medical Service Program," dated April 2005. The document includes numerous damning admissions. Defendants state that the "current **[*13]** vacancy rate in upper management positions within the Health Care Services Division's Field Management Branch [is] now approximately 80 percent." Additionally, the Department lacks regional administrators who would provide clinical oversight to doctors and nurses in the field. Furthermore, "areas such as budget, personnel, contracts, procurement, information systems, physical plant, and space issues [] continue to pose fundamental barriers to compliance." The document also refers to CDC medical care as a "broken system." *Id.* at 6.

Unfortunately, while recognizing the depth of the problem, defendants' Strategies document fails to exhibit the force of will necessary to tackle the problem. Instead, it is fraught with the same kind of ineffective measures that have proven so inadequate over the past years. Most of the proposed actions in the document are followed by highlighted caveats such as: "*Implementation is contingent on Governor's approval, funding availability, and legislative approval.*" (emphasis in original) These kind of contingency statements are prime examples of the depth and breadth of the problem at hand.

Other elements of the Strategies document are equally **[*14]** elusive. Defendants state that they will develop plans or proposals, with no indication of when the plans would be effectuated. The document also is vague and insufficiently detailed, has time periods that are excessively long, and fails to address how defendants will approach the critical task of removing incompetent medical staff from patient care.

Defendants have conceded at the recent status conferences that the most they are able to do at this point is to attempt to institute some "stop gap" measures, and even some of those appear beyond their capability. Moreover, defendants' representatives have publicly acknowledged that defendants are unable to correct the problem on their own, and that unconstitutional conditions will remain until an outside entity is hired to take over. Defendants have devised a plan to contract out health care management services, at headquarters and the institutions level, to a private entity. However, the process of identifying and selecting an appropriate entity or entities (assuming that such entities exists, are willing to take on the task, and will charge an amount the state is willing to pay) will, by defendants estimate, take at least eighteen **[*15]** months, and defendants have no estimate as to when the new entity will actually be able to make the changes necessary to show an improved standard of care in the prison system. Further, in this Court's experience, defendants' estimates for completing tasks have been consistently unreliable. In the meantime, prisoners continue to unnecessarily die, suffer, and go unattended.

**POTENTIAL REMEDIES**

The courts have long recognized that *HN1* while lawful incarceration necessarily operates to deprive prisoners of certain rights and privileges they otherwise would enjoy in free society, prisoners do not lose all their civil rights. Rather, fundamental civil rights follow the prisoner through the prison gate. As the Supreme Court has held:

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some

238.

responsibility for his safety and general well-being. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his **[*16]** basic human needs -- e.g. food, clothing, shelter, medical care, and reasonable safety -- it transgresses the substantive limits on state action set by the . . . Due Process Clause.

*DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 199-200, 103 L. Ed. 2d 249, 109 S. Ct. 998 (1989); *see also* *Johnson v. California*, __ U.S. __, 160 L. Ed. 2d 949, 125 S.Ct. 1141, 1149-50 (2005) (stating that HN2 Eighth Amendment claims of cruel and unusual punishment in prison are judged under the "deliberate indifference" standard, rather than the lower standard of whether the state's actions were "reasonably related" to "legitimate penological interests"); *Toussaint v. McCarthy*, 926 F.2d 800, 801 (9th Cir. 1990), *cert. denied* 502 U.S. 874, 116 L. Ed. 2d 171, 112 S. Ct. 213 (1991) (even those prisoners at "the bottom of the social heap . . . have, nonetheless, a human dignity and certain rights secured by the Constitution of the United States"); *Madrid v. Gomez*, 889 F.Supp. 1146, 1244-45 (N.D. Cal. 1995).

First and foremost among these rights is the preservation of life and the prevention of needless death, which necessarily requires an adequate system for the delivery **[*17]** of health care services. When prisoners are dying due to the neglect or incompetence of doctors and other medical staff employed by the state, as the facts thus far compellingly indicate in this case, there can be no doubt but that the Constitution is being violated. In light of these violations, it is the duty of the Court to find an effective remedy.

HN3 Federal courts possess "whatever powers are necessary to remedy constitutional violations." n3 *Stone v. City and County of San Francisco*, 968 F.2d 850, 861 (9th Cir. 1992), citing *Hutto v. Finney*, 437 U.S. 678, 687 n. 9, 57 L. Ed. 2d 522, 98 S. Ct. 2565 (1978). This equitable power includes the capacity to appoint a receiver. *See* *Dixon v. Barry*, 967 F.Supp. 535, 550 (D.D.C. 1997); *Bracco v. Lackner*, 462 F.Supp. 436, 455-56 (N.D. Cal. 1978); *Newman v. Alabama*, 466 F.Supp. 628, 635 (M.D. Ala. 1979). At the same time, federal courts must be mindful of the interests of state and local authorities in managing their own affairs. As such, they must exercise restraint, using the least possible power adequate to the end proposed. *See, e.g.*, *Missouri v. Jenkins*, 495 U.S. 33, 51, 109 L. Ed. 2d 31, 110 S. Ct. 1651 (1990) **[*18]** (before intruding on local authority, district court must assure itself that no lesser alternatives are adequate to the task). On balance, the Ninth Circuit has held that HN4 "where federal constitutional rights have been traduced, principles of restraint, including comity, separation of powers and pragmatic caution dissolve . . ." *Stone*, 968 F.2d at 861.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

N3 HN5 "A consent decree is enforceable as a judicial decree and 'is subject to the rules generally applicable to other judgments and decrees."' *Labor/Cmty Strategy Ctr. v. Los Angeles Metro. Transp. Auth.*, 263 F.3d 1041, 1047 (9th Cir. Aug. 31, 2001), citing *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378, 116 L. Ed. 2d 867, 112 S. Ct. 748 (1992). Indeed, a federal court's power to enforce a consent decree is no less than the power to enforce any other judgment. *Stone*, 968 F.2d at 861 n.20 ("The respect due the federal judgment is not lessened because the judgment was entered by consent").

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

The Prison Litigation Reform Act **[*19]** (PLRA), 18 U.S.C. § 3626(a)(1)(A), which governs this case, recognizes these competing concerns. HN6 The Act codifies the Court's authority to issue prospective relief that fully remedies a constitutional violation, while mandating that the

relief not be overly broad. The relevant language of the PLRA is as follows:

> HN7 Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A). The Second Circuit, however, recently held that HN8 "the deference due prison administrators by courts is implicated primarily by questions relating to institutional **[*20]** security of a type not raised" in the context of health-related conditions. *Benjamin v. Fraser*, 343 F.3d 35, 52 (2nd Cir. 2003).

Thus far, the Court has relied on a combination of specific court orders, reports from the court experts, and regular supervision through monthly status conferences in an effort to facilitate an effective remedy in this case. The Court proceeded in this fashion to display its confidence in the new team assembled by the Governor, and to give defendants the maximum amount of deference and flexibility to meet the objective of complying with constitutional standards by the means and methods that they, with their institutional background and experience, deem appropriate. As the background provided above shows, defendants have failed to demonstrate that they have the will and capacity to make the necessary changes. Therefore, the Court must consider more drastic remedial measures, as discussed below.

**A. Receivership**

HN9 Courts are empowered to appoint receivers to take over state or local institutions if necessary to enforce a court order. *See* *Dixon v. Barry*, 967 F.Supp. 535 (D.D.C. 1997) (appointing receiver for Commission **[*21]** on Mental Health Services); *Newman*, 466 F.Supp. at 635-36 (appointing receiver for Alabama State Prisons, stating: "The extraordinary circumstances of this case dictate that the only alternative to non-compliance with the Court's orders is the appointment of a receiver for the Alabama prisons."); *Shaw v. Allen*, 771 F.Supp. 760, 762 (S.D. W.Va. 1990) HN10 ("Where more traditional remedies, such as contempt proceedings or injunctions, are inadequate under the circumstances a court acting with its equitable powers is justified, particularly in aid of an outstanding injunction, in implementing less common remedies, such as a receivership, so as to achieve compliance with a constitutional mandate."); *Gary W. v. Louisiana*, 1990 U.S. Dist. LEXIS 1746, 1990 WL 17537, * 17, * 28-33 (E.D. La. Feb. 26, 1990) (appointing receiver to oversee state children's services agencies where court's mandates were continually met with "a dismal record of non-compliance and management by crisis"); *Turner v. Goolsby*, 255 F.Supp. 724, 730 (S.D. Ga. 1966) (state superintendent appointed receiver for county school system); *The Judge Rotenberg Educ. Cntr., Inc. v. Comm'r of the Dep't of Mental Retardation*, 424 Mass. 430, 677 N.E.2d 127 (Mass. Supreme Court 1997) **[*22]** (appointing receiver of state Department of Mental Retardation); *Wayne County Jail Inmates v. Wayne County Chief Executive Officer*, 178 Mich. App. 634, 444 N.W.2d 549, 556 (Mich. App. 1989).

The case law reflects that HN11 courts resort to the appointment of receivers when two essential conditions are met: there is a grave and immediate threat or actuality of harm to plaintiffs, and the use of less extreme measures of remediation have been exhausted or prove futile. Additionally, courts have considered the following related factors: (1) whether continued insistence that compliance with the Court's orders would lead only to confrontation and delay; (2) whether there is a lack of leadership to turn the tide within a reasonable period of time; (3) whether there is bad faith; (4) whether resources are being wasted; and

2396

(5) whether a receiver is likely to provide a relatively quick and efficient remedy. *See* Dixon, 967 F.Supp. at 550; *District of Columbia v. Jerry M.*, 738 A.2d 1206, 1213 (D.C. Ct. App. 1999) (reversing appointment of receiver based on trial court's consideration of only the single factor of defendant's historical failure to comply with court mandates). **[*23]**

As discussed above, the deaths and irreparable injury to prison inmates that are ongoing in the prison system are unparalleled in terms of the gravity of harm. The Court recognizes that it has not let as many years pass as in some other cases where contempt and other methods have been used over the course of many years and even longer than a decade. n4 But the Court firmly believes that the proper measure of futility is not one that can be calculated simply in chronological terms, but rather is one that should be measured qualitatively in the present moment. By that measure, we are at a point of maximum futility in this case, where the State has publicly confessed its inability to grapple with the problem in any appreciable systemic manner for what is likely to be years to come. *See, e.g., Gary W.*, 1990 U.S. Dist. LEXIS 1746, 1990 WL 17537, * 32 ("In instances of justifying [receivership], the courts have typically found a lack of leadership that could be expected to improve conditions within a reasonable period of time, systemic deficiencies in administrative, organizational, and fiscal structures, institutional inertia, and similar indicia of bureaucratic morass.") The Court does not believe **[*24]** that the Constitution can reasonably be construed to require the court to sit idly by while people are needlessly dying. Rather, the Court believes it has the discretion -- indeed, the duty -- to take immediate action in a manner coextensive with the degree of ongoing and persistent harm. *See, e.g., Gary W.*, 1990 U.S. Dist. LEXIS 1746, 1990 WL 17537, * 30 ***HN12***("[T]he responsibility of this Court is 'clear and compelling: to use its broad and flexible equitable powers to implement a remedy that, while sensitive to the burdens that can result from a decree and the practical limitations involved, promises, *realistically to work now.*'") (emphasis in original), quoting *Green v. County School Bd.*, 391 U.S. 430, 439, 20 L. Ed. 2d 716, 88 S. Ct. 1689 (1968); *see also Swann v. Charlotte-Mecklenberg Bd. of Ed.*, 402 U.S. 1, 16, 28 L. Ed. 2d 554, 91 S. Ct. 1267 (1971) (the scope of relief must be determined by the nature of the violation); *Feliciano*, 1990 U.S. Dist. LEXIS 7215, 1990 WL 83321, * 11 (less than four years following stipulation to increase the size of prison cells, the court concluded: "[I]t is neither the function nor the intention of this court to hold a gun to the head of any of the defendants in this litigation; it should be equally **[*25]** clear, however, that this court of equity will not suffer a wrong of such constitutional magnitude . . . to go any longer without an adequate remedy," including a possible receivership). While some courts may have waited inexplicably long periods of time before appointing a receiver, *see e.g. Gary W.*, 1990 U.S. Dist. LEXIS 1746, 1990 WL 175337, at * 28 (receiver appointed after 15 years of failed remedies), the mistakes of those cases, and the attendant loss of years of critical services, need not, and shall not, be repeated here.

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 The Court also notes that receivership is not the most extreme remedy conceivable. In *Crain v. Bordenkircher*, 180 W. Va. 246, 376 S.E.2d 140, 142 (Supreme Court W.Va. 1988), the court issued a "rule to show cause" for the appointment of a receiver to oversee the funding and construction of a new prison (costing roughly $ 50 million, despite the court's recognition of the state's "great economic distress"), stating that such appointment would be "clearly a lesser evil than . . . [the prisoners'] release from the penitentiary because of unconstitutional conditions of confinement." *See also Feliciano v. Colon*, 1990 U.S. Dist. LEXIS 7215, 1990 WL 83321, * 10 (D. Puerto. Rico 1990) (placing defendants on notice that their failure to cure contempt could subject them to "compensatory fines," "coercive fines," "accelerated award of good time to prisoners to reduce population density," and "the imposition of a receivership.")

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*26]**

**B. Civil Contempt**

The Court does not believe that a contempt finding is necessarily a prerequisite to the appointment of a receiver. *See, e.g.*, Gary W., 1990 U.S. Dist. LEXIS 1746, 1990 WL 17537 at * 30 ("[T]his court concludes that an Order holding the defendants in contempt is not an adequate remedy . . . [since] such measures 'promise only confrontation and delay.'") (quoting *Newman*, 466 F.Supp. at 635). Determining whether to proceed with a contempt finding will depend, at least in part, on the testimony proffered at the evidentiary hearings, and whether defendants continue to appear incapable of curing the constitutional violations short of implementing their long-term plan. n5 In the event that contempt becomes appropriate, this Order ensures that defendants have been put on legally adequate notice.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 It is the Court's present perception that at least a portion of defendants' problem has been an inability to adequately penetrate and motivate an intransigent and resistant bureaucracy that has long been in place.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*27]**

*HN13*Under well-settled law, civil contempt occurs when a party disobeys a court order "by failure to take all reasonable steps within the party's power to comply." *Go-Video, Inc. v. The Motion Picture Assoc. of Am.*, 10 F.3d 693, 695 (9th Cir. 1993). Initially, the evidence must show, by a clear and convincing standard, that the alleged contemnors violated a specific and definite order of the Court. *Id.; Stone*, 968 F.2d at 856, n. 9. The burden then shifts to the contemnors "to demonstrate why they were unable to comply." *Id.* To satisfy this burden, contemnors must show that they took "every reasonable step to comply." *Id.; Sekaquaptewa v. MacDonald*, 544 F.2d 396, 404 (9th Cir. 1976) (issue is whether defendants have performed "all reasonable steps within their power to insure compliance").

*HN14*The purpose of civil contempt is remedial, not punitive. As such, the failure to comply need not be wilful or intentional, and good faith is not a defense. *Go-Video*, 10 F.3d at 695; *Stone*, 968 F.2d at 856. Indeed, intent is irrelevant. *Id.* Where every reasonable effort has been made to comply, however, a few **[*28]** technical or inadvertent violations will not support a finding of contempt. *Go-Video*, 10 F.3d at 695; *General Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986). Nor is contempt appropriate if the party's action is "based on a good faith and reasonable interpretation" of the decree. *Go-Video*, 10 F.3d at 695.

Here, the Court identifies the following specific and definite provisions of the Court's prior orders which defendants have failed to meet:

June 13, 2002 Stipulation and Order

1. Paragraph 5, regarding institutions listed for roll-out in 2003 and 2004; and

2. Paragraph 6 regarding nurse staffing, treatment protocols, and a priority ducat system.

September 17, 2004 Stipulated Order re Quality of Patient Care and Staffing

1. Paragraphs 1 through 12 regarding the establishment and implementation of an effective Quality Improvement in Correctional Medicine (QICM) program. The Court recognizes that, though delayed, defendants did successfully contract with U.C. San Diego to run the QICM program. However, implementation has been bogged down, and there appears little to no prospect that defendants can meet [*29] their obligations in a timely fashion;

2. Paragraphs 14 through 16 regarding the identification and treatment of high-risk patients; 240

3. The portions of Paragraphs 17 and 18 requiring the interim hiring of central office and

regional medical and nursing directors;

4. Paragraph 21 regarding the completion of a credentialing policy; and

5. Paragraph 24 regarding hiring for at least nine Quality Management Assistant Teams (QMAT) positions. The Court is aware that while most of the QMAT positions have been filled, those individuals have been redirected to providing non-QMAT services at particular institutions, thereby leaving the QMAT process in abeyance. n6

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 Plaintiffs have not yet had the opportunity to identify any other provisions of the Court's previous orders upon which a contempt finding might be based. If plaintiffs wish to identify any such provisions, they may do so by submitting an ex parte motion to supplement the OSC, with no hearing, to be filed and served by May 17, 2005.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**ORDER**

Given the **[*30]** deplorable state of affairs in the California prison medical delivery system, and the judicial power -- indeed obligation -- to remedy the situation, as discussed above, the Court is compelled to move forward as expeditiously as possible in this case, within the constraints of due process and fundamental fairness. The Court sets forth the following procedure.

The parties already have been informed at previous status conferences that the Court is considering various options for further judicial intervention, including contempt and the appointment of a receiver. However, because the injunction in this case is the result of a settlement rather than a trial, the Court does not yet have any factual findings upon which to base further remedial orders. Therefore, the Court has raised with the parties the desirability of creating an evidentiary record upon which to ground any further remedial action. In an effort to avoid delay, the Court instructed the parties to meet and confer and present a plan for conducting evidentiary hearings, so that the hearings and the OSC can move forward in tandem. The parties have presented the Court with a proposal to present testimony from the court experts **[*31]** and a limited number of defendants' representatives on May 31, June 1-2, and June 7-9, 2005. The Court has accepted this proposal, and now formally confirms that these sessions will proceed from 8:30 a.m. to 1:30 p.m. each of those days. The parties shall file a joint pre-hearing statement by May 25, 2005 identifying the order of witnesses and the subject matter of the testimony for each witness.

Following the notice provided by this OSC, and the evidentiary hearings, defendants will be given an opportunity to respond to the OSC, and plaintiffs will have a subsequent opportunity to reply to defendants' submission. The Court then will issue a ruling, including findings of fact and conclusions of law. If the Court finds it necessary to appoint a receiver, the Court will instruct the parties to submit a list of candidates, and the Court will assemble its own list. Subsequently, after conferring with the parties, the Court will select the receiver and define the receiver's powers. n7

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n7 *See, e.g.,* Dixon, 967 F.Supp. at 555-56 (D.D.C. 1997) (receiver granted broad power to implement consent decree, including full contractual and personnel power); *Shaw*, 771 F.Supp. at 764 (granting authority to oversee county jail that ordinarily rested with sheriff, including power to appoint personnel and enter contracts); *Reed v. Rhodes*, 500 F.Supp. 363, 397-98 (D.C. Ohio 1980), *aff'd in part, rev'd in part* 635 F.2d 556 (6th Cir. 1980) (receiver

granted authority to direct all department personnel; hiring, firing, and transfer authority; and to issue instructions to superintendent regarding policies, budget, and regulations).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*32]**

While it is premature at this stage to discuss the role of a receiver, should one be appointed the Court wishes to make clear that any such appointment would be limited to the area of health care delivery and the scope of the appointment will not extend beyond that field. The state officials in charge of operating all non-medical aspects of the Department of Corrections will retain their full powers. n8 The temporal scope of the receivership would be limited as well. The receivership will be terminated at such time as the Court becomes satisfied that defendants, either by themselves or by engaging outside contractors, are both willing and able to meet and maintain constitutional standards.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n8 There may be occasions where medical care remedial measures conflict or intersect with custodial or other non-medical interests. In these circumstances, the Court will resolve all such matters in a manner as least intrusive as possible on the non-medical interests.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

By proceeding in the manner described above, the Court **[*33]** intends to move as quickly as possible toward a realistic, effective, and constitutionally adequate remedy in this case, while at the same time providing defendants with sufficient notice so that they can fully and properly address the issues. The Court recognizes that if time were not of the essence, and if plaintiff class members were not literally dying as the days and months of non-compliance pass, it might wait until conclusion of the hearings to issue this OSC. With this recognition, the Court advises the parties that it will remain flexible and that the procedures described herein are subject to alteration at the parties' request and as the Court deems fit. Moreover, with respect to the substantive remedy itself, the Court encourages all parties to think as creatively as possible, and the Court will remain open to all reasonable alternatives.

In conclusion, with good cause appearing, defendants are hereby ORDERED TO SHOW CAUSE on July 11, 2005 at 10:00 a.m., why a receiver should not be appointed to manage health care delivery for the Department of Corrections until defendants prove that they are capable and willing to do so themselves or by contracting with an outside entity, **[*34]** and why they should not be held in civil contempt of this Court's prior orders, as specified above. Any response by defendants to this Order to Show Cause must be filed and served by June 22, 2005; plaintiffs shall have until July 6, 2005 to file and serve a reply to defendants' submission.

**IT IS SO ORDERED.**

DATED May 10, 2005

THELTON E. HENDERSON

UNITED STATES DISTRICT JUDGE

Source: Legal > / . . . / > CA Federal & State Cases, Combined
Terms: name(plata) and date geq (10/05/2003) (Edit Search | Suggest Terms for My Search)
View: Full
Date/Time: Wednesday, October 5, 2005 - 6:45 PM EDT

241

* Signal Legend:

- Warning: Negative treatment is indicated
- Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available

* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

2254 — 1983

FILING FEE PAID: Yes — No
IFP MOTION FILED: Yes — No
COPIES SENT TO: Court — Pro Se

FILED
JUL 31 2008
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY — DEPUTY

I (a) PLAINTIFFS

Ester Burnett

DEFENDANTS

Arnold Schwarzenegger, et al

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Ester Burnett
PO Box 731
Imperial, CA 92251
V-35245

ATTORNEYS (IF KNOWN)

'08 CV 1403 H AJB

II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III

III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX (For Diversity Cases Only) FOR PLAINTIFF AND ONE BOX FOR DEFENDANT

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).

42 U.S.C. 1983

V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)

**CONTRACT**
- ☐ 110 Insurance
- ☐ Marine
- ☐ Miller Act
- ☐ Negotiable Instrument
- ☐ 150 Recovery of Overpayment &Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153Recovery of Overpayment of Veterans Benefits
- ☐ 160 Stockholders Suits
- ☐ Other Contract
- ☐ 195 Contract Product Liability

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectmant
- ☐ 240 Tort to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury- Medical Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/Accommodations
- ☐ 444 Welfare
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence Habeas Corpus
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☒ 550 Civil Rights

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710Fair Labor Standards Act
- 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc.
- ☐ Security Act

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (13958)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS - Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reappointment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities Exchange
- ☐ 875 Customer Challenge 12 USC
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State
- ☐ 890 Other Statutory Actions

VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)

1 Original Proceeding ☐ 2 Removal from State Court ☐ 3 Remanded from Appelate Court ☐ 4 Reinstated or Reopened ☒ 5 Transferred from another district (specify) EASTERN CA ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

VII. REQUESTED IN COMPLAINT: ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23 DEMAND $ Check YES only if demanded in complaint: JURY DEMAND: ☐ YES ☐ NO

VIII. RELATED CASE(S) IF ANY (See Instructions): JUDGE Docket Number

DATE 7/31/2008 ~~SIGNATURE OF ATTORNEY OF RECORD~~

R. Mueller